**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| FMS Investment Corp., ) | 19-308 C |
| ) | |
| Plaintiff, ) | Case No. XX-XXX |
| ) | |
| v. ) | Judge:_____ |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, FMS Investment Corp. ("FMS"), files this Complaint to protest:

(A)     The unreasonable, arbitrary, and dilatory conduct of the Department of Education ("ED" or the "Agency") under Solicitation No. ED-FSA-16-R-0009 (the "PCA Solicitation"); and

(B)     The terms of each of the following solicitations: Solicitation No. 91003119R0005 (the "Enhanced Processing Solution RFP"); Solicitation No. 91003119R0008 (the "Business Process Operations RFP"); and Solicitation No. 910031119R0007 (the "Optimal Processing Solution RFP") (collectively, the "Three RFPs").

FMS is a Private Collection Agency ("PCA") specializing in the collection of defaulted student loan debt.  The PCA Solicitation, still an open and active RFP, seeks to procure default collection services for Federal student loans.  As set forth in this Complaint, despite this Court's injunction against cancelling the PCA Solicitation, ED has failed to perform any meaningful action to pursue the PCA Solicitation or further analyze its needs since September 2018, resulting in an illegal and unjustified de facto cancellation of the PCA Solicitation.  Moreover, none of the Three

RFPs may serve as a basis for cancelling the PCA Solicitation.  The Three RFPs seek to procure, among other separate services, default collection services for Federal student loans.  But the terms of each of the Three RFPs are arbitrary, capricious, and contrary to law.

As set forth in this Complaint, for a significant period of time, ED has been running its default collection program using only a handful of small business.  ED and these small business contractors cannot keep up.  Student loan default rates are significantly outpacing rates of collection by those small business debt collection contractors.  ED Secretary Betsy DeVos admits that defaults are growing and vast sums of money are not being collected.

In fiscal year 2014, ED generated $9.2 billion in recoveries on a $52 billion portfolio using its slate of 22 PCAs, which included 17 large PCAs.  By fiscal year 2018, those results had plummeted: ED only generated $10.4 billion on a $166 billion portfolio utilizing 11 small business PCAs, five large Award Term Extension ("ATE") PCAs with diminished, aging portfolios, and two reinstated ATE firms.  In fiscal year 2019, given the reduction in capacity to just 11 small business PCAs, ED is on a trajectory to recover even less: approximately $6 billion on a projected $195 billion portfolio. This is due to ED's current plan to eliminate the large ATE PCAs as of April 2019, which, together, generated $5.2 billion in recoveries in fiscal year 2018.

ED can start to solve this problem by making awards to large business PCAs under the open, live PCA Solicitation.  That PCA Solicitation is an available solicitation under which ED can procure defaulted student loan collection services.  In fact, ED has PCA proposals in its possession that were submitted under that very procurement.  All ED needs to do is take adequate care to perform a reasonable and supportable evaluation of proposals and make awards to competent PCAs.  With new contracts in place to bring PCA recovery capacity to the fiscal year 2014 level, ED would be able to resolve an additional estimated $19 billion each year.  In addition,

ED could then focus on the development of its desired new information technology ("IT") platform and systems and the implementation of loan servicing and defaulted loan debt collection services on that new IT platform.  This simple solution benefits all parties involved: ED can work on developing its new servicing platform; the PCAs can continue operating; defaulted borrowers receive more responsive service in actively addressing their loan situation; and the Government increases its collections on defaulted student debt.  Everyone wins.

Nevertheless, as discussed in this Complaint, instead of following through on its obligations under the PCA Solicitation, ED persistently has attempted to obtain defaulted student loan debt collection services through unorthodox means.  These creative (yet consistently flawed) attempts, however, have irrationally tried to exclude the large business PCAs.  Previously, ED claimed to have a "new vision" for the program: enhanced servicing.  But upon being enjoined by this Court for having no actual plan behind this "new vision," this concept appears to have fallen by the wayside.  In the latest maneuver, ED has now illegally bundled defaulted student loan debt collection services with separate and distinct requests for loan servicing and, of all things, development of sophisticated IT platforms and systems.  The effect of such bundling, as a substantial weight of case law holds, is to arbitrarily restrict competition, because nothing about bundling these three distinct services together is necessary to meet ED's needs.

Defaulted student loan debt collection services are distinct from loan servicing.  ED readily acknowledges that these badly-needed services are distinct.  Debt collection services are, in fact, commercial items for which Congress permits payment out of amounts recovered.  And it is patently obvious that the procurement of sophisticated IT platforms and systems is very different that both loan servicing and defaulted loan collection services.  The Federal Acquisition Regulation ("FAR"), in fact, has an entire section dedicated to IT systems contracting as a special,

distinct endeavor.  ED's new Three RFPs violate the FAR and the Competition in Contracting Act ("CICA") in numerous ways, and cannot serve as a basis to procure defaulted student loan debt collection services.  As a consequence, this matter has now come full circle back to the PCA Solicitation, a procurement that seeks services that ED critically needs, that ED has no basis to cancel and is obligated to complete.

Herein, FMS seeks an order from this Court holding (A) that ED improperly has attempted to cancel the PCA Solicitation by failing to perform any reasonable action or make awards under that solicitation; (B) that ED is required to extend FMS's existing contract with a new Award Term Extension to remedy ED's continuing unreasonable and dilatory conduct in awarding new contracts under the PCA Solicitation; (C) that ED is compelled to take reasonable and meaningful action to make awards under the PCA Solicitation for default collection services; (D) that the terms of the Three RFPs are arbitrary, capricious and contrary to law and that ED is enjoined from awarding any contracts under any of the Three RFPs; and (E) that none of the Three RFPs can serve as a basis upon which to cancel the PCA Solicitation.

## SUMMARY

1.     This action is a pre-award bid protest challenging ED's de facto cancellation of the PCA Solicitation and the terms of the Three RFPs.

2.     The necessity for this action results from ED's continuing failure to conduct a lawful and reasonable procurement to make default collection service contract awards, which are necessary to collect the nation's ballooning defaulted student loan debt.

3.     On September 14, 2018, this Court enjoined ED from cancelling the PCA Solicitation.  Thereafter, ED tried—without prior notice to potential offerors—to obtain default collection services traditionally performed by PCAs under a large procurement for the Next Generation Financial Services Environment ("NextGen").  To do so, ED attempted to add those

services into the second phase of the NextGen procurement, an action that completely excluded all PCAs from being able to compete to provide the separate and specialized collection services that they—and only they—provide.  After FMS and other PCAs protested, with this Court's encouragement, ED took corrective action and terminated the NextGen solicitations, recognizing that its actions were arbitrary, capricious, and contrary to law.

4.      In its latest attempt to circumvent making awards under the PCA Solicitation, ED issued the Three RFPs, each of which includes requirements for default collection services.

5.      Beyond its folly of trying to insert defaulted loan debt collection services into the NextGen procurement and its latest gambit of trying to insert defaulted loan debt collection services into the Three RFPs, ED has not done anything to proceed with the PCA Solicitation and has not done anything to properly procure the necessary—in fact, required—services of defaulted loan debt collection.

6.      As set forth below, the Three RFPs suffer from a litany of defects and violations of law, each one of which mandates that the Three RFPs be terminated, and that no contract be awarded under any of them.  Hence, none of the Three RFPs is a proper solicitation for defaulted student loan debt collection services.

7.      FMS therefore seeks an order from this Court holding (A) that ED improperly has attempted to cancel the PCA Solicitation by failing to perform any reasonable action or make awards under that solicitation; (B) that ED is required to extend FMS's existing contract with a new Award Term Extension to remedy ED's continuing unreasonable and dilatory conduct in awarding new contracts under the PCA Solicitation; (C) that ED is compelled to take reasonable and meaningful action to make awards under the PCA Solicitation for default collection services; (D) that the terms of the Three RFPs are arbitrary, capricious and contrary to law and that ED is

enjoined from awarding any contracts under any of the Three RFPs; and (E) that none of the Three RFPs can serve as a basis upon which to cancel the PCA Solicitation.

## PARTIES

8.  Plaintiff FMS is a Maryland corporation with its principal place of business at 1701 Golf Road, Rolling Meadows, Illinois 60008. FMS, along with its affiliate companies, is the national leader providing services to student borrowers and their families since 2004.

9.  Defendant is the United States Government, acting by and through ED.

## JURISDICTION AND STANDING

10.  The Court has jurisdiction over this bid protest under 28 U.S.C. § 1491(b)(1).

11.  FMS is an incumbent PCA contractor on ED's student loan debt collection contract; a dedicated competitor for a follow-on default collection services contract; a one-time awardee of a contract under the PCA Solicitation; a recently successful litigant in enjoining ED's illegal attempt to cancel the PCA Solicitation; and a recently successful litigant in challenging ED's attempt to insert default collection services into Phase II of the NextGen procurement.

12.  FMS's incumbent task order contract, Contract Order No. ED-FSA-15-O-0028, will expire as of April 21, 2019. Absent relief from this Court or an award by ED to FMS under the PCA Solicitation, as of the end of April 2019, FMS will no longer have a default collection services prime contract under which it can collect defaulted student loan amounts owed to the U.S. taxpayers.

13.  FMS has standing to bring this bid protest because it is an actual offeror under the PCA Solicitation and has consistently and diligently pursued a new contract for default collection services from ED. To the extent that ED now seeks to shift default collection services from the PCA Solicitation to the Three RFPs, FMS will continue to seek a contract for default collection

work.  Thus, FMS is a prospective offeror under the PCA Solicitation and the Three RFPs, and it has a direct economic interest in each of those solicitations.

## STATEMENT OF FACTS

### A.    Loan Servicing and Defaulted Loan Collections

14.    ED's Office of Federal Student Aid ("FSA") awards and administers grants, work-study funds, and low-interest loans to approximately 13 million students annually.  FSA has long operated pursuant to settled definitions of delinquency and default.  Since the early 1980s, ED, through contracts administered by FSA, has relied upon PCAs to collect defaulted student loans.

15.    According to FSA, a borrower's loan becomes "delinquent" the first day the borrower misses a payment.  https://studentaid.ed.gov/sa/repay-loans/default (last visited February 27, 2019).  There are consequences when a loan becomes delinquent.  For one thing, if a borrower becomes more than 90 days delinquent, the loan servicer will report the delinquency to the three major national credit bureaus.  *Id.*  As explained by FSA on its website, a delinquent loan may go into default.  *Id*.

16.    According to FSA, the point when a loan is considered to be in default varies depending on the type of loan.  For a loan made under the Federal Direct Loan Program or the Federal Family Education Loan Program, the loan is considered in default if no payment is made for a period of at least 270 days.  This definition of default is widely used throughout the industry. For example, the Consumer Financial Protection Bureau, which has authority over banks, lenders, and other financial companies, explains on its website that:

> Default is the failure to repay a loan according to the terms agreed
> to in the promissory note. For most federal student loans, you will
> default if you have not made a payment in more than 270 days.

https://www.consumerfinance.gov/ask-cfpb/what-does-it-mean-to-default-on-my-federal-student-loans-en-649 (last visited February 27, 2019).

17.     In accordance with the requirements of the Debt Collection Improvement Act of 1996, OMB Circular A-129, and other rules controlling collection and servicing of Federal credit programs, FSA's administration of a federal student loan starts with a loan servicer, who maintains communication with the borrower and accepts payments toward the loan under a payment plan.

18.     If a borrower fails to make a payment on his or her student loan for 270 days (for most student loans), the loan enters "default."  FSA then removes the account from the contractor that had been servicing the loan (the loan servicer), and places the account with a default collection services contractor (a PCA) to begin default collection or rehabilitation proceedings.

19.     It is then the PCA's job to locate and establish communications with the borrower, and then either enter into a voluntary repayment plan or institute collection proceedings, such as administrative wage garnishment ("AWG").  Once the borrower and the PCA agree to a collection plan, and the borrower has made payments under the plan for a specified number of months, the loan is transferred back to a loan servicer for the servicer to resume processing and servicing the "rehabilitated" loan.  The lifecycle of a student loan may include multiple defaults and separate efforts by both loan services and debt collectors.

20.     In short, the loan servicer and default collector have distinct roles relating to student loans.  It is the loan servicer's responsibility to manage and service the student loan so long as the borrower is making payments, and it is the PCA's responsibility to collect upon loans if the borrower defaults and the loan is removed from the loan servicer.

21.     These distinctions are significant as Congress has passed laws that apply to debt collectors, but do not apply to loan servicers who service loans.  *See* 15 U.S. Code § 1692a(6)(F)(iii) (excluding from the definition of a "debt collector" "any person collecting or

attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person").

22.     A loan servicer, which is given non-defaulted loans to service by ED, therefore is not a "debt collector" under federal statute.  However, a PCA, which receives loans from ED only after the borrower is in default, is a "debt collector."  This distinction is important because PCAs— as debt collectors—are subject to the Fair Debt Collection Practices Act ("FDCPA"), which "authorizes private lawsuits and weighty fines designed to deter the wayward practices of 'debt collector[s]', a term embracing anyone who 'regularly collects or attempts to collect … debts owed or due … another.'"  *Henson v. Santander Consumer USA Inc.*, 137 S.Ct. 1718, 1719 (2017).

23.     Because each of these roles historically has been wholly separate, companies have specialized in performing one service or the other.  FMS focuses its business solely on the collection of defaulted loans.  Tackling defaulted loans requires skills and expertise that differ substantially and materially from the skills and expertise required for loan servicing.  FMS has systems, processes, and procedures to efficiently collect defaulted student loan debt while ensuring compliance with statutes and rules applicable to debt collection, such as the FDCPA.  Loan servicers do not possess these skills, expertise, and processes.

### B.     Debt Collection Services Are Commercial Items For Which Congress Permits Payment Out Of Amounts Recovered

24.     Debt collection services are commercial items under the FAR.  The General Services Administration ("GSA") administers Federal Supply Schedule 00CORP (The Professional Services Schedule) which includes financial and business solutions services, and specifically "Category 520 4 Debt Collection Provide collection services and servicing of defaulted loans which may include borrower negotiations, restructuring, and workout agreements."  https://www.gsaelibrary.gsa.gov/ElibMain/sinDetails.do?scheduleNumber=00CO

RP&specialItemNumber=520+4&executeQuery=YES (last visited February 27, 2019).  There are

60 contractors that hold this GSA schedule contract, which covers the exact same defaulted student

loan collection services that ED has now included in the Three RFPs.

25.     Not only are debt collection services commercial items under the FAR and on the

GSA schedule, they are authorized under the U.S. Code as a distinct type of contract.  31 U.S.C.

§ 3718 covers "Contracts for collection services."  This statute authorizes contracts to recover

indebtedness owed to the United States Government and mandates that the contractor be subject

to the "laws and regulations of the United States Government and state governments related to

debt collection practices." 31 U.S.C. § 3718(a)(2)(B).  Moreover, such a contract need not be

constrained by amounts provided in an appropriation law, but rather the contractor's compensation

may be paid from the amount recovered.  31 U.S.C. § 3718(d) and (e).

**C.     Default Rates Are Out Pacing Rates Of Collection By ED's Current Small Business Debt Collection Contractors**

26.     Presently, ED has a number of small business contractors serving as debt collectors

for defaulted student loan debt.  These are the only contractors receiving new defaulted accounts

to attempt collections on, and this has been the case for most of the last year.

27.     The statistics pertaining to student loan debt default are staggering.  There is

approximately $1.56 trillion in total U.S. student loan debt.  Approximately 44.7 million

Americans have student loan debt.  About 11.5% of student loans are 90 days or more delinquent

or are in default.

28.     ED has not made any default or collection data available for 2019 at the time of the

filing of this Complaint.  However, the total amount of debt in default rose for the last four years

from $51.35 billion in 2015 to more than $165.97 billion in 2018.  During that same period, PCA

recovery rates fell from about 19 percent per year to approximately only 6 percent per year, an

alarming correlation directly tied to ED's failure to award collection contracts to large business PCAs over that time period.

29.    According to a Brookings Institute report, trends show that cumulative default rates on student loan debt continue to rise between 12 and 20 years after the borrower obtains the loan, and once Brookings applied those trends, it concluded that  nearly 40 percent of borrowers may default on their student loans by 2023.    https://www.brookings.edu/wp-content/uploads/2018/01/scott-clayton-report.pdf (last visited February 27, 2019).  Taking into account Brookings' independent findings, many hundreds of millions of dollars of defaulted student loans, which U.S. taxpayers are funding, will go uncollected despite the availability of PCAs like FMS that could collect a substantial amount of that money if ED enlisted their services.

30.    ED's leadership does not dispute findings from independent entities like Brookings. In late November 2018, ED Secretary Betsy DeVos publicly announced that rising student loan debt has created a "crisis in higher education."  https://www.forbes.com/sites/zackfriedman/2018/11/28/student-loan-debt-crisis/#6c3f87c521e3 (last visited February 27, 2019).  According to Forbes, Secretary DeVos said that student loan debt has risen $500 billion since 2013, and she "raised a 'red warning flag' that student loan debt is crippling students, federal taxpayers and stealing from future generations."  *Id.*

31.    As Secretary DeVos explained in her November 27, 2018 speech:

It took 42 years—1965 until 2007—for the student loan balance to grow to 500 billion dollars. It took only six years for the loan balance to double—to one trillion dollars—in 2013. One-seventh the amount of time it took to get to 500 billion.

***And today, only five years later, FSA holds nearly 1.5 trillion dollars in outstanding loans.***

1.5 trillion dollars is almost impossible to fathom. So, let me put it this way: 1.5 trillion dollars is more than 10 thousand dollars of someone

else's student loan debt for each and every American taxpayer—145 million of them.

At 1.5 trillion dollars, FSA's loan portfolio is now one-third of the Federal government's balance sheet. Last year, uncollateralized student loans—which are all of them, by the way—accounted for over 30 percent of all federal assets.

One third of the balance sheet. Only through government accounting is this student loan portfolio counted as anything but an asset embedded with significant risk.

In the commercial world, no bank regulator would allow this portfolio to be valued at full, face value.

Federal Student Aid has a consumer loan portfolio larger than any private bank. Behemoths like Bank of America or J.P. Morgan pale in comparison. FSA also is the largest direct loan portfolio in the whole Federal government—by far—surpassing all other federal direct loans combined by 1.1 trillion dollars.

And yet, only 24 percent of FSA borrowers—one in four—are currently paying down both principal and interest. ***Nearly 20 percent of all loans are delinquent or in default. That's seven times the rate of delinquency on credit card debt.***

And since 2010, the debt level of individual borrowers has ballooned. 70 percent of loan growth since then has been driven by increases in individual borrower debt load, only 30 percent is due to a growth in the number of borrowers. Nearly three quarters of accumulated debt represents the same students taking out more and more loans.

This phenomenon is true for all types of higher ed institutions. And this trend line continues to grow.

https://www.ed.gov/news/press-releases/us-secretary-education-betsy-devos-warns-looming-crisis-higher-education (last visited February 27, 2019) (emphasis added).

32.     ED has been losing substantial ground in collecting debt in recent years.  In fiscal year 2014, the PCAs generated nearly $9 billion in recoveries on a $52 billion portfolio of defaulted student loan debt.  After ED stopped using the large business PCAs in fiscal year 2017, ED generated approximately $10 billion in recoveries on a $166 billion portfolio.  The portfolio of defaulted student loan debt more than doubled, but ED's collections increased by about 10

percent.  These figures unequivocally demonstrate a need for more PCAs, and the award of contracts under the PCA Solicitation would help ED improve these figures substantially.

33.    Notwithstanding these alarming statistics, and the incredible statements by its own Secretary, ED has done nothing with the PCA Solicitation since it was enjoined from cancelling it in September 2018.

34.    Instead, for multiple years, ED has engaged in an odyssey of repeated failures to lawfully procure default collection services from large business PCAs.  This has left ED to try to cover its default collection requirements with a group of small businesses.  Among that group, two or three small businesses are performing most of the work.  But, as the data discussed above shows, these small businesses cannot keep pace with the ballooning defaults, which has resulted in more and more defaulted student loan debt going uncollected.  That otucome—the failure to collect on defaulted student loan debt—is a failure by ED to meet its mandate to Congress and the U.S. taxpayers.

D.    <u>**For Years, ED Has Failed To Procure Default Collection Services**</u>

35.    On December 11, 2015, ED issued the PCA Solicitation seeking to award the next iteration of default collection contract awards.  The PCA Solicitation stated that ED would award multiple Indefinite Delivery/Indefinite Quantity ("IDIQ") contracts and Task Orders to an undefined number of awardees.  Forty-seven offerors, including FMS, submitted proposals in response to the PCA Solicitation.

36.    On December 9, 2016, ED notified FMS that it along with six other offerors had been selected for award under the PCA Solicitation.  *See Gen. Revenue Corp.*, B-414220.2 et al., (Comp. Gen. Mar. 27, 2017).  Following ED's December 2016 award announcements, numerous disappointed offerors filed bid protests at the Government Accountability Office ("GAO").  GAO consolidated some of the protests, and addressed some of the protests alone.

37.     On March 27, 2017, GAO issued a decision on the consolidated protests. *See id.* GAO sustained the protests in part and denied the protests in part, finding that ED had failed to conduct reasonable and equal technical and past performance evaluations. *Id.* GAO recommended that ED amend the PCA Solicitation to accurately reflect its needs; and then conduct and adequately document a new evaluation of proposals under the past performance and management approach factors. *Id.* GAO also recommended that, after conducting a new evaluation, ED prepare and adequately support a new source selection decision. *Id.* Unfortunately, ED never recovered from GAO's initial finding that it had not properly conducted the default collection services procurement.

38.     On March 28, 2017, Continental Service Group, Inc. ("ConServe") filed a bid protest with this Court. *See Continental Serv. Grp., Inc. v. United States*, No. 17-449 et al. ConServe challenged both ED's evaluation of its proposal and the number of defaulted borrower accounts it was receiving under its incumbent 2015 Award Term Extension ("ATE") agreement. Additional bid protests in the Court followed.

39.     On May 19, 2017, the Government filed a notice of corrective action in response to the Court protests advising the Court that ED had decided to implement the GAO's recommendations. *See id.*, Dkt. No. 122. Dr. Patrick Bradfield, FSA's Director of Acquisition and Head of the Contracting Activity filed a sworn declaration stating that, "FSA intends to take corrective action under this Solicitation in response to the recommendations of the [GAO] and the exhortations of the Court to find a global solution to these protests." Exhibit A ¶ 4. As Dr. Bradfield explained, ED's plan "will entail making minor amendments to the Solicitation, requesting revised proposals, and conducting a new evaluation." *Id.*

40.     Having agreed to follow GAO's recommendation, ED plainly had reevaluated its requirements for default collection services and decided that the PCA Solicitation still accurately reflected its needs.   Nowhere in his sworn declaration did Dr. Bradfield state that ED was reevaluating its debt collection system, its need for default collection services, or its intention to procure those default collection services under the PCA Solicitation.

41.     According to Dr. Bradfield, ED would complete the reevaluation, responsibility determinations, and other pre-award activities by August 24, 2017, and by August 25, 2017, ED would issue new notices of award and notices of termination of the default collection services contracts it had originally awarded in December 2016 (if any).   FMS timely submitted a fully responsive proposal on June 20, 2017.

42.     ED failed to meet its schedule for the reevaluation.   ED did not conclude the reevaluation or announce new award decisions until several months after its stated completion date, and even then, only after ordered to do so by this Court.

**E.      ED Announced The NextGen Procurement As Solely For Loan Servicing**

43.     On August 4, 2017, while ED was conducting its corrective action reevaluation under the PCA Solicitation, William Leith, FSA's Chief Business Operations Officer, filed a sworn declaration under penalty of perjury in this Court to clarify the differences between ED's loan and debt collection services.   *Continental Serv. Grp., Inc. v. United States*, No. 17-449 et al., Dkt. No. 183-2 ("Leith Decl."), attached here at Exhibit B.   Additionally, Mr. Leith's declaration explained how loan servicing was unrelated to the single procurement for PCA default collection services. *Id.*   ED, through Mr. Leith's sworn declaration, also intended to provide this Court information about the planned NextGen solicitation.

44.     Speaking on behalf of ED, Mr. Leith represented to this Court that the NextGen procurement would relate "***solely to loan servicing and not collection activities for defaulted***

-15-

*loans.*" *Id.* ¶ 9 (emphasis added).  Mr. Leith explained that loan servicing is "managing loans which are not in default, meaning while the borrowers are in school, in the post-graduation grace period, or in repayment status." *Id.* ¶ 5.  Mr. Leith continued:

> The Department contractors who perform that loan servicing work (commonly referred to as "loan servicers") receive 'booked' loans after the funds are disbursed to students, contact borrowers once they are in the grace period (i.e., prior to beginning repayment of a loan) to determine the desired repayment plan, and set up payment methods. Once in repayment, the loan servicer contractors provide borrowers with billing statements, process payments, and offer services to borrowers such as processing changes to repayment plans, forbearance and deferments, and the like.

*Id.*

45.     As Mr. Leith emphasized within his sworn statement, ***"[t]he work of the loan servicers is separate and distinct from the debt collection work*** that the PCAs perform under their respective default collection services contracts.  PCA contractors perform services on only defaulted loans." *Id.* ¶ 6 (emphasis added).  Mr. Leith explained that debt collection concerns "loans which are extremely delinquent (payment is 360 days past due)." *Id.*  He further explained that debt collectors perform activities that loan servicers do not, insofar as debt collectors "conduct 'skip trace efforts' to obtain contact information on borrowers, contact borrowers seeking to collect, explain various options available for curing the default, including loan rehabilitation programs, and set up rehabilitation payment plans. PCAs also process administrative wage garnishment procedures, if applicable." *Id.*

46.     In speaking specifically about the NextGen procurement, Mr. Leith told this Court that ED had cancelled an earlier loan servicing solicitation and that, as of August 2017, ED intended to develop a Next Generation Processing and Servicing Environment for those services. *Id.* ¶ 3.  He attached a copy of ED's press release about NextGen to this declaration. *Id.*  Notably, the press release referred only to servicing, not default collections:

> The anticipated FSA Next Generation Processing and Servicing Environment will provide for a single data processing platform to house all student loan information while at the same time allowing for ***customer account servicing*** to be performed either by a single contract servicer or by multiple contract servicers. This new approach is also expected to require separate acquisitions for database housing, system processing and ***customer account servicing*** which will allow for maximum flexibility today and into the future. FSA expects these contemplated changes to the ***servicing and processing environment*** to provide the opportunity for additional companies to submit proposals for contracting with FSA.

*Id.*, ED press release Aug. 1, 2017, "Secretary DeVos Announces Intent to Enhance FSA's Next Generation Processing and Servicing Environment Creating the Foundation of Tomorrow's Student Loan Program" (emphasis added).

47.     If the press release was not clear enough, Mr. Leith explained in his sworn declaration that:

> Neither of these press releases, nor the Federal Student Loan Servicing Solicitation to which they both relate, are at all related to the debt collection solicitation (Solicitation No. ED-FSA-16-R-0009) under which the private collection agencies (PCAs) will perform debt collection services. ***As explained below, the work to be performed under Solicitation ED-FSA-16-R-0009 is different from loan servicing, involving an entirely separate procurement effort***.

Id. ¶ 4 (emphasis added).

48.     Mr. Leith emphasized that "[i]n short, ***these two functions (loan servicing versus default collection), are substantively different*** and take place at different stages in the life of a loan. FSA acquires these two types of services using ***distinct and separate solicitations*** and contracts. Loan servicer contractors are assigned work from a pool of accounts distinct and separate from the pool of accounts the PCAs service." *Id.* ¶ 7 (emphasis added).

49.     To further emphasize the differences between loan servicing and default collections, Mr. Leith attached as Exhibit C to his declaration a chart listing the distinct activities

performed by these two groups of contractors, each possessing specific skills and expertise to perform their tasks. *Id.* Later in his declaration, Mr. Leith again stated in no uncertain terms that ED's "*development of the Next Generation Processing and Servicing Environment in no way impacts any corrective action currently underway on the PCA [S]olicitation at issue in these cases, as such activities relate solely to loan servicing and not collection activities for defaulted student loans*." *Id.* ¶ 9 (emphasis added).

50.     Mr. Leith's declaration was made under oath on behalf of ED and submitted to this Court by the DOJ. The *ConServe* case in which this declaration was filed ended on February 14, 2018, just six days before ED issued the NextGen Phase I RFP. At no time during the pendency of that case, or the several related cases afterwards, did Mr. Leith or the Government inform this Court that Mr. Leith's sworn declaration was no longer accurate.

**F.     ED Released The NextGen RFP Without Default Collection Services**

51.     On February 20, 2018, ED issued the Phase I NextGen RFP. In the NextGen RFP, ED stated that it was seeking to procure services for the servicing of non-defaulted accounts. *See, e.g.*, Ex. B, Leith Decl. ¶ 9 (noting that NextGen "activities relate solely to loan servicing and not collection activities for defaulted student loans").

52.     In addition, ED separately stated that it intended to procure the NextGen platform in phases, and that ED was pursuing *only the loan servicing* phase at this time. The NextGen Phase I RFP demonstrated this iterative procurement process by illustrating both a current and future state for the NextGen system. ED's Phase I NextGen solicitation expressly *excluded* default collection services.

G.     **ED Made New But Flawed Awards Under The PCA Solicitation**

53.     On January 11, 2018, ED issued two new notices of award under the PCA Solicitation and unsuccessful offeror notices to the 40 other competing PCAs.  FMS received an unsuccessful offeror notice the afternoon of January 11, 2018.

54.     After receiving its debriefing letter, on February 9, 2018, FMS filed a Complaint at this Court protesting ED's irrational, arbitrary, and capricious evaluation and the resulting flawed award decisions.  *FMS Investment Corp. et al. v. United States*, Nos. 18-204 et al., Dkt. No. 1. Numerous other unsuccessful offerors filed similar Complaints, and the actions were consolidated, with FMS's protest being designated as the lead case.  *See, e.g., id*., Dkt. No. 16.

55.     On February 11, 2018, FMS moved for a Temporary Restraining Order and a Preliminary Injunction to enjoin ED from recalling accounts under its bridge contract.  *See FMS Investment Corp. et al. v. United States*, Nos. 18-204 et al., Dkt. No. 11.  After ED produced certain "Core Documents," briefing, and oral argument, on February 26, 2018, the Court granted FMS's motion and issued a preliminary injunction to preserve the status quo while it further evaluated the merits of FMS's protest.

56.     In issuing the injunction, the Court indicated that it had "serious questions over ED's evaluation of proposals in this [PCA Solicitation] procurement."  *Id*., Dkt. No. 126 at 3.  The Court stated that "[t]he evidence before the Court points to inconsistencies, omissions, unequal treatment of offerors, and cherry-picked data that the Court finds to be rather problematic."  *Id*. at 3-4.  As a result, the Court concluded that FMS and the other consolidated plaintiffs were likely to succeed on the merits of their bid protests.  In other words, ED once again had failed to properly issue contract awards for necessary default collection services.

57.     The Court also found that FMS had sufficiently demonstrated that it would be irreparably harmed absent preliminary injunctive relief while ED had failed to offer any

justification that it would be harmed at all if the injunction were entered. *Id.* at 4. Finding that the "balance of hardships clearly weigh[s] in favor of Plaintiffs," given that "there will be little to no harm to the Government if injunctive relief is granted," *id.*, the Court found that preliminary injunctive relief was appropriate and granted FMS and the other plaintiffs' motions.

### H.    ED Attempted To Cancel The PCA Solicitation, Claiming It Had A New Plan

58.    On March 9, 2018, the Government filed its Administrative Record ("AR"). *See id.*, Dkt. Nos. 131. Just days before another oral argument, on March 19, 2018, the Government filed a notice informing the Court and the parties that ED had been reviewing the protests and the PCA Solicitation "in order to assess its options and to identify the best path forward for the agency and borrowers." *Id.*, Dkt. No. 149 at 1. The Government stated that "ED has reached a point in its analysis where it appears likely that a course of action other than continued litigation of the pending protests will be pursued," but it did not specify what actions ED actually would take. *Id.*

59.    On May 3, 2018, the Government filed a notice with the Court indicating that it had completed its review of the PCA Solicitation, and that it had ***decided to cancel the PCA Solicitation*** "due to a substantial change in the requirements to perform collection and administrative resolution activities on defaulted Federal student loan debts." *FMS Investment Corp. et al. v. United States*, Nos. 18-204 et al., Dkt. No. 188 at 1. The May 3 Notice, which ED issued the same day that Phase I NextGen proposals were due, provided:

> In the future, ***ED plans to significantly enhance its engagement at the 90-day delinquency mark*** in an effort to help borrowers more effectively manage their Federal student loan debt. ED expects these enhanced outreach efforts to reduce the volume of borrowers that default, improve customer service to delinquent borrowers, and lower overall delinquency levels. The current private collection agencies (PCA) under contract with ED have sufficient capacity to absorb the number of accounts expected to need debt collection services while the process for transitioning to the new approach is developed and implemented. Therefore, additional PCA contract work is not currently needed.

*Id.* (emphasis added).

60.     ED gave no indication as to when or how it would implement this new "plan" or the basis for believing that additional outreach efforts—which it apparently assumed the borrower would respond to—would reduce debt collection demand so much as to render a procurement for default collection services superfluous.  Instead, despite volumes of contrary information that ED itself has published and is otherwise widely available in the press, and nearly four years of attempting to award contracts under the PCA Solicitation, ED claimed that its new, yet-to-be-developed future plan would so greatly reduce ED's statutorily required default collection services demand as to render the need for PCAs "nonexistent."

61.     In a subsequent filing with this Court, on May 23, 2018, the Government submitted a May 3, 2018 Memorandum to File authored by Murthlyn Aldridge, Contracting Officer.  *Id.*, Dkt. No. 244-1.   This Memorandum to File had the subject line, "CANCELLATION DECISION—SOLICITATION NO. ED-FSA-16-R-0009 DEBT COLLECTION SERVICES" (the "Cancellation Decision").  A copy of the Cancellation Decision is attached as Exhibit C.

62.     In several respects Ms. Aldridge's Cancellation Decision was consistent with the Notice that the Government filed with the Court on May 3, 2018.  Ms. Aldridge wrote that after making the awards to two PCAs, "FSA Business Operations informed FSA Acquisitions that FSA's needs and requirements for servicing student loans in delinquency and default will change significantly in the near future."  She did not define what she meant by "near future." Ms. Aldridge then explained that she had reviewed "FSA's revised requirements" and based on that review, she determined "that the contracts awarded under Solicitation ED-FSA-16-R-0009 will not satisfy FSA's new requirements and therefore are no longer needed."   Ms. Aldridge, however, did not identify what those revised requirements consisted of or when they were developed.

63.     Instead, Ms. Aldridge wrote in her Cancellation Decision about a "new vision" that FSA had "for an enhanced servicer(s) to provide services to borrowers *beginning ninety (90) days after a borrower account becomes delinquent* and continue those services through the resolution of any subsequent default."  (Emphasis added).  She stated that "FSA's need for [PCA] services as a function separate from the work provided by the enhanced servicer(s) will diminish rapidly in the coming months and ultimately become nonexistent."  Ms. Aldridge's assertions, however, completely contradict information and assertions that Mr. Leith made to the Court in his August 4, 2017 sworn declaration.  As discussed above, in that sworn declaration, Mr. Leith explained that the loan servicers service the loans, and the PCAs collect on the loans that inevitably fall into default.

64.     According to Ms. Aldridge in the Cancellation Decision, on or about May 3, 2018, ED came up with a new idea to "service borrower accounts *starting at 90 days or more delinquent* versus 360 days or more delinquent."  (Emphasis added).  According to the Cancellation Decision, to facilitate the "new" idea, ED plans on creating a new portfolio "for all borrower accounts that are 90 days or more delinquent."  To service this new portfolio, Ms. Aldridge wrote that "FSA will need a contractor(s) that will focus solely on the resolution of delinquencies and collection activities for the *new portfolio of work that will be comprised of accounts beginning at 90 or more days delinquency*."  This new approach will require that "[t]he contractor(s) will provide all aspects of collection and default resolutions related to servicing borrower accounts in repayment including entitlements such as deferments, forbearances, repayment plans discharge/forgiveness, etc. and the same contractor(s) will be able to handle post default collections such as [Administrative Wage Garnishment] and [Treasury Offset Program]."  In short, the Cancellation

Notice stated that it was ED's intention to take two, entirely separate services—loan servicing and default collection services—and combine them under a single contract.

65.     The Cancellation Decision also had an accompanying May 3, 2018 memorandum, which described ED's new "enhanced services" idea.  Exhibit D.  On page 2 of that memorandum, ED stated that the contractor providing enhanced services would possess "full and complete understanding" of "all methods of collection and default resolution."  *Id.* at 2.

66.     But, as industry publication insideARM observed ED could not implement this "new vision" for many years:  "In addition to getting all servicers on one platform (the Navients, Nelnets, etc.), industry experts noted that the system design revealed in December 2017 included a default management module as well. It seemed, though, that this module would be ***years away from becoming a reality,*** as it hasn't yet been the subject of a technology solicitation." https://www.insidearm.com/news/00044012-ed-data-shows-109-increase-student-loan-de/    (last visited February 27, 2019) (emphasis added).  Ms. Aldridge even admitted that the plan was (generously put) in its infancy.  In fact, ED did not even know whether the plan is consistent with the law, explaining that at some point, "[a]ll proposed changes to current collection practices will be reviewed to ensure legal compliance with the Higher Education Act, Department and Treasury regulations, and other applicable regulations before they are implemented."

67.     Based on Ms. Aldridge's justification nonetheless, the Government moved to dismiss all the protests of the January 2018 awards.  The Court dismissed the pending protests as moot, but indicated that interested parties could separately challenge the Cancellation Decision.

## I.     This Court Enjoined ED From Canceling The PCA Solicitation

68.     FMS filed a protest challenging the Cancellation Decision with the Court on June 18, 2018.  Seven other PCAs similarly filed protests challenging ED's decision to cancel the PCA

Solicitation.   The consolidated plaintiffs argued that ED's Cancellation Decision was undocumented, unreasonable, and arbitrary and capricious.

69.     Among other arguments, plaintiffs argued that ED's decision to cancel the PCA Solicitation because of its "new vision" of enhanced servicers was irrational because ED could not even approximate when it might be able to procure these services.  Without having any sort of timetable as to when it would issue a solicitation seeking these enhanced servicer services, it was not reasonable for ED to claim that it no longer needed PCA default collection services.  At the very least, ED would need default collection services during the interim while ED created an acquisition plan, developed a solicitation, notified potential offerors of the new requirements, conducted a procurement, made enhanced servicer contract awards, and actually accepted the new processing and collection systems that needed to be developed.  As the plaintiffs argued, despite these numerous, substantive, and complex steps, ED had not even thought about a plan for completing it—ED had no idea whether enhanced servicers would be up a running in the coming years or even in this decade.

70.     ED could not rebut those arguments.  In fact, the Government conceded that ED had not developed an actual plan for procuring enhanced servicing.  On July 19, 2018, in open court, the Government confirmed to the Court that ED had **no plan** about when it plans to issue a solicitation to procure the enhanced servicer solution or even how it intends to do so:

> MR. PEHLKE: They -- my understanding is ***there's no target date right now*** for the next -- for moving to phase -- ***what would be -- could be a phase two or a different solicitation to bring that together, and that's why in the cancellation -- in the Administrative Record and the things that you see around it, the determination was made, because that was a concern***.  What they looked at is do we have the capacity and the ability to continue to move forward, to meet all of our requirements, to fulfill our mission, while we develop that? And they determined yes.

Hr'g Tr. 39:14-24, July 19, 2018 (emphasis added), excerpt attached at <u>Exhibit E</u>. Thus, by the Government's own admission, there was no date when it might issue a solicitation to implement the "new vision."

71.     The Government also informed the Court that ED's enhanced servicer vision—which includes default collection services as identified in ED's May 3 memorandum that accompanied the Cancellation Decision of the same date—***was not included in the NextGen Phase I procurement***.  The Government similarly conceded this exclusion:

> MR. PEHLKE: So the NextGen went onto the street on February 20th. The proposals were due in April.  They are currently being evaluated for phase 1, and ***phase 1 is about implementing and developing this seamless system online.*** Because currently, what – and this you see in some of the enhanced servicer description and some of the problems that we discuss in our briefs is designed to deal with, right now there's every PCA, every debt collector, they have their own websites, there's a lot of different mechanisms for borrowers to deal with whoever it is handling their account, and the goal is to get one platform that services the life of a loan.
>
> ***So that's phase 1 is about developing that technology***. When -- so my understanding of the timeline right now is the ***one decision that needs to be made for ED is whether or not they are going to do the enhanced servicing strategy via phase 2*** of the NextGen procurement, or if they're going to separately procure it. Separate services. ***And that decision won't be made until they finish the phase 1 evaluation, which is ongoing.***

Hr'g Tr. 58:14-22, August 30, 2018 (emphasis added), excerpt attached at <u>Exhibit F</u>.

72.     As the Government expressly informed the Court: enhanced servicing services—including default collection services—were not included in NextGen Phase I, and that ED would not decide when and how to procure those services until after procuring an IT platform upon which to service loans.

73.     On September 14, 2018, this Court agreed with FMS and the other plaintiffs and issued an opinion and order permanently enjoining ED from proceeding with the cancellation of the PCA Solicitation.

74.     Based on the parties' briefs, the "scant" 33 page record, and oral argument, this Court concluded that "ED either did not have, or did not sufficiently document, a rational basis for its decision to cancel the solicitation."  As relevant here, this Court noted that the hasty maneuvers of ED appeared "slipshod," and that even ED's own May 3, 2018 documents note that, however grand ED's "new vision" may be, "the program still needs to be reviewed for compliance with applicable laws and regulations."  The Court continued:

> Furthermore, the [Administrative Record] is missing critical information about the enhanced servicer program. ***The AR does not include any plan or timeline for implementing the program***.  It does not include a request for proposals, or any mention of what that request might look like.  It does not refer to a source of funding.  It does not even include a copy of the solicitation that ED cancelled to clear a path for the enhanced servicers.

*Id*. (emphasis added).

75.     After detailing numerous other flaws in ED's rationale, the Court concluded, as follows:

> The cancellation notice and the AR purport to outline a significant policy change. ***ED had clearly planned for PCAs to continue to administer defaulted student loans as recently as January 2018 because the agency awarded two PCA contracts that month.***  Yet not four months later, in a procurement cancellation notice, ED declared a new direction and an end to contracting for PCA services.  ED needs to provide a "reasoned analysis" for the policy change.  For all the reasons above, it has failed to do so.

*Id*.  (emphasis added) (internal citations omitted).

76.     In short, having reviewed the full AR of ED's attempt to cancel the PCA Solicitation, and having heard argument from the parties, this Court concluded that ED had no plan

for enhanced servicers, which included default collection services.  ED even expressly admitted that its enhanced servicer "vision"—including default collection services—was not part of NextGen Phase I, and that ED would not even consider whether to add these requirements into NextGen until after it procured a new IT platform.

77.     Although this Court enjoined ED from cancelling the PCA Solicitation on September 14, 2018, ED has not done anything to proceed with that solicitation.

**J.     ED Released Flawed Phase II Solicitations For The NextGen Procurement, Attempting To Include Default Collection Services Secretly**

78.     Just ten days after being enjoined from cancelling the PCA Solicitation, on September 24, 2018, ED issued the solicitations for Phase II of NextGen.

79.     Surprisingly, ED attempted to procure defaulted loan debt collection services in the new Phase II NextGen solicitations.  For instance, paragraph C.3.3.b. of the Phase II solicitation provided, "Student aid back-office processing" provides that the contractor will provide solutions that, among other things, engage in the following:  "Rehabilitation, Administrative Wage Garnishment (AWG), Treasury Offset Program (TOP), and other related processing."  AWG was authorized by § 3720D. "Garnishment" of the Debt Collection Improvement Act of 1996.  31 U.S.C. §§ 3701, et seq.  AWG is an administrative process that requires that debtors be notified of the Government's intent to have their wages withheld by their employer.  As part of the process, the borrower who has failed to make payments on a loan has a right to request a hearing.  As noted by Mr. Leith in Exhibit C to his sworn declaration, AWG is the work of debt collectors, not loan servicers.  *See* Exhibit B, Leith Decl.

80.     Initially, ED was not forthcoming about whether it was trying to add defaulted loan collection services into the NextGen procurement.  Beginning on September 26, 2018, another PCA, ConServe, asked ED whether ED intended to procure default recovery services (i.e.,

traditional PCA services) and/or "enhanced servicing" services under NextGen Phase II.  Exhibit

G.  By October 1, 2018, ConServe had followed up on the question three times, but ED still had

not responded.  Exhibit H.

81.     On October 5, 2018, ED expressly confirmed that it intended to procure default

collection services under the Phase II solicitation for NextGen:

> The Phase I Solicitation advised prospective offerors that NextGen
> contract(s) may encompass any and all activities associated with
> servicing of student aid, including servicing aid at every stage in the
> lifecycle, from application and disbursement of the aid, to payment
> and to servicing in delinquency or default status.  As such, the Phase
> II Solicitation language for Business Process Operations (formerly
> referred to as Components E&F) advises eligible, prospective
> offerors that potential NextGen contract(s) may service the entire
> student aid lifecycle and life of the loan, ***including default
> servicing***.

Exhibit I (emphasis added).

### K.     ED's OIG And Congress Became Concerned About ED's Administration Of Loan Servicers' Contracts And Loan Servicers' Performance

82.     In the midst of ED's NextGen procurement efforts, ED's Office of Inspector

General ("OIG") began reviewing ED's administration of loan servicer contracts.  That review

culminated in a February 12, 2019 report: "Federal Student Aid: Additional Actions Needed to

Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held

Student Loans," ED-OIG/A05Q008 (the "OIG Report").

83.     At the same time, Congress also became concerned about loan servicer

performance and accountability, and presented the President with legislation to begin to address

those concerns.

84.     On September 28, 2018, the President signed into law the Department of Defense

and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing

Appropriations Act, 2019 (the "Pub.L. 115-245").  Pub.L. 115-245 establishes a requirement that

in order to use the Federal funds available to through September 30, 2020 for student loan servicing, ED must use more than one loan servicer.

> For Federal administrative expenses to carry out part D of title I, and subparts 1, 3, 9, and 10 of part A, and parts B, C, D, and E of title IV of the HEA, and subpart 1 of part A of title VII of the Public Health Service Act, $1,678,943,000, to remain available through September 30, 2020: . . . *Provided further*, That in order to promote accountability and high-quality service to borrowers, the Secretary shall not award funding for any contract solicitation for a new Federal student loan servicing environment, including the solicitation for the FSA Next Generation Processing and Servicing Environment as amended by the Department of Education on February 20, 2018, unless such an environment provides for the participation of ***multiple student loan servicers*** that contract directly with the Department of Education to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to payoff with certain limited exceptions, and allocates student loan borrower accounts to eligible student loan servicers based on performance: . . .

85.     This law is intended to ensure that ED does not procure loan servicing from one loan servicer.  Rather, ED is required to award contracts to more than one loan servicer, so that it can allocate accounts to the loan servicers on the basis of performance.

**L.     ED Abandoned And Cancelled Its Original NextGen Procurement**

86.     FMS and several other PCAs filed bid protests at this Court challenging ED's exclusion of them from the NextGen competition.  This Court consolidated those bid protests under the case, *Navient Solutions LLC v. United States*, No. 18-1679C (the "NextGen Protest").

87.     On December 4, 2018, the Court held an oral argument on one of the plaintiff's motion for preliminary injunction in the NextGen Protest.

88.     During the hearing on December 4, 2018, the Court informed the parties that ED's action of moving forward on the NextGen procurement without giving the PCAs an opportunity to participate in the procurement "would be a blatant violation of competition requirements."  Hr'g Tr. 36: 25-37 – 37: 1-4, December 4, 2018.

89.     On December 14, 2018, the Government filed a Motion to Stay Pending Corrective Action, *see Navient Solutions*, No. 18-1679C, Dkt. No. 66, stating that it intended to cancel the relevant components of the NextGen solicitation by January 15, 2019.

90.     Trade publication insideARM summed up the state of ED's affairs as a result of this development in a January 10, 2019 article:

> The primary characteristic of the program is it's a dynamic, active, and growing inventory of more than $1.5 trillion dollars with roughly $150 billion in defaulted debts underwritten by taxpayers that must be managed closely and carefully. ***ED's NextGen system design (and procurement process) has not credibly addressed how it plans to manage its bad debt***; one of the largest and most complex consumer credit programs in the world. Its inventory has accumulated over the past forty years and is growing at roughly 13.1% each year, on average, since 2000.

https://www.insidearm.com/blogs/arm-in-focus/00044629-ed-cancels-latest-phase-nextgen-procureme/ (last visited February 27, 2019) (emphasis added).

91.     On January 15, 2019, ED cancelled the relevant components of the NextGen solicitation.

92.     On February 12, 2019, the Court dismissed the NextGen Protest without prejudice. In its Order, the Court noted that FMS had filed a motion for leave to file a supplemental complaint alleging that ED's newest, revised solicitation improperly bundles different types of student debt collection and administration services. *Navient Solutions*, No. 18-1679C, Dkt. No. 81.

**M.     ED Issued Three Interrelated RFPs Based On A "Life Of The Loan Plan"**

93.     On January 15, 2019, ED issued the Three RFPs.  One RFP is called NextGen Enhanced Processing Solution (Solicitation No. 91003119R0005); another RFP is called NextGen Business Process Operations (Solicitation No. 91003119R0008); and the third RFP is called NextGen Optimal Processing Solution (Solicitation No. 910031119R0007).

94.     Each of the Three RFPs incorporates an identical document that outlines the contractor's responsibility under each contract for the "Life of loan servicing intended state: Continuous, frequent, and tailored customer engagement." Enhanced Processing Solution RFP at Attachment 12; Optimal Processing Solution RFP at Attachment 9; and Business Process Operations RFP at Attachment 11.  This document, attached to this Complaint at <u>Exhibit J</u>, summarizes ED's new apparent plan going forward: the "Life of the Loan Plan".

95.     The Life of the Loan Plan included some details on what ED's loan servicing contractor would be required to do starting at the 90 days' delinquent mark, which Ms. Aldridge's May 3, 2018 Cancellation Decision alluded to but never explained.  At 91 to 270 days past due on a loan, the servicer would now make "more frequent outbound calls with cautionary tone" and use a "multi-channel engagement, i.e., phone, email, chat, text."  Life of the Loan Plan at 91-270 DPD. The back-office operations would (somehow) use new automated techniques to try to track borrows better at this point. *Id.*

96.     Yet, the servicing "enhancements" that ED has devised since it improperly attempted to cancel the PCA Solicitation are nothing more than a strategy to have its servicer work harder—a dubious strategy given contemporaneous information about servicer effectiveness.

97.     The OIG Report issued on February 12, 2019 chronicles that FSA failed to track servicers' noncompliance with contract requirements, failed to require servicers to follow contract requirements, and failed to employ any logical metrics in assigning loans to servicers based on performance.  *Id*. at 9.  Thus, while ED had attempted to cancel the PCA Solicitation based on a premise that its servicer contracts would reduce defaults, the OIG found that during that relevant time, FSA had failed to administer its servicing contracts effectively.

98.     In any event, the Life of the Loan Plan in the Three RFPs expressly recognizes separate services are necessary once a borrower's loan reaches 271 days past due.  At that point, PCA services are necessary.

99.     ED's Life of the Loan Plan details both "Customer engagement" and "Back-office" defaulted loan collection functions.  At 271+ days, the "Payment cycle" of the loan is deemed to be "Technical and reported default," according to the document.  This time frame corresponds with the long-standing time frame when a loan is considered in default.

100.    Once the loan is in default under the RFPs, according to the Life of the Loan Plan, the contractor will engage in: "Daily outbound calls with recovery tone"; "Intensive, frequent engagement through other channels"; "Digital self -service for loan rehab"; and "Cost effective contact."

101.    Under the Life of the Loan Plan ED is requiring the successful contractor under each of the Three RFPs to make "[d]aily outbound calls with recovery tone" to each defaulted borrower.  Not one of the Three RFPs explains how ED can require that its contractor call each defaulted borrower daily with a "recovery tone" when the Fair Debt Collection Practices Act prohibits harassment or abuse of a defaulted borrower, which includes "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."  15 U.S.C. § 1692d(5).

102.    Back-office functions of the Life of the Loan Plan also kick in once the loan is in default.  Back office systems are required to achieve the following:  "Focus on successful borrower resolution"; "Automated admin. actions implemented immediately and continued"; "Vendor incentive program based on Vendor incentive program based on default reduction"; "Alternative skip tracing"; and "Streamlined loan rehabilitation (i.e., paystub OCR)."

**N.**     **The Three RFPs**

103.    The services under each of the Three RFPs will include defaulted student loan

collection services in addition to traditional servicing of those loans when not in default.

104.    According to the Three RFPs, the contractor should expect a volume of over seven

million defaulted accounts.  *See*, e.g., Enhanced Processing Solution RFP, Attachment 20, Volume

Assumptions.  The Three RFPs also anticipate a total loan volume of over 200 million at the start

of the contract.  *Id.*

105.    In the <u>Enhanced Processing Solution RFP</u>, ED seeks proposals for a new IT

platform that aggregates all non-defaulted and defaulted student debts, as well as servicing loans

and collecting defaulted student loan debt.

    a.    One contractor will be selected to provide the IT system to "consolidate the
          functionalities of the multiple websites, mobile applications, and contact
          centers that currently exist across the full customer lifecycles (from
          application to school to servicing to default)."   Enhanced Processing
          Solution RFP ¶ C.2.2.

    b.    The a sole contractor will develop an IT system and the "[s]olution shall
          track, project/forecast, and provide servicing functions for delinquent and
          defaulted customer accounts."  *Id.* ¶ C.3.3.b.

    c.    The sole contractor will also provide all loan servicing and debt collection
          activities.  Moreover, these services will be provided under the resulting
          contract for an ***indeterminate period of time*** until the Business Process
          Operations RFP contract is issued:  "Business process operations: Solution
          may serve ***as the sole business process operations*** (both contact center
          support and back-office processing) ***provider*** for all customer accounts as
          they are migrated onto the new servicing platform until the multiple vendors
          to be awarded under the separate Business Process Operations solicitation
          are fully operational."  *Id.* ¶ C.3.3.e (emphasis added).

    d.    The single Enhanced Processing Solution contractor will service over 200
          million borrower accounts.  *Id.* ¶ L-2.4.1.2 (The contractor's "solution will
          scale from its current operating capacity to support FSA's portfolio (nearly
          200 million loans today and growing)").  *Id.* ¶ L-2.4.1.2.b.

    e.    Because this RFP does not provide any specific time when the Business
          Process   Operations   contract   under   the   related   Solicitation   No.

91003119R0008 will be awarded, the successful contractor under the Enhanced Processing Solution RFP will be responsible to design and build the IT platform that consolidates all of ED's current systems, perform loan servicing, and perform default collection services for an undetermined period of time. The end of that undefined time period is dependent on ED's ability to run a successful procurement for the Business Process Operations RFP and award one or more contracts for those services. And, as discussed below, ED has not established a proposal due date for the Business Process Operations RFP.

f.      The resulting contract award "will be a hybrid of a firm-fixed priced (FFP) contract and an indefinite-delivery indefinite-quantity (IDIQ) contract." *Id.* ¶ C.1.2. The RFP explains that "Indefinite-delivery indefinite-quantity CLINs will be incorporated for the Business Process Operations objectives." *Id.*

g.      The periods of performance will be "Solution Delivery (FFP) – no greater than three months after award"; "Solution Operations and Maintenance (FFP) – a base period of one year, with nine one-year option periods"; and "Business Process Operations (IDIQ) – a base ordering period of five years, with one five-year optional ordering period". *Id.*

h.      Accordingly, while the IT system will be delivered in three months after the contract award, the contractor may perform loan servicing and defaulted loan debt collection services for up to 10 years under the resulting contract.

106.    In the Business Process Operations RFP, ED seeks proposals for contractors to provide equipment and personnel to conduct customer outreach and contact functions for the entire "loan lifecycle."

a.      ED's goal with the Business Process Operations RFP is to "procure an enterprise-wide, FSA-branded omni-channel digital platform featuring a mobile-first, mobile-complete, and mobile-continuous solution." *Id.* at 5.

b.      This RFP states that the "digital platform will consolidate the functionalities of the multiple websites, mobile applications, and contact centers that currently exist across the full customer lifecycles (from application to school to servicing to default)." *Id.* at 5-6.

c.      Within this RFP, ED describes the litany of disparate services that it has consolidated. *See id.* at 9-10.

d.      ED did not establish a final technical proposal due date for this RFP. Instead, ED announced that it would set a final proposal due date after it completes the procurement of the Enhanced Processing Solution.

e. Thus, there is no foreseeable time by which ED will procure defaulted student loan collection services under the Business Process Operations RFP.

107. The third RFP in the trilogy, the Optimal Processing Solution RFP, seeks proposals for an IT platform composed of "a set of modular solutions that are seamlessly integrated microservices." Optimal Processing Solution RFP ¶ C.2.3. This RFP also seeks business process operations services similar to the two other RFPs.

a. The resulting award under the Optimal Processing Solution RFP "will be a firm-fixed priced contract." *Id*. ¶ C.1.2.

b. The required periods of performance will be as follows: "Solution Delivery for Milestone 1 (FFP) – no later than twenty-four (24) months after award" but "[s]eparate periods of performance will be identified for the Milestone TBDs listed in Section C.2.5"; "Solution Operations and Maintenance (FFP) – a base period of one year, with fourteen (14), one-year option periods"; and "Business Process Operations (IDIQ) – a base ordering period of five years, with two (2), five-year optional ordering periods." *Id*.

c. Accordingly, the contractor will deliver the IT system up to two years after the contract award, and the contractor may perform loan servicing and defaulted loan debt collection services for up to 15 years under the contract.

d. Proposals under Optimal Processing Solution RFP are due by March 25, 2019. *Id.* ¶ L-2.2.5.

108. On February 19, 2019, ED published an amendment (Amendment 2) to the Enhanced Processing Solution RFP. That amendment provides, among other things:

a. The submission due date for proposals is "TBD". Enhanced Processing Solution RFP, Amendment 2 at page 3 of 7.

b. That only one contract award will be made under the RFP. *Id.*, Question & Response 2.

c. That the undefined Command Center in the RFP (which is responsible to set performance standards and direct the contractor) will be provided by "[a]nother vendor." *Id.*, Question & Response 4.

d. That FSA does not anticipate that the "same vendor will be awarded contracts for both EPS [Enhanced Processing Solution RFP] and BPO [Business Process Operations RFP] due to an apparent conflict of interest". *Id.*, Question & Response 26. Yet, ED did not provide any information

about the "apparent conflict of interest" or whether this "apparent conflict of interest" extended to the Enhanced Processing vendor's subcontractors.

109.    On February 20, 2019, ED published an amendment (Amendment 2) to the Business Process Operations RFP.    That amendment provides, among other things, that the proposal due date will be posted by ED "after an award for the Enhanced Processing Solution is made."    Business Process Operations RFP, Amendment 2 at page 4 of 7.

110.    ED's responses to questions included in Amendment 2 of the Business Process Operations RFP further confirmed that even ED recognizes that loan servicing and defaulted student loan debt collection are separate and distinct services, although combined into one RFP by ED.  Specifically, a potential offeror asked in Question 19:

> Ref L.2.4.2 Past Performance -- If an offeror currently has a contract for ED Servicing and a separate contract for ED Collections, would they count as separate "past work experiences" since they have different work requirements, contracting officers, contract terms/requirements, etc, or would they have to be submitted as a single "past work experience" since both contracts are ultimately with ED?

To which ED responded:   "The two experiences could be submitted as separate past work experiences."  Business Process Operations RFP, Amendment 2, Question & Response 19.

## O.    The Three RFPs Perpetuate Many Old Flaws And Include New Flaws

111.    The FAR provides that contractor teaming arrangements may be desirable to both the Government and contractors.  FAR 9.602(a).  The FAR further notes that teaming arrangements "may be particularly appropriate in complex research and development acquisitions, but may be used in other appropriate acquisitions, including production."  FAR 9.602(b).

112.    The Three RFPs are not research and development acquisitions.  Rather, each of the Three RFPs seek to acquire three separate and distinct products and services: an IT platform; student loan servicing; and defaulted student loan debt collection services.

113.   Further, acknowledging that no contractor is able to provide the three separate and distinct products and services, each of the Three RFPs also requires offerors to use non-exclusive teaming agreements in forming a team, or multiple teams, to compete for the contracts:

> Offerors shall not enter into any exclusivity agreements with subcontractors.  Nothing in the offeror's teaming agreement or other arrangement with a proposed subcontractor shall prohibit or restrict in any way the ability of the proposed subcontractor from pursuing subcontract or teaming arrangements with other offerors participating in this competition or from entering in any such arrangement.  Proposals that include the use of exclusivity agreements will be considered by the Government as deficient and eliminated from consideration.

Found in each of the Three RFPs at ¶ L-2.1.

114.   With respect to defaulted student loan collection services, the Three RFPs failed to include pricing templates for commission-based pricing for defaulted loans collection or rehabilitation.  Business Process Operations RFP, Attachment 18, Pricing Template.  Yet, the Life of the Loan Plan explicitly provides that the debt collector will receive compensation incentives based on collections and "default reduction."

115.   Each of the Three RFPs also includes a conflict of interest provision, which states:

> (a)(1) The contractor, subcontractor, employee, or consultant, has certified that, to the best of its knowledge and belief, there are no relevant facts or circumstances that could give rise to an organizational or personal conflict of interest (see FAR Subpart 9.5 for organizational conflicts of interest) (or apparent conflict of interest) for the organization or any of its staff, and that the contractor, subcontractor, employee, or consultant has disclosed all such relevant information if such a conflict of interest appears to exist to a reasonable person with knowledge of the relevant facts (or if such a person would question the impartiality of the contractor, subcontractor, employee, or consultant). Conflicts may arise in the following situations: . . .
>
> (iii) Impaired objectivity —A potential contractor, subcontractor, employee, or consultant, or member of their immediate family (spouse, parent, or child) has financial or other interests that would impair, or give the appearance of impairing, impartial judgment in

the evaluation of government programs, in offering advice or recommendations to the government, or in providing technical assistance or other services to recipients of Federal funds as part of its contractual responsibility. . . .

Found in each of the Three RFPs at ¶ 3452.209-71, Conflict of Interest (MAR 2011).

116.    Since May 3, 2018, when ED claimed in its Cancellation Decision that "the need for [PCA] services as a function separate from the work provided by the enhanced servicer(s) will diminish rapidly in the coming months and ultimately become nonexistent," *see FMS Investment Corp. v. United States*, Nos. 18-204 et al., Dkt. No. 244-1:

    a.    This Court enjoined ED's Cancellation Decision as unsupported;

    b.    ED tried to procure defaulted student loan debt collection services from service providers that had qualified on Phase I of the initial NextGen solicitation and illegally locked out PCAs from competing; and

    c.    ED has not done anything with respect to the PCA Solicitation.

117.    Instead, ED has embarked on a new strategy of issuing the Three RFPs that improperly bundle PCA defaulted student loan debt collection work with other, distinct, sophisticated, and wholly separate work that PCAs cannot perform.

118.    Specifically, a material portion of two of the Three RFPs can be performed only by an experienced IT firm.  Likewise, a material portion of each of the Three RFPs can be performed only by an experienced loan servicer.  And, finally, a material portion of each of the Three RFPs can be performed only by an experienced PCA.

119.    A procurement record must provide a reasonable basis for an agency's decision to award one contract that bundles separate and distinct services.  In this case, ED's procurement record does not include any rational, reasonable basis to award one contract that bundles the acquisition of one or more IT systems with services that are separate and distinct from each other – loan servicing services and defaulted loan debt collection services.

P.   **IT Systems Contracting Is A Special, Distinct Endeavor**

120.   The Office of Management and Budget issued Circular A-130, Managing Federal Information as a Strategic Resource on July 28, 2016.  FAR Part 39—Acquisition of Information Technology described the requirements for federal agencies, including ED, to procure IT systems, and FAR Part 39 incorporates Circular A-130.  In acquiring IT, an agency shall identify its requirements pursuant to Circular A-130.  FAR 39.101(a)(1).

121.   Under the Circular, an agency is required to "ensure that IT resources are distinctly identified and separated from non-IT resources during the planning, programming, and budgeting processes in a manner that affords agency CIOs appropriate visibility and specificity to provide effective management and oversight of IT resources."  Circular A-130 at page 7.

122.   The Enhanced Processing Solution RFP and the Optimal Processing Solution RFP blend IT requirements and traditional loan servicing and default collection service requirements into an amalgamated RFP, under which it is not possible to decipher distinct budgeting or pricing requirements.

123.   FAR 39.103 implements 41 U.S.C. § 2308, a statute that mandates that an agency, "[t]o the maximum extent practicable, . . . should use modular contracting for an acquisition of a major system of information technology."    41 U.S.C. § 2308(a); *see also* FAR 39.103(a) ("agencies should, to the maximum extent practicable, use modular contracting to acquire major systems (see FAR 2.101) of information technology."

124.   Modular contracting requires that a system of IT be divided into several smaller acquisition increments.  FAR 39.103(b).  Modular contracting of IT promotes ease of management, opportunities for subsequent increments to take advantage of technological evolutions, reduced risk, and the ability of an agency to use appropriate contracting techniques for various increments. *Id*.

125.    To avoid obsolescence, a modular contract for an IT system should be awarded within 180 days after the date on which the solicitation is issued, and cancelled if that is not achievable.  FAR 39.103(e).  Moreover, delivery should be within 18 months after the solicitation is issued.  *Id.*

### Q.    ED Bundled A Requirement For An IT Product And Student Loan Services

126.    In the case of the Enhanced Processing Solution RFP, ED requires delivery of the IT platform within three months, but ED is also procuring non-IT services (student loan servicing and defaulted student loan debt collection services) for a period of up to 10 years after the date of the contract award under the same solicitation.

127.    In the case of Optimal Processing Solution RFP, the delivery of the procured IT system exceeds the proscribed 18 month delivery period of Circular A-130 and FAR 39.103(e).

128.    The Business Process Operations RFP consolidates several distinct and independent services from default recovery services (typically performed by PCAs) to financing services (application and eligibility, origination and disbursement and in-school servicing typically performed directly by ED in conjunction with higher education institutions) to a host of other in-repayment and back-office post-school processing services (typically performed by loan servicers).

129.    Curiously, bundling the procurement of an IT system with substantive loan services performed by a servicer is exactly the opposite of what ED initially set out to do in its NextGen procurement, a short time ago.  As discussed above, in August 2018 the Government told this Court that ED was first procuring a "seamless system online" and that ED had not decided whether it would procure enhanced servicing.  Hr'g Tr. 58:14-22, August 30, 2018, excerpt at Exhibit F.

130.    In the face of this Court's injunction of ED's Cancellation Decision and only after ED unsuccessfully attempted to add defaulted student loan collection services to the original

NextGen solicitation did ED decide to issue the Three RFPs to bundle defaulted student loan collection services with a complicated IT platform requirement and loan servicing requirements.

## COUNT I

### ED HAS CAUSED A DE FACTO AND
### ILLEGAL CANCELLATION OF THE PCA SOLICITATION

131.    FMS incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Complaint.

132.    In its September 14, 2018 decision, this Court held that "ED either did not have, or did not sufficiently document, a rational basis for its decision to cancel" the Default Collection Procurement. *FMS Investment Corp.*, 139 Fed. Cl. at 223. This Court noted that the administrative record relied upon by ED was "scant," that it appeared "slipshod," and that ED's new program to procure default recovery services "still needs to be reviewed for compliance with applicable laws and regulations." *Id.* at 225 (emphasis added).  This Court also highlighted additional flaws in ED's attempted cancellation:

> Furthermore, the AR is missing critical information about the enhanced servicer program. The AR does not include any plan or timeline for implementing the program. It does not include a request for proposals, or any mention of what that request might look like. It does not refer to a source of funding. It does not even include a copy of the solicitation that ED cancelled to clear a path for the enhanced servicers.

The AR also lacked thorough estimates of current and future defaulted loan volumes and loan processing capacity. For these reasons, the Court enjoined ED from cancelling the Default Collection Procurement based on the AR that it submitted.

133.    In a subsequent Order, this Court clarified that the protest proceedings had been restored to "the posture of the process before the illegal cancellation." *Id.* at 227; *FMS Investment Corp. v. United States*, 139 Fed. Cl. 439, 440 (2018).

134.     Since September 14, 2018, ED has not made any material effort or taken any cognizable action to proceed with the PCA Solicitation, nor has ED provided any information to FMS or any other offeror competing for a contract under the PCA Solicitation.  ED has never provided a "reasoned analysis" to justify the cancellation of the PCA Solicitation.  Instead, ED's lack of action has resulted in an effective cancellation of the PCA Solicitation.  Permitting ED to continue to ignore its obligations to evaluate proposals and award contracts under the PCA Solicitation will allow ED to perfect its de facto cancellation of the PCA Solicitation and achieve a result that it had been enjoined from achieving once before—this time, however, through inaction.

135.     If ED's new justification for doing nothing and effectively cancelling the PCA Solicitation relies on the presence of defaulted student loan collection services in any one of the Three RFPs, such a justification is baseless and unreasonable due to the numerous flaws in those RFPs and the fact that no PCA is able to propose to provide all the distinct, separate yet bundled products and services required by the Three RFPs.

136.     For these reasons, FMS is entitled to the relief it seeks in this Complaint.

### COUNT II

### THE THREE RFPs EACH IMPROPERLY CONSOLIDATE DISTINCT ITEMS AND SERVICES: (1) AN IT SYSTEM; (2) STUDENT LOAN SERVICING; AND (3) STUDENT LOAN DEFAULT RECOVERY SERVICES

137.     FMS incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

138.     Under CICA and the FAR, agencies must obtain full and open competition using procedures consistent with applicable law.

139.     CICA generally requires that solicitations permit full and open competition and contain restrictive provisions only to the extent necessary to satisfy the procuring agency's needs.

*See* 41 U.S.C. § 3301; FAR Subpart 6.1; *Charles H. Tompkins Co. v. United States*, 43 Fed.Cl. 716, 720 (1999) ("A consequence of this [full and open competition] duty is the requirement that solicitation provisions which restrict competition be used only to the extent necessary to satisfy the needs of the agency or as authorized by law.") (internal quotations omitted).  Under CICA, the term "full and open competition" means that "all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement."  41 U.S.C. § 107.

140.    In this case, ED has bundled an IT acquisition with a student loan servicing acquisition which itself bundles separate services to both service loans and to collect defaulted student loan debt, requirements that ED had always procured separately.

141.    Moreover, ED's own Life of the Loan Plan, which is included in each of the Three RFPs, depicts separate and discrete requirements for engaging borrowers at 271 days past due on a loan – the period when the loan is deemed in default.

142.    ED's only justification for bundling these significant and distinct requirements, if any, is the possibility of some administrative convenience insofar as ED would only need to administer one contract.  However, the fact that the agency may find that combining the requirements is more convenient administratively, is not a legal basis to justify combining the requirements, if the combining of requirements restricts competition.

143.    For these reasons, FMS is entitled to the relief it seeks in this Complaint.

### COUNT III

**IF ALLOWED, ED'S FRAMEWORK UNDER THE THREE RFPs
WILL RESULT IN AN ILLEGAL CONTRACT TO ONLY ONE SERVICER**

144.    FMS incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Court.

145.    As discussed above, Pub. L. 115-245 requires that any contract for a new federal student loan servicing environment have multiple student loan servicers.  In requiring this, Congress intended to promote accountability and high-quality service to borrowers.  Congress's intent was to avoid the pitfalls documented in the OIG Report, which found that ED and its loan servicers lack accountability and performed poorly in the area of loan servicing.

146.    Yet, ED developed a scheme with the Three RFPs that will result in the award of one contract initially under the Enhanced Processing Solution RFP to perform the student loan servicing work.

147.    Moreover, the sole servicer under the Enhanced Processing Solution RFP will have a contract that authorizes it to perform loan servicing (alone) for up to 10 years.

148.    The Enhanced Processing Solution RFP and the follow-on RFPs that form the overall framework, therefore, plainly violate the very law that Congress passed to authorize funding for the new student loan servicing environment.

149.    For these reasons, FMS is entitled to the relief it seeks in this Complaint.

## COUNT IV

### ED'S IMPROPER CONSOLIDATION OF
### LOAN SERVICING AND DEFAULT RECOVERY
### CREATES AN UNMITIGABLE CONFLICT OF INTEREST

150.    FMS incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

151.    ED's improper consolidation of default recovery services with loan servicing has created an unmitigable conflict of interest for any winning team that would impair its objectivity. An underlying principle of the FAR's conflict of interest rules is "[p]reventing the existence of conflicting roles that might bias a contractor's judgment." *Aegis 14 Techs. Grp., Inc. v. United States*, 128 Fed. Cl. 561, 575 (2016) (quoting FAR 9.505(a)) (emphasis added). This Court also

has explained that the "primary concern" of an impaired objectivity organizational conflict of interest ("OCI") is that "a firm might not be able to render impartial advice." *Sigmatech, Inc. v. United States*, No. 18-1425C, 2018 WL 6920166, at *40 (Fed. Cl. Nov. 30, 2018) (internal quotations omitted); *see also Turner Const. Co., Inc. v. U.S.*, 94 Fed. Cl. 561, 569 (2010); C2C Innovative Solutions, Inc., B-416289, B-416289.2, July 30, 2018, 2018 CPD ¶ 269 at 8 (stating that "an impaired objectivity OCI exists where a firm's ability to render impartial advice to the government will be undermined by the firm's competing interests, such as a relationship to the product or service being evaluated").

152.     To the extent defaulted loan collection services are paid from the amount recovered under and of the Three RFPs, the consolidation of default recovery services with loan servicing under each RFP creates an unmitigable OCI.  As noted above, default recovery services and loan servicing historically have been procured separately and compensated under separate payment regimes with different funding sources. PCAs performing default recovery services are compensated through a contingency fee that is based upon the amount of money actually recovered from defaulted borrowers, and the fee is derived from the funds collected. *See* 31 U.S.C. §§ 3718(d)-(e). Loan servicers, on the other hand, are paid a set monthly fee per account through Congressional appropriations. *See*, *e.g.*, H.R. Rep. No. 115-862 at 149 (setting the appropriation amount for "Loan Servicing Activities" in fiscal year 2019 at $980,000,000); H.R. Rep. No. 115-244 at 125 (setting the appropriation amount for "Loan Servicing Activities" in fiscal year 2018 at $1,017,000,000).  Thus, the winning contractor will be subject to both payment regimes.

153.     Under such a framework, the winning contractor will have a financial incentive to divert incoming accounts and shift resources to the service that will provide higher compensation and profits, which may conflict with what is best for the borrowers or the Government. As a result,

this inherent incentive to assign accounts and shift resources to the more profitable components will impair the winning team's objectivity and will affect its ability to render impartial "services to recipients of Federal funds as part of its contractual responsibility." Ex. 1, Business Process Operations RFP at 32.

154.    Placing dual, historically separate responsibilities on the same contractor will impair that contractor's objectivity in performing either of those responsibilities.  Either the contractor's objectivity will be impaired within the loan servicing component or it will be impaired within the default collection component.  No contractor could reasonably mitigate this inevitable conflict of interest because the RFP requires the contractor to perform both, conflicting services.

155.    There is no indication that ED has reviewed or analyzed this inherent structural conflict of interest or determined any possible means of mitigating or avoiding it.

156.    For these reasons, FMS is entitled to the relief it seeks in this Complaint.

## COUNT V

## THE TERMS OF THE THREE RFPs ARE UNLAWFUL

157.    FMS incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

158.    In addition to the structural issues identified above, and the illegality relating to the single servicer, the Three RFPs contain requirements that violate federal law, indicating that ED still has not performed any legal review of the changes it is arbitrarily attempting to make to the U.S. Government's servicing and collection of federal student loans.

159.    As one example of an illegal requirement, the Life of the Loan Plan provided with the Three RFPs provides ED's vision of the "tailored customer assistance throughout the life of the loan" that offerors under the Business Process Operations are required to fulfill.  *See* Business Process Operations RFP at 9.  This Life of the Loan plan states that, for loans that have defaulted—

those that are more than 271+ "Days past due"—Business Process Operations contractors are to make "**Daily outbound calls** with recovery tone" and to make "**Intensive, frequent engagement** through other channels." *See* Ex. J (emphasis added).

160.    Under the Debt Collection Improvement Act of 1996, 31 U.S.C. 3701 et seq., Congress sought "to maximize collections of delinquent debts owed to the Government by ensuring quick action to enforce recovery of debts and the use of all appropriate collection tools" including "rely[ing] on the experience and expertise of private sector professionals to provide debt collection services to Federal agencies."  Pub. Law. 104-134 § 31001(b)(1), (b)(7).

161.    Under 31 U.S.C. § 3718, the head of executive agencies "may enter into a contract with a person for collection service to recover indebtedness owed, or to locate or recover asses of, the United States Government."  However, the Debt Collection Improvement Act requires, among other clauses, that such collection contract provide that the collecting agent "is subject to – laws and regulations of the United States Government and State governments related to debt collection practices."  This naturally would include compliance with the Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq.

162.    Under the Fair Debt Collection Practices Act, "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.  This type of harassment can include, but is not limited to, "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."  *Id.* § 1692d(5).

163.    ED's vision—expressly stated and referred to under the RFP Section "Operating Elements and Related Requirements"—is for the Business Process Operations contracts is to make

"**daily outbound calls** with recovery tone" and to make "**intensive, frequent engagement** through other channels" to *every single defaulted borrower every single day*.  In short, ED's vision is that the Business Process Operations contractors violate the Fair Debt Collection Practices Act with "intensive" customer engagement.

164.   ED's stated pricing scheme actually incentivizes this "intensive, frequent" contact that will harass borrowers.  Under the provided pricing template that all offerors *are required* to complete, offerors are to propose prices based on a *per call* basis.  *See* Business Process Operations RFP, Attachment 18, Pricing Template.  And this compensation is not tied at all to actual collection of debt from the defaulted borrowers.  In other words, under ED's provided—and required— pricing methodology, Business Process Operations contractors will be compensated solely for making calls to defaulted borrowers, thereby incentivizing even more calls to these individuals.  In short, the pricing scheme required to be completed as part of an offeror's proposal financially incentivizes harassment of defaulted borrowers.

165.   Because ED's requirements necessarily encompass violations of "laws and regulations of the United States Government and State governments related to debt collection practices," the envisioned Business Process Operations contracts are not legally authorized collection contracts under the Debt Collection Improvement Act.  Thus ED is proposing to award illegal contracts.

166.   ED might have recognized this had it actually performed a legal review of its new proposed collection regime.  But because it still has failed to even ascertain whether the "enhanced services" concept is even legal given the myriad state and federal debt collection statutes and regulations, ED has failed to promulgate a lawful RFP.

167.    Because the terms of the Three RFPs is unlawful, FMS is entitled to the relief it seeks in this Complaint.

**COUNT VI**

**THE TERMS OF THE THREE RFPs ARE
VAGUE AND INCOMPLETE, MAKING IT IMPOSSIBLE
FOR INTERESTED CONTRACTORS TO COMPETE ON A LEVEL PLAYING FIELD**

168.    FMS incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

169.    As alleged above, the Three RFPs improperly bundle numerous different procurements under the same RFPs.  While this is improper itself because it unreasonably restricts competition, it also needlessly complicates the terms of the RFPs because ED is procuring totally separate and distinct items and services—a brand new IT platform; loan servicing; and default collection services.  The result is an RFP full of nebulous jargon that fails to provide offerors sufficient information to compete on a level playing field.  In short, the Three RFPs fail to articulate what ED actually seeks to procure.

170.    This is acutely noted in the context of default collection services.  The Three RFPs all indicate that the selected offerors must provide servicing throughout the "life of the loan," but it fails to articulate what the goals are for each discrete step within that "lifecycle."  Instead, offerors are provided only high level platitudes about ED's "Goals and Vision."  *See* Enhanced Processing Solution RFP at 5; Business Process Operations RFP at 5.

171.    Under the prior PCA contracts, the goals of default collection were clear: maximize collections on defaulted student loans in compliance with applicable law.  As a result, PCAs were compensated with a commission based on the amounts recovered from borrowers.  However, under the Three RFPs, there is no indication as to what ED expects in terms of default collection services.  Instead, the RFP simply provides that ED "intends to measure its success in part on how well it

improves customer outcomes."  *Id.*  The RFPs then provide the following "examples of improved customer outcomes":

- Increased customer satisfaction scores;

- Better informed borrowing decisions;

- Decreased percentage of borrowers in delinquency or default;

- Reduction of borrowers in deferment and forbearance;

- Increased borrower repayment rate;

- Increased digital self-service by customers (instead of calls to FSA); and

- Reduction in mail correspondence and payments (in favor of digital solutions).

*Id.*

172.   The application of "outcomes" in the context of default recovery services is ambiguous.  The only outcome that even tangentially relates to default collections is "increased borrower repayment rate," yet this would seem to conflict with the first provided improved outcome—increased customer satisfaction.  Debt collection is an inherently unpopular business, frequently angering those who are being collected from.  In the event of a conflict, which "improved outcome" takes precedence?  Should offerors less vigorously pursue collection in order to maintain higher satisfaction scores, even though they are compensated only on the number of calls made to defaulted borrowers rather than the amounts collected?   The Three RFPs do not answer these, or other, questions, leaving all offerors only to guess at the emphasis and importance of default collection under this RFP.

173.   Further, likely because there is no clear definition of what success is, there is no indication in any of the RFPs how success will be measured in the default collection context and

consequently, how ED will judge proposals.  The Three RFPs do not indicate whether success will be judged on gross amounts collected, customer satisfaction scores, number of defaulted borrowers contacted every day, number of borrowers rehabilitated, number of borrowers brought current on loans or put on alternative payment plans, etc.  Offerors simply have no idea how they will be evaluated—and thus, what they need to propose—based on the Three RFPs terms.

174.    ED acknowledges the ambiguity presented, and attempts to foist the issue onto the offerors, effectively asking the offerors to tell ED what success is and how it should be measured. Both the Enhanced Processing Solution RFP and Business Process Operations RFP require offerors to submit Performance Work Statements and a Performance Measurement volume. Enhanced Processing RFP at 64, 66; Business Process Operations RFP at 58, 61.

175.    For the Performance Work Statement, offerors are instructed to tell ED how "they will achieve or exceed FSA's goals and vision."  *See*, *e.g.* Business Process Operations at 58.  As explained above, ED has not provided a goal and vision for default collection services, so offerors will simply need to make it up under the ambiguous admonition to "improve customer outcomes." Without defined goals, offerors cannot compete equally because every offeror will be supplying its own goals and their own plan to meet those goals.  This will result in completely different bases upon which to judge each offeror's proposal.

176.    Because they have to provide their own goals, offerors must also furnish ED their own metrics so ED can attempt to measure whether the contractor is living up to its own goals. For example, under the Business Process Operations RFP, offerors are instructed to submit a template proposing performance measures which would be used to track progress against NextGen vision and goals."  *Id.* at 61.  The RFP continues, "[p]roposed performance measures must identify metrics, definitions, frequency of measurement, rationale for measuring, and either minimum

standards or end state and annual targets." *Id.* Although ED states that this volume will not be evaluated, it is clear that ED is asking the offerors to develop the requirements and metrics for performance with these Solicitations—work that ED itself should have done prior to issuing them. As a result, ED clearly intends to use one offeror's proposed metrics, even though it will be making its award decisions without actually disclosing those performance measures to all competing offerors ahead of time.

177.    Without any guidance on what the default collection goals are, and how success will be measured against those goals, offerors cannot compete on a level playing field.  There is no common field of competition.  Without any information or guidance from ED, there is no way offerors can compete intelligently for these bundled default collection services.

178.    Further, this ad hoc approach is unreasonable in light of ED's stated goal to make multiple awards under the Business Process Operations RFP.  If each offeror is (a) setting its own goals, (b) defining its own performance measurements, and (c) being evaluated only on the merits of its own goals, there is no way to reasonably evaluate proposals or administer the resulting contracts.  Either every contractor will be following its own goals—thus, likely leading to different approaches and outcomes—or ED will pick one offeror's goals and metrics and apply those to the other offerors (either at the evaluation or performance stage), despite those offerors not addressing or offering to provide such services.  This is unreasonable because it will lead either to disparate treatment of the offerors during the evaluation or to contracts with requirements the offerors did not propose to meet.  This is unreasonable, arbitrary and capricious.

179.    Finally, further complicating issues, the Enhanced Processing Solution RFP requires offerors to provide business process operations until ED makes awards under the Business Process Operations RFP.  However, the Enhanced Processing RFP expressly states that the

Enhanced Processing "Solution will be held to the same performance measures, as well as the common pricing, as the separate Business Process Operations vendors (***to be defined at award of the Business Process Operation vendors)***." Enhanced Processing Solution RFP at 12 (emphasis added).

180.    In other words, the Enhanced Processing Solution contractor is required to perform services under performance measures and a pricing structure that will not be defined when the Enhanced Processing Solution contractor must begin providing those services. Further, there is no indication as to what happens if no Business Process Operation contracts are ever awarded. It is, in short, a procurement that expressly includes services with no rules, no measurable goals, and no defined pricing. Without this information, the Enhanced Processing Solution RFP is so vague and ambiguous that offerors cannot compete with others on the same terms.

181.    In short, this is a black box procurement. Offerors are instructed only to "improve customer outcomes," told to provide a proposal, and, based on some undisclosed rubric, ED will select the one it likes best. Such an ad hoc solicitation and evaluation scheme is not reasonable and does not permit offerors to compete on a level playing field.

182.    Because the terms of the Three RFPs is unlawful, FMS is entitled to the relief it seeks in this Complaint.

**COUNT VII**

**INJUNCTIVE RELIEF**

183.    FMS incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

184.    Under the decisions of this Court, four factors are considered when assessing whether a plaintiff if entitled to injunctive relief: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds relief;

(3) whether the balance of hardships to the respective parties favors granting injunctive relief; and (4) whether the public interest is served in granting injunctive relief. *FirstLine Transp. Sec., Inc. v. United States*, 119 Fed. Cl. 116, 127 (2014) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). Success on the merits is the most important factor, but no single factor is dispositive. *Id.* (citing *Blue & Gold Fleet L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993)).

185.    As shown above, FMS has established that it will succeed on the merits of its protests.

186.    FMS will be irreparably harmed if ED is permitted to proceed with the Three RFPs or cancels the PCA Solicitation.

187.    In considering the balance of hardships, the decisions of this Court weigh the irreparable harm the plaintiff will suffer absent an injunction against the harm such an injunction may inflict on the defendant. *See WHR Group, Inc. v. United States*, 115 Fed Cl. 386, 404 (2014). Here, the balance of hardship clearly tips in favor of FMS, which will suffer demonstrable irreparable harm as it will be shut out from competing for a default collection services contract that it has vigorously pursued for the past several years simply because ED arbitrarily decided to bundle default collection services with services that FMS does not provide. The Government will suffer limited hardship in being required to actually follow the law in procuring its new IT platform, and follow on contracts for loan servicing and default collection services.

188.    The public interest is best served through the grant of the injunction, as it will ensure that ED will not be permitted to limit competition through improper bundling, and instead must award the contract through a fair competition and in accordance with procurement law.

## **PRAYER FOR RELIEF**

FMS respectfully requests that this Court render judgment in its favor and issue an order as follows:

(A)     That ED improperly has attempted to cancel the PCA Solicitation by failing to perform any reasonable action or make awards under that solicitation;

(B)     That ED is required to extend FMS's existing contract with a new Award Term Extension contract to remedy ED's continuing unreasonable and dilatory conduct in awarding new contracts under the PCA Solicitation;

(C)     That ED is compelled to take reasonable and meaningful action to make awards under the PCA Solicitation for default collection services;

(D)     That the terms of the Three RFPs are arbitrary, capricious and contrary to law and that ED is enjoined from awarding any contracts under any of the Three RFPs;

(E)     That none of the Three RFPs can serve as a basis upon which to cancel the PCA Solicitation; and

(F)     Awarding FMS any such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

/s/ David R. Johnson
David R. Johnson
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
Email: drjohnson@velaw.com

*Lead Attorney for Plaintiff*
*FMS Investment Corp.*

*Of counsel:*
Tyler E. Robinson
Ryan D. Stalnaker
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
Email: trobinson@velaw.com

*Attorneys for Plaintiff*
*FMS Investment Corp.*

Date:  February 27, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 27, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system.  A true and correct copy was also served by e-mail to:

U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20530
E-mail: nationalcourts.bidprotest@usdoj.gov

/s/ David R. Johnson
David R. Johnson