## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### BID PROTEST

_____
                          )

**FMS INVESTMENT CORP.,** *et al.*,   )       <span style="color:red">**REDACTED VERSION**</span>
                          )

       **Plaintiffs,**         )
                          )       **No. 19-308C**

   **v.**                    )       **(Consolidated)**
                          )

**UNITED STATES,**         )       **(Judge Thomas C. Wheeler)**
                          )

       **Defendant.**      )       ███████████
_____ )

---

### DEFENDANT'S OPPOSITION TO
### PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

---

                         JOSEPH H. HUNT
                         Assistant Attorney General

                         ROBERT E. KIRSCHMAN, JR.
                         Director

                         PATRICIA M. McCARTHY
                         Assistant Director

OF COUNSEL:

TRACEY SASSER                   ALEXIS J. ECHOLS
Assistant General Counsel        Trial Attorney
United States Department of Education  United States Department of Justice
Division of Business and Administrative Law  Civil Division
                               Commercial Litigation Branch
JANA MOSES                     P.O. Box 480
DAVID R. PEHLKE              Ben Franklin Station
Trial Attorneys                 Washington, DC  20044
United States Department of Justice   Telephone: (202) 616-0463
Civil Division                  Facsimile: (202) 307-2503
Commercial Litigation Branch       E-mail: alexis.j.echols@usdoj.gov

April 10, 2019                   Attorneys for Defendant

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................2

ARGUMENT .......................................................................................................6

    I.    Legal Standards ...................................................................................6

    II.    This Court Lacks Jurisdiction To Enjoin A Contract From Expiring According To Its Own Unambiguous Terms ............................................................7

    III.    Plaintiffs' Motions To Enjoin All Or Parts Of The Ongoing Next Gen Procurement Are Either Unsupported Or Unnecessary .........................................11

    IV.    Plaintiffs Fail To Demonstrate A Likelihood Of Success On The Merits ............12

        A.    FSA Has Provided A Rational Basis For Its Decision To Cancel The Defaulted Loan Collection Procurement ...........................................12

            1.    FSA Has Provided A Rational Basis For Its Conclusion That The Current PCA Contractors Retain Sufficient Capacity To Absorb Newly Defaulted Accounts Until Next Gen Is In Place ...............14

            2.    FSA Has Provided A Rational Basis For Its Conclusion That The Current PCA Contractors Perform At Least As Well As Large PCAs .................................................................................17

        B.    Next Gen Is A Rational Alternative To Traditional Loan Servicing .........19

            1.    Next Gen Resolves A Fundamental Impediment To Optimal Borrower Engagement ..................................................................19

            2.    The Next Gen Solicitation Provides Sufficient Detail Regarding The Work To Be Performed ........................................................26

            3.    Next Gen's BPO Solicitation Does Not Present CICA Or FAR Violations ...................................................................................31

            4.    Next Gen's BPO Solicitation Does Not Violate Consumer Protection Laws ...........................................................................34

    V.    Plaintiffs Fail To Establish Irreparable Harm .......................................37

    VI.    The Balance Of Harms Favors Allowing The Recall To Continue And Expiration Of The ATE Contracts By Their Express Terms .................................................38

VII.     The Public Interest Favors Allowing The Recall To Proceed ...............................40

CONCLUSION.........................................................................................................................40

# TABLE OF AUTHORITIES

## <u>Cases</u>

*2B Brokers, et al.*,
    B-298651, Nov. 27, 2006, 2006 CPD ¶ 178 ............................................................................ 32

*Akalwadi v. Risk Mgmt Alternatives, Inc.*,
    336 F. Supp. 2d 492 (D. Md. 2004) ...................................................................................... 37

*Akima Intra-Data, LLC v. United States*,
    120 Fed. Cl. 25 (2015) ................................................................................................... 11, 18

*Alder Terrace, Inc. v. United States*,
    161 F.3d 1372 (Fed. Cir. 1998) ............................................................................................. 7

*Am. Gen. Leasing, Inc. v. United States*,
    587 F.2d 54 (Ct. Cl. 1978) ........................................................................................... passim

*Better Service*,
    B-26751, Jan. 18, 1996, 96-1 CPD ¶ 90 .............................................................................. 32

*Che Consulting, Inc. v. United States*,
    125 Fed. Cl. 234 (2016) ....................................................................................................... 31

*Cincom Systems, Inc. v. United States*,
    37 Fed. Cl. 266 (1997) ........................................................................................................... 6

*Coastal Corp. v. United States*,
    6 Cl. Ct. 337 (1984) ............................................................................................................. 12

*Continental Service Group, Inc. v. United States*,
    722 F. App'x 986 (Fed. Cir. 2018) ............................................................................... passim

*EDP Enters., Inc.*,
    B-284533.6, May 19, 2003, 2003 CPD ¶ 93 ........................................................................ 32

*FMC Corporation v. United States*,
    3 F.3d 424 (Fed. Cir. 1993) ................................................................................................... 6

*FMS Investment Corp. v. United States*,
    139 Fed. Cl. 439 (2018) ......................................................................................................... 4

*FMS Investment Corp. v. United States*,
    136 Fed. Cl. 439 (2018) ............................................................................................. 4, 9, 10

*FMS Investment Corp. v. United States*,
    139 Fed. Cl. 221 (2018) ............................................................................ 4

*Geo-Med, LLC v. United States*,
    126 Fed. Cl. 440 (2016) ...................................................................... 32, 36

*Int'l Mgmt. Servs., Inc. v. United States*,
    80 Fed. Cl. 1 (2008) ........................................................................... 7, 25

*Lermer Germany GmbH v. Lermer Corp.*,
    94 F.3d 1575 (Fed. Cir. 1996)................................................................... 6

*Madison Servs., Inc. v. United States*,
    92 Fed. Cl. 120 (2010) ............................................................................ 12

*Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*,
    24 F.3d 1368 (Fed. Cir. 1994).................................................................. 8

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................ 6

*Nat'l Customer Eng'g*,
    B-251135, Mar. 11, 1993, 93-1 CPD ¶ 225 ........................................... 32

*National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004)................................................................ 6

*Navient Solutions, LLC v. United States*,
    141 Fed. Cl. 181 (2018) ............................................................... 5, 11, 38

*Nichia Corp. v. Everlight Arms, Inc.*,
    855 F.3d 1328 (Fed. Cir. 2017)................................................................ 6

*Novell, Inc. v. United States*,
    46 Fed. Cl. 601 (2000) ............................................................................ 7

*Pemco Aeroplex, Inc. v. United States*,
    B-280397, Sep. 25, 1998, 98-2 CPD ¶ 79.............................................. 32

*Reynolds v. Army and Air Force Exch. Serv.*,
    846 F.2d 746 (Fed. Cir. 1988).................................................................. 7

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (2018)............................................................................... 6

*SOS Int'l LLC v. United States,*
  127 Fed. Cl. 576 (2016) ................................................................................ 6

*Tyler Construction Group,*
  570 F.3d 1329 (Fed. Cir. 2009) .................................................................... 31

*Vantex Serv. Corp.*,
  B-290415, Aug. 8, 2002, 2002 CPD ¶ 31 ................................................... 32

*Yakus v. United States,*
  321 U.S. 414 (1940) ...................................................................................... 7

*Winter v. Natural Resources Defense Council,*
  555 U.S. 7 (2008) .......................................................................................... 6

*Yakus v. United States,*
  321 U.S. 414 (1940) ...................................................................................... 7

## Statutes

10 U.S.C. § 2469a .............................................................................................. 32

15 U.S.C. § 631(j)(3) ......................................................................................... 31

15 U.S.C. § 1692d(5) ............................................................................. 19, 36, 37

15 U.S.C. § 1692e .............................................................................................. 34

28 U.S.C. § 1491(b) ............................................................................................. 8

41 U.S.C. § 107 .................................................................................................. 19

Pub. L. No. 107-314, Div. A, tit. III, § 333(a) (2002), 116 Stat. 2514 ........... 32

Pub. L. No. 105-135, §§ 411-417, 111 Stat. 2617-2620 ................................. 31

Pub. L. No. 111-240, §§ 1311-1314, 124 Stat. 2536-40 .................................. 31

## Regulations

13 C.F.R. § 125.2(d)(1) ...................................................................................... 31

48 C.F.R. § 2.101 ............................................................................................... 31

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | | |
|---|---|---|
| _____ | ) | |
| **FMS INVESTMENT CORP.**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 19-308C** |
| **v.** | ) | **(Consolidated)** |
| | ) | |
| **UNITED STATES,** | ) | **(Judge Thomas C. Wheeler)** |
| | ) | |
| **Defendant.** | ) | **FILED UNDER SEAL** |
| | ) | |
| _____ | ) | |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

Defendant, the United States, respectfully submits this opposition to the motions for preliminary injunction filed by plaintiffs FMS Investment Corp. (FMS), Continental Service Group, Inc. (ConServe), Account Control Technology, Inc. (ACT), GC Services Limited Partnership (GC Services), and Windham Professionals, Inc. (Windham) (collectively, plaintiffs). Plaintiffs are all private collection agencies (PCAs) that provide services to the Department of Education, Office of Federal Student Aid (FSA), each under its own task order. In their motions, plaintiffs ask the Court to enjoin FSA from recalling the last accounts remaining under their award-term extension (ATE) task orders set to expire on April 21, 2019, and to award them extended performance under those task orders. In addition, some of the plaintiffs request that the Court enjoin FSA from soliciting proposals, accepting proposals, or making contract awards under the Next Generation Financial Services Environment (Next Gen) procurement, Solicitation No. 910031-19-R-0008 for Business Process Operations (BPO Solicitation).

As a threshold matter, this Court does not possess jurisdiction to enjoin a contract from expiring according to its own unambiguous terms. And, plaintiffs' motions to enjoin that recall should be denied because, among other reasons, unlike in February 2018, there are no material facts here to distinguish the requested injunction from the injunction that Progressive Financial Services (Progressive) secured in 2017, and the Court of Appeals for the Federal Circuit later invalidated in *Continental Service Group, Inc. v. United States*, 722 F. App'x 986, 992 (Fed. Cir. 2018) (*ConServe*). What's more, plaintiffs provide no basis for enjoining FSA from proceeding with those aspects of the Next Gen procurement that have no connection at all to traditional default loan collection activities.

Alternatively, the Court should deny plaintiffs' motions for preliminary injunctive relief because plaintiffs have failed to demonstrate that they are likely to succeed on the merits or that they will incur irreparable harm if a preliminary injunction is not granted.

Focused only upon the potential to make multi-million-dollar profits, the PCA plaintiffs aim to dictate how FSA should meet its mission needs by demanding that the agency retain a fragmented system that the agency has found no longer benefits student loan borrowers. Plaintiffs ask the Court to require FSA to permanently subsidize their niche industry by granting them an entitlement to incumbency in perpetuity. The problem with plaintiffs' application is that this continued foothold and nonexistent entitlement comes at the unjustifiable expense of student borrowers.

## **BACKGROUND**

In 2009, plaintiffs executed task orders for debt collection services with FSA. *See, e.g.*, Exhibit 1 (FMS Task Order and ATE). Section 4.1 of the task order Statement of Work states:

> The Contractor has twelve (12) months, beginning with the date of each
> transfer, to convert defaulted accounts to payment-in-full, satisfactory

2

> repayment schedules, administrative resolution, or to prepare the account for AWG or litigation.  [FSA] shall recall accounts not converted to one of these six categories within the twelve (12) month period.

*Id.*  No other provision in the task orders limits FSA's contractual right to recall accounts that have not been successfully resolved within 12 months of assignment to a PCA.  Section B.3.3 of the task orders grants FSA the discretion to transfer accounts to new contracting vehicles that a PCA enters into during its "in-repayment retention period."  *Id.*  ("If the Contractor enters into a subsequent Task Order or contract with [FSA] . . . [FSA] *may* transfer any or all accounts from this Task Order to the new Task Order or contract." (emphasis added)).  The in-repayment retention period is a two-year period following the end of the contract's "ordering period" (including any exercised options).  *Id.* (section B.3.1).  There are no provisions in the task orders that guarantee a PCA the right to a transfer of accounts not in repayment to a new contracting vehicle.  There are no provisions in the task orders that guarantee a PCA an extension of the expiration date of the contract until a new award is made.

Plaintiffs executed two-year award term extension task orders that became effective on April 22, 2015.  *Id.*  The 2015 task orders explicitly and fully incorporate all terms from the 2009 task orders.  *Id.*  Plaintiffs received their final assignment of new accounts in December 2016.  *Id.* at ¶ 23.  In December 2017, pursuant to section 4.1, all accounts that were not in-repayment or otherwise successfully resolved were subject to recall.

When December 2017 began, however, FSA could not execute any account recalls pursuant to section 4.1, because this Court had enjoined it from doing so.  *See ConServe*, 722 F. App'x at 992.  The Government appealed that injunction.  *Id.* at 993.  On December 8, 2017, the Federal Circuit stayed the portion of the injunction that had blocked FSA from recalling accounts.  *Id.*  At that time, FSA completed the recall of accounts from entities whose task orders

3

had expired while the temporary restraining orders and injunctions issued during the prior protests were in effect.

On January 11, 2018, FSA announced awards to two PCAs, Windham Professionals, Inc. (Windham) and Performant Recovery, Inc. (Performant).  On January 12, 2018, the Federal Circuit reversed portions of the challenged injunction, including the portion that prevented the recall of accounts.  *Id.* at 996.  On January 18, 2018, ED informed the affected PCAs that it would be announcing a recall plan, which it did announce on February 5, 2018.  Multiple PCAs, including the plaintiffs in this action, protested the award decision and sought a preliminary injunction of any recall.  *See FMS Investment Corp. v. United States*, Fed. Cl. No. 18-204.  This Court granted the motion for an injunction of any recall of accounts from the plaintiffs.  *FMS Investment Corp. v. United States*, 136 Fed. Cl. 439 (2018).

On May 7, 2018, FSA announced that it had cancelled the defaulted loan collection procurement as well as the contract awards to Windham and Performant.  A number of PCA plaintiffs protested the cancellation and the plaintiffs again sought an injunction of any recall of accounts.  *See FMS Investment Corp. v. United States*, Fed. Cl. No. 18-204.  The Court denied that motion for an injunction from the bench on June 26, 2018, and a renewed motion on July 19, 2018, also from the bench.  Fed. Cl. No. 18-862, ECF Nos. 24, 77.  FSA then proceeded with the orderly periodic recall of accounts from plaintiffs, with the final recall scheduled to occur on or before the expiration of the task orders on April 21, 2019.  On September 14, 2018, this Court held that FSA's cancellation of the defaulted loan procurement lacked a rational basis.  *FMS Investment Corp. v. United States*, 139 Fed. Cl. 221 (2018).  The Court enjoined FSA from proceeding with cancellation of the defaulted loan procurement on the basis of the administrative

record before the Court in that protest. *FMS Investment Corp. v. United States*, 139 Fed. Cl. 439 (2018) (order granting motion for clarification regarding scope of injunction).

In October 2018, certain PCAs filed bid protest actions in this Court challenging FSA's plan to procure loan collection work through phase II of its Next Gen solicitation. *See Navient Solutions, LLC v. United States*, Fed. Cl. No. 18-1679. The plaintiffs claimed that they did not know that work they might be interested in pursuing would be procured through phase II, and as a result, they did not participate in phase I (only successful phase I bidders could proceed to phase II). *See, e.g.*, Navient Compl. at ¶¶ 8-10, (Fed. Cl. No. 18-1679). The agency agreed to take corrective action and to resolicit phase II services as a standalone procurement. Fed. Cl. 18-1679, ECF No. 66. FSA released the revised solicitations on January 15, 2019. *See* https://www.fbo.gov/index?s=opportunity&mode=form&id=4996c0ae407d2037afa0ee6ebe8aed 76&tab=core&_cview=1. Plaintiff FMS also once again sought an injunction of the continued recall of its accounts. *See Navient Solutions, LLC v. United States*, 141 Fed. Cl. 181 (2018). The Court denied that motion, finding that FMS was asking for relief, an extension of its ATE, which the Court could not award even if FMS were to succeed in the protest. *Id.* at 184.

On February 27, 2019, the lead case in this protest was filed. *FMS Investment Corp. v. United States*, Fed. Cl. No. 19-308. On March 6, 2019, FSA cancelled the defaulted loan collection procurement. AR Tab 1, at 1. In March 2019, responding to a request from the PCA plaintiffs, FSA issued amendments to two of the three Next Gen solicitations, which removed transitional collection work from the Enhanced Processing Solution (EPS) solicitation and the Optimal Processing Solution (OPS) solicitation. *See* https://www.fbo.gov/index?s= opportunity&mode=form&id=4996c0ae407d2037afa0ee6ebe8aed76&tab=core&_cview=1. The

procurement of collection work is now isolated in the BPO solicitation.  On March 29, 2019, plaintiffs filed their motions for preliminary injunction.

## ARGUMENT

### I.    Legal Standards

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)); *see also National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004).  Because the grant of an injunction is "extraordinary relief," the Court applies "exacting standards." *Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1577 (Fed. Cir. 1996). To obtain an injunction prior to trial, the movant must establish the following: 1) the movant is likely to succeed on the merits at trial, 2) the movant will suffer irreparable harm if preliminary relief is not granted, 3) the balance of the hardships tips in the movant's favor, and 4) a preliminary injunction will not be contrary to the public interest. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  The Supreme Court has made clear that each factor of this test must be satisfied in order to obtain injunctive relief. *Winter*, 555 U.S. at 20, 21; *see also Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (2018) ("Since *Winter*, we have held that the party seeking the injunction must be able to 'demonstrate that it has at least a fair chance of success on the merits for a preliminary injunction to be appropriate.'") (other citations omitted); *Nichia Corp. v. Everlight Arms, Inc.*, 855 F.3d 1328, 1341 (Fed. Cir. 2017) (observing that a movant must demonstrate all four factors on the "merits of its particular case").

The party seeking preliminary injunctive relief bears the extremely heavy burden of demonstrating its entitlement to this extraordinary relief by clear and convincing evidence. *See SOS Int'l LLC v. United States*, 127 Fed. Cl. 576, 587 (2016); *Cincom Sys., Inc. v. United States*,

37 Fed. Cl. 266, 268 (1997).  A party faces an even greater burden when it seeks injunctive relief, which, if granted, would interfere with Governmental operations.  *Yakus v. United States*, 321 U.S. 414, 440 (1940).

## II.    This Court Lacks Jurisdiction To Enjoin A Contract From Expiring According To Its Own Unambiguous Terms

The PCA plaintiffs ask the Court to enjoin FSA from recalling the last accounts remaining under the task orders set to expire on April 21, 2019.  Although the PCA plaintiffs frame the request as a matter of preventing a recall, as they have repeatedly requested from the Court over the course of these several proceedings, they are in fact asking the Court to suspend the unambiguous termination date of their existing contracts with FSA.  This request is made more remarkable by the fact that the contracts that plaintiffs ask the Court to reform through its injunctive powers are not even before the Court as the subject of the current bid protests. Plaintiffs' theory, simply, is that the "status quo" requires the Court to guarantee each of them an indefinite contract with FSA, uninterrupted, until they receive a new contract from FSA.  This ignores the fact that the "status quo" for these task orders is an expiration date of April 21, 2019, after which plaintiffs will no longer have any contractual right to hold any accounts.  This also ignores the fact that this Court's bid protest jurisdiction does not include the power to override a contract expiration date, particularly where those contracts were awarded under procurements that are wholly unrelated to those at issue here.

Subject-matter jurisdiction is a threshold issue.  *Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 4 (2008).  When a defendant challenges this Court's jurisdiction, the plaintiff bears the burden of proving that subject-matter jurisdiction exists.  *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citation omitted).  Plaintiff must make its showing by a preponderance of the evidence.  *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748

(Fed. Cir. 1988).  "Ambiguities with regard to jurisdiction should be 'resolved against the assumption of jurisdiction.'"  *Novell, Inc. v. United States*, 46 Fed. Cl. 601, 606 (2000) (quoting *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1373 (Fed. Cir. 1994)).

To come within this Court's bid-protest jurisdiction, plaintiffs must object to a solicitation "for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of the statue or regulation in connection with a procurement or a proposed procurement." *See* 28 U.S.C. § 1491(b).  Here, plaintiffs attempt to connect the expiring task orders to the current protests by arguing that if they were to receive a new contract FSA *could* elect to allow them to retain whatever accounts they hold at that time under the terms of hypothetical *new* contracts, meaning, not via an extension of the expiring task orders.  Both the Federal Circuit and this Court have indicated that an expiring task order does not furnish a sufficient nexus to the protest of a new procurement to fall within the Court's jurisdiction over that protest.

In *ConServe*, the Federal Circuit invalidated this Court's injunction of FSA's contractual right to assign or recall accounts as a part of its management of existing contracts.  *ConServe*, 722 F. App'x at 993.  In that case, Progressive advanced an argument similar to the argument plaintiffs advance here.  As is the case here, Progressive's task order expired while the protest was pending (in April 2017).  *Id.* at 991. Progressive sought an injunction barring FSA from recalling its accounts upon the expiration of its task order on the grounds that "had it received a new contract while its 2009 contract was still active, accounts from its old contract would have been retained as part of its new contract."  This Court had enjoined FSA from recalling accounts upon the expiration of Progressive's task order.  *Id.* at 994 ("It also barred [FSA] from recalling accounts from the 2009 contracts after those contracts expired on April 21, 2017.").  The Federal

Circuit reversed, holding that Progressive's theory of harm was too speculative to support the injunction.

> This entire theory of harm is speculative . . . .   Any claimed unfairness relies on the notion that, had Progressive received a new contract while the old one was still active, it would have been entitled to retain its old accounts.  That is not the case.  The disputed 2016 contracts, like the 2009 contracts before them, use permissive language that allows Education to transfer accounts to a new contract, but does not entitle PCAs to retain accounts when their old contracts expire.

*Id.* at 996.

The task orders issued to PCAs do not entitle PCAs to retain accounts beyond the expiration of the contract, regardless of whether they have new contracts.  *See* Ex. 1 (FMS Task Order).  Any theory to the contrary is necessarily speculative and cannot sustain a request to enjoin the end of a contract by its terms.  That fact is fatal to plaintiffs' request for an injunction, because the sole basis for the alleged nexus between the requested relief and the solicitation under protest is the notion that holding accounts at the time of award will entitle them to retain those accounts.  But, as the Federal Circuit has already explained, this perverts the concept of preservation of the "status quo."  The status quo here never included the retention of contracts across unique and separate procurements.  Instead, the status quo must be measured according to the state of play when the litigation began.  *Id.* at 994-95.  Regarding the recalling of accounts from expiring contracts, the status quo in this case is the same as it was in *ConServe*:  "Education was free to assign accounts to any of its valid contracts and to recall accounts from contractors with expired contracts."  *Id.* at 994.

This Court previously enjoined FSA from recalling any accounts from the PCA plaintiffs. *FMS Investment Corp. v. United States*, 136 Fed. Cl. 439 (2018).  At that time (February 2018), the PCA plaintiffs were about to enter the final year of their task orders.  *See, e.g.*, Ex. 1.  FSA

The Court found the facts at that time distinguishable from the facts the Federal Circuit emphasized in *ConServe*.  Specifically, the Court noted that the recall plan had been scheduled to occur soon after the award decision under protest.  *FMS Investment Corp.* 136 Fed. Cl. at 444. The Court also noted that not all of the PCAs with ATEs were being treated the same under the plan, because Windham Professionals, an awardee in the decision under protest, had not yet been scheduled for recall.  *Id.*  The Court additionally stated that "[t]his recall is unlike ED's previous recalls, which were linked to either full contract expiration (as in the case of Progressive) or other non-procurement related events."  *Id.*

After FSA's first cancellation of the default collection procurement (May 2018), it planned to proceed with a staged recall of accounts from PCAs with contracts set to expire in April 2019.  The PCA plaintiffs once again sought an injunction to block the planned recall.  *See*, *e.g., FMS Investment Corp. v. United States*, Fed. Cl. No. 18-862, ECF No. 14.  The Court denied that request and the recall has proceeded since then, with FSA recalling a percentage of remaining non-paying accounts each month.  *See id.* at ECF No. 24.  On April 21, 2019, the task orders will expire and FSA will recall whatever accounts, paying or non-paying, that remain with each of the plaintiffs.  The PCA plaintiffs' motion to enjoin that recall should be denied because, unlike in February 2018, there are no material facts here to distinguish the requested injunction from the injunction that Progressive secured in 2017, and that the Federal Circuit vacated in *ConServe*.  As was the case with Progressive, the task orders are set to expire.  Thus, plaintiffs are not asking the Court to merely delay a recall plan while the task orders are still in effect, that is, while the PCAs at issue still hold a contractual basis to service accounts.  Instead, they are asking the Court to extend indefinitely, by judicial action, the explicit expiration date of the task orders at issue until a day that may never come – the day the PCA plaintiffs secure new contracts

to service accounts.  There would be no consideration for such a gratuitous extension, and, as the Federal Circuit held in *ConServe*, that theory is too speculative.  The motions for an injunction of the recall of accounts upon the expiration of the task order should be denied.

In December 2018, in the first generation of Next Gen protests, FMS sought precisely what the PCA plaintiffs seek again here – a Court-ordered extension of their task orders.  *See Navient*, 141 Fed. Cl. at 181-84.  The Court noted that "'[n]o federal contractor has a right to maintain its incumbency in perpetuity, and the potential loss of the benefits of incumbency does not' amount to irreparable harm."  *Id.* at 184 (quoting *Akima Intra-Data, LLC v. United States*, 120 Fed. Cl. 25, 28 (2015)).  The Court explained why FMS's invocation of the "status quo" was also unavailing, because the status quo at the time of litigation included the expiration of the task orders.  *Id.* Therefore, the requested relief sought to go beyond the status quo.  *Id.*  Here, just as in *Navient*, plaintiffs are seeking relief that the Court cannot grant – an extension of their task orders.  *See id.  ConServe* and this Court's prior rulings all demonstrate why this request should be denied.

## III.    Plaintiffs' Motions To Enjoin All Or Parts Of The Ongoing Next Gen Procurement Are Either Unsupported Or Unnecessary

Some of the plaintiffs include in their preliminary injunction motions requests that the Court enjoin FSA from proceeding with any awards under the Next Gen procurement, *see, e.g.*, ACT Motion (ECF No. 57), or from proceeding with the BPO procurement (the Next Gen procurement that aligns most closely with traditional collection activities), *see, e.g.*, ConServe Motion (ECF No. 61).  Plaintiffs provide no basis for enjoining FSA from proceeding with those aspects of the Next Gen procurement that have no connection at all to traditional default loan collection activities.  Specifically, no basis is provided to enjoin FSA from proceeding with Solicitation No. 910031-19-R-0005 (EPS) and Solicitation No. 910031-19-R-0007 (OPS).

11

Proposals for the BPO procurement will not be due until after awards are made for the EPS solicitation.  *See* https://www.fbo.gov/index.php?s=opportunity& mode=form&id=7f10f2a542aab133f25763657d7b43ae&tab=core&_cview=1 at Amendment 002.  The submission date for EPS proposals was April 2, 2019.  There will not be an award made in that procurement for many weeks, at least.  And after that, some lead time will be provided for BPO offerors to complete and submit their proposals.  An injunction of the BPO procurement serves no purpose, as this protest should conclude prior to the due date for proposals.  FSA also commits to informing the Court and the parties if a proposal due date for the BPO procurement is imminent and this protest is still pending before this Court.

## IV.   Plaintiffs Fail To Demonstrate A Likelihood Of Success On The Merits

### A.   FSA Has Provided A Rational Basis For Its Decision To Cancel The Defaulted Loan Collection Procurement

The Court's jurisdiction extends to an agency's decision to cancel a solicitation.  *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 125–26 (2010).  In the context of a negotiated procurement, where a contracting officer has discretion to cancel a solicitation, the agency's cancellation decision requires only "'a coherent and reasonable explanation of its exercise of discretion.'"  *Id.* at 126.  As such, an agency's cancellation decision in the course of a negotiated procurement is "reduc[ed] to nothing more than rational-basis review."  *Id.*; *see Coastal Corp. v. United States*, 6 Cl. Ct. 337, 344 (1984) ("[T]he absence of regulations strongly suggests that there are no constraints on the cancellation of a negotiated procurement, other than the normal ones applicable to all agency action: that it be free from arbitrariness, capriciousness and abuse of discretion."); *Am. Gen. Leasing, Inc. v. United States*, 587 F.2d 54, 58–59 (Ct. Cl. 1978) (finding a cancellation of a solicitation to be reasonable and stating that "[i]t is settled law that no assurance exists that [any] contractor will receive an award and that the Government retains, in

its discretion, the right to reject all bids without liability, even after there have been extensive

negotiations with a bidder").

The PCA plaintiffs argue that the decision to cancel the default collection procurement

lacks a rational basis for two primary reasons:  1) the current and future flow of defaulted loans

will overwhelm the existing contract holders before Next Gen brings new collection capacity on

line; and 2) the Next Gen procurement does not present a rational alternative to traditional

default collection work.  Plaintiffs have not demonstrated a likelihood of success on the merits in

their challenge to the cancellation because the Cancellation Decision and supporting materials

articulate a "coherent and reasonable explanation" of the discretionary decision to cancel the

default collection procurement.  Specifically, the decision to cancel rests on:  1) an analysis of

historical, current, and future projections of defaults; 2) an assessment of current PCA capacity

based on PCA reports, FSA reviews of PCA performance, and periodic discussions with current

PCAs about performance; and 3) the assessment that loans will increasingly migrate to the Next

Gen system, which will provide life of the loan servicing, including services for defaulted loans.

More generally, and perhaps most importantly, the PCAs largely ignore the fact that Next

Gen is not, despite their efforts to characterize it to the contrary, just a rebundling of traditional

loan servicing.  The manner of defaulted loan collection work that the current PCAs are

performing, and that plaintiffs ask this Court to codify as the only way that the agency may

lawfully collect defaulted loans now and forever, is not an element of the Next Gen procurement.

Instead, Next Gen seeks to change FSA's entire approach to loan servicing and collection,

aiming for a more seamless environment that focuses on the borrower, rather than just the status

of the loan.  As discussed in greater detail below in section IV.B., this approach involves new

alignments of various servicers and services, automating certain processes that used to be

performed by servicers (including defaulted loan collectors), and a new task-based pricing

scheme.  FSA is moving to a new model that does not include traditional defaulted loan

servicing.  Continuing with a vestigial procurement that has no place within this new model

would be an irrational waste of everyone's time and resources.

> **1.       FSA Has Provided A Rational Basis For Its Conclusion That The Current PCA Contractors Retain Sufficient Capacity To Absorb Newly Defaulted Accounts Until Next Gen Is In Place**

Plaintiffs manipulate and cherry-pick the data in the Administrative Record to attack

FSA's conclusion that current contract-holders retain sufficient capacity to meet FSA's needs for

defaulted loan collection until Next Gen is projected to come on line in fiscal year 2020.  If one

cuts back down to the historical data and the trends, then it is clear that FSA has articulated a

rational basis for concluding that it does not need a stop-gap defaulted loan procurement for the

little time remaining until Next Gen is operational.

The data point one must begin with is how many new defaulted loan accounts are

projected to need PCA assignment over the coming period.  To make its estimate, FSA first

determined what percentage of new defaulted loans actually pass through to a PCA – 80 percent.

AR Tab 1, at 8.  FSA then looked to the trend lines established in the historical data.  *Id.*  Over

the prior three calendar years (2016, 2017, and 2018), total the number of defaulted loans has

increased by 629,158 accounts, 516,805 accounts, and 362,927 accounts, respectively.  AR Tab

21, at 2788.  Thus, the trend line is decreasing.  Of those new accounts, approximately 80 percent

will pass through to a PCA.  AR Tab 1, at 8.  The two most recent years (2017 and 2018) exhibit

year-over-year growth of 7.7 percent and five percent.  *Id.*; AR Tab 1, at 9.  Despite the

decreasing trend line, FSA elected to use an annual increase of eight percent to estimate the

forward-going growth in defaulted loans.  AR9.  FSA then applied that growth rate to the coming

years, electing to extrapolate out to 2024 as opposed to merely the projected launch date of Next

14

Gen.  AR Tab 20, at 2782.  The eight percent growth rate generates approximately 3.3 million

new accounts between now and the end of 2024 (from 5.9 million accounts to 9.2 accounts).  *Id.*

Plaintiffs do not offer a serious challenge to this estimate.  That is not surprising, because

the estimate is based on the hard historical data.  And, that data actually shows a *decreasing*

trend line.  But, because it is impossible to account for unforeseen events, such as an economic

downturn, that could affect the immediate term number of new defaults, FSA elected to apply a

very conservative growth rate of eight percent.  AR Tab 1, at 9.  Given this reasonable estimate

of growth over the coming five years, the next point of the analysis is whether PCA capacity

over that period will be able to manage the 3.3 million new accounts estimated to require

assignment to a PCA during that period.

As noted in the Decision Memorandum, FSA "continually assess[es] the capacity and

capability of the Small Business PCAs to effectively collect on current and future volumes of

defaulted student loan borrower accounts. "  *Id.*  The PCA plaintiffs attack FSA's assessment of

PCA capacity because it includes requests for capacity information from the PCAs.  *See, e.g.*,

ECF No. 56 at 27-28 (FMS Memorandum).  This is a strange attack.  Why should FSA not ask

its contractors what their capacity looks like in the near term?  As FSA notes in the Decision

Memorandum, the PCAs "assess and plan for capacity through a staff-to-portfolio ratio

calculation."  AR Tab 1, at 9.  The ability to handle new accounts depends on whether staff is

available to handle the new accounts – it is rational for FSA to rely in part on a PCA's estimates

based on its staffing.  Indeed, no one but the individual PCA would be able to generate

information derived from its own current and future planned staffing levels.  This leads to

another strange point of attack for the PCA plaintiffs – that FSA's reliance on current PCA

capacity is irrational because it also takes into account the ability of PCAs to add staff or to

subcontract.  *See, e.g.*, ECF No. 61 at 24-25 (ConServe Memorandum); AR Tab 1, at 9-10 (Dec.

Mem. 9-10).  They do not explain why FSA must base its capacity estimate on a fixed staffing

level of all available PCAs and assume no subcontracting should a need arise.  In reality, the

firms have the ability to hire staff and to subcontract, and there is no reason for FSA to exclude

reality from its consideration.  Indeed, one would presume that a large PCA, like a small

business PCA, would also hire more staff or secure subcontractors if it felt it was needed and

appropriate.

FSA did not, however, rely exclusively on PCA estimates of capacity.  As noted above,

FSA continually assesses capacity.  As a part of that process it reviews the performance metrics

of PCAs.  AR Ex. 23.  These metrics include staffing levels, collection results, borrower

complaints, quality assurance scores, and FSA call monitoring results.  AR Ex. 23, 24.  FSA also

meets with each PCA on a monthly basis to review these metrics and discuss any issues.  AR Ex.

24.  Based on this data and review, FSA determined that significant excess capacity exists over

the 2019 to 2024 period – the estimated 2024 capacity is approximately 17 million accounts, and

the estimated need is approximately 9 million accounts.  That is a surplus capacity of 8 million

accounts.

FMS argues that FSA's reliance on this estimate is necessarily irrational because FSA is

withholding new account assignments from one current PCA with performance issues over the

most recent review period.  ECF No. 56 at 28-30; *see also* AR Tab 25, at 12347.  That PCA

estimated to FSA that it could handle 500,000 additional accounts a month.  *Id.*  FMS reasons

that this gives the lie to FSA's entire estimate.  That, of course, is false.  First, one could

eliminate this PCA's projected workload *entirely* from the estimate and there would still remain

excess capacity of 4 million accounts.  AR Ex. 21.  Second, FMS ignores the portion of the

record that discusses the measures the PCA is taking to address the issues identified (including a new script), and the fact that the most recently measured call audit score for that PCA, following the introduction of the new script, had already improved to 98.7 percent, which is higher than the average PCA score.  AR Tab 25, at 12347.  Third, FMS's decision to highlight this one example only supports the reasonableness of FSA's approach.  It demonstrates that FSA relies on more than PCA estimates to assess capacity.  It analyzes performance data and it meets regularly with PCAs to discuss those results.  FMS's argument inadvertently showcases the benefits of this process, because it establishes:  1) FSA will cut off a PCA that is underperforming; 2) FSA meets with all PCAs to discuss any problems they are having; and 3) the steps a PCA takes to address the problems FSA identifies can correct those problems.  Thus, FMS's example does not show that a PCA's estimates should be eliminated from consideration.  It instead shows that the facts support the logical conclusion that a PCA working on issues through a cooperative process with FSA could correct those issues and regain eligibility for new accounts.

### 2.     FSA Has Provided A Rational Basis For Its Conclusion That The Current PCA Contractors Perform At Least As Well As Large PCAs

The PCA plaintiffs' final broad area of attack on FSA's short-term reliance on the current PCAs is performance.  According to plaintiffs, their recovery rates are so superior to the small business PCAs that it is necessarily irrational to rely only on the small business PCAs for a short period of time.  The first problem with this argument is that there is no baseline.  That is, there is no minimum recovery rate that one could say marks the line of what is reasonable or unreasonable.  The fact is that defaulted loan accounts are, by definition, the accounts least likely to result in payment.  As a result, the historical recovery rates are never particularly high.

FMS brings this point to the fore when it takes the net cash collection figures in the Decision Memorandum, which included all recoveries, and then recalculates them without

recoveries from the Treasury Offset Program (TOP).  That exercise reduces the amount of cash

recoveries to, on average, $500 million dollars a year, with recovery rates of .5 percent,

.42 percent, and .32 percent.  FMS fails to account for the fact that in each of those years

accounts were being handled by both small business PCAs and large scale PCAs.  FMS also does

not account for any distortive effects that could arise from the fact that the large PCA account

volume was increasingly limited to "in-repayment accounts" (students already paying) through

their ATEs, as opposed to the increasing volume of more difficult brand new defaults that were

being assigned to small business PCAs.

More significantly, however, are the errors that beset FMS's attempt to recast the

numbers.  FMS subtracts the wrong amount for its 2018 calculation of cash collections.  *See*

FMS Memorandum at 32, n. 15.  FMS subtracts $2.84 billion from the net collections figure for

that year, instead of the actual TOP figure of $2.48 billion.  *Id.*; *see also* Ex. 2 at ¶ 5 (M. Bryant

Decl.).  When the correct number is subtracted the net collection rate is .58 percent, not .32

percent.  Ex. 2 at ¶ 5.  That figure represents a higher net collection rate during the period of

small business PCA dominance, just as was discussed in the Decision Memorandum.  AR Tab 1,

at 11.  FMS's attempt to recast the numbers also fails because the general recovery figures that

FSA discussed in the Decision Memorandum also includes recoveries due neither to TOP or to

PCA efforts.  Ex. 2 at ¶¶ 6-8.  The tables attached to the Bryant declaration isolate only PCA

recoveries (cash (Table 1) and total recoveries (Table 2)).  *Id.*  This calculation reveals trends

similar to those in the Decision Memorandum – net cash collection rates have risen since the

small businesses have taken a larger role, and the steep decline in overall collection rates

experienced under large PCA domination has slowed dramatically since the small businesses

started taking more and more work (the overall recovery rate fell from 13 percent to eight

percent from the end of 2014 to the end of 2016, and since then it has declined only an additional

percentage point to 7 percent).  *Id.*  In both cases it most also be emphasized that the total

portfolio size has gone up during this period, which raises the denominator for any recovery rate

calculation.  *Id.*  Any way the data is presented it demonstrates the same thing:  FSA had a

rational basis to conclude that the current PCAs perform similarly to the large PCAs.  *See* AR

Tab 1, at 11.

### B. <u>Next Gen Is A Rational Alternative To Traditional Loan Servicing</u>

Next Gen implements a comprehensive strategy for student borrower account servicing.

Rather than relying upon an antiquated system that treats various stages of account servicing as

stand-alone activities requiring independent service solutions, Next Gen brings FSA's approach

into alignment with the student loan industry's current best practices.  This paradigm shift

resolves fundamental challenges that have long since plagued student account servicing.  It does

not, as alleged by plaintiffs, result in the improper bundling of services in violation of the

Competition in Contract Act (CICA), 41 U.S.C. §§ 107, 3301, nor does it run afoul of the Fair

Debt Collection Practices Act  (FDCPA), 15 U.S.C. § 1692d(5).  The Court should not,

therefore, sustain plaintiffs' protest of the Next Gen solicitation.

### 1. <u>Next Gen Resolves A Fundamental Impediment To Optimal Borrower Engagement</u>

Plaintiffs' arguments rely upon a gross mischaracterization of Next Gen, under which

FSA provides a rational alternative to traditional loan servicing and seeks to ensure that public

resources are used efficiently and effectively to promote borrower success and protect taxpayers'

investments.  To achieve FSA's vision, Next Gen transforms how the agency provides account

servicing to more than 42 million student loan borrowers for the full Federal student aid

lifecycle—from increasing awareness about the availability of Federal grant and loan assistance through loan application and, eventually, payoff or loan forgiveness.  AR Tab 17, at 2528.

FSA is not merely "bundling" loan services, such that the servicing of defaulted accounts are just tacked on to the servicing of accounts in good standing.  Rather, Next Gen employs a unified technological approach and new loan servicing methods to reduce borrower confusion about who is servicing their loan(s) and to improve loan repayment outcomes, including by implementing a single data management and servicing platform so that borrower information and account history is centrally housed and available to use during each borrower interaction (regardless of intervening changes in account status or time in between interactions).  *See* AR Tab 31, at 14286; AR Tab 32, at 14383; AR Tab 53, at 20012.  This means that borrowers can log into one website, a single portal hosted by ED, to get information about their Federal student loan(s), make payments, apply for benefits, and manage their account — regardless of loan status, eliminating the need for borrowers to know the name of an individual servicer.  This also means that multiple vendors will utilize the same portal to access borrower account information and to provide seamless access to borrower information and consistent loan servicing communication to borrowers.

FSA intends to minimize handoffs between servicers and foster continuity of messaging by requiring that all BPO vendors respond to ALL calls received, not just those concerning either accounts in good standing or in default status, a shift towards long-standing commercial practice. AR Tab 32, at 14387-388.  Most importantly, FSA's new approach aims to reduce the number of borrowers who enter delinquency and, ultimately, default.  *See, e.g.*, AR Tab 53, at 20015 (BPO Statement of Work ("Solutions shall provide tailored customer assistance throughout the life of the loan to make it unlikely borrowers would ever become a defaulted borrower, to the maximum

extent practicable.")).  FSA envisions Next Gen as an effective model to improve borrower

outcomes, which necessarily requires abandoning the old model under which FSA had been

operating.

Addressing FSA's historical approach to loan servicing, ED Secretary Betsy DeVos

stated in the agency's Fiscal Year 2017 Financial Report:

> Access to federal student aid has allowed millions of students to
> further their education at an institution of higher learning, yet the
> customer experience for acquiring and paying off these loans has
> been subpar at best.  Complex applications, confusing notifications
> and multiple platforms have all led to a lack of clarity and created
> an onerous process for borrowers.  This reality has prompted us to
> begin transforming Federal Student Aid's service delivery by
> implementing the Next Generation Processing and Servicing
> Environment.  Our goal is to put in place a servicing system that will
> greatly enhance the user experience while protecting taxpayer
> dollars.

AR Tab 17, at 2519.  *See also* Tab 19, at 2753-54; Hearing on student loan servicing oversight

before the House Appropriations Subcommittee on Labor, Health and Human Services and

Education (statement by Chairwoman Rosa Delauro (D-Conn.)) (Although "[i]t will surprise no

one that there is a student debt crisis," it is less well known that "[w]e are facing a student loan

servicing crisis.").

When developing Next Gen, FSA gleaned information from a cross-section of sources.

In February 2015, FSA and the Bureau of the Fiscal Service at the Department of the Treasury

(Treasury) launched a two-year pilot program focused on the servicing of defaulted student

loans.  AR Tab 16, at 2503 (July 2016 Report on Initial Observations from the Fiscal-Federal

Student Aid Pilot for Servicing Defaulted Student Loan Debt).  During the pilot program, FSA

referred a sample of loans from its outstanding defaulted Federal student loan portfolio (usually

collected by PCAs) to Treasury for collection.  The pilot program revealed that student

borrowers have faced a number of challenges, including confusion concerning which company is servicing the loan.  *Id.* at 2508.

For example, once a loan defaults, FSA transfers the loan(s) to a default management and collection system (DMCS) and attempts to bring the loan back to good standing.  If unsuccessful, collections activities are transferred to one of a group of contracted PCAs that pursue default resolution.  AR Tab 53, at 20010.  Then, if a borrower successfully rehabilitates their loan(s), FSA transfers the loan(s) from the PCA to a new company, a student loan servicer.  *Id.* at 2511; *see also* AR Tab 31, at 14272 (example of the student lending lifecycle).  This transfer may occur anytime within a week to 60 days, during which borrowers must continue to make monthly payments to the PCA and are not informed about which servicer will have their loan until the transfer is complete.  AR Tab 16, at 2511.  This lack of clear information during the transition period can cause confusion about where payments should be sent and which servicer to contact with problems or other questions.  *Id.*  When the transfer is complete, and the student borrower is notified of the new servicer, the borrower must establish new login credentials and familiarize themselves with a new digital platform or new loan servicing statements, notices, etc.  Because some borrowers may default more than once, the PCA-to-loan servicer cycle can be particularly confusing, present frustrating communication challenges, and interfere with the borrower's ability to repay their loan(s).  Understandably disorienting for the borrowers, this process often results in rehabilitated borrowers being handed off multiple times between DMCS, PCAs, and loan servicers, increasing the risk of a new default.



AR Tab 31, at 14272.

Many of the borrowers engaged by Treasury during the pilot program "were often unaware of, or confused about, their repayment options, which likely contributes to a reluctance to engage with collectors and to the low contact and resolution rates."  AR Tab 16, at 2507. Many borrowers seemed unaware that they could utilize loan rehabilitation to make affordable monthly payments based on their income.  *Id.*  Treasury and FSA proposed that borrowers in default "may be more willing to take action on their defaulted loan if they have clear information about the available options."  *Id.*

Moreover, the pilot program revealed that many borrowers were confused when contacted by a party other than Education regarding their student loans.  *Id.*  And, "opportunities

for borrower confusion [were] elevated because, during the stages of delinquency, several different third-party contractors contact the borrower under their own brand names and borrowers may have previously had contact with different contractors such as loan servicers, FSA's defaulted loan servicer, and other PCAs." *Id.* at 2508.

To resolve that confusion, FSA and Treasury proposed "[e]mploying consistent Education branding on communications for defaulted borrowers [to] reduce confusion and increase confidence in the legitimacy of the collection activity." *Id.* at 2507.

In addition, FSA's new approach also responds to mounting criticism from Congress and oversight organizations, including the Consumer Financial Protection Bureau (CFPB). *See* AR Tab 33a, at 14389 (hyperlinks to letters, reports, and press accounts). In a January 2018 letter, numerous members of the United States Senate directed ED to "either justify continuing to send taxpayer dollars to these debt collectors or end the use of separately-contracted default servicing." AR Tab 33a., at 14389, Letter from the United States Senate, 115th Cong., Sen. Richard Blumenthal *et al.*, to Sec. DeVos and Dr. A. Wayne Johnson, Chief Operating Officer, Federal Student Aid (Jan. 23, 2018) (Senate Letter). The senators underscored that Federal loan repayment concerns "the long-term success of borrowers, not simply maximizing funds repaid." Senate Letter at 2. Explaining that "borrowers are required to pay for their own costs of collections," making it "almost always profitable" for a PCA to continue collections on even small debts, the senators declared that the "very goals of private collection agencies are not aligned with the goals of federal student aid programs." *Id.* They further noted that "current Departmental process provides perverse financial incentives for private collection agencies to aggressively pursue borrowers that no reasonable private sector company would pursue without a government guarantee." *Id.* They further indicated that, in some cases, ED pays PCAs "nearly

$40 in compensation for $1 in cash recovered from certain borrowers through loan

rehabilitation," thereby "rewarding these agencies for behaviors that work in opposition to the

prospect of student borrower success." *Id.* at 1, 2 (citing Consumer Financial Protection Bureau.

"Annual report of the CFPB Student Loan Ombudsman." Oct. 17, 2016.

https://files.consumerfinance.gov/f/documents/102016_cfpb_Transmittal_DFA_1035_Student_L

oan_Ombudsman_Report.pdf).

The 2016 annual report of the Consumer Financial Protection Bureau (CFPB) student

loan ombudsman (CFPB Report) analyzes complaints submitted by student loan borrowers from

Sep. 1, 2015, through Aug. 31, 2016, and "highlights debt collection and servicing problems

plaguing the federal programs designed to help defaulted student loan borrowers" rehabilitate

their loans.  CFPB, Research and Reports, https://www.consumerfinance.gov/data-

research/research-reports/2016-annual-report-cfpb-student-loan-ombudsman/ (last visited April

9, 2019).  The report calls attention to the different compensation schemes for loan servicers and

PCAs.  CFPB Report at 31.  Specifically, unlike a "loan servicer, which is generally paid a fixed

monthly fee irrespective of a borrower's repayment arrangement, many collectors, including the

Department of Education's private collection agencies (PCAs), receive supplemental incentive-

based compensation driven by short-term borrower outcomes." *Id.*  According to the report,

"recent analyses produced by a broad range of stakeholders – including government agencies,

student loan market analysts, credit rating agencies, and guaranty agencies – highlight poor

repayment outcomes over the medium and long term." *Id.*

FSA also requested market research to educate itself on potential methods of modernizing

and simplifying the loan servicing platform to create a more unified borrower engagement

experience under a single FSA brand.  AR Tab 12, at 677-83 (Next Gen Request for Information

(RFI) identifying Next Gen design principles, "key customer journeys," and procurement and transition principles). FSA received 61 responses to its request for information, from which it developed seven principles for customer experience and seven principles for technical and operational architecture, which "informed[ed] prospective requirements and evaluation criteria for the Next Generation Environment." AR Tab 13 (RFI responses); AR Tab 31, at 14293-303 (summary of Next Gen market research). From an operational perspective, the market research identified a number of alternative loan servicing and highlighted the shortcomings of the existing loan servicing and debt collection environment, including limited and inconsistent borrower engagement. AR Tab 32, at 14385-386.

Focused only upon the potential to make multi-million-dollar profits, the PCA plaintiffs aim to dictate how FSA should meet its mission needs by demanding that the agency retain a fragmented system that the agency has recognized no longer benefits student loan borrowers.

## 2. The Next Gen Solicitation Provides Sufficient Detail Regarding The Work To Be Performed

Plaintiff ACT argues that the Next Gen solicitation "clearly anticipate[s] the provision of default debt collection services at a high level, but provide[s] no definitive requirements or goals for offerors to understand what should be proposed or how their proposals will be evaluated." ACT Br. at 32. ACT's argument is belied by the record and ignores Next Gen preventative and rehabilitative approach to defaulted loans. As previously discussed, the new approach under Next Gen aims to reduce the number of borrowers who enter delinquency and, ultimately, default. *See, e.g.*, AR Tab 53, at 20015 (BPO Statement of Work ("Solutions shall provide tailored customer assistance throughout the life of the loan to make it unlikely borrowers would ever become a defaulted borrower, to the maximum extent practicable.")). Therefore, because FSA is moving to a new model that eliminates fragmented loan servicing and does not include

traditional defaulted loan servicing, it makes sense that the Next Gen solicitation does not include terms traditionally found in a PCA solicitation as plaintiffs would prefer.

And, the solicitation provides sufficient detail concerning the work to be performed by the BPO vendors.  Generally, with the new technological infrastructure in place (as outlined in the OPS solicitation), BPO vendors will "provid[e] the personnel necessary to respond to inbound customer (*e.g.*, student applicants, borrowers, etc.) and partner (*e.g.*, schools) inquiries, execute separately-developed outbound outreach campaigns, and perform back-office processing activities that cannot be automated."  AR Tab 53, at 20012 (BPO Solicitation at 6).

Specific examples of the solicitation's requirements include activities concerning "back-office processing."  *Id*. at 200016 (BPO Solicitation at 10).  BPO vendors are expected to provide "review, validation, and processing associated with enrollment, applications, and requests for various grant and loan programs and loan status adjustments such as:"

- All repayment plan processing (e.g., income-driven repayment) across all loan types and statuses, including application and eligibility review, income checks and payment calculations, and annual recertification activities;

- Processing associated with military service members, including requests for deferment and forbearance, Servicemembers Civil Relief Act benefits, and hostile pay benefits;

- School and customer enrollment processing, including manual entry of hard-copy applications;

- Deferment and forbearance application processing;

- Loan consolidation origination applications and request processing;

- Specialty programs (e.g., TEACH, TPD, PSLF, Perkins, Pell) and Title IV reinstatement processing;

- Specialty claims processing (e.g., discharge and forgiveness, based on bankruptcy, school closure, borrower defense, false certification, unpaid refund, disaster discharge, among others); and,

- Provide technical help desk support to Schools for Origination and Disbursement Processing for the Direct Loans, Title IV Grant Programs (ie Pell, TEACH etc), including but not limited to, origination and disbursement data submittal issues, Program funding issues, Program funds to disbursement reconciliations, Subsidized Usage Limit (SULA) escalations, Grant overpayment processing, and borrower credit appeals.

- Conduct error and dispute resolution investigation and processing, including:

  o Direct and indirect credit bureau disputes filed by customers or initiated by the credit bureaus, within timelines established by law;

  o Account maintenance, including manual correction of errors identified through data integrity scans and in response to FSA change requests; and,

Concerning performance management, BPO vendors are expected to include performance management mechanisms that would enable improved and ongoing achievement of metrics.  A set of defined metrics will be measured to determine volume allocations to BPO vendors and may also be established as service level agreements.  "Example contact center support metrics may include, but are not limited to, customer satisfaction (*e.g.*, post-interaction survey rating), accuracy/quality (*e.g.*, quality review score, first call resolution, customer callbacks, and complaint rate), and availability/responsiveness (*e.g.*, average speed to answer/response, abandonment rate, agent available time, maximum/longest hold time)."  *Id.* (BPO Solicitation at 7).  "Examples of back-office processing may include, but are not limited to, task turnaround time, task completion rate, and task error rate."  *Id.*

As another example, BPO vendors are also responsible for "maintaining robust cybersecurity protections and features to protect customer data."  FSA informs the offerors that BPO vendors

> must comply with the conditions in the attached "02 – Security Technical Requirements" at contract award.  The vendor's solution shall meet Federal Information Security Management Act (FISMA), NIST standards, and all cybersecurity regulations and mandates, including Presidential Executive Order (EO) 13800 - Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure, to Identify, Protect, Detect, Respond, and Recover. The vendor's solution shall ensure that all development and management tools, including project management, version control, code repositories, DevSecOps management, monitoring, and cybersecurity, etc., are identified in the technical solution and in the system security boundary.
>
> Solution shall be hosted in a secure environment. If any aspect of the solution is hosted in the cloud, the solution must be FedRAMP-approved or FedRAMP-"ready", or must be hosted in a private cloud, per the definition in the attached "02-Security Technical Requirements."  The solution may not be hosted in a shared, multi-tenant environment.

AR Tab 53, at 20015 (BPO Solicitation at 9).

In addition, FSA's new model involves a new task-based pricing scheme.  The BPO solicitation includes a pricing template for all offerors to complete and to provide the agency with additional information in ultimately determining a fair and reasonable price.  AR Tab 53a, at 20281-20286 (BPO Solicitation, Attachment 18, Pricing Template and Instructions).  Because the BPO vendors are expected to respond to all calls received, not just calls the plaintiffs are categorizing as non-default and default, the categories of pricing are largely categorized by "contact center support" and "back-office processing."  *Id.*   Price proposals for contact center support services must include calls for servicing, calls for application and eligibility, calls for technical support, chat sessions for servicing, chat sessions for origination and disbursement, and inbound mail responses, etc.  And, price proposals for back-office processing must include calls

for servicing, calls for application and eligibility, and calls for originations and disbursements,

etc. *Id.*

Moreover, FSA has responded to the potential offerors' questions concerning pricing and

made it clear that FSA does not intend to use the same pricing structure that is in place under the

PCA contracts.

| Question 52 | Collection activity is typically priced as a percentage of dollars collected, which is a combination of calls, emails and other contact types along with back office processing functions. How should the offeror price current PCA activities in the template provided? | Offeror shall complete Attachment 20 - Pricing Template in accordance with the provided instructions. FSA does not intend to continue use of the current PCA pricing structure. |
|---|---|---|
| Question 57 | If the scope of work for this solicitation is to include debt collection services currently performed by PCAs, will FSA allow an offeror to perform both loan servicing, as described in this solicitation, and debt collection services? If yes, then how does FSA intend to avoid the conflict of interest between loan servicing and debt collection servicers? | The Enhanced Processing Solution shall handle pre- and post-default activities. The pricing structure, and other terms of the contract, for the various services to be provided under the contract will be designed to avoid any potential that a contractor performing loan servicing would benefit by having loans go into default. This would mitigate the appearance of a conflict of interest. |
| Question 64 | If it is the intent of FSA to have enhanced servicer provider (or business process operations (BPO) provider) handle these defaulted loans - can FSA provide in C.4 Expected Volumes - the number of calls per loan in a post 360 day default status that currently the PCAs are providing this service as those volumes do not appear to be in the 'expected volumes' table.  Additionally, will these default collections be priced on a contingency basis, as is currently the pricing methodology or a different pricing methodology as it appears there is no mechanism in the current pricing table for these types of inbound and outbound communications. | Per Attachment 04 - Additional Current State Technical Constraints, there are approximately 1,400,000 annual live operator-assisted calls for defaulted accounts. FSA does not intend to continue use of the current default collections pricing structure. Vendors are free to propose alternate pricing methodology per the pricing template instructions. |

EPS Solicitation, Amendment 5, Attachment 25 - Responses to Questions, available at https://www.fbo.gov/index?s=opportunity&mode=form&id=4996c0ae407d2037afa0ee6ebe8aed76&tab=core&_cview=1.

### 3.      Next Gen's BPO Solicitation Does Not Present CICA Or FAR Violations

Plaintiffs improperly cast the BPO solicitation as an improper "bundling" of services resulting in violations of the Competition In Contracting Act (CICA) and the Federal Acquisition Regulation (FAR).  When viewed fairly, the BPO solicitation is not merely a consolidation or "bundling" of distinct services, as alleged.  Rather, the BPO solicitation implements a fundamentally different approach to account servicing where the operative platform utilizes a holistic approach to the student borrower experience.

Plaintiffs give short shrift to the statutory and regulatory context for their "bundling" argument.  They conflate CICA's general commandment that agencies "obtain full and open competition through the use of competitive procedures" when conducting procurements and the FAR's anti-bundling provisions.  Plaintiffs do not grapple with the fact that the purpose of anti-bundling laws is to protect small business concerns.  The anti-bundling provision of the Small Business Act, 15 U.S.C. § 631(j)(3), requires agencies to "avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors."  *See also* 13 C.F.R. 125.2(d)(1)(A)-(D); 48 C.F.R. § 2.101.  With this prohibition, Congress aimed to preserve opportunities for small businesses to receive federal prime contracts, unless the bundling is "necessary and justified."  Pub. L. No. 105-135, §§ 411-417, 111 Stat. 2617-2620 (1997); Pub. L. No. 111-240, § 1311-1314, 124 Stat. 2536-40.

Cases from this Court and the Federal Circuit have held that in order to constitute bundling, a solicitation must meet two criteria: (1) it must "consolidate two or more requirements

that were previously procured under separate smaller contracts into a single contract," and (2) the solicitation must "likely be unsuitable for award to a small business." *Che Consulting, Inc. v. United* States, 125 Fed. Cl. 234, 245 (2016); *Tyler Constr. Group*, 570 F.3d 1329, 1333 (Fed. Cir. 2009). In order to prevail on their anti-bundling challenge, plaintiffs must demonstrate that small business cannot perform the alleged bundled requirements. Indeed, as the Court recognized in *Geo-Med, LLC v. United States*, 126 Fed. Cl. 440, 449 (2016), neither the Court nor GAO will even consider bundling allegations where such a showing is not made.

Here, plaintiffs make no such showing—presumably because, although they attempt to leverage bundling prohibitions meant to protect small business concerns, they are not small businesses that would be in a position to address the issue. In support of their anti-bundling arguments, plaintiffs cite a litany of decisions by the Government Accountability Office (GAO). *See* ACT Br. at 28-29; ConServe Br. at 13-15; GC Services Br. at 19-20. All of the cases cited discuss alleged improper bundling of contract requirements in the context of unduly limiting participation of small businesses. *See 2B Brokers, et al.*, B-298651, Nov. 27, 2006, 2006 CPD ¶ 178; *EDP Enters., Inc.*, B-284533.6, May 19, 2003, 2003 CPD ¶ 93; *Vantex Serv. Corp.*, B-290415, Aug. 8, 2002, 2002 CPD ¶ 131; *Nat'l Customer Eng'g*, B-251135, Mar. 11, 1993, 93-1 CPD ¶ 225. *But see Pemco Aeroplex, Inc. v. United States*, B-280397, Sep. 25, 1998, 98-2 CPD ¶ 79 (construing the Air Force's bundling of services pursuant to express authorization under the National Authorization Act for Fiscal year 1998, 10 U.S.C. § 2469a, repeated by Pub. L. No. 107-314, Div. A, tit. III, § 333(a) (2002), 116 Stat. 2514); *Better Serv.*, B-265751, Jan. 18, 1996, 96-1 CPD ¶ 90 (GAO analysis is unclear as to whether small business concerns are issue, but relies upon *National Customer Eng'g*, which clearly addresses bundling in the small business context). Plaintiffs do not point to any case law sustaining an anti-bundling challenge out of

concern that it would restrict competition for firms that are other than small.  Accordingly, their challenge must fail.

Even if the Court were to entertain the PCA plaintiffs' anti-bundling challenge, as discussed above, plaintiffs have mischaracterized the Next Gen BPO solicitation as a bundling of disparate services currently provided for under separate contracts.  Plaintiffs urge the Court to take a reductive view of Next Gen's scheme.  FSA does not combine pre-existing requirements under PCA procurements and loan servicing procurements in the BPO solicitation.  FSA, instead, sets forth an entirely new scheme.  In order to resolve the pervasive issues appurtenant to the treatment of account servicing as readily divisible, discrete activities, FSA has determined that student borrowers are best served by discontinuing its ineffectual approach and reconstructing the entire servicing environment.  With this, FSA has redefined its requirements to provide an integrated, seamless solution.  Thus, accusations of bundling are misplaced.

Furthermore, plaintiffs have failed to establish how such bundling unduly restricts competition.  The BPO solicitation provides that contractor personnel will respond to inquiries from student applicants and borrowers and partner schools, execute outreach campaigns, and perform back-office processing activities that cannot be automated.  AR Tab 10, at 449.  Plaintiffs have not demonstrated that their businesses are incapable of meeting these requirements or that these requirements result in an impermissible restriction to competition.  To the contrary, it does not appear that the skills required to provide traditional default collection services are of such a different nature that plaintiffs could not leverage their experience and meet the requirements of this new servicing environment.

### 4.      Next Gen's BPO Solicitation Does Not Violate Consumer Protection Laws

Plaintiffs' assertion that Next Gen's BPO solicitation violates applicable consumer protection laws relies upon an exaggerated reading of the administrative record.  Reasonably construed, the record fails to support plaintiffs' narrow view of the world, where the BPO solicitation necessarily violates consumer protection laws.

Plaintiffs cite two examples of how the BPO solicitation would violate the FDCPA.  The first example concerns FSA's "Single-Brand" approach.  *See* FMS Br. at 22-24; ConServe Br. at 30-33; ACT Br. at 30-31.  One of the biggest criticisms of the patchwork nature of FSA's existing approach is that student borrowers are subject to handling by several different companies of the course of their account services.  With each exchange, student borrowers are vulnerable to unnecessary confusion and potential delays in issue resolution.  To address this issue directly, FSA has resolved to provide student borrowers with a "consistent experience solely under the FSA brand," regardless of account status or servicing vendor.

Plaintiffs infer from the intent to proceed under a "single brand," that a contractor engaged in any activities akin to collection activities will necessarily be in violation of FDCPA's prohibition on debt collectors from "[t]he use of any business, company, or organization other than the true name of the debt collector's business, company, or organization."  *See* 15 U.S.C. § 1692e.  The BPO Solicitation does not, however, include any script compelling this conclusion. If any inference is to be drawn from the general pursuit of a "single brand" approach, in light of the law and the assumption of regularity, it is that FSA would require contractors to identify themselves in compliance with the FDCPA requirement *and* the "single brand" approach.  A solution as simple as representing that the identified contractor is contacting the student borrower on behalf of FSA and ensuring that all communications included the FSA brand associated with

all servicing the student borrower's account.  To do so would not be a misrepresentation of the type prohibited by the FDCPA.

Plaintiffs' second example concerns FSA's reference to "High Touch Servicing Plan."  In 2018, FSA studied best-in-class collection practices and compared those industry best practices to FSA's current default collections recovery scheme.  AR Tab 15.  FSA concluded that there was limited and inconsistent customer engagement under its current strategy.  AR Tab 15, at 2499.  FSA further concluded that its current services, including plaintiffs, engaged delinquent customers with low intensity as compared to commonplace commercial practice.  AR Tab 15, at 2500.

Current services lag behind the industry with respect to consumer engagement in several respects:



*Id.*

FSA concluded that it intended to move delinquency management closer to commercial practice under Next Gen.  AR Tab 15, at 2502.

The record clearly reflects FSA's intentions in this regarding, diagramming issues within the current state of servicing and their associated solutions, informed by industry best practices:

| From the current state of … | To an ideal state of… |
|---|---|
| **Limited and inconsistent outreach** to delinquent customers | **Frequent standardized, appropriately toned, and multi-channel contact attempts** |
| **Primarily generalist customer service talent** servicing delinquent accounts without specialized expertise | **Dedicated and specialized talent with extensive specialist training and expertise** in servicing delinquent customers |
| **Low right party contact rate**: customer contact info rarely updated; skip tracing started after 720 DPD | **Proactive contact info update requests** and **skip tracing starting at 0 DPD** |
| **No account differentiation by default risk level** or other attributes | **Use of analytics to segment accounts** based on default risk level |
| **Limited push to customer of education**, about repayment options or other content | **Personalized educational content pushed to customers** (e.g., on repayment options) |
| **Negotiated compensation structures** that do not clearly connect to the right activities | **Incentive-based compensation** – one-time (cure) and residency fees (account servicing) |
| **Limited performance tracking and reporting** on customer contact frequency and type or performance broadly | **Standardized tracking and reporting** built into collections middleware |
| **Limited vendor performance reporting** on public-facing websites | **More robust** publicly published vendor performance reporting |

*Id.*

From this, and general references to a "High Touch Servicing Plan" in the PCA solicitation cancellation decision memorandum, plaintiffs argue that the BPO solicitation will require contractors to contact up to three times a day in alleged violation of the FDCPA, 15 U.S.C. § 1692d(5) and Massachusetts state law, 940 MASS. CODE REGS. 7.04; 29 MASS. CODE REGS. 18.14(1)(d).  The FDCPA precludes debt collectors from "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."  15 U.S.C. § 1692d(5).  Applicable Massachusetts state law prohibits debt collectors from initiating a communication with a debtor

in excess of two times in each seven-day period to the student borrower's home, or more than twice for each debt in any 30-day period at some place other than the student borrower's home. 940 MASS. CODE REGS. 7.04.

The BPO solicitation does not provide for contractors' initiation of a specific number of calls for the collection of debts, whether to the student borrower's home or otherwise. The record simply reflects a general commitment by FSA to increase student borrower engagement beyond the current contractors average call rate, the highest of which is 1.3 calls daily and the lowest of which is less than 1.5 calls monthly. AR Tab 15, at 2500-2502. The record also reflects that the agency included experts from CFPB in its review of collection performance and consideration of alternative approaches to improve borrower outcomes and drive improved cost effectiveness. AR 4. CFPB has yet to raise an objection to FSA's implementation of Next Gen.

As ConServe concedes, the FDCPA "does not impose a specific, bright-line limit on how often a debt collector can call a debtor to attempt to collect a debt." ConServe Br. at 31. *See also* 15 U.S.C. § 1692d(5). Rather, a finding that the collection activities have violated this FDCPA provision require a case-by-case inquiry. *See, e.g. Akalwadi v. Risk Mgmt Alternatives, Inc.*, 336 F. Supp. 2d 492, 506 (D. Md. 2004). As it relates to Massachusetts consumer protection laws, plaintiffs fail to cite to any actual requirement of the BPO solicitation in violation thereof. The agency's stated commitment to optimize student borrower engagement, particularly in light of its consultation with CFPB, is insufficient to support plaintiffs' sweeping conclusion that the BPO solicitation violates applicable consumer protection laws.

## V.     Plaintiffs Fail To Establish Irreparable Harm

This Court already rejected the theory of irreparable harm upon which plaintiffs largely rely in support of their motions to enjoin the recall: the loss of revenue from those contracts. *See*

*Navient*, 141 Fed. Cl. at 184-85; *see also, e.g.*, FMS Memorandum at 35; GC Services

Memorandum at 35.  The Court stated in its December 18, 2018 Opinion:  "FMS will not suffer

irreparable harm because of [FSA's] failures to issue a new solicitation for PCA services, or

because [FSA] likely failed to comply with various competition requirements in executing the

Next Gen procurement.  FMS's financial strain is 'the unavoidable result' of its ATE coming to

an end."  *Id.* at 185.  The financial harms plaintiffs claim will befall them when their ATEs

expire are due solely to the agreed-upon expiration of those contracts, and not to anything that

they are protesting here.  In *Navient*, the Court also rejected the non-financial alleged harm of

lost incumbency, because no contractor has a right to hold a contract in perpetuity and the loss of

incumbency does not constitute an irreparable harm.  *Id.* at 184.  The expiration of a contract by

its own terms is not an irreparable harm.  *See id.* at 185 ("The Court's power to issue a

preliminary injunction does not exist to remedy this type of harm.").

Plaintiffs also fail to demonstrate that they will suffer an irreparable harm if the Next Gen

solicitation is allowed to proceed as this litigation continues.  As discussed above, the EPS and

OPS solicitations do not contain defaulted debt collection work.  Proposals for the BPO

solicitation will not be due for some time (some amount of time after the award in EPS, which is

still at least many weeks away).  Plaintiffs cannot allege a viable irreparable harm based on a

proposal due date that is not even set and that will very likely come after this litigation is

complete.  And, as stated above, FSA will notify the Court and the parties if a BPO proposal due

date will be announced while the litigation is still pending in this Court.

## VI.  The Balance Of Harms Favors Allowing The Recall To Continue And Expiration Of The ATE Contracts By Their Express Terms

Plaintiffs seek to enjoin FSA's completion of the recall and expiration of the ATE

contracts on April 21, 2019.  As discussed above, the Court cannot provide the relief sought.  In

any event, should the Court consider such relief, the requested preliminary injunctions should not issue because the balance of harms weighs in favor of student borrowers, and, by extension, FSA.

If the Court were to enjoin the completion of the recall of accounts only, the relief would be of no moment, because the ATE contracts would be set to expire within days of the Court's order.  As a result, accounts would be left with servicers who will not have a contractual vehicle through which to provide any services.  This lapse in services would come during a critical time—during the student borrowers' effort to rehabilitate their defaults, which requires the borrower to make nine monthly payments within a 10-month period.  To interrupt that effort would work an undue hardship on affected student borrowers.

Further, if the Court were to enjoin the completion of the recall *and* termination of plaintiffs' contracts until this matter is resolved, the borrower will still be subject to undue harm. The resolution of this matter will likely take less than the amount of time necessary for a student borrower to complete the rehabilitation process.  Upon resolution of the matter, FSA would complete the recall and the contract would expire soon thereafter.  Then, a borrower who might be in the middle of the rehabilitation process would be moved to another PCA.  This transition automatically results in a period of time when the newly assigned PCA will not be able to reach out to the borrower if any issues arise.  During that time, if an issue does arise, then that borrower will be particularly vulnerable to falling out of his or her repayment program.  The only way to avoid creating this additional risk for borrowers is to deny the pending motions for preliminary injunction.

**VII.**    **The Public Interest Favors Allowing The Recall To Proceed**

The harm to student borrowers and to the Government that the requested injunction threatens also demonstrates that the public interest favors not issuing an injunction.  The parochial interests of five entities with expiring contracts, who only wish to retain accounts for which they are earning no money on the chance that maybe they can still bring some of those accounts into repayment plans and extract some more money from the dying days of their contracts, pale next to the significant public interest in giving defaulted borrowers, who owe money to the United States, the best opportunity to pay back that money and resolve their default.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny the motions for a preliminary injunction.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General


ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

TRACEY SASSER                              s/ Patricia M. McCarthy
Assistant General Counsel                  PATRICIA M. McCARTHY
United States Department of Education      Assistant Director
Division of Business and Administrative Law


                                           s/ Alexis J. Echols
JANA MOSES                                 ALEXIS J. ECHOLS
DAVID R. PEHLKE                            Trial Attorney
Trial Attorneys                            United States Department of Justice
United States Department of Justice        Civil Division
Civil Division                             Commercial Litigation Branch
Commercial Litigation Branch               P.O. Box 480
                                           Ben Franklin Station
                                           Washington, DC  20044
                                           Telephone:  (202) 616-0463
                                           Facsimile:  (202) 307-2503
                                           E-mail: alexis.j.echols@usdoj.gov


April 10, 2019                             Attorneys for Defendant

# EXHIBITS

# EXHIBIT 1

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS *OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30* | 1. REQUISITION NUMBER EDOFSA-09-000184 | | PAGE 1 OF  78 |
|---|---|---|---|

| 2. CONTRACT NO. GS-23F-0063J | 3. AWARD/EFFECTIVE DATE JUL 01, 2009 | 4. ORDER NUMBER ED-FSA-09-O-0011 | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|

| 7. FOR SOLICITATION INFORMATION CALL: ▶ | a. NAME | b. TELEPHONE NUMBER *(No collect calls)* | 8. OFFER DUE DATE/ LOCAL TIME |
|---|---|---|---|

| 9. ISSUED BY   CODE FSA-FS2 | 10. THIS ACQUISITON IS |
|---|---|

United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3
Washington DC 20202

☐ UNRESTRICTED OR  ☐ SET ASIDE:            % FOR:
☐ SMALL BUSINESS   ☐ EMERGING SMALL BUSINESS
NAICS:             ☐ HUBZONE SMALL BUSINESS
SIZE STANDARD:     ☐ SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS   ☐ 8(A)

| 11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED  ☐ SEE SCHEDULE | 12. DISCOUNT TERMS 0 Days 0% Net 30 | ☐ 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | 13b. RATING 14. METHOD OF SOLICITATION ☐ RFQ  ☐ IFB  ☐ RFP |
|---|---|---|---|

| 15. DELIVER TO   CODE FSA-FS2 | 16. ADMINISTERED BY   CODE FSA-FS2 |
|---|---|

United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3

United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3

| 17a. CONTRACTOR/ OFFEROR   CODE 00020095   FACILITY CODE | 18a. PAYMENT WILL BE MADE BY   CODE FSA-BUD |
|---|---|

FINANCIAL MANAGEMENT SYSTEMS, INC TIN: 521856693
1000 E WOODFIELD RD        CAGE: 1TEX0
SCHAUMBURG IL 601734728    DUNS: 620653568

Budget Group/Invoice Admin
US Department of Education/FSA/CFO/BG/FSAA
830 First Street, NE, Suite 54B1
Washington DC 20202-0001

TELEPHONE NO.

| ☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED  ☐ SEE ADDENDUM |
|---|---|

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| Please | see continuation page for line item details. | | | | |

*(Use Reverse and/or Attach Additional Sheets as Necessary)*

| 25. ACCOUNTING AND APPROPRIATION DATA See Schedule | 26. TOTAL AWARD AMOUNT *(For Govt. Use Only)* $1.00 |
|---|---|

| ☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4, FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA | ☐ ARE  ☐ ARE NOT ATTACHED |
|---|---|
| ☐ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4, FAR 52.212-5 IS ATTACHED. ADDENDA | ☑ ARE  ☐ ARE NOT ATTACHED |

| ☒ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN   2   COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED | ☐ 29. AWARD OF CONTRACT: REF. _____ OFFER DATED _____. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS: |
|---|---|

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA *(SIGNATURE OF CONTRACTING OFFICER)* |
|---|---|

| 30b. NAME AND TITLE OF SIGNER *(Type or print)* BALAJI RAJAN CEO | 30c. DATE SIGNED 3/27/09 | 31b. NAME OF CONTRACTING OFFICER *(Type or print)* Mike Winslow | 31c. DATE SIGNED 4/1/09 |
|---|---|---|---|

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 3/2005)
Prescribed by GSA - FAR (48 CFR) 53.212

## SCHEDULE Continued

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE $ | AMOUNT $ |
|---|---|---|---|---|---|
| | 2009 PCA Task Order Award<br>For Debt Collection and Administrative Resolution<br>Services.  See continuation pages for details. | | | | |
| 0001 | Award CLIN (For award purposes only) | 1.00 | SE | 1.00 | 1.00 |
| | Accounting and Appropriation Data:<br>4253XNOYR.B.CONV.EN000000.A25.2521A.000.000.0000.000000<br>$1.00 | | | | |
| 0002 | Direct Loan (DL) (4253) | 0.00 | SE | 0.00 | 0.00 |
| 0003 | Federal Family Education Loan (FFEL) Financing (4251) | 0.00 | SE | 0.00 | 0.00 |
| 0004 | Federal Family Education Loan (FFEL) Liquidating (0230) | 0.00 | SE | 0.00 | 0.00 |
| 0005 | National Direct Student Loan (NDSL), Pell, and SEOG<br>(5557) | 0.00 | SE | 0.00 | 0.00 |
| 0006 | Smart Loans | 0.00 | SE | 0.00 | 0.00 |
| 0007 | Reserved | 0.00 | SE | 0.00 | 0.00 |

## SECTION B – SUPPLIES OR SERVICES AND PRICES/COSTS

**B.1    GENERAL**
This Task Order is issued in accordance with the General Services Administration's (GSA) Financial and Business Solutions (FABS) Schedule under Special Item Number (SIN) 520-4 for private collection services.

**B.2    TYPE OF CONTRACT**
This is a Performance-Based, Firm Fixed Price Task Order award, with provisions for pricing arrangements.

**B.3    ORDERING PERIODS**
The first Ordering Period for the Task Orders will be from July 1, 2009 (the effective date) through twenty-four (24) months, with multiple, optional ordering periods. The total Ordering Period, excluding any award term(s) earned, will not exceed 60 months from the date of initial data transfer, or October 22, 2009. This is not a multiyear contract as defined in FAR 17.1.

1) In addition, each contractor shall continue to work on accounts it retains during the **In-Repayment Retention Period.** Upon expiration of the Ordering Period(s) of this Task Order, the in-repayment retention period will begin. If the Government exercises one or more Optional Ordering Periods, the In-Repayment Retention Period shall begin subsequent to the last Optional Ordering Period exercised. The in-repayment retention period will run for twenty-four (24) months, except that upon return, recall or transfer of all accounts from this Task Order, the in-repayment retention period will end. During the in-repayment retention period, the Contractor may retain, except as provided in paragraph (3) below, accounts that remain in repayment in accordance with the SOW. No transfer of accounts to the Contractor will occur during the in-repayment retention period.

2) Prior Private Collection Agency (PCA) Task Orders—If the Contractor holds a prior Task Order (e.g. one awarded in the year 2004) with ED for debt collection services, at any time during the in-repayment retention period of that prior Task Order, ED may transfer any or all accounts from that prior Task Order to this Task Order. Accounts transferred under this provision are subject to the prices and terms of this Task Order, except that the transferred accounts would *not* be included in the Competitive Performance and Continuous Surveillance (CPCS) performance indicators.

3) Subsequent PCA Task Orders—If the Contractor enters into a subsequent Task Order or contract with ED for debt collection services, at any time during the in-repayment retention period of this Task Order, ED may transfer any or all accounts from this Task Order to the new Task Order or contract. Accounts transferred under this provision will be subject to the prices and terms of the Task Order or contract to which the accounts are transferred.

**B.4    PROVISIONS FOR PRICING AND PAYMENT**
A.    The total amount obligated and available for payment under this Task Order is $___1_____. Payment shall be made in accordance with the terms of the GSA Schedule Contract and the Pricing Schedule shown in Clause B.5 and with any other supplemental payment scheme that may otherwise be negotiated and specified.

B.    The Government shall have the right to unilaterally increase the amount of obligated funds under this order at any time in order to provide sufficient funds to cover the anticipated

volume of services or supplies for the remainder of the term. Additional funds will be obligated on appropriate modifications signed by the Contracting Officer.

C.   The Government shall also have the right to unilaterally decrease the amount of this order in the same manner as above.

## B.5   PRICING SCHEDULE

B.5.1   Commissions and Fees will be fixed for the price categories listed below and shall apply to the first Ordering Period and the optional Ordering Periods.

| Category | Commission/Fee | |
|---|---|---|
| **Regular Payments** | | |
| **Pricing Alternative #1** | | |
| o   Direct | 16.0% | /dollar |
| o   Non-Direct | 17.5% | /dollar |
| **Pricing Alternative #2** | | |
| o   First-placement Direct | 15.0% | /dollar |
| o   Secondary placements | 17.5% | /dollar |
| | | |
| **Administrative Wage Garnishment (AWG)** | | |
| **Pricing Alternative #1** | | |
| o   Payments will be made based on Regular Payment Alternative in use | | |
| **Pricing Alternative # 2** | 14.0% | /dollar |
| | | |
| **Final Rehabilitation** | | |
| **Pricing Alternative #1** | | |
| o   Direct | 13.5% | /dollar |
| o   Non-Direct | 15.0% | /dollar |
| **Pricing Alternative #2** | | |
| o   First-placement Direct | 12.5% | /dollar |
| o   Secondary placements | 15.0% | /dollar |

| **Final Consolidation** | | |
|---|---|---|
| o   Direct | 6.5% | /dollar |
| o   Non-Direct | 6.5% | /dollar |

| **Administrative Resolution (AR) Fee** | | |
|---|---|---|
| AR Pricing | $50 | /per AR unit |

### B.5.2   Pricing Alternatives

### B.5.2.1 Commission Alternatives

The Government shall have the unilateral right to select either Pricing Alternative #1 or Pricing Alternative #2 at any time. The Government may exercise its right to select a Pricing Alternative by the Contracting Officer giving written notice to the Contractor at least 60 days before the effective date of the change. The Government may exercise its right to change Pricing Alternatives as many times as it chooses. Unless the Government exercises its right to make a change, Pricing Alternative #1, for Regular Payments and AWG Payments, shall be used.

(1) Under Pricing Alternative #1, the "Direct" category includes all Federal Direct Student Loan (FDSL) debts or any other debts, which are bought or made by the Department, assigned to the Contractor. "Non-Direct" includes all other debts assigned to the Contractor.
(2) Under Pricing Alternative #2, the "First-Placement Direct" category includes FDSL debts, and any other debts owned by the Department, which have not been previously assigned to any ED PCA contractor. Secondary placements include all other debts assigned to the Contractor. In most cases, another PCA or a Guaranty Agency will have previously attempted to collect secondary placement debts.

### B.5.2.2 Administrative Resolution Fee Alternatives

The Government shall have the unilateral right to select either AR Pricing Alternative #1 or AR Pricing Alternative #2 at any time. The Government may exercise its right to select a Pricing Alternative by the Contracting Officer giving written notice to the Contractor at least 15 days before the effective date of the change. The Government may exercise its right to change Pricing Alternatives as many times as it chooses. Unless the Government exercises its right to make a change, AR Pricing Alternative #1 shall be used.

(1) Under AR Pricing Alternative #1, the number of administrative resolution units will vary by AR type in accordance with Section 3.4 of the SOW.
(2) Under AR Pricing Alternative #2, all types of administrative resolutions will be paid on the basis of 3 AR units each. ED anticipates this alternative would be used if AR Pricing Alternative #1 is not feasible due to system limitations or other factors.

### B.5.3   Regular Payments

Under Pricing Alternative #1, the Contractor shall be paid the **17.5%** commission on regular non-Direct Loan payments and **16.0%** commission on FDSL payments, excluding payments received as a result of Administrative Wage Garnishment (AWG). Under Pricing Alternative #2, the Contractor shall be paid the **17.5%** commission on payments received on secondary placements and **15.0%** commission on first-placement FDSL payments, excluding payments received as a result of Administrative Wage Garnishment (AWG).

### B.5.4   Administrative Wage Garnishment (AWG)

Under Alternative #1, the Contractor shall be paid the same rate as Regular Payments as described in Regular Payments Alternative #1. For Alternative #2, the Contractor shall be paid the **14%** commission on payments received as a result of AWG.

### B.5.5   Final Consolidation

The Contractor will be paid the commission rate of **6.5%** on the final payoff value of the debts consolidated provided the borrower meets all regulatory and statutory requirements, as well as any additional requirements set by Federal Student Aid (FSA), the consolidation lender or that lender's guarantor.

In addition, the borrower must have made six (6) consecutive monthly payments each of which equals or exceeds 0.5% of the total balance to be consolidated and was made in the 140 days preceding the date on which the account is certified for consolidation. Payments of 1% or greater are considered reasonable and affordable and no financial statement is required.

Payments of less than 1% will require a financial statement. If the borrower has not met the payment requirements above, the Contractor shall be paid no commission on the Lender's consolidation payment.

### B.5.6   Rehabilitations

For rehabilitations under Pricing Alternative #1, the Contractor will be paid the commission rate of 15.0% on the final payoff amount of non-Direct loans rehabilitated and 13.5% on the final transfer value of FDSL debts rehabilitated provided the borrower meets all regulatory and statutory requirements. For rehabilitations under Pricing Alternative #2, the Contractor will be paid the commission rate of 12.5% on the final transfer value of first-placement FDSL debts rehabilitated, 15.0% on the final transfer value of secondary-placement FDSL debts rehabilitated, and 15.0% on the final payoff amount of FFEL loans rehabilitated provided the borrower meets all regulatory and statutory requirements. In addition under both Pricing Alternatives, the borrower must make nine (9) voluntary (to be considered "timely," a borrower's payment must be received within 20 days of the monthly due date) payments equal to the minimum required percentage of the final payoff or transfer value (i.e. combined principal, interest, fees and projected collection costs). Payments of this amount are automatically considered reasonable and affordable, and no financial statement is required to substantiate these payments. If the borrower's account is rehabilitated and the nine (9) timely payments are less than the minimum required, the account will be considered an "Administrative Rehabilitation" and the Contractor will be paid based on the administrative resolution units applicable to an Administrative Rehabilitation.

### B.5.7   Administrative Resolution Units

The Contractor will be paid a fee of $50 for each Administrative Resolution Unit completed by the Contractor.

### B.5.8    Accounts Not Eligible for Commission or Fee

1. No commission will be paid for any consolidation or rehabilitation where any of the borrower's voluntary monthly payments do not equal or exceed the required amounts.
2. No commission will be paid for any consolidation or rehabilitation where it is determined that, at the request of the Contractor, effective dates of the required payments have been changed or altered.
3. No commission shall be paid for any consolidation or rehabilitation where the borrower, prior to consolidation or rehabilitation, qualified for write-off of the loan for reasons including, but not limited to, permanent and total disability, fraud, bankruptcy, death, and close school and false certification claims.
4. No commission will be paid if the Contractor has not counseled the borrower on his or her eligibility for such write-offs, both orally and in writing. Written counseling must be done via a Department-approved or created letter, and oral counseling must be documented on the Department of Education (ED) system.
5. The Contractor will not be paid a commission fee on any defaulted Consolidation Loan that has been re-consolidated.
6. No commission shall be paid on any account consolidated where a wage garnishment payment had posted in the 90 days prior to certification. This does not include voluntary payments miscoded by the Department as wage garnishment payments.
7. No commission shall be paid on any nonstandard compromise in excess of the following limits per CPCS period:
   - 6 for a contractor in the Unrestricted Pool and

- 3 for a contractor in the Small Business Pool.
  (Unused limits do *not* carry over to subsequent CPCS periods.)

8. Unless ED approves an exception, no commission or fee will be paid for any consolidation, rehabilitation or administrative resolution where the PCA or the borrower did not meet any material (as determined by the Government) written requirement established by the Government.

9. No commission shall be paid on any compromise payment where compromise procedures were not followed (i.e., the compromise agreement letter is not sent to the borrower, the compromise information is not documented on the ED notepad, etc.).

If, in any of the above instances, the Department inadvertently pays a commission, the Department reserves the right to subsequently recover any such commission from the Contractor.

10. The pricing schedule does not include any bonus incentive fees. Refer to Clause H.6, "Special Task Order Bonus Payment Plan."

## B.6   CONTRACT LINE ITEMS (CLINs)

The following Contract Line Items (CLINs) are hereby incorporated into the Task Order:

| CLIN No. | Description/Type of Money |
|---|---|
| 0001 | Award CLIN (For award purposes only) |
| 0002 | Direct Loan (DL) (4253) |
| 0003 | Federal Family Education Loan (FFEL) Financing (4251) |
| 0004 | Federal Family Education Loan (FFEL) Liquidating (0230) |
| 0005 | National Direct Student Loan (NDSL), Pell, and SEOG (5557) |
| 0006 | Smart Loans |
| 0007 | Reserved |

## B.7   DESCRIPTION OF PRICE CATEGORIES

### B.7.1   Commission Fee

Commissions shall be paid to the Contractor on dollars collected under the Task Orders at the rates specified in Section B.5 above.

The dollars eligible for Contractor commissions are those deposited net dollars (total deposit less any returned checks). The Contractor shall receive commission on any payment received eight (8) calendar days or more after the date the account is transferred to the Contractor and up to fourteen (14) calendar days after the date the account is returned to the Government.

The Contractor shall also receive commissions on an account that was approved for compromise and the dollars (certified funds, money order, etc.) were posted and deposited up to thirty (30) calendar days from the date the account is returned.

The Contractor shall not be paid a commission for the following:

1) Dollars received by the Government within seven (7) calendar days after the Government transferred the account to the Contractor. The Government has sent collection letters and payments resulting from the Government's efforts will not be eligible for commission.

2) School, lender or other third party payments. Such payments are not considered repayments from the borrower, but reimbursements of a portion of debts paid by the Government. Should a borrower pay the school or lender fifteen (15) calendar days after the date of the transfer to the Contractor, the Contractor shall provide complete documentation of that account before any commission may be paid.

3) Lender repurchases of FFEL debts.

4) Unidentified payments. Such payments, not posted to the account of any borrower are not subject to commission payment.

5) Any adjustment to the outstanding balance of accounts through administrative resolution including amounts waived through write-off, compromise, cancellation or closure due to the borrower's death, disability, bankruptcy or incarceration.

6) Dollars collected in excess of an individual's balance, resulting in overpayment by the borrower.

7) Dollars received on any account fifteen (15) calendar days or later from the date the account was returned to the Government.

8) Dollars received through any Federal, State or local government salary offset, refund, garnishment (with the exception of administrative wage garnishment initiated by the Contractor), cancellations (i.e. teacher, military, Peace Corp, etc.), or other administrative action that results in the reduction or elimination of the debt in a manner beyond the scope of the Contractor's performance.

### B.7.2   Commission Adjustment

**Nonstandard Compromises**—Subject to the limitations in this paragraph, the Contractor may, without prior approval from the Government, offer a borrower a compromise that goes beyond the current compromise standards set by the Government. A contractor in the Unrestricted Pool is limited to no more than 6 nonstandard compromises in any single quarter. A contractor in the Small Business Pool is limited to no more than 3 nonstandard compromises in any single quarter. (Unused allowances do not carry over to subsequent quarters.) The Government may, at its sole discretion, set further limits on the use of nonstandard compromises. If the borrower accepts a nonstandard compromise offer, the Contractor is responsible for the netback difference between the nonstandard compromise settlement and the applicable compromise standard set by the Government. The Contractor must properly notify ED when providing a nonstandard compromise. The Government shall reduce the Contractor's commissions on any nonstandard compromise settlement made by the Contractor. In instances where the Contractor offered a nonstandard compromise amount, the commission adjustment shall be based on the netback dollars to the Government. Example:

Borrower's total balance is $13,125. The Contractor compromises in conflict with the Government's current compromise standards and collects $8,000 and is initially paid a commission fee of $1,400 (17.5%). The Government recovers $6,600.

Under the applicable compromise standards, the Contractor would only have accepted a compromise agreement under which the borrower pays $10,500. The resultant netback to the Government would have been $8,662.50. The Government has lost $2,025 ($8,662.50 minus $6,600 = $2,062.50); therefore, the Government will deduct $2,062.50 from the Contractor's next commission payment.

**Bankruptcy**—In the case of bankruptcy, where the Contractor fails to forward the bankruptcy documents to the Litigation Branch within three (3) calendar days from date of receipt of the documentation, the Government shall reduce the Contractor's overall commission by an amount equal to the amount the Government would have recovered in the course of the bankruptcy adjudication (if any recovery would have been made).

**Administrative Resolution Fee**—The Contractor shall be paid a fixed fee for each administrative resolution unit performed under this Task Order, as defined in the Statement of Work. The Contractor must have completed the requirements stated within the Statement of Work and, if applicable, the accounts have been systematically returned on the ED Collections System before the Contractor will be eligible to be paid the administrative resolution fee.

**B.8    Invoice/Voucher Procedures**

A.    Payments under this Task Order are based on data maintained in ED's systems. Each month, the Government will prepare and send an invoice to the Contractor. The Government will also send detailed documentation supporting the amounts on the invoice. The Contractor shall review these materials and return the invoice via e-mail in order to be paid for products and/or services rendered under this Task Order. (The Contractor should only e-mail the primary invoice, not the supporting detail, which is already collected and maintained by the COR.) The parties agree that the e-mail message returning the invoice to ED will constitute an electronic signature indicating the Contractor's approval of the invoice.

If the Contractor does not agree with any part of the invoice, the Contractor shall immediately notify the Government at the invoice correction contact point indicated by the Government. The Contractor shall not make any changes to the invoice (except that the Contractor may add the invoice or voucher number as indicated below.). If changes are needed, the Government will send the Contractor a corrected invoice.

Federal Student Aid's "Designated Billing Office" is:
US Department of Education
Union Center Plaza
Federal Student Aid Administration
830 First Street, N.E. Suite 54B1
Washington, D.C. 20202-0001
E-mail: InvoiceAdmin@ed.gov

The Contractor shall e-mail the invoice to InvoiceAdmin@ed.gov, with "cc" copies to the Contract Specialist and the COR.

B.    The Contractor is responsible for ensuring that the invoice meets the requirements for a "proper" invoice. Normally, the Government will enter the information required on the invoice. The Contractor is responsible for ensuring the accuracy and completeness of the information. At a minimum the following items must be addressed in order for the invoice to be considered "proper" for payment:

(1) Name and address of the Contractor.

(2) Invoice or voucher number. The Invoice or voucher number must be in the format AG###-YEAR-MO, where:

      i.      "AG###" is the agency number (e.g., AG555) that FSA has assigned to the Contractor for this Task Order.

      ii.     "YEAR" is the four-digit year (e.g., "2010" for the invoice covering services provided in September 2010)

     iii.    "MO" is the one or two-digit code for the month covered by the invoice (e.g., "9" for the invoice covering services provided in September).

(3) Invoice Date.

(4) The Task Order number must be included on the invoice and be correct.

(5) Description, quantity, unit of measure, unit price, and extended price of the item delivered must agree with the contract or order.

(6) Terms of any prompt payment discount offered.

(7) Name, title, and phone number of persons to be notified in event of defective invoice.

(8) The period of time covered by the invoice.

*(End of Section B)*

---

## SECTION C - DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

**C.1 SCOPE OF ORDER**
See Statement of Work, Attachment A.

**C.2 SUBCONTRACTORS AND THIRD PARTIES**
**C.2.1 Flow-Down Provisions**
The Contractor shall ensure that subcontracts include flow-down provisions where required by clauses incorporated into this Task Order or into the Contractor's GSA Schedule contract. Any subcontract under which the subcontractor will have access to ED data or systems must include provisions incorporating the requirements of Statement of Work Section 6.2, Security Requirements, and clauses H.11 Privacy Act, H.12 Security Clearance and User ID Requests, and H.13 Removal from Project Access.

**C.2.2 Consent to Subcontract**
If the Contracting Officer provides consent to subcontract, the consent does not constitute an approval of a contract agreement with a subcontractor, nor does it require the Prime contractor to issue the subcontract.

Prior to releasing any data protected by the Privacy Act to a subcontractor (or any third party) the Contractor shall provide to the Government a copy of the subcontract or other documentation demonstrating that the Contractor has met the requirements of paragraph C.2.1 of this clause. The Contractor shall provide a copy of this documentation to the Contract Specialist and Contracting Officer's Representative (COR). The Contractor must obtain the Contracting Officer's consent to proceed before releasing any data protected by the Privacy Act to a subcontractor. The Contractor may request this consent prior to execution of the proposed subcontract.

*(End of Section C)*

## SECTION D - PACKAGING AND MARKING

**D.1    FSA 27-1 Labeling of Documents (June 2007)**
The Contractor shall not label any data produced in performance of this contract in a way that would restrict the Government's right to use or release the information. If applicable, the Contractor shall include a legend that identifies sensitive data that should not be released for security reasons. Under FAR clause 52.227-14, Rights in Data-General clause, this data may be used for any purpose the Government deems appropriate. Deliverables shall not contain vendor-specific logos, mottos, watermarks, or holograms.

The Contractor shall not use, particularly for proposals, U.S. Government logos, such as the U.S. Department of Education or Federal Student Aid.

(End of Clause)

*(End of Section D)*

## SECTION E – INSPECTION AND ACCEPTANCE

**E.1   ONSITE INSPECTIONS**

The Government reserves the right to make periodic, unannounced site inspections of the Contractor's offices and any subcontractor offices(s). The purpose of these inspections shall be to assess contractor performance, particularly in the areas of adherence to the Task Order requirements and applicable legislation, and the security of records.

*(End of Section E)*

## SECTION F – DELIVERIES OR PERFORMANCES

**F.1   TRANSFER OF ACCOUNTS**

Accounts shall be transferred to the Contractor throughout the Ordering Period(s) of this Task Order in accordance with the Statement of Work. At the expiration of the Ordering Period(s) of the Task Order, all Government accounts and associated data in the Contractor's possession shall be returned to the Government, and commissions on eligible dollars collected shall cease.

*(End of Section F)*

## SECTION G – TASK ORDER ADMINISTRATION DATA

### G.1    GOVERNMENT POINTS OF CONTACT

The following describes the roles and responsibility of individuals who will be the primary points of contact for the Government on matters regarding contract administration as well as other administrative information. The Government reserves the right to unilaterally change any of these individual assignments at anytime. The base mailing address for Federal Student Aid is constant except for suite numbers.

> U.S. Department of Education
> Federal Student Aid
> Union Center Plaza
> Suite # (see table below)
> 830 First Street, NE
> Washington, DC 20202-5405

Written communications shall make reference to the Contract Number and Task Order Number and shall be mailed to the address above.

### G.1.1   CONTRACTING OFFICER (CO)

The Contracting Officer (CO) identified in Section G.1 has the overall responsibility for the administration of these Task Orders. The CO, without right of delegation, is the only individual authorized to take actions on behalf of the Government to amend, modify or deviate from the contract terms, conditions, requirements, specifications, details and/or delivery schedules. The CO may delegate certain specific responsibilities to its authorized representative - the CO's Representative (COR). The CO is responsible for overall administration and the final closeout of the contract, and when necessary, shall:
  (a) Provide scope oversight;
  (b) Serve as liaison between the Contractor and the Department;
  (c) Assist in expediting orders;
  (d) Ensure compliance with contract requirements;
  (e) Issue the CO's final decision and handle all contract-level contractual disputes under the Contract Disputes Act; and
  (f) Place all contract modifications against the Contract.

### G.1.2   CONTRACTING OFFICER'S REPRESENTATIVE (COR)

(a) The CO may have several representatives to assist in the monitoring and administering the Task Orders. The COR is responsible for the technical aspects of the contract or the specific Task Order, acting as the technical liaison with the Contractor and any other responsibilities that are specified in the contract or the specific Task Order.

(b) The COR duties include but are not limited to:
   (1) Monitor and assure that the contractor performs the technical requirements of the contract;
   (2) Communicate technical direction to the contractor;
   (3) Review, evaluate, and comment on any aspect of the contract and its performance to include problem areas, quotes, and technical issues, and to make written recommendations to the CO;

(4) Preparing technical evaluations to support determinations that requested changes are not outside the scope of the contract;

(5) Assist the CO in analyzing a claim, recommend settlement position, and participate in the resolution process;

(6) Coordinate site entry for contractor/government personnel as appropriate;

(7) Prepare monthly performance evaluations in accordance with the contract Quality Assurance Surveillance Plan (QASP);

(8) Advise the CO at the completion of the contract, as to receipt of all items, services, and reports required under the contract, and the compliance with all contract provisions;

(9) Provide advice and assistance to the CO in those areas of contract administration that are not specifically covered in this designation.

(c) The COR is not authorized to make any commitments or otherwise obligate the Government or authorize any change which affect the contract price, terms or conditions. The COR does not have authority to act as agent of the Government under this contract. Any Contractor requests for changes shall be submitted in writing directly to the CO with a copy to the COR. No such changes shall be made without the written authorization of the Contracting Officer. Only the CO has authority to direct or negotiate any changes in the statement of work; modify or extend the period of performance, change the delivery schedule, authorize reimbursement to the Contractor any costs incurred during the performance of this contract or otherwise change any terms and conditions of this contract or accept/reject deliverables.

(d) The COR may be changed by the Government at any time, notification of the change, including the name and address of the successor COR, will be provided to the Contractor by the CO in writing.

## G.2   EDAR 3452.243-70 KEY PERSONNEL (AUG 1987) (TAILORED)

The personnel designated as Key Personnel in this Performance-Based Firm Fixed Price Task Orders are considered to be essential to the work being performed hereunder. This clause and its requirements shall expire exactly one (1) year after the date of contract award.

(a) Prior to diverting any of the specified individuals to other programs, or otherwise substituting any other personnel for specified personnel, the contractor shall notify the contracting officer in writing, in advance and shall submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the contract effort. No diversion or substitution shall be made by the contractor without written consent of the contracting officer; provided, that the contracting officer may ratify a diversion or substitution in writing and that ratification shall constitute the consent of the contracting officer required by this clause. The contractor shall be modified to reflect that addition or deletion personnel.

Such notification shall include:

(1) An explanation of the circumstances necessitating the substitution;

(2) A complete résumé of the proposed substitute; and

(3) Any other information requested by the CO to enable him/her to judge whether or not the Contractor is maintaining the same high quality of personnel that provided the partial basis for award.

(b) The CO will evaluate such requests and promptly notify the Contractor of his/her approval or disapproval in writing. All disapprovals will require resubmission of another substitution within 15 calendar days by the Contractor.

(c) Designated Key Personnel
The following Contractor personnel are designated as Key for the Task Order:

*[Name phone, and email address and contact info of key personnel from offeror's quote to be inserted and submitted by contractor. Duplicate table as necessary to include all key personnel information.]*

| | Key Personnel | Key Personnel |
|---|---|---|
| Name | | |
| Title | | |
| Email | | |
| Telephone | | |
| Fax | | |
| Mailing Address | | |
| Web Site | | |

| | Key Personnel | Key Personnel |
|---|---|---|
| Name | | |
| Title | | |
| Email | | |
| Telephone | | |
| Fax | | |
| Mailing Address | | |
| Web Site | | |

### G.3    CONTRACT ADMINISTRATOR

Promptly upon award of this Task Order, the Contractor shall designate one individual as the Contract Administrator for this order and provide the name, address, phone, fax and e-mail address to the CO, Contract Specialist, COR and the Assistant COR. The Contractor shall promptly notify the CO, Contract Specialist, COR and the Assistant COR whenever this information changes.

(End of Section G)

## SECTION H – SPECIAL TASK ORDER REQUIREMENTS

**H.1   FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE TASK ORDER (Mar 2000) TAILORED**

(a)   The Government may extend the term of this Task Order by written notice to the Contractor prior to expiration of the first Ordering Period of the Task Order, provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the Task Order period of performance expires. The preliminary notice does not commit the Government to an extension.

(b)   If the Government exercises this option, the extended Task Order shall be considered to include this option clause.

(c)   The total duration of the first Ordering Period of performance of this Task Order, including the exercise of any optional Ordering Periods under this clause, shall not exceed 60 months from the date of contract award, excluding any award term(s) earned.

(d)   The Government may, at its discretion, exercise option periods of up to 24 months, providing that the total Task Order period of performance does not exceed 60 months from the date of award.

If the Government exercises one or more Optional Periods, the 24-month In-Repayment Retention Period will begin subsequent to the last Optional Period exercised.

**H.2   OPTION FOR INCREASED QUANTITY**

The Government may unilaterally increase the quantity of accounts transferred to the Contractor by any amount at the prices specified within Section B, "Pricing Schedule", at any time during the Task Order Ordering Period.

**H.3   FAR 52.217-8, OPTION TO EXTEND SERVICES (Nov 1999)**

The Government may require continued performance of any services within the limits and at the rates specified in the Task Order. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. This option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor prior to expiration of the period of performance of the Task Order.

**H.4   AWARD TERM EXTENSION**

In addition to the Ordering Periods stated in Clause B.3 and any options terms exercised pursuant to clause H.1, the Contractor may earn performance extensions (hereinafter called "award terms"), based upon the quality of performance during the evaluation periods. If the Contractor has an average CPCS rating of 75 or greater over the life of the Task Order, or the last 12 CPCS periods (whichever is shorter), the Government may, award the Contractor an award-term extension in accordance with the terms of this clause in recognition of the Contractor's excellent or better quality performance.

(a) Award-term extensions are subject to the following conditions:
   i.     Funds are available;
   ii.    The requirement covered by the award-term fulfills an existing Government need;
   iii.   The contractor accepts the Government's target pricing and terms.

(b) It is the Government's intent to time any award-term extension so that the extension period will coincide with the award date of the next round of Task Orders. Accordingly, the Contracting

Officer may, determine whether to award an award-term extension at any time after completion of the Ordering Period of the Task Order.

(c) The Contracting Officer may award an award-term extension under this clause by providing a written notice to the Contractor prior to expiration of the Ordering Period of the Task Order, provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the Task Order Ordering Period expires. The preliminary notice does not commit the Government to an extension.

(d) Decisions regarding the award term are not subject to the Disputes Clause or review by any authority above the Contracting Officer.

(e) Any award-term extension under this clause will be executed in the form of a new Task Order issued by the Contracting Officer under the Contractor's then current GSA Schedule contract.

    i.    The award-term Task Order extension will be subject to the terms and conditions of the existing Task Orders, including any extension thereto.

    ii.    The effective date of the award-term Task Order extension may be timed to coincide with the award date of the next round of PCA Task Orders.

    iii.    The Government target prices for the current PCA Task Orders will apply to the award-term extension.

    iv.    If the Contractor is a small business at the time the Contracting Officer issues the award-term Task Order extension, the Contractor will become part of the new Small Business Pool. Otherwise, the Contractor will be included in the new Unrestricted Pool.

    v.    A new CPCS record will be established for the award-term extension to track the Contractors' performance in then new CPCS pool.

    vi.    The Government may transfer any remaining accounts held by the Contractor under this Task Order to the award-term new Task Order, in accordance with provisions in this Task Order and the award-term Task Order.

## H.5   CONTRACTOR PERFORMANCE EVALUATION

(a) The Competitive Performance and Continuous Surveillance (CPCS), an in-depth evaluation, shall be conducted to determine the adequacy of the contractors' performance on all accounts transferred. CPCS will utilize two separate PCA pools for determining contractor standing. PCAs that received Task Order awards under the small business competition (and have not subsequently transferred to the Unrestricted Pool) will be in the Small Business Pool. All other PCA contractors will be in the Unrestricted Pool.

(b) Several months after the first placement of accounts, the Government shall conduct the first CPCS to measure the relative performance of each PCA contractor during the CPCS surveillance period. This first CPCS surveillance period will run from the first placement of accounts through March 31, 2010. Subsequent CPCS evaluations will be conducted quarterly.

(c) Each contractor that achieves the highest ranking in one of the three primary performance indicators: Dollars Collected, Accounts Serviced and Administrative Resolutions will receive the total potential points for the respective performance indicator. The points assigned to the remaining contractors for the three performance indicators will be based on the relative percentage each contractor is behind the lead contractor.

(d) Bonus payments and transfers of new accounts shall be based upon each contractor's total CPCS score. The contractors with the top two or three CPCS scores will receive bonus payments on dollars collected during the evaluation period as described in Section H.6. A contractor's most recent CPCS score will be applicable for all transfers until the completion of the next regular CPCS evaluation.

(e)  The Government will evaluate PCA contractors using the following performance indicators, except as changed in accordance with paragraph (f) of this clause. (All indicators will be measured at two decimal places):

**(1)  PERFORMANCE INDICATOR #1: DOLLARS COLLECTED PERCENTAGE - 70 Points.** The Dollars Collected Percentage will be calculated based upon the following formulas:

<u>Formula #1:</u>
**DOLLARS COLLECTED FOR THE GOVERNMENT (DC)** –DC is the gross amount the Government realizes before the contractor's commissions have been subtracted from the dollars collected. Dollars collected are defined as regular collections, administrative wage garnishment payments, and the final sale and transfer value of all debts rehabilitated.
<u>Example:</u>
- CA's regular collections and administrative wage garnishment payments sum to $3,500,000 for the three (3) month period.
- CA's final sale of all debts rehabilitated totaled $2,500,000 for the three (3) month period.
- Dollars Collected for the Government is $6,000,000. ($3,500,000 plus $2,500,000).

<u>Formula #2:</u>
**CURRENT INVENTORY BALANCE (CIB)**—CIB is the beginning balance of all accounts held by the Contractor at the end of the previous CPCS period. (The Government will assign a fixed CIB for the first CPCS surveillance period.) The inventory balance is comprised of principal, interest and fees. Projected collection costs are not included.
<u>Example:</u>
- Contractor A's ending inventory for Month 3 of the previous CPCS period is $250,000,000 and 60,000 accounts.
- For the CPCS surveillance period, the current inventory balance (CIB) is $200,000,000 and the current inventory of accounts (CIA) is 60,000.

**CURRENT INVENTORY OF ACCOUNTS (CIA)**—CIA is the same as CIB, except accounts, instead of dollars, are measured.

<u>Formula #3:</u>
**AVERAGE INVENTORY BALANCE (AIB)**–AIB is the average (mean) CIB from the four most recent CPCS surveillance periods. For the first three CPCS surveillance periods, the AIB will be the average of the CIB from the current and all previous CPCS surveillance periods. The inventory balance is comprised of principal, interest and fees. Projected collection costs are not included.
<u>Example:</u>
- Contractor A's CIB for
  - CPCS period #3 is $200,000,000
  - CPCS period #4 is $233,000,000
  - CPCS period #5 is $242,000,000
  - CPCS period #6 is $248,000,000
- For CPCS period #6, the average inventory balance (AIB) is $230,750,000

**Formula #4:**
**DOLLARS COLLECTED PERCENTAGE (DCP)**–DCP is a percentage determined by dividing DC by AIB, (DC/AIB).
Example:
a.   There are only two contractors in competition.
b.   The DCP following the preceding examples would be:
c.   DC of $6,000, 000 divided by AIB of $230,750,000 equals DCP: 2.60%
d.   Contractor B's DC is $6,250,000 and its AIB is $250,000,000.
e.   Contractor B achieves a DCP of 2.50%.
f.   Contractor A achieves the highest DCP during the surveillance period of 2.60%
g.   For Performance Indicator #1, Contractor A will be awarded the full 70 points while Contractor B will be awarded 67.31 points. [(2.50 / 2.60) X 70].

### (2) PERFORMANCE INDICATOR #2: ACCOUNT SERVICING PERCENTAGE (ASP) - 20 Points.

ASP is the proportion of the sum of the net number of:
a.   Accounts approved, and if required returned, for administrative resolution (only one administration resolution is counted in CPCS per *account* resolved), and
b.   Accounts that had payments received during the CPCS surveillance period.

The ASP would be calculated as follows:
a.   Contractor A submitted and was approved for 1,500 litigation accounts, returned and approved for 500 non-cash account resolutions, and received payments on 3,250 accounts. Total accounts serviced sum to 5,250. The contractor's CIA is 50,000. ASP is 5,250 divided by 50,000 or 10.50%.
b.   Contractor B submitted and was approved for 750 litigation accounts, returned and approved for 250 non-cash account resolutions, and received payments on 2,000 accounts. The total accounts serviced sum to 3,000. The contractor's CIA is 60,000. ASP is 3,000 divided by 60,000 or 5.0%.
c.   For Performance Indicator #2, since Contractor A has the best ASP, Contractor A will be awarded the full 20 points. Contractor B will be awarded 9.52 points. ((5.0/10.50) x 20))

### (3) PERFORMANCE INDICATOR #3: ADMINISTRATIVE RESOLUTION PERCENTAGE (ARP) - 10 points.
ARP is the proportion of accounts prepared and, if required, returned for non-cash resolution to ED. Only one administration resolution is counted in CPCS per *account* resolved. See preceding example for Performance Indicator #2 for calculation methodology.

### (4) SMALL BUSINESS SUBCONTRACTING – A plus or minus range of points.
This performance indicator only applies to contractors in the Unrestricted Pool. This performance indicator will not be used for CPCS period #1 and will not begin until initiated by the Government. At least thirty days before the start of the first CPCS period a Small Business Subcontracting measure will apply, the Government shall provide to the Contractor the measurement factors, relative weights, point range, targets, formulas and methodology related to calculation of the Small Business Subcontracting performance indicator.

When implemented, the Small Business Subcontracting performance indicator will measure contractors' small business subcontracting relative to the targets and intent described in

subsection H.15 (b) of this Task Order. Contractors will receive plus scores for exceeding targets and will receive minus scores for missing targets. Unlike most other CPCS performance indicators, the rating for Small Business Subcontracting may be based on performance during the previous CPCS surveillance period(s).

Similar to the other CPCS performance indicators, the top SQ performer will receive the full points available (The point range for Small Business Subcontracting will be as established by the Government, but will not be greater than +5 to –5).

The Government may eventually incorporate the Small Business Subcontracting performance indicator into the Service Quality performance indicator.

**(5) SERVICE QUALITY (SQ) – A plus or minus range of points.** The Government may measure a variety of mostly objective factors that contribute to the quality of service provided to ED and its borrowers. These factors may include accuracy and completeness, rejections, bounced checks, customer satisfaction or other factors. In addition, the Government may, at its discretion, incorporate the Small Business Subcontracting performance indicator into the SQ performance indicator.

Unlike most other CPCS performance indicators, the SQ rating may be based on performance during the previous CPCS surveillance period(s). The Government does not plan to apply an SQ measurement at the start of the Task Order. Prior to the first account transfer to which an SQ measure will apply, the Government shall provide to the Contractor the measurement factors, relative weights, point range, targets, formulas and methodology related to calculation of the Service Quality performance indicator.

(f)   The Government reserves the right to change any aspects of the CPCS, including but not limited to the formulas, relative weights assigned to performance indicators, point ranges, possible exclusion of specified types of administrative resolutions from either the ASP or the APR, or the frequency or methodology of calculation. The Government shall give written notice to the Contractor at least thirty days before the start of the first CPCS period affected by a change to any aspect of CPCS set forth elsewhere in this clause.

## H.6   SPECIAL TASK ORDER BONUS PAYMENT PLAN

(a) **Bonus Incentives**—The top performers under these Task Orders set the standards by which all PCA contractors are measured. These high standards help drive better performance by all PCA contractors under the Task Orders. The purpose of the bonus payment plan is to incentivize all contractors and to reward the contractors that provide the best performance under the Task Orders.

(b) **Ties**—For purposes of earning bonus payments, PCA contractors with CPCS scores that are within one half (½) point of each other will be considered to be in a tie. If two or more PCA contractors finish in a tie within their respective pool, the Government will pay the bonus percentage to each contractor. If two PCA contractors finish in a tie for first place, the next highest ranked PCA will remain in third place.

(c) **CPCS Scores**—All bonuses under this clause are based on the Contractor's performance as measured by CPCS. Notwithstanding any other terms of this Task Order, the contractor may not receive a bonus payment if its CPCS score applicable to that bonus is less than 65 points.

(d) **Base for Bonus Percentages**—The bonus payment will be applied to the dollars collected by the Contractor. For bonus payment purposes, dollars collected are defined as regular collections, administrative wage garnishment payments and the final sale of all FFEL debts rehabilitated. *No bonus will be applied to the transfer value of Direct Loan Program Rehabilitations.*

(e) **Initial CPCS Ranking**—As described in Clause H.5, Contractor Performance Evaluation, the first CPCS surveillance period will run from the first placement of accounts through March 31, 2010. At the end of the first CPCS period, the top three (3) contractors in the Unrestricted Pool will be paid the bonus payment for that quarterly surveillance period. The bonus payment plan will be based upon the following scale:

| Competitive Performance & Continuous Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 5% |
| Second | 3% |
| Third | 1% |

For the contractors in the Small Business Pool, the top two (2) contractors will be paid the bonus payment for that quarterly CPCS surveillance period. The bonus payment plan will be based upon the following scale:

| Competitive Performance & Continuous Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 5% |
| Second | 3% |

No Long-Term bonus will be paid on the initial CPCS surveillance period.

(f) **Long-Term CPCS Bonus**— Beginning with the second CPCS surveillance period and continuing through the base period of this Task Order, the long-term CPCS ranking will be based on the combined totals from all CPCS performance periods over the life of the Task Order. Beginning with the first CPCS period of the first option term of the Task Order, the "Long-Term" CPCS ranking will be based on the combined totals for the last seven (7) CPCS periods (i.e., 21 months). For this calculation the top three (3) contractors in the Unrestricted Pool will be paid a bonus on dollars collected for the most recently completed quarterly CPCS surveillance period based upon the following scale:

| Competitive Performance & Continuous Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 5% |
| Second | 3% |
| Third | 1% |

For the contractors in the Small Business Pool, the top two (2) contractors will be paid the bonus payment for that quarterly CPCS surveillance period. The Long-Term bonus payment plan will be based upon the following scale:

**Competitive Performance & Continuous**

| Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 5% |
| Second | 3% |

(g) **Quarterly CPCS Bonus**— Beginning with the second CPCS surveillance period, will be based on contractors' performance during the quarterly CPCS surveillance period. The top three (3) contractors in the Unrestricted Pool will be paid the bonus payment for that quarterly CPCS surveillance period. The bonus payment plan will be based upon the following scale:

**Competitive Performance & Continuous**

| Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 3% |
| Second | 2% |
| Third | 1% |

For the contractors in the Small Business Pool, the top two (2) contractors will be paid the bonus payment for that quarterly surveillance period. The bonus payment plan will be based upon the following scale:

Competitive Performance & Continuous

| Surveillance (CPCS) Ranking | Bonus |
|---|---|
| First | 3% |
| Second | 2% |

(h) **Maximum Bonus Payments**—No contractor may earn more than 6% in combined bonuses during any CPCS surveillance period. The top performer on the Long-Term CPCS ranking will only be eligible for an additional 1% bonus regardless of its ranking on the "Quarterly" CPCS. The second place agency on the Long-Term CPCS ranking may not earn more than 5% in combined bonuses during any CPCS period. The second place agency on the Long-Term CPCS ranking will only be eligible for an additional 2% bonus if it finishes first on the "Quarterly" CPCS, and only 1% for a second or third place finish. All other agencies will be eligible for the full amount of the listed "Quarterly" CPCS bonuses. Thus, the maximum percentage a PCA in the Unrestricted Pool may receive in combined bonuses during any CPCS surveillance period is:

| Contractor's Long-Term Ranking | Contractor's Quarterly Ranking | | | |
|---|---|---|---|---|
| | #1 | #2 | #3 | below #3 |
| #1 | 6% | 6% | 6% | 5% |
| #2 | 5% | 4% | 4% | 3% |
| #3 | 4% | 3% | 2% | 1% |
| Below #3 | 3% | 2% | 1% | 0% |

The maximum percentage a PCA in the Small Business Pool may receive in combined bonuses during any CPCS surveillance period is:

| Contractor's Long-Term Ranking | Contractor's Quarterly Ranking | | |
|---|---|---|---|
| | #1 | #2 | below #2 |
| #1 | 6% | 6% | 5% |
| #2 | 5% | 4% | 3% |
| Below #2 | 3% | 2% | 0% |

## H.7    CPCS STANDING AND PERFORMANCE RANGE

(a)  The CPCS performance range is defined as Scoring 55 or more points on an individual CPCS.

(b)  A finish within the CPCS performance range does not assure that the Contractor will receive a Task Order extension under the option clause or any other provisions of this Task Order. Decisions to extend the Task Orders will be based on a total range of issues, completely within ED's discretion.

(c)  Other factors being equal, for purposes of this Task Order, the Government considers CPCS scores:

1. Of 85 or higher to be an indicator of Outstanding performance;
2. From 75 up to 85 to be an indicator of Excellent performance;
3. From 65 up to 75 to be an indicator of Good performance;
4. From 55 up to 65 to be an indicator of Average performance;
5. From 45 up to 55 to be an indicator of Below Average performance; and
6. Below 45 to be an indicator of Poor performance.

These adjectival ratings are intended to serve as convenient groupings and references within the context of these Task Orders and the contractor's PCA pool. They do not necessarily reflect past performance ratings that the contractor would receive either under this Task Order or for any future procurement. The Government may consider other factors including, but not limited to: complaints, small business subcontracting, security risks or violations, computer system inadequacies, or deficiencies in procedures, quality control or training.

## H.8    SMALL BUSINESS MENTORING

(a)  A contractor that receives an award under the Small Business Pool shall promptly establish a relationship with a mentor from among the Unrestricted Pool PCA contractors. (The Contracting Officer may waive this requirement upon request of a small business, if the small business provides evidence that mentoring assistance is unnecessary.) Within 30 days of contract award, the small business contractor shall send a notice to the Contract Specialist and the Contracting Officer's Representative indicating the name of the mentor selected. A small business may only change its mentor with the prior written authorization of the Contracting Officer. If the small business contractor is unable to locate a suitable large business mentor within 30 days of Task Order award, ED will try to facilitate an arrangement. ED may assign a mentor from the Unrestricted Pool to a small business, if the Contracting Officer determines such action appropriate to the circumstances.

(b)  ED Experienced PCA contractors in the Unrestricted Pool are encouraged to enter into mentoring relationships with a small business PCA contractor. ED reserves the right to require the contractors in the Unrestricted Pool to establish a mentoring arrangement with a designated

small business PCA contractor, if the Contracting Officer determines such action appropriate to the circumstances.

(c)     The mentoring may include loans or gifts of technology or other resources, training or transfers of employees between companies or other arrangements agreeable to both parties. The mentoring may not include direct financial support, such as loans of capital from the business in the Unrestricted Pool to the small business or stock or bond purchases. However, it not the intent of this clause to restrict a small businesses access to financing outside of the mentoring process. For example, ED would not object to a small business obtaining a loan from a financial institution that customarily makes business loans, even if the financial institution also owned a controlling interest in the small business' PCA mentor contractor.

(d)     While it is ED's intent to be flexible in allowing mentoring arrangements that will promote successful Task Order performance by both parties, no deviations from the SOW or other Task Order provisions will be allowed without the Contracting Officer's approval. Mentoring arrangements may not give, nor contain provisions that would potentially give, the business in the Unrestricted Pool a control (as defined in FAR 19.101 Explanation of Terms.) in the small business contractor or one of its small business team partners.

(e)     To encourage meaningful mentoring support, ED will provide bonus payment awards to the Unrestricted Pool mentor based on the competitive performance of the small business contractor. (i.e., if the small business earns a performance bonus, its mentor will be rewarded with a bonus payment.) During the First Ordering Period of the Task Orders, the Unrestricted Pool mentor will receive a bonus equal to the bonus earned by the small business. During the Optional Ordering Periods, the Unrestricted Pool mentor will receive a bonus equal to half the bonus earned by the small business. No mentoring bonuses will be paid after the initial Optional Ordering Period. ED reserves the right to adjust bonus payment awards.

(f)     For purposes of this clause, ED will recognize only one mentoring relationship under a Task Order. Although nothing in this clause is intended to prohibit additional mentoring relationships, ED will pay a mentoring bonus to only one Unrestricted Pool mentor for each small business contractor. Similarly, ED will not pay an Unrestricted Pool contractor a bonus for mentoring more than one small business contractor.

**H.9   ORGANIZATIONAL LIMIT ON TASK ORDERS**
(a) The Government intends to award more than one Task Order as a result of this solicitation. More than one award from this solicitation will be made to small business concerns.

(b) No organization, including any affiliate, division or parent of the organization, may receive or hold more than one Task Order resulting from this solicitation. For purposes of this clause, Task Orders in both the Small Business and the Unrestricted Pools are considered to have resulted from the same solicitation. Thus, this restriction prohibits an organization from receiving or holding Task Orders under both the Small Business Pool and the Unrestricted Pool or within a single pool.

(c) If, after award, one organization that holds a Task Order under this solicitation, purchases, merges with or otherwise enters into an affiliation with another organization that also held a Task Order as a result of this solicitation, only one Task Order will remain in effect. The Contractor may choose which Task Order will continue. If the Contractor does not choose or if there is disagreement or ambiguity, the Contracting Officer will determine which Task Order will continue. The continuing Contractor may choose either to have ED:

1.) Recall all accounts (including those in repayment) from the expiring Task Order within sixty days of the effective date of the sales or merger transaction; or

2.) Transfer all accounts (including that not in repayment) to the continuing Task Order within sixty days of the effective date of the sales or merger transaction. All transferred accounts would be included in performance indicators for the continuing Task Order.

(d) No organization may participate in more than one Task Order—whether as an awardee, a member of a team arrangement or as a subcontractor—to the extent that it would in essence be competing against itself, as determined by the Contracting Officer. ED does not intend to approve a subcontract or team arrangement that would allow an organization to essentially compete against itself. The Contracting Officer may waive this restriction if the subcontract or team arrangement is:

1. Part of a mentoring relationship;
2. With an organization whose purpose is to provide employment for persons with disabilities; or
3. Of such special benefit to the public or the Federal Government that the Contracting Officer determines in writing that that it is in the best interests of the Federal Government to waive the restriction.

(e) ED does not consider a small business contracting with one or more large businesses to be essentially competing with itself. Thus, the subcontracting restriction in paragraph (d) of this clause does not apply to:

1. A small business that subcontracts to more than one contactor in the Unrestricted Pool, nor
2. A contractor in the Small Business Pool that subcontracts to one or more contractors in the Unrestricted Pool.

## H.10   CANCELLATION OF TASK ORDERS

The Government reserves the right to recall all accounts and cancel the Task Order if the Contracting Officer determines that the Contractor has performed poorly or fails to perform under the terms of the order. Any contractor that finishes below the CPCS performance range on three (3) consecutive CPCS rating periods is deemed to have performed so poorly that its Task Order is in jeopardy of being cancelled. However, a finish within the CPCS performance range does not preclude cancellation of a Task Order for poor performance. The Government may consider other factors including, but not limited to: complaints, small business subcontracting, security risks or violations, computer system inadequacies, or deficiencies in procedures, quality control or training.

Any contractor that does not have a Department-issued Authority To Operate (ATO) prior to the first data transfer or October 22, 2009, will not receive any accounts and the Task Order may be cancelled.

## H.11   PRIVACY ACT

The clauses at FAR 52.224-1 (APRIL 1984) entitled "Privacy Act Notification" and FAR 52.224-2 (APRIL 1984) entitled "Privacy Act" are incorporated herein by reference.

## H.12   SECURITY CLEARANCE AND USER ID REQUESTS

Contractor staff proposed to perform work under this Task Order shall be subject to ED investigation criteria. Contractor staff working without a final clearance does so on a conditional basis while obtaining the required clearance. The ED investigation includes, at a minimum, the following items:

- Investigation of criminal record
- Reference checks
- Check for defaulted student loans

- Security clearances

The U.S. Department of Education Contractor Employee Personnel Security Screenings Policy defines security levels. ED assigns the security level appropriate for each labor category, commensurate with the duties and system access of the position. The security level also dictates when new or replacement staff may begin to perform work under this Task Order relative to the submission of the security clearance paperwork. The security levels and work rules include:

- High Risk (Level 6C) – An employee cannot assume high-risk positional duties until the security investigation is completed and approved by ED. A waiver option is available, on approval by the OM Computer Security Officer (CSO) and ED's ADP Security Oversight Staff. Employees selected for these positions can work in a lower-level position until the clearance is approved.
- Moderate Risk (Level 5C) – An employee can start working moderate risk positional duties upon submission of the security clearance paperwork to the OM CSO through the COTR.
- Low Risk (Level 1C) – An employee can start working low risk positional duties upon submission of the security clearance paperwork to the OM CSO through the COTR.

The Contractor shall:

- Ensure, at the Project Manager level, that the security clearance and User ID paperwork required by ED is accurately and thoroughly completed and submitted to ED no later than with the submission of a resume for additional or replacement personnel.
- Obtain its supply of security clearance forms directly from the OM CSO.
- Reproduce as needed the ED/CCF User ID request form (88-01) for this specific project.
- Remove any individual from their position for whom ED disapproves and withdraws their clearance and immediately revoke their access to all ED systems.

Clearance Submission Guidelines
The Contractor shall submit security paperwork for any position requiring an ED clearance based on the ED Information Technology Security Manual and the guidelines contained herein. Table 1 details the forms that contractor staff shall complete to request processing of a security clearance.

Table 1. Clearance Forms Required for Positions

| Form | Title | Copies | High Risk | Moderate Risk | Low Risk |
|------|-------|--------|-----------|---------------|----------|
| SF-306 | Federal Employment Form (as Used for background check, Application for Federal Employment (Rev. 6-88); Complete items 6, 17, 29, 25-28, 36, 38-44, 45 if applicable | 2 | X | X | X |
| SF-85P | Questionnaire for Public Trust Positions (Rev. Sept 1995) | 2 | X | X | X |
| FD-258 | Fingerprint Card | 1 original | X | X | X |
| SF-85 | Questionnaire for Non-Sensitive Positions (Rev. Sept 1995) | 2 | | | X |

In the submission of security clearance paperwork, the Contractor shall:

a. Assure the clearance level sought for the employee is based upon the criteria established by ED

b. Assure that the employee completes the proper forms, as detailed in Table-1 as follows:
   i. Employees without a clearance must complete all required forms.
   ii. Employees with current or previous clearances must complete additional forms as required to meet all requirements.

c. For employees with current or previous clearances requiring no additional paperwork:
   **Complete a memo, on company letterhead with an authorized signature, with the following:**
   1. Full name
   2. Date and place of birth
   3. Social Security Number
   4. Level of security clearance
   5. Employer Name
   6. Date of investigation
   7. (At time of investigation)
   8. Task Order Number
   9. Agency completing the investigation

d. For employees with current or previous clearances requiring additional paperwork, forward the completed additional paperwork to the Contractor's Project Manager. This primarily concerns upgrading to a higher security level.

e. Ensure that the proper forms are accurate and complete before forwarding the forms in sealed envelopes, through the COR, to the OM CSO.

f. Notify the employee's manager of the security investigation results.

g. Remove the employee from performing work under this Task Order in the event of a clearance denial and revoke all User IDs.

h. Ensure that no one receives a User ID for any Recipient and Financial Management system(s) component operated outside the ED/CCF until the ED/CCF User ID is approved by the OM CSO and established at the ED/CCF.

## H.13  REMOVAL FROM PROJECT ACCESS
**When employees are removed from positions, for any reason, the Contractor shall:**
a. Revoke all access authorizations
b. Retrieve all specific keys and badges
c. Change the combinations on all locks to which the employee had access
d. Review the employee's obligations to the organization
e. Notify appropriate ED security officials of the removal action and request emergency termination of the ED/CCF User ID if appropriate to the cause for removal
f. Submit, within two (2) workdays, the ED/CCF User ID request form (88-01) to the assigned ADP Systems Manager to cancel the system access.

**For all access terminations, the Contractor shall:**
a. Follow the Checklist for Employee Termination
b. Assure that the departing employee either completes all assigned tasks or briefs the replacement on the requirements and status of ongoing tasks
c. Determine the employee's access termination date
d. Immediately notify the assigned ADP Systems Manager(s) if access termination is for cause and request an immediate revocation of access
e. Complete the Manager's Checklist for Employee Termination and forward the checklist to the Project Manager
f. Review with the employee their obligation to protect related data
g. Assure that the employee completes the Access Termination Statement

**The Project Manager shall:**
a. Notify ED of the access termination action on the employee
b. Notify the assigned ADP Systems Managers of the access termination date

## H.14  SMALL BUSINESS SUBCONTRACTING TARGETS AND REPORTS
(a) This subsection applies only to contractors in the Small Business Pool. For purposes of this subsection, the term "subcontractor" includes members of team arrangements. The Contractor agrees that the total amount of payments to subcontractors and members of a contractor team arrangement that are not small business concerns shall not exceed 20% of Task Order proceeds (i.e., of payments by the Government to the Contractor). If the Contractor exceeds this limitation, the Contracting Officer shall give the Contractor written notice requiring the Contractor to reduce its use of other-than-small-business subcontractors or team members. If within 6 months of the date of the Contracting Officer's notice, the Contractor's payments to subcontractors and team members still exceed the limitation (calculated on a task-order-to-date basis), the Contracting Officer may assess liquidated dated damages in a manner and amount similar to that described in the clause at I.5, FAR 52.219-16 Liquidated Damages-Subcontracting Plan (Jan 1999).

(b) This subsection does not apply to contractors in the Small Business Pool. ED seeks to ensure that small business are given meaningful opportunities and collectively receive a substantial portion of the revenue from these Task Orders. The Contractor agrees to subcontract a

substantial portion of the work under this Task Order to small businesses. By the 20th of each month, the Contractor shall submit to the ED Contract Specialist a subcontracting report (or reports) in the format prescribed by the Contracting Officer or the Contracting Officer's Representative.

If the Contractor applied small business subcontracting targets to a major subcontractor, ED will allow the Contractor to include second-tier subcontracts to small businesses (i.e. the major subcontractor's subcontracts) in subcontracting data it reports related to items 1 and 2 below. For purposes of this Task Order, a major subcontract is defined as one exceeding 10% of contract Task Order proceeds for the period.

1.   ED will include small business subcontracting as part of the CPCS Service Quality measure described in Clause H.5, Contractor Performance Evaluation, of this Task Order. To ensure meaningful subcontract opportunities, ED will give greater weight in CPCS to subcontracts that assign accounts for collection to small businesses. ED's goal is to ensure that small businesses receive a fair share of revenue under this Task Order.

2.   Small business subcontracts are not restricted to collection efforts. However, to ensure that small businesses have opportunities collecting defaulted students loans, the following targets shall apply to each quarterly CPCS surveillance period:

Placement to a small business subcontractor of at least the following of percentage of accounts transferred to the Contractor that quarter within 5 business days of ED's transfer of the account to the Contractor.

**Percentage of Accounts Assigned**

| | |
|---|---|
| Contract Base Period, | 3% |
| April 2011 through March 2012 | 5% |
| April 2012 through March 2013 | 7% |

The target percentages are based on each quarter, not each transfer. For example, a contractor could do all of its small business placements from a single transfer from ED. No target shall apply to the initial CPCS period.

Accounts that the Contactor has selected or culled in a biased manner may not be counted toward the target. However, the Contractor may select accounts for placement if the selection is made for the small business's benefit. For example, a selection of accounts for placement might be based on borrowers located in a geographical area on which the small business focuses.

## H.15   GOVERNMENT-FURNISHED COMPUTER FACILITIES

A private contractor provides a Government computer facility. The PCA contractor will have on-line access, Monday through Friday, 8:00 am to 10:00 p.m. eastern time. The system will not be available on Federal holidays. Occasionally, the system may be available on weekends when batch processing permits. The system may also be unavailable during peak processing periods or due to planned or unexpected system outages.

## H.16   ED307-17 CONFLICTS OF INTEREST (2007)

(A)  The contractor, subcontractor, employee or consultant, has certified that, to the best of their knowledge and belief, there are no relevant facts or circumstances which could give rise to an organizational or personal conflict of interest, (see FAR Subpart 9.5 for organizational conflicts of interest), (or apparent conflict of interest) for the organization or any of its staff, and that the contractor, subcontractor, employee or consultant has disclosed all such relevant information if such a conflict of interest appears to exist to a reasonable person with knowledge of the relevant facts (or if such a person would question the impartiality of the contractor, subcontractor, employee or consultant). Conflicts may arise in the following situations:

1.  Unequal access to information – a potential contractor, subcontractor, employee or consultant has access to non-public information through its performance on a government contract.

2.  Biased ground rules – a potential contractor, subcontractor, employee or consultant has worked, in one government contract, or program, on the basic structure or ground rules of another government contract,

3.  Impaired objectivity – a potential contractor, subcontractor, employee or consultant, or member of their immediate family (spouse, parent or child) has financial or other interests that would impair, or give the appearance of impairing, impartial judgment in the evaluation of government programs, in offering advice or recommendations to the government, or in providing technical assistance or other services to recipients of Federal funds as part of its contractual responsibility.

    i.  "Impaired objectivity" includes but is not limited to the following situations that would cause a reasonable person with knowledge of the relevant facts to question a person's objectivity:

    ii.  financial interests or reasonably foreseeable financial interests in or in connection with products, property, or services that may be purchased by an educational agency, a person, organization, or institution in the course of implementing any program administered by the Department;

    iii.  significant connections to teaching methodologies that might require or encourage the use of specific products, property or services; or

    iv.  significant identification with pedagogical or philosophical viewpoints that might require or encourage the use of a specific curriculum, specific products, property or services,

Offerors must provide the disclosure described above on any actual or potential conflict (or apparent conflict of interest) of interest regardless of their opinion that such a conflict or potential conflict (or apparent conflict of interest) would not impair their objectivity.
In a case in which an actual or potential conflict (or apparent conflict of interest) is disclosed, the Department will take appropriate actions to eliminate or address the actual or potential conflict (or apparent conflict of interest), including but not limited to mitigating or neutralizing the conflict, when appropriate, through such means as ensuring a balance of views, disclosure with the appropriate disclaimers, or by restricting or modifying the work to be performed to avoid or reduce the conflict. In this clause, the term "potential conflict" means reasonably foreseeable conflict of interest.

(B)  The contractor, subcontractor, employee or consultant agrees that if "impaired objectivity, or an actual or potential conflict of interest (or apparent conflict of interest) is discovered after the award is made, it will make a full disclosure in writing to the Contracting Officer. This

disclosure shall include a description of actions that the Contractor has taken or proposes to take, after consultation with the Contracting Officer, to avoid, mitigate, or neutralize the actual or potential conflict (or apparent conflict of interest).

(C)  Remedies - The Government may terminate this contract for convenience, in whole or in part, if it deems such termination necessary to avoid the appearance of a conflict of interest. If the Contractor was aware of a potential conflict of interest prior to award or discovered an actual or potential conflict (or apparent conflict of interest) after award and did not disclose or misrepresented relevant information to the Contracting Officer, the Government may terminate the contract for default, or pursue such other remedies as may be permitted by law or this contract. These remedies include imprisonment for up to five years for violation of Title 18, U.S. Code, § 1001 and fines of up to $5000 for violation of Title 31, U.S. Code, § 3802. Further remedies include suspension or debarment from contracting with the federal government. The Contractor may also be required to reimburse the Department for costs the Department incurs arising from activities related to conflicts of interest. An example of such costs would be those incurred in processing Freedom of Information Act requests related to a conflict of interest.

(D)  In cases where remedies short of termination have been applied, the contractor, subcontractor, employee or consultant agrees to eliminate the organizational conflict of interest, or mitigate it to the satisfaction of the Contracting Officer.

(E)  The Contractor further agrees to insert in any subcontract or consultant agreement hereunder, provisions which shall conform substantially to the language of this clause, including specific mention of potential remedies and this paragraph (E).

## H.17   WAGE DETERMINATION

It is the responsibility of the contractor to apply the appropriate wage determinations made by the U.S. Department of Labor.  The contractor shall use the applicable wages based on the contract performance locality.  The wage determinations can found at the Department of Labor's website: http://www.wdol.gov.  (See Section J, Attachment B.)

*(End of Section H)*

## PART II - CONTRACT CLAUSES

### SECTION I - CONTRACT CLAUSES

**I.1    CLAUSES INCORPORATED BY REFERENCE - ALTERNATIVE I (FAR 52.252-2) (FEB 1998)**
This order/contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this address: http://www.arnet.gov/far/.

**I.2    FAR 52.203-13 Contractor Code of Business Ethics and Conduct (Dec 2008)**

**I.3    FAR 52.203-14 Display of Hotline Poster(s) (Dec 2007)**

**I.4    FAR 52.215-2 Audit and Records—Negotiation (June 1999)**

**I.5    FAR 52.219-8 Utilization of Small Business Concerns (May 2004)**

**I.6    FAR 52.219-9 Small Business Subcontracting Plan (Nov 2007)**

**I.7    FAR 52.219-16 Liquidated Damages-Subcontracting Plan (Jan 1999)**

**I.8    FAR 52.219-25 Small Disadvantaged Business Participation Program--Disadvantaged Status and Reporting (Oct 1999)**

**I.9    FAR 52.222-41 Service Contract Act of 1965 (Nov 2007)**

**I.10   FAR 52.222-43 Fair Labor Standards Act and Service Contract Act—Price Adjustment (Multiple Year and Option Contracts) (Nov 2006)**

**I.11   FSA 24-1 Release of Information under the Freedom of Information Act (Jan. 2008)**
By entering into a contract with the Department of Education, the contractor, without regard to proprietary markings, approves the release of the entire contract and all related modifications and Task Orders including, but not limited to:

(1)    Unit prices, including labor rates,

(2)    Statements of Work/Performance Work Statement generated by the contractor,

(3) Performance requirements, including incentives, performance standards, quality levels and service level agreements,

(4) Reports, deliverables and work products delivered in performance of the contract (including quality of service, performance against requirements/standards/service level agreements),

(5) Any and all information, data, software and related documentation first provided under the contract,

(6) Proposals or portions of proposals incorporated by reference, and

(7) Other terms and conditions.

**I.12    FSA 27-1 Labeling of Documents (June 2007)**
The Contractor shall not label any data produced in performance of this contract in a way that would restrict the Government's right to use or release the information. If applicable, the Contractor shall include a legend that identifies sensitive data that should not be released for security reasons. Under FAR clause 52.227-14, Rights in Data-General (or 52.227-15, -16, -17) clause, this data may be used for any purpose the Government deems appropriate. Deliverables shall not contain vendor-specific logos, mottos, watermarks, or holograms.

The Contractor shall not use, particularly for proposals, U.S. Government logos, such as the U.S. Department of Education or Federal Student Aid.

**I.13    FSA 27-2 Limitations on the Use or Disclosure of Government Furnished Information Marked with Restrictive Legends (December 2006)**
(a) For contracts under which data are to be produced, furnished, or acquired, the terms "limited rights" and "restricted rights" are defined in the Rights in Data - General clause of this contract.
(b) Proprietary data, technical data or computer software provided to the Contractor as Government furnished information (GFI) under this contract may be subject to restrictions on use, modification, reproduction, release, performance, display, or further disclosure.
   (1) *Proprietary data with legends that serve to restrict disclosure or use of data.* The Contractor shall use, modify, reproduce, perform, or display proprietary data received from the Government with proprietary or restrictive legends only in the performance of this contract. The Contractor shall not, without the express written permission of the party who owns the data, release or disclose such data or software to any person.
   (2) *GFI marked with limited or restricted rights legends.* The Contractor shall use, modify, reproduce, perform, or display technical data received from the Government with limited rights legends or computer software received with restricted rights legends only in the performance of this contract. The Contractor shall not, without the express written permission of the party whose name appears in the legend, release or disclose such data or software to any person.
   (3) *GFI marked with specially negotiated license rights legends.* The Contractor shall use, modify, reproduce, release, perform, or display proprietary data, technical data or computer software received from the Government with specially negotiated license legends only as permitted in the license. Such data or software may not be released or disclosed to other persons unless permitted by the license and, prior to release or disclosure; the intended recipient has completed the use and non-disclosure agreement. The Contractor shall modify paragraph (1)(c) of the use and non-disclosure agreement to reflect the recipient's obligations regarding use, modification, reproduction, release, performance, display, and disclosure of the data or software.

(c) Indemnification and creation of third party beneficiary rights.
   (1) The Contractor agrees to indemnify and hold harmless the Government, its agents, and employees from every claim or liability, including attorneys fees, court costs, and expenses, arising out of, or in any way related to, the misuse or unauthorized modification, reproduction, release, performance, display, or disclosure of proprietary data, technical data or computer software received from the Government with restrictive legends by the Contractor or any person to whom the Contractor has released or disclosed such data or software.

(2) The Contractor agrees that the party whose name appears on the restrictive legend, in addition to any other rights it may have, is a third party beneficiary who has the right of direct action against the Contractor, or any person to whom the Contractor has released or disclosed such data or software, for the unauthorized duplication, release, or disclosure of proprietary data, technical data or computer software subject to restrictive legends.

## I.14   FSA 27-3 Use and Non-Disclosure Agreement

(a) Except as provided in paragraph (b) of this clause, proprietary data, technical data or computer software delivered to the Government with restrictions on use, modification, reproduction, release, performance, display, or disclosure may not be provided to third parties unless the intended recipient completes and signs the use and non-disclosure agreement at paragraph (c) of this clause prior to release or disclosure of the data.

(1) The specific conditions under which an intended recipient will be authorized to use, modify, reproduce, release, perform, display, or disclose proprietary data or technical data subject to limited rights, or computer software subject to restricted rights must be stipulated in an attachment to the use and non-disclosure agreement.

(2) For an intended release, disclosure, or authorized use of proprietary data, technical data or computer software subject to special license rights, modify paragraph (1)(d) of the use and non-disclosure agreement to enter the conditions, consistent with the license requirements, governing the recipient's obligations regarding use, modification, reproduction, release, performance, display or disclosure of the data or software.

(b) The requirement for use and non-disclosure agreements does not apply to Government contractors which require access to a third party's data or software for the performance of a Government contract that contains the clause, Limitations on the Use or Disclosure of Government Furnished Information Marked with Restrictive Legends.

(c) The prescribed use and non-disclosure agreement is:

Use and Non-Disclosure Agreement

The undersigned, ___(Insert Name) ___, an authorized representative of the ___(Insert Company Name) ___, (which is hereinafter referred to as the "Recipient") requests the Government to provide the Recipient with proprietary data, technical data or computer software (hereinafter referred to as "Data") in which the Government's use, modification, reproduction, release, performance, display or disclosure rights are restricted. Those Data are identified in an attachment to this Agreement. In consideration for receiving such Data, the Recipient agrees to use the Data strictly in accordance with this Agreement:

(1) The Recipient shall —

(a) Use, modify, reproduce, release, perform, display, or disclose Data marked with SBIR data rights legends only for government purposes and shall not do so for any commercial purpose. The Recipient shall not release, perform, display, or disclose these Data, without the express written permission of the contractor whose name appears in the restrictive legend (the "Contractor"), to any person other than its subcontractors or suppliers, or prospective subcontractors or suppliers, who require these Data to submit offers for, or perform, contracts with the Recipient. The Recipient shall require its subcontractors or suppliers, or prospective subcontractors or suppliers, to sign a use and non-disclosure agreement prior to disclosing or releasing these Data to such persons. Such agreement must be consistent with the terms of this agreement.

(b) Use, modify, reproduce, release, perform, display, or disclose proprietary data or technical data marked with limited rights legends only as specified in the attachment to this Agreement. Release, performance, display, or disclosure to other persons is not authorized unless specified in the attachment to this Agreement or expressly permitted in writing by the Contractor.

(c) Use computer software marked with restricted rights legends only in performance of Contract Number ___(insert contract number(s)) ___. The Recipient shall not, for example, enhance, decompile, disassemble, or reverse engineer the software; time share, or use a computer program with more than one computer at a time. The recipient may not release, perform, display, or disclose such software to others unless expressly permitted in writing by the licensor whose name appears in the restrictive legend.

(d) Use, modify, reproduce, release, perform, display, or disclose Data marked with special license rights legends (To be completed by the contracting officer. See (a)(2) of the Use and Non-Disclosure Agreement clause. Omit if none of the Data requested is marked with special license rights legends).

(2) The Recipient agrees to adopt or establish operating procedures and physical security measures designed to protect these Data from inadvertent release or disclosure to unauthorized third parties.

(3) The Recipient agrees to accept these Data "as is" without any Government representation as to suitability for intended use or warranty whatsoever. This disclaimer does not affect any obligation the Government may have regarding Data specified in a contract for the performance of that contract.

(4) The Recipient may enter into any agreement directly with the Contractor with respect to the use, modification, reproduction, release, performance, display, or disclosure of these Data.

(5) The Recipient agrees to indemnify and hold harmless the Government, its agents, and employees from every claim or liability, including attorneys fees, court costs, and expenses arising out of, or in any way related to, the misuse or unauthorized modification, reproduction, release, performance, display, or disclosure of Data received from the Government with restrictive legends by the Recipient or any person to whom the Recipient has released or disclosed the Data.

(6) The Recipient is executing this Agreement for the benefit of the Contractor. The Contractor is a third party beneficiary of this Agreement who, in addition to any other rights it may have, is intended to have the rights of direct action against the Recipient or any other person to whom the Recipient has released or disclosed the Data, to seek damages from any breach of this Agreement or to otherwise enforce this Agreement.

(7) The Recipient agrees to destroy these Data, and all copies of the Data in its possession, no later than 30 days after the date shown in paragraph (8) of this Agreement, to have all persons to whom it released the Data do so by that date, and to notify the Contractor that the Data have been destroyed.

(8) This Agreement shall be effective for the period commencing with the Recipient's execution of this Agreement and ending upon ___(Insert Date) ___. The obligations imposed by this Agreement shall survive the expiration or termination of the Agreement.

_____
Recipient's Business Name


_____          _____
Authorized Representative                                          Date

_____
Representative's Typed Name and Title

*(End of Section I)*

## PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

### SECTION J – LIST OF ATTACHMENTS

| ATTACHMENT | DESCRIPTION |
|---|---|
| A | Statement of Work |
| B | Wage Determination |

*(End of Section J)*

### Attachment A - Statement of Work
### Private Sector Collection Activity
### For Student Related Debts

## 1.1    INTRODUCTION

The U.S. Department of Education (ED), Federal Student Aid, performs collection and administrative resolution activities on debts resulting from non-payment of student loans made under the Federal Family Education Loan (FFEL) Program: Stafford Loans (formerly the Guaranteed Student Loan Program and including Federally Insured Student Loans), Supplemental Loans for Students, PLUS Loans (formerly Parental Loans for Undergraduate Students), and Consolidation Loans; the William D. Ford Federal Direct Student Loan (Direct Loan) Program (formerly known as the Federal Direct Student Loan Program): Federal Direct Stafford/Ford Loan Program, Federal Direct Unsubsidized Stafford/Ford Loan Program, Federal Direct Consolidation Loan, and Federal Direct Plus Loans; and Federal Perkins Loans (formerly National Direct/Defense Student Loans). ED conducts similar collection and administrative resolution activities on debts resulting from a student's failure to fulfill grant requirements under the Pell Grant Program, the Supplemental Educational Opportunity Grant Program, the Academic Competitiveness Grant (ACG) and the National Science and Mathematics Access to Retain Talent (National SMART) grant. [Background information on each of these programs may be found in the website library – http://fsacollections; or at http://ifap.ed.gov.]

Since 1981, ED has contracted for the services of Private Collection Agencies to support collection and administrative resolution activities on debts maintained by ED. Under this Task Order, the Contractor shall:

- Perform duties in coordination with the ED Service Centers. The Service Centers are: Washington Service Center, 830 First Street, NE, Washington, D.C.; Atlanta Service Center, 61 Forsyth Street, Atlanta, Georgia; Chicago Service Center, 500 W. Madison Street, Suite 1520, Chicago, Illinois; and San Francisco Service Center, 50 Beale Street, San Francisco, California.
- Establish within ninety (90) calendar days of Task Order award, administrative and collection office (s) dedicated **exclusively** to the collection and resolution of ED accounts.

The collection office need not be located at the same site as the administrative office. The administrative office must also function as a liaison office between ED and the Contractor. Meetings between the Contracting Officer's Representative (COR), Assistant Contracting Officer's Representative, the monitor and the individual Contractor may take place either in the Contractor's administrative office, their collection office, any subcontractor or satellite office, or any ED designated Office. The Contractor may, at its option, establish additional collection offices (referred to as a satellite-collection office) at any time during the Task Order period; however, the Contractor must incur the cost of the additional telecommunication line(s). These satellite-collection offices must conform to all applicable requirements set forth in the contract and Task Order. The same Contractor employee shall maintain direct management control over both the primary office and the sub offices. Only one administrative office must service these offices. The Contractor shall obtain the COR's approval before opening a satellite office.

- Accept and return account data for collection by electronic file transfer in the specified formats provided by ED. (see ED's Default Management Collection System Manuals contained within the PCA website "Library" – http://fsacollections)
- Establish and maintain computer software and hardware which can accept and accommodate data on all ED accounts, be updated on a daily basis, and provide the information specified in this Statement of Work. The Contractor shall generate Billing Statements through the ED System. The Contractor shall generate all letters through their computer system and transfer to the ED System letter history screen via secure **electronic file transfer (EFT)**. Access to all ED

account data must be restricted to the collection and resolution activities on ED accounts <u>exclusively</u>.

Adhere to all ED security requirements as outlined in the Departmental Directive, Handbook OCIO-01, Handbook for Information Assurance Security Policy, including any future revisions, and any other ED specified security policy documents; maintaining, at the Contractor location, the same level of security for all ED account data as is maintained on ED's system.

- Obtain an Authorization to Operate (ATO) from the Federal Student Aid Chief Information Officer prior to 10/3/09. ED will provide checklists and templates, which must be completed by a third party reviewer. The checklist and templates are based on NIST 800-53 requirements.
- Establish a training program for each loan program and related ED campaigns and initiatives to encompass the complete range of collection activity specified in this Task Order. This program must include comprehensive initial and follow-up training of Contractor and subcontractor employees relative to the activities to be performed and the laws and regulations, which govern such activities received.
- Provide a mailbox to receive ED correspondence, exclusively, at a U.S. Post Office located in the area of the administrative office, and pick-up correspondence received at this box at least once each workday.
- Perform activities in strict adherence with all applicable Federal and State laws and regulations in a professional and courteous manner; and support the mission of the ED/Collections, which is to: "Provide quality customer service and sound credit management to maximize net revenue".
- Provide facilities, equipment and perform actions necessary for large-scale nationwide collection of Federal Government debts.
- Locate and contact borrowers to demand payment of their debts to the Federal Government, or otherwise resolve their debt.
- Prepare eligible cases for administrative resolution, Administrative Wage Garnishment (AWG) and litigation, based on the criteria in the Task Order, and meet established goals set by ED. The Contractor shall be responsible for obtaining documentation in accordance with administrative resolution procedures [as outlined in the Procedures Manual], or as requested by ED, and the forwarding of all such materials upon request.
- Return all accounts and associated records, accompanied by all required documentation, to ED within timeframes specified in the Task Order, as outlined in the Deliverable Section.
- Protect the Federal Government against loss of monies and loss of or damage to property.
- Agree to indemnify, defend and hold the Federal Government harmless from all liability, loss, damages, claims and other expenses, including attorney's fees and court costs, originating from or in connection with the Contractor's performance under this Task Order.
- Take all necessary steps, as warranted, by each State or locality to insure that it is operating within the laws of the jurisdiction except insofar as Federal law supersedes these requirements, as specifically directed or approved by ED in the collection of monies owed to the Federal Government. This includes meeting all applicable State-licensing requirements, including the successful completion by Contractor employees of any State mandated exams prior to the first placement of accounts. ED anticipates face-to-face meetings three or four times per year coordinated by either ED or the contractors at a designated location within the continental United States. ED will also hold periodic update/training meetings. Registration fees may be required of participants. Contractors are responsible for their travel expenses to the meetings and periodic update/training meetings.

- The Contractor, in connection with other collection efforts involving the same borrower under any other contract, shall not access related data on ED accounts. More specifically, no information relative to an ED account may be exchanged or consolidated in any medium with information regarding the same borrower from another Federal agency, school, etc.
- The contractor shall adhere to all terms, conditions, and requirements set forth in the SOW and any ED policies and procedures established in conjunction with this contract. Failure to follow these requirements may lead to ED taking administration action. Potential penalties for specific issues may include, but are not limited to, loss of commission/fees, recalling of accounts, withholding account transfers, loss of bonus funds, staff removal, and/or termination of Task Order.

## 1.2   GENERAL ACCOUNT CHARACTERISTICS

The general characteristics of the portfolio, as of December 31, 2007, having a balance (principal, interest, penalty fees, fees, administrative costs) of $500.00 or more are available in the PCA website library (http://fsacollections). ED does not guarantee that these numbers and values will precisely reflect the accounts eligible for transfer. They are presented as general portfolio characteristics.

## 1.3   LAWS AND REGULATIONS GOVERNING COLLECTION ACTIVITY

Collection activity on debts held by the Department of Education is authorized and regulated by a number of different statutes and regulations, including those listed here. The Contractor is required to conduct its actions in a way that complies with these Federal and State laws. Failure to do so may result in immediate punitive measures and/or termination of the Task Order. -- Title IV, Parts A through G of the HEA (20 U.S.C. 1070 - 1098d.) and implementing regulations (34 CFR Parts 668, 674, 682, 685, 690and 691);

- The Federal Claims Collection Standards (31 CFR Parts 901-904).
- The Bankruptcy Code, as amended (11 U.S.C. 101 et seq.), especially sections 362(a) and 523(a)(8)(B).
- The Privacy Act of 1974 (5 U.S.C. 552a).
- ED Debt Collection Regulations (34 CFR Parts 30, 31, and 34).
- Debt Collection Act of 1982 and the Debt Collection Improvement Act of 1996, as codified at 31 U.S.C. 3701 - 3720E. -- The Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq, and, as required by 31 U.S.C. 3718, State law regulating collection actions except where such State law is preempted by Federal law.

The Secretary of Education has statutory authority to contract for Collection services under section 430(b) of the HEA (20 U.S.C. 1080(b) and 20 U.S.C. section 1087hh(e)(4)), and the Department of Education Organization Act of 1980 (20 U.S.C. 3475).

## 1.4   TRANSFER OF ACCOUNTS

ED's initial transfer will be 15,000 accounts to each large business contractor and 5,000 accounts to each small business contractor no earlier than 90 days after Task Order award, upon successful implementation of the deliverables as outlined in Section 5.1 Task Order Deliverables. Though ED has the final determination on all transfer amounts, the first several transfers may be level until the CPCS Performance measures are initiated (See Section H.5). In addition, the first several account transfers after the competitive period formally begins, may contain base pool transfer amounts for each agency, along with, competitive percentage transfer amounts.

ED has performed at least minimum collection activity on all accounts. ED will not distinguish an account by the number of times it has been placed with a collection agency until such time as a new system is implemented, which can track and make commission payments based on number of times placed. ED will not make transfers based on the default date of the loan. The only common characteristic is that each

account will be categorized as delinquent. Any minimum balance criteria (principal, interest, penalty fees, fees, administrative costs) will be at the government's discretion.

Additional account transfers will be based on contractor performance and evaluations conducted by ED. **Failure to achieve a level of performance that falls within the "performance range" may result in no additional account transfers to poor performers until performance within the performance range is achieved**. [Description and timing of evaluations to be conducted in determining contractor performance can be found in Section H.5.]

### 1.4.1   INVENTORY CONTROL LIMITS

A Contractor may, at its discretion, request a limit on the number of accounts that it wishes to accept ("inventory control limit"), under the following conditions:

- By the 10th--The Contractor must send its request to set an inventory control limit on the next transfer to the COR and Assistant COR no later than the 10th of the month.
- Reason--The Contractor must state the reason it wishes to cap its transfer volumes at this time
- Other conditions set by COR--The COR may establish in writing additional limits or conditions related to Inventory Control Limits at any time during the performance of the Task Order.

ED has the final authority on all account transfers and recalls. ED expressly reserves the right to approve, deny or change any Contractor request to set an inventory control limit. Regardless of whether a Contractor has requested an inventory control limit, ED may limit transfers to a Contractor for any reason.

### 1.4.2   ED TRANSFER LIMITS

ED reserves the right, at any time, to limit the number of accounts transferred to a Contractor.

For example, the COR's Office may issue a policy indicating that ED will not transfer a volume of accounts greater than 50% of the contractor's CIA. If ED withholds "earned" accounts from a transfer, ED will carryover the number of accounts not transferred and will add those to the "earned" account transfer volume at the next transfer. This process will be repeated with each transfer until the carryover has been eliminated.

### 2.1   IMPLEMENTATION

In implementing their collections program, the Contractor shall establish an operational system to store ED account records on its own computer system; establish the technological ability for ED to remotely access the Contractor's collection computer system (supplying any software, hardware, and connectivity) and providing any necessary training to ED on the Contractor's collection system at the Contractor's expense finalize procedures relating to the transfer of accounts, reports and other information between ED and the Contractor; prepare a Collections Training Manual and a Standard Operating Procedures Manual (including letters and forms that will be generated from the Contractor's collection system); and finalize a Quality Control Plan for use by Contractor and subcontractor personnel. The Contractor must complete these requirements prior to the first transfer of accounts.

After the initial account transfer, the Government shall perform an initial review - Contract Implementation Evaluation (CIE) – with all Contractors or those Contractors meeting certain established review criteria (e.g. new ED Contractors, former small businesses moving up to the unrestricted classification, etc.) in order to assess system related operations, the interface between the Contractor's computer system(s) and the ED-System, and the administrative interface between the Contractor and ED. ED reserves the right to conduct on-site and/or off-site reviews with each Contractor under the most appropriate method based upon review criteria and with an effort to maximize all available resources.

### 2.2   TRAINING

The Contractor's <u>Collection Training Manual</u>, <u>Standard Operating Procedures Manual</u> (that must include all Industry abbreviations in use by its collections), and the <u>Quality Control Plan</u> must be approved by the Contracting Officer's Representative (COR) and Assistant Contracting Officer's Representative.

ED will provide training on appropriate ED Procedures to the Contractor's Training Staff. Thereafter, the Contractor's Training Staff shall train all other Contractor employees and conduct regular training sessions for its employees and any subcontractor employees to ensure adherence to applicable laws, regulations and ED policies. The Contractor shall conduct additional training to inform its employees and any subcontractor employees of all changes in operational procedures, laws or regulations as they are modified or updated. The Contractor shall also provide State and locality debt collection-related training to the employees, including the successful completion by Contractor and subcontractor employees of any State-mandated exams.

Each employee and subcontractor employee assigned to this Task Order must receive training relevant to the Privacy Act of 1974 and Security Awareness, and shall certify, in writing, that they have received this training before they begin any collection activity on ED accounts. .) Each employee must then re-take this training each year by July 15. Signed certifications must be forwarded to the address below within five (5) calendar days after completion of training along with an excel spreadsheet with the employee's name, SSN, Training date and Sent date. (After the Task Order award, ED will provide the certification form to be signed by each employee and subcontractor employee along with the excel format)

> Attention: Privacy Act Certification Team
> 61 Forsyth Street SW
> Room 19T89
> Atlanta, GA 30303

The Contractor shall measure the effectiveness of the training by administering post-training tests. The COR and Assistant COR may review the results to ascertain the need for additional training and testing. A certification form for all training provided in support of this Task Order must be signed by each Contractor and subcontractor employee and maintained on file by the Contractor. Along with certifications, the Contractor must record (electronic spreadsheets, tracking forms, etc.) all training provided to Contractor employees or subcontractors by individual names, training topics, and dates of training. The Contractor shall make certifications and all training records available for Government review at the request of the CO, COR, assistant COR or ED Monitors.

The Contractor may request site visits for technical assistance and/or training. The Contractor will be responsible for travel costs incurred for requested technical assistance and/or training site visits. Proposed costs must be consistent with the most current Government per diem rates for lodging and meals. The PCA Training Manual may be referenced for additional information relative to request procedures. All payments by the Contractor for site visit costs must be made to the Government (E.g., the Contractor may not make payments to a hotel or a Federal employee).

A schedule of all update training conducted during the month and a brief synopsis of the subject matter covered in each training session must be included in the Contractor's Management and Fiscal Report.

## 2.3    QUALITY CONTROL

ED is committed to quality control as a means of ensuring quality performance and achievement. The Contractor shall also adopt this philosophy and, to that end, shall design a quality control plan and, upon final approval by the COR, shall implement the plan. To monitor and provide contractor oversight, one on-site review, along with periodic off-site reviews, may be performed annually. The reviews may be

announced or unannounced. If significant instances of non-compliance are found, potential compliance concerns exist, or if changes are made by the Contractor or ED that may affect performance in accordance with the Task Order, follow-up or additional compliance reviews may be conducted. The reviews will focus on compliance with federal regulations, Task Order and contract requirements, policies, etc. Agency Review Reports, including any findings, and corrective actions, will be issued at the completion of each review. All areas of the ED collections Contract are subject to review and all finding/concerns must be resolved. Penalties for specific issues may include, but are not limited to, loss of commission/fees, recalling of accounts, withholding account transfers, loss of bonus funds, staff removal, and/or termination of Task Order.

### 2.3.1   REMOTE CALL MONITORING

All Contractors shall provide ED the capability to remotely monitor Contractor "collection calls" on all ED accounts.

"Unrestricted" contractors shall provide ED the capability to remotely monitor all "collection calls" by accessing automated call recordings of collection calls through a secure web-based portal.

"Small Business" contractors shall provide ED the capability to remotely monitor all "collection calls" through accessing the agency phone system; however, "Small Business" contractors shall provide ED the capability to remotely monitor all "collection calls" by accessing automated call recordings of collection calls through a secure web-based portal within 2 years of the Task Order award.

ED will use remote phone monitoring and call recordings to perform compliance reviews of collection activities, assess call quality on ED accounts and monitor individual collectors in reference to complaints. The Contractor must inform all parties that calls will be recorded and/or monitored for quality review purposes.

For ED purposes, "collection calls" refer to any out-going or in-coming calls related to any collection activity on an ED account. Collection activities include, but are not limited to, request for payments, administrative resolutions, ED loan payment programs, administrative wage garnishments, skip tracing, verifications, etc.

Remote call monitoring through recorded calls must include all "collection calls" regardless of account, subject or duration. Other requirements include:
> Storage of up to 90 days worth of calls
> Ability to retrieve specific calls by day or by individual contractor staff
> Recorded calls must be afforded the same protection as any other ED sensitive borrower data.

Remote call monitoring through agency phone systems must allow ED monitors the ability to listen to individual contractor staff or randomly listen to the next available call.

Remote call monitoring (phone system or recorded calls) applies to the primary ED contractor (includes all satellite offices). If a primary contractor (small or unrestricted) uses a subcontractor to perform "collection calls," the primary contractor must be able to remotely monitor the subcontractor collection calls at the start of the subcontract award; and, must be able to record all subcontractor collection calls within 2 years of the subcontract award.

Agencies must provide any training, manuals, procedures, etc. necessary for ED staff to utilize the agency's remote call monitoring or call recording system.

## 2.4   RESOLUTION OF COMPLAINTS

ED will maintain a Complaint Tracking System that will include both verbal and written complaints. ED will track by agency, individual collector, and nature of the complaint. When ED has received one or more complaints for a collector of a type or violation that is a concern to ED, the Contractor shall, upon notification, immediately remove that collector from the ED Task Order. When the subject of any complaint is a concern to ED, the COR/Assistant COR will notify the Contract Administrator to immediately cease the activity causing the concern. If there are complaints regarding this activity after the Contract Administrator has been notified, a two (2)-point reduction in the next quarterly CPCS score will occur.

Contractors shall adhere to all complaint procedures required by ED. At a minimum, complaint procedures will encompass time frames, proper documentation, and notification requirements. Please see the PCA Procedures Manual for more detailed information.

## 2.5   COLLECTION LETTERS/FORMS

The Contractor shall obtain ED's approval of all collection letters and forms used by the Contractor, and/or generated from the Contractor's own computer system, prior to usage. The Contractor shall also obtain ED's approval with regards to any changes made to collection letters/forms. Contractor attorneys must approve all ED agency letters/forms (and any changes) prior to submission to ED and proof of acceptance by the Contractor legal counsel must be provided to ED along with the letter submission. Any letter requesting repayment from the borrower must be generated with a coupon. The specifications for this coupon will be provided after Task Order award. The Contractor shall transmit to ED on a weekly basis the letter history to include any return mail as outlined in the document "Standard Letters and Forms," which ED will provide after Task Order award.

If changes and or corrections are needed on contract letters and the Contractor has been notified to make the changes, the Contractor must have all changes/corrections made and submitted, along with proof of Contractor legal counsel approval, to the ED contact person for review and approval within 30 days. If the Contractor does not comply with this timeframe, transfer of accounts will be withheld until the letters are approved. The Contractor must provide a final production copy of all approved letters to the ED contact person, COR, Assistant COR and Monitor within 10 calendars days after notification by ED that the letters have been approved.

## 2.6   DOCUMENTATION OF COLLECTION ACTIVITY

The Contractor shall immediately record, on its own computer system, all collection activity occurring on an account, including, but not limited to, - documentation of all in-coming and out-going calls; complete, clear, accurate summaries of phone conversation; clear correspondence receipts and deliveries; etc.

The Contractor shall update the ED-System with borrower's name, address, home and work telephone number changes and information regarding the borrower's employment, i.e., employer's name, address and telephone number. Reference the Procedures Manual for transmission mechanisms, security constraints and other specific data of inputs required by the ED-System.

## 2.7   REPAYMENTS

The Contractor is strictly <u>prohibited</u> from soliciting the receipt and processing of payments under this Task Order. The Contractor is also prohibited from soliciting post-dated checks. ED's Lockbox will not accept post-dated checks. Reference the Procedures Manual for instructions relative to this subject.

### 2.7.1   Credit Cards
Any contractor that processes credit cards/debit cards for accounts under this Task Order shall abide by all credit card securities and requirements as outlined by ED and contained in the Payment Card Industry Data Security Standard (PCI DSS). The Contractor is responsible for the security of any cardholder data it maintains or possesses.
(See Section 6.2 for additional security requirements)

## 2.8   CORRESPONDENCE
Routine: The Contractor shall process routine incoming correspondence within ten (10) calendar days of receipt. Correspondence must be received, and maintained at the Contractor's administrative office. Correspondence must be retained at the administrative office when the collector is located at the sub office. Correspondence includes all documentation received pertaining to a "current" borrower account. Documentation received on accounts no longer placed with an agency will be forwarded to an ED designated site (see PCA Procedures Manual for specific correspondence requirements).

Other: Other incoming correspondence as outlined in the PCA Procedures manual must be referred to ED within one (1) business day. See Procedures Manual for detailed instructions.
Contractors shall have the ability to image, electronically store and produce viable copies (legible, same format as original document) of all incoming correspondence and, if requested by ED, can send electronically secure imaged documents.

Unless otherwise stated in the Task Order, under the GSA Scheduling Contract or specifically instructed by ED, agencies must retain account information for the life of the contract.

## 3.1   RESOLUTION OF ACCOUNTS
The Contractor shall systematically resolve all accounts transferred in accordance with the terms and conditions of the Task Order.

The Contractor shall ensure that all attempts to collect on accounts transferred do not involve harassment, intimidation, false, or misleading representation. There shall be no unnecessary communications concerning such debt to persons other than the borrower or the borrower's designated representative. All requests for information from specified third parties, as defined in the PCA Procedures Manual, must be referred to ED upon receipt. (E.g. congressional inquires, etc.)

## 3.2   REQUIRED ACTIVITIES, DOCUMENTATION AND STANDARDS
Listed below are the required collection activities to be performed by the Contractor, the required documentation to be obtained by the Contractor, and ED standards to be followed by the Contractor.

### A.   LOCATING AND CONTACTING THE BORROWER
Upon initial contact with the borrower, the Contractor's employee shall clearly identify themselves as working for a firm under contract to ED, verify that the borrower's name, address, email address, and telephone numbers are current and obtain employer's name, address and telephone numbers. This information, including all changes, must be updated to the ED-System via the next regular transmission of data.

The use of cell phones (personal or business) by regular collection staff to contact borrowers or any third party is expressly prohibited. A limited number of higher-level management may use cell phones to contact borrowers or third parties in special circumstances. A list of managers that a Contractor wants to be able to use cell phones must be forwarded to the COR and Assistant COR for approval. All cell phone calls must be properly documented in the Contractor collection system with the phone number, date, time, employee identification, and call summary. The agency must ensure cell phones are used according to all applicable federal, state, and local laws regarding debt collection communications. (See PCA Procedures Manual for more detail)

Whenever the Contractor determines that the address last known to ED is undeliverable or the account address record has been coded 'U', the Contractor shall perform skip-tracing efforts. If the Contractor contacts the borrower at an address other than the last address known to ED, the Contractor shall reissue its first demand letter to the borrower at the new address. The Contractor shall process the address update in the next regular transmission of such data.

## B.    REPAYMENT OF ACCOUNTS

The Contractor will attempt to obtain payment in full or settlement. Whenever the Contractor determines that repayment in full is not immediately possible, the Contractor shall negotiate a mutually agreed upon reasonable and affordable repayment schedule employing ED's philosophy relative to repayment recovery of accounts. Generally, repayment schedules should affect resolution of the account within five (5) years or sixty (60) month from the first payment date. The Contractor shall draft and send a "Repayment Agreement" letter (ED will provide Standard Letters and Forms with sample text after Task Order award) to the borrower confirming the payment arrangement which the borrower has agreed to and shall flag the account to receive the ED-System generated monthly billing statement.

The Contractor may determine that a borrower wishes to repay the debt but is unable to make the minimum monthly payment amount to pay the debt in full within five years. At that point, the Contractor shall obtain verbal financial information and forward to the borrower a standard financial statement form (See Standard Letters and Forms, Financial Statement, which ED will provide after Task Order award.) The Contractor shall establish a temporary repayment plan based on the verbal information. Once the statement is returned to the Contractor by the borrower, the Contractor shall determine if the temporary repayment plan is supported by the financial data. If not, the Contractor shall negotiate a new repayment schedule. For all non-ED "program" repayment plans (e.g. rehabs, consolidations, etc.), the Contractor shall review the borrower's repayment agreement and current financial status every 6 months to determine if adjustments are necessary.

The Contractor shall draft and send a "Repayment Agreement" Letter (See Repayment Agreement Letter sample text in Standard Letters and Forms, which ED will provide after Task Order award.) to the borrower confirming the payment arrangement which the borrower has agreed to and shall flag the account to receive the ED-System generated monthly billing statement.

However, if based on the financial information received, it is determined that the borrower is unable to pay, the account should be returned as "INA" (Inability to Pay at Present) at the next prescribed time frame. The Contractor shall also document their collection history as to why the borrower is unable to pay.

Gratuitous payments do not constitute an agreed upon repayment arrangement.

1. Accounts Eligible for Compromise
   The following restrictions apply to compromise activities:
   a) Compromise settlements must <u>not</u> be offered as the first option in collection negotiations.
   b) Contractor personnel may only discuss compromise settlements after negotiations on the borrower's ability to pay have progressed, and only under those circumstances wherein ED has not forbidden the compromise. Reference the Procedures Manual for instructions relative to this subject. The Contractor, as outlined in Section 4.2 of the Statement of Work, must return all accounts on which the compromise payment is received.

## C.      FEDERAL EMPLOYEES

Periodically, ED performs matches with Federal employee databases and if the account is not in current repayment ED retains the right to recall the account from the Contractor.

## D.      LOAN REHABILITATION AND CONSOLIDATIONS

1. Loan Rehabilitation allows borrowers to have their loans (with the exception of loans with judgments) taken out of default, and their credit bureau report updated to reflect a current status. Payments posted to the borrowers account must have accurate effective date information. Any account determined to have the effective date of a payment changed or altered will not be eligible for rehabilitation until the required nine monthly payments within a ten month period have been made by the borrower. . The Contractor shall forward accounts eligible for the monthly rehabilitation sale to ED or ED's designated representative. Required supporting documentation must be attached.
2. Consolidation allows the borrower to consolidate all student loan debts with one lender whether the loans are in default or not. The borrower must make the minimum required monthly payments. The Contractor shall complete the lender verification forms (LVC) and update the ED-System screen for accounts eligible for consolidation.

The completed lender verification forms will be forwarded to the consolidation lender. Copies of all LVCs, along with screen prints of the ED-System, must be maintained by the Contractor and forwarded to the ED Monitor upon request. The Contractor shall audit 100% of LVCs.
See PCA Procedures Manual for more detail.

## E.      DELINQUENT ACCOUNTS

An account is considered delinquent when a subsequent payment has not been received by the sixtieth (60) day from the last payment. If the Contractor is unable to convince the borrower to bring his/her account current by the next payment due date, the Contractor shall review the account to determine if it is eligible for one of the following:
1. Administrative Wage Garnishment (AWG). The Contractor shall determine if the borrower is a candidate for administrative wage garnishment. If the account is eligible, the Contractor shall move the account into the AWG sub-system, or
2. Litigation. If the account is eligible, the Contractor shall send to the borrower a notice of intent to litigate.
For accounts ineligible for litigation or AWG, the Contractor shall pursue further collection activity.

## 3.3    CANDIDATES FOR ADMINISTRATIVE WAGE GARNISHMENT

If during the course of the Contractor's collection effort, the borrower indicates to the Contractor no intention of repaying the debt(s), the borrower is a potential candidate for AWG (for possible Litigation, please see section 3.4 Administrative Resolutions)

### A.    ADMINISTRATIVE WAGE GARNISHMENT (AWG)

AWG is an alternative means of enforcing collections of defaulted loans held by ED. ED is authorized to garnish up to fifteen (15) percent of the borrower's disposable salary. The law governing AWG prohibits an employer from discharging the borrower as a result of the garnishment.

If during the Contractor's research, it is determined that the borrower has the ability to but no intention of paying, the borrower may be a candidate for AWG. The Contractor shall determine if the borrower is eligible for possible AWG in accordance with ED procedures.

### 3.4    ADMINISTRATIVE RESOLUTIONS

The Contractor may determine that certain accounts fall within categories (A) through (G) below. Accounts returned as deaths, disabilities, bankruptcies and programmatic cancellations are eligible for full, non-discretionary write-off of the debt by ED. Also, accounts processed based on an income contingent repayment plan (ICRP) or through Litigation will be counted as an Administrative Resolution. More specific information on all administrative resolutions may be found in the PCA Procedures Manual.

In such situations, the Contractor shall perform the steps indicated for the applicable category and obtain the required documentation. ED reserves the right to modify, change or remove administrative resolutions (including required documentation) if ED determines it is in the Government's best interest.

Incarceration processing may be changed with a 30-day notice from the Contracting Officer. At that time, if the contractor finds a borrower who they believe is incarcerated, they may send the borrower data to the Department and request the borrower be removed from their inventory without regard to the length of time the account has been with the contractor.

Accounts recommended by the Contractor for write-off, must be returned by the Contractor by specific categories on Contractor return files or submitted for manual recall by ED.

There are two pricing alternatives for paying agencies an administrative resolution. Both AR pricing alternatives are based upon AR units (one unit equals $50). Under the first AR pricing alternative, the number of administrative resolution units as determined by ED will vary by AR type. The following chart provides the current fee structure based upon the type of administrative resolution:

| Administrative Resolution (AR) Type | # of AR units |
|---|---|
| Bankruptcy – Chapter 13 | 3 (Bankruptcy submissions can be removed) |
| Bankruptcy – Chapter 7 | 4 (Bankruptcy submissions can be removed) |
| Death | 3 |
| Disability | 4 |
| ICRP | 2 |
| Incarceration | 3 (Incarceration can be removed from this SOW) |
| Programmatic Cancellation | 2 |
| Standard Litigation | 4 |
| Special Litigation | 6 |

| Administrative Rehabilitation | 2 |
| Other | 0-6 |

ED reserves the right to adjust the number of AR units for each Administrative Resolution to best meet the needs of the Government. Adjustments may occur due to changes in cost, volume production, regulations, state requirements, documentation mandates, etc.

Under the second pricing alternative, all types of administrative resolutions will be paid on the basis of 3 AR units each.

The Government may designate, in writing, additional types of administrative resolutions (ARs). The Government will designate the number of AR units that will apply to the additional AR type. An additional type of administrative resolution designated by the Government would be for work the Contractor performs that results in:

- Return of an account to the Government for discharge of the debt or for suspension of collection efforts; or
- Increased recoveries to the Government on the accounts in the designated category. (In this case, the Government may allow the Contractor to retain the account to continue collection or resolution efforts.)

Administrative Resolutions include:

### A.    DEATH
The borrower's death must be documented with an original or certified copy of the death certificate or an accurate and complete photocopy of an original or certified copy of the death certificate, to support the discharge of a Title IV loan due to death.

**NOTE:** Periodically, ED may validate records against the Social Security Death Index. Accounts on ED's database that match the Social Security Death Index on name and Social Security number will automatically be written off. If an exact match does not occur, an exception report will be generated. These excepted accounts may be transferred to the Contractor. Verification of death on these accounts must be documented as stated above.

### B.    DISABILITY
If a borrower claims to be disabled, the Contractor shall advise the borrower that a "Request for Cancellation of Loans on Grounds of Permanent and Total Disability" (Refer to Standard Letters and Forms, OMB Form1845-0065, which ED will provide after Task Order award) must be completed by a doctor of medicine or a doctor of osteopathy legally licensed to practice medicine in the 50 U.S. states and/or U.S. Territories/Commonwealths as listed on Form 1845 and in regulations.

The Contractor shall within three (3) calendar days of the borrower's request for disability status, forward the OMB Form 1845-0065 to the borrower. The Contractor shall update the account collector notepad upon completion of this action.

The Contractor shall review the borrower's request for disability and determine the borrower's eligibility for discharge. The Contractor shall verify that all certificates are thoroughly completed

and the doctor's diagnosis is for a totally and permanently disabling condition. The Contractor shall secure a credit bureau report for debtor employment information and contact any listed employer for verification. The Contractor shall contact the American Medical Association or other State Licensing Agencies to verify that the doctor who signs the certificate is licensed to practice medicine in that state. The Contractor shall send a list of accounts recommended as dischargeable along with all disability documentation to ED for review and approval.

## C.    BANKRUPTCY

When the borrower states he/she has filed for bankruptcy, the Contractor shall obtain a copy of the court's notice of the first meeting of creditor's and the schedule of creditors. If the notice is received unsolicited directly from the court, the listing of creditors is not necessary. For Chapter 13 Bankruptcy (Wage Earner Plan), the Contractor shall follow the most current procedures in force at the time of the bankruptcy document receipt.

Whenever the borrower states that he/she has filed bankruptcy and the debt(s) has been discharged prior to the current date, the Contractor shall obtain the following:

   **a)    A copy of the Discharge Notice or the Court's First meeting of Creditor's, and**
   b)   The Listing of Creditors.

For Chapter 7 (liquidation) and Chapter 11 (reorganization) Bankruptcies, the Contractor shall determine whether the debt(s) is/are dischargeable or non-dischargeable.

The Contractor shall send a list of accounts recommended as dischargeable along with all bankruptcy documentation to ED for review and approval. If approved by ED, the Contractor will send the appropriate form letter within five (5) calendar days from the date of receipt of the bankruptcy approval by ED.

If the Contractor uses one of the services (approved by the COR) that provide bankruptcy verification, a copy of their documentation showing the court, filing date, discharge date, etc. may be used in lieu of the forms stated above.

At the discretion of the Department, Bankruptcy processing may be suspended. If suspended, the contractor will have the ability to recommend any borrower account be removed from its inventory for reason of Bankruptcy. Detailed processing flows and procedures will be distributed as part of the suspension process.

## D.    PROGRAMMATIC CANCELLATIONS

Special cancellation conditions are applicable to certain Perkins notes in cases where the borrower meets specified teaching, Peace Corp, Vista law enforcement and military requirements.

If the borrower claims entitlement to cancellation, the Contractor shall determine the borrower's entitlement to such cancellation within three (3) calendar days from the date of receipt of cancellation documents from the borrower. In the case of only partial cancellation, the Contractor shall submit to ED the necessary documentation for reduction of the borrower's account balance.

The Contractor shall be responsible for negotiating the repayment of all remaining outstanding balances for accounts that are eligible for only partial cancellation. The Contractor will not receive payment for partial cancellation.

## E.    INCARCERATIONS

In situations where the borrower is determined to be incarcerated, the Contractor shall obtain verification from a prison official of the borrower's earliest release date. The Contractor shall document ED's system with the prison official's name, title (or official website), prison, prison telephone number and earliest release date.

If the borrower is to be incarcerated for a period exceeding nine (9) months, the Contractor shall recommend the account be recalled. If the borrower is scheduled to be incarcerated for a period of less than nine (9) months, the Contractor shall suspend collection activity on the account and follow up after the borrower's anticipated parole date. The Contractor shall also document the account notepad with this information.

At the discretion of the Department, Incarceration processing may be suspended. If suspended, the contractor will have the ability to recommend any borrower account be removed from its inventory for reason of Incarceration. Detailed processing flows and procedures will be distributed as part of the suspension process.

## F.    INCOME CONTINGENT REPAYMENT PLAN (ICRP) ACCOUNTS

Income Continent Repayment consolidations are accounts, which are consolidated without the borrowers making the required payments under the regular consolidation program. The contractor shall document the account notepad with information regarding the borrower's financial condition.

## G.    LITIGATIONS

If the Contractor determines through the course of collections, that the borrower has no intention of repaying their debt(s), the borrower is a potential candidate for litigation. For litigation purposes, the borrower account must meet certain criteria and the Contractor must prepare litigation packages within prescribed guidelines.

The Contractor shall conduct research to determine the borrower's ability to repay to include obtaining evidence that assets are in the borrower's name and that these assets can be seized or attached by lien.

Upon preparation of the account for litigation, the Contractor shall immediately submit the case file to ED for approval. ED will review each case for accuracy and compliance within thirty (30) days of receipt. If the Contractor fails to meet any litigation preparation requirements, the case will be returned to the Contractor for correction or completion of the requirements. The Contractor shall update any information contained in the package that becomes outdated due to non-compliance by the Contractor. The Contractor will receive the appropriate fixed fee for each case reviewed, and accepted by ED for referral to the Department of Justice.

The Government may designate, in writing, certain types of litigation accounts as "Special Litigation." Generally, "Special Litigation" accounts are those in categories for which the FSA believes the Government will be most effective in obtaining payment via the litigation process (e.g. borrower accounts within specific zip codes, etc.). A "Standard Litigation" account is any litigation preparation case that is not in a "Special Litigation" category designated by the Government.

## H.   ADMINISTRATIVE REHABILITATIONS

If a borrower's account is rehabilitated and the 9 timely payments are less than the minimum payment amount required, the Contractor will receive an administrative fee in lieu of a commission payment.

## 3.5   SUSPENSION OF COLLECTION ACTIVITY

The Contractor shall immediately suspend collection activity on an account and, if necessary (or requested by ED), refer the issue, (NOT RETURN THE ACCOUNT) to ED or ED's representative for resolution within five (5) calendar days after any of the following occur:

a) The borrower disputes the amount owed citing, for example, that the debt was never incurred, was paid off, or should have been canceled.

b) The borrower raises a legal defense against repayment (for example: closed school, ability to benefit, fraud, forgery, or circumstances under which ED may be prohibited from pursuing collection).

c) The borrower requests a written review or hearing in response to the 65-Day Notice of Federal Offset or 30 days Administrative Wage Garnishment Notice. The Contractor shall process all such correspondence in accordance with ED requirements and guidelines.

Once ED has made a decision, the Contractor will be notified to resume collection activity or close and return the account. Failure by the Contractor to cease collection activity as required will result in recall of the account by ED.

## 3.6   CO-MAKERS

Prior to the first transfer of accounts, ED will have initiated collection efforts in pursuit of both the borrower and co-maker prior to transfer of accounts to the Contractor. Once the Contractor determines that the borrower is unlocatable, unable to repay the loan(s) or is delinquent, the Contractor shall pursue collection from the co-maker to the extent permitted by law, or as instructed by ED.

## 4.1   RECALL OF ACCOUNTS

A. The Contractor has twelve (12) months, beginning with the date of each transfer, to convert defaulted accounts to payment-in-full, satisfied in full, satisfactory repayment schedules, administrative resolution, or to prepare the account for AWG or litigation.
     ED shall recall accounts not converted to one of these six categories within the twelve (12) month period.

B. Periodically, ED performs matches with Federal employee databases and if the account is not in current repayment, will recall the account from the Contractor.

C. In cases where an ED employee or ED representative has documented the account collector notepad with a repayment agreement, has placed the account on billing, and the first payment has posted within fifteen (15) days of the due date, the account may be immediately recalled by ED and no commission for any payment received will be granted to the Contractor.

## 4.2   RETURN OF ACCOUNTS

The Contractor shall work an account to the level of effort as specified in the Task Order before the Contractor returns the account to ED. However, the Contractor may not return an account prior to six months from the date of transfer, unless the account balance is resolved. ED reserves the right to recall or require the return of any account or accounts at any time. During the first CPCS period, ED intends to

recall accounts as frequently as 4 months after transfer. ED reserves the right to require Contractors to hold accounts for longer than 6 months.

    **A.** The Contractor shall follow procedures relating to the return of accounts as outlined below:

        1. Any account that has been settled-in-full, or worked to the level of effort set forth in the Task Order must be returned by the Contractor within thirty calendar days after it reaches the applicable status.

        2. Changes in these time frames shall be made only with the approval of ED.

    **B.** Accounts returned for Administrative Resolution must be returned via secure electronic file transfer (EFT) by the Contractor. The Contractor shall complete all paperwork for administrative resolutions. Those accounts identified as meeting ED requirements for write-off must be returned by type, as specified by ED, during regular Contractor electronic file returns. (All deaths would be grouped together, all Chapter 7 dischargeable Bankruptcies would be grouped together and all Chapter 13 Bankruptcies would be grouped together on that one file.) The Contractor shall submit to ED an electronic file by type, SSN and name for each account. The Contractor shall ensure ED's access to documentation (imaged or hardcopy) to support their request.

    If ED determines that the Contractor has met Task Order requirements, the Monitor will approve the transmittal and return to the Contractor. The Contractor will then fax the transmittal and forward the EFT records to ED's computer contractor within two days. If the Monitor disapproves the transmittal, the Contractor will be informed of its deficiencies. The Contractor shall resolve these deficiencies before resubmitting the data to ED. The Contractor will prepare and forward administrative resolution documentation in the format requested by ED (hardcopy or imaged) to the appropriate government office or contractor designated by ED. Please see the PCA Procedures Manual for more information.

## 4.3    RETENTION OF IN-REPAYMENT ACCOUNTS

The Contractor shall retain in-repayment accounts during the full period of performance (including any options, if exercised) of its Task Order with ED. Upon expiration of the period of performance (including any options exercised to extend the period of performance); the Contractor shall retain in-repayment accounts for an additional 24 months. Accounts will be recalled when there are no payments for 90 days.

The Contractor shall work these accounts in accordance with the terms and conditions of the Task Order. The Contractor shall provide billing and/or collection activities for the in-repayment accounts as long as they are assigned to the Contractor.

The Contractor will be paid for any accounts resolved via the administrative resolution process during the retention period.

## 4.4    TASK ORDER PHASE OUT AND CLOSE OUT OF ACCOUNTS

    **A. Non-Retention Accounts**

ED will conduct an orderly recall of all outstanding non-retention accounts on which there has been no payment within the last 90 days upon the effective date of phase out. This process will begin no later than ninety (90) calendar days prior to the last phase of the Task Order.

    **B. Retained in-repayment Accounts**

ED will conduct an orderly recall of all retained in-repayment accounts upon the effective date of expiration of the Task Order unless the Contractor has been awarded a subsequent ED Collections Task Order or contract.

The Contractor shall, according to Federal and/or State laws, destroy or dispose of, in a manner, which will prevent any unauthorized disclosures, any records containing personally identifiable information, which are not to be returned to ED. The Contractor may be liable for criminal penalties as specified in the Privacy Act (Subsection (i)) for failure to meet these requirements. Contractor shall send visitor logs to the COR for final review and disposal.

## 5.1   CONTRACTOR DELIVERABLES

The Contractor's schedule of deliverables is shown below. The Contractor shall forward one (1) copy of the deliverables (marked with an asterisk *) to the Contracting Officer (CO) and one (1) copy to the Contracting Officer's Representative (COR), one (1) copy to the Assistant Contracting Officer's Representative and one (1) copy to the appropriate ED Monitor, and shall notify all representatives, as listed above, of the accomplishment of all deliverables.

| Requirement | Time-Frame from Task Order Award |
|---|---|
| **Priority A** | |
| Establishment of the administrative and collection office. | In place within ninety (90) days of Effective date of Task Order award. |
| Establishment of an operational system. | In place within ninety (90) days of Effective date of Task Order award. |
| Post Office Box rented at the U.S. Post Office dedicated solely to ED Task Order. | Obtained and functional within ninety (90) days of Effective date of Task Order Award, July 1, 2009.Task Order award. |
| Toll-free collection telephone number dedicated solely to ED Task Order for borrowers residing in the U.S., territories and possessions and provide a means for borrowers outside the U.S. to call in without incurring a charge. | Obtained and functional within ninety (90) days of Effective date of Task Order award. |
| Provide and test software to be used on ED's PC workstations at the regional collection center office, if required by ED. | Completed within ninety (90) days of Effective Date of Task Order award. |
| Submission of electronic transfer of test data for: name, address, and telephone number changes; employment data; letter history updates; billing requests; and return of accounts. | Completed within ninety (90) days of Effective Date of Task Order award. |
| Procedures to transfer accounts, reports, etc. between ED and the Contractor. | Completed within ninety (90) days of Effective Date of Task Order award. |
| Successful testing of letter coupons. | Completed within ninety (90) days of Effective Date of Task Order award. |
| First draft version of the Collections Training Manual and the Standard Operating Procedures Manual (including letters that will be generated from the Contractor's collection system)* | Completed and submitted electronically and in hardcopy form to ED within Effective Date of Task Order award. |
| First draft version of a Quality Control Plan outlining the quality control procedures* | Completed and submitted electronically and in hardcopy form to ED within ninety (90) days of Effective Date of Task Order award. |

| First draft version of the Disaster Recovery Plan* | Completed and submitted electronically and in hardcopy form to ED within ninety (90) days of Effective Date of Task Order award. |
|---|---|
| Listing of Position Descriptions mapped to the ED position descriptions for ED system access | Completed within ninety (90) days of Effective Date of Task Order award. |
| **Priority B** | |
| Final version of the Collections Training Manual and the Standard Operating Procedures Manual (including letters that will be generated from the Contractor's collection system)* | Completed within 30 days of ED approval of draft version. |
| Final version of a Quality Control Plan outlining the quality control procedures* | Completed within 30 days of ED approval of draft version. |
| Final version of the Disaster Recovery Plan including the first Physical Access review* | Completed within 30 days of ED approval of draft version |
| Updates to Disaster Recovery Plan | Any time changes are made that significantly change the plan |
| Submission of electronic file transfer of data for: name, address, and telephone number changes; employment data; billing requests; letter history update, and return of accounts. | Daily for account updating (borrower demographics and employment reference data) and weekly for all others. (ED reserves the right to modify time frames to best meet system and contract requirements) |
| Submission of all project staff and new hires' SSNs for matching against the ED-System and NSLDS databases to determine default status for any federal student loans. | Monthly (or whenever requested by ED) |
| Electronic file listing returned accounts and account files. | Weekly (or sooner based upon current system capabilities) |
| Electronic submission of the Quality Control Report, Management and Fiscal Report, Staff Roster Report, Correspondence Report, Misdirected Report and the Security Awareness Training Report | Monthly |
| Physical Access Review | Within 1 year of Task Order award and annually thereafter |
| Yearly Security and Specialized training | Annually by July 15th |

The Contractor shall submit to ED test files for the transfer of data for: name, address, telephone number changes; employment data; billing requests; letter history update; and return of accounts. The Contractor must correct any deficiencies or errors found and notify the ED Monitor of the corrections within five (5) days of notification by ED's systems contractor. Failure by the Contractor to make the required corrections will result in a delay of the initial transfer of accounts until the deficiencies are corrected.

The Contractor shall submit, to the ED computer contractor, test files to be approved before the first production run can occur for the Contractor. Upon approval, the Contractor is "certified". The Contractor must be re-certified when modifications or enhancements are made to ED-System software, which impact the files submitted by the Contractor. If the Contractor changes its computer processing vendor/facility, or

makes changes in computer hardware and/or software that affect processing of files, the Contractor must be re-certified. No transfer of accounts will occur until the Contractor's hardware, software, and telecommunications lines are functional and meet certification requirements.

Any electronic reports, imaged documents or information requested by and/or forwarded to ED that contain Personally Identifying Information (PII) must be protected using the most current Department's Security Standards and, in addition, at a minimum must be 128-bit AES encrypted and password protected.

## 5.2    PERIODIC CONTRACTOR DELIVERABLES

The Contractor shall prepare and furnish one copy of the following deliverables to the Contracting Officer, COR, Assistant COR and the appropriate ED Monitor, on at least a monthly basis due by the fifteenth (15th) day of the following month (by next business day if the 15th falls on a weekend/holiday):

- Quality Control Report;
- Management and Fiscal Reports;
- Project Staff Report
- Correspondence Report
- Misdirected Payment Report
- Security Awareness Training Report

The Government reserves the right to modify or adjust all required reports, add additional reports and/or alter time frames as necessary. In addition, reports must contain all required data in the exact order and format requested by ED. Failure to provide complete and/or timely reports may lead to ED taking administrative action.

**(a)    Quality Control Report**

Each Contractor will have established Quality Control measures to review contractual requirements. For each electronic Quality Control Report, the Contractor shall incorporate Quality Control categories that include the size of the sample, the numbers and types of problems found, and all corrective actions taken.

Quality Control Categories must include:

- Monitoring of collector/customer service calls
- Correspondence for proper handling/response
- Administrative Wage Garnishment (AWG)
- Accounts compromised
- Account balances on Contractor's computer system vs. ED-System
- Administrative Resolutions (both submissions to ED for review and approval and electronic file transfer data to the ED computer Contractor)
- Loan Consolidation Verification Certifications (LVC)
- All Electronic File Transfer information prior to mailing/transmission (Account Updates (name, address, phone numbers, employment), Letter History Updates, Billing, Account Return, etc.)
- Training: Date of Training, Topic, Attendees, and Results of Test Given. This data should be available during agency reviews. Specific training includes:
  - Privacy Act (including Privacy Act Statement completed and mailed to ED)
  - FDCPA (including fact that employees took test and passed)
  - ED Policies, Procedures and new initiatives (including fact that employees took test and passed.)

(A sample QC Report format will be provided after Task Order award.)

**(b)** **Management and Fiscal Reports**

The Contractor shall produce, on at least an end of the month schedule, due by the fifteenth (15th) day of the following month, an electronic management and fiscal report designed to monitor Task Order performance. This report must be considered a part of the Contractor's measuring system for its quality control plan.

At a minimum, this report must contain the following items:

- Information on dollars collected (current month and year-to-date).
- Number of "accelerated" rehabs processed each month, along with a break down of the number of days between the first and last payments for accounts in specific numerical groupings as defined by ED.
- Monthly rehabilitation queue totals (number of accounts and P&I total of accounts where the borrower has completed at least the first 5 payments towards rehabilitation to include an overall total, as well as, Direct and non-Direct totals)
- Information (including corrective actions) on any problems incurred by the Contractor during the month and a status update on any outstanding problems from previous months.
- The number of complaints received each month; for each complaint, the Contractor must provide: a brief summary of the complaint issues, whether the complaint was determined to be valid or invalid, the date received and the name of the collector involved.
- Discuss the work performed over the month just completed (including manpower requirements, administrative resolution, litigation, collections, AWG, etc.) and report on projected activity for the upcoming month(s).
- A schedule of all update training conducted during the month and a brief synopsis of the subject matter covered in each training session.
- Pertinent information that needs to be brought to the attention of the Contracting Officer e.g. late EFTs, information regarding outstanding issues awaiting an ED response, etc.
- The Contractor shall provide adhoc reports as requested by ED.

(A sample Management and Fiscal Report format will be provided after Task Order award.)

**(c)** **Project Staff Roster Report**

The Contractor shall provide the COR, Assistant COR, and ED Monitor an electronic project staff roster, at least monthly, detailing:

- All individuals employed,
- ED contract hire date
- Security level status requested
- E-Quip (security clearance website) release date
- Individuals no longer employed, including separation date.
- Employee SSNs when requested by ED (ED may require SSNs to be submitted in a separate format and at different intervals)

(A sample Staff Roster Report format will be provided after Task Order award.)

**(d)** **Correspondence Report**

The Contractor shall provide the COR, Assistant COR and ED Monitor an electronic Correspondence Report on a monthly basis that contains the following:

- A list of all correspondence received for a given month broken down by the borrower's account number, type of correspondence by code (financial statement, general inquiries, powers of attorney, returned disability applications, etc.), and an optional comments section.

- Current correspondence categories and codes to be utilized include:
  1. AWG - All correspondence pertaining to the AWG process (hearings, pay stubs for VPY, fin statements, etc.)
  2. AR - Admin resolution documentation (BNK/DIS/INCAR/DEA - applications, letters, certificates, etc.)
  3. CPL - Complaints
  4. ER - Employer verification documentation
  5. CD - Cease and desist/do not contact
  6. MP - Misdirected payments
  7. DV - Dispute/Verification (validity request/pnote request/payment history/incorrect balance/wrong party); also include cancellations - closed school, ATB, false certifications, etc.
  8. DP - Disclosure permission (POA, auth to speak to third parties/attorney, etc.)
  9. PC - Program Correspondence (all docs associated with rehab/consolidation process - agreement letters/LVCs/financial documents, etc.)
  10. AC - All Attorney correspondence
  11. RPY - All correspondence related to non-program/AWG repayments - financial docs, W-2s, compromises, repay requests, etc.
  12. TOP - TOP related inquires/issues
  13. TPR - Third party requests, inquires from outside agencies
  14. BL - Borrower letters (NOT listed in other categories - requests for info, questions, Title IV letters, SIF, BIF, refusal to pay, etc.)
  15. MIS - Miscellaneous (any correspondence that does not fall in the categories listed above)

(A sample Correspondence Report format will be provided after Task Order award.)

**(e)    Misdirected Payment Report**
The Contractor shall provide the COR, Assistant COR and ED Monitor an electronic Misdirected Report on a monthly basis that contains the following:
- All misdirected payments received during the previous month.
- For each payment, the report will contain the borrower's account number, the date the payment was received, and the payment amount.

(A sample Misdirected Payment Report format will be provided after Task Order award.)

**(f)    Security Awareness and Privacy Act Training Report**
The Contractor shall provide the COR, Assistant COR and ED Monitor an electronic Security Awareness and Privacy Act Training Report on a monthly basis that contains the following:
- Employee name, email address, company name, job title, training course identification and date of last security awareness training

(A sample Security Awareness and Privacy Act Training Report format will be provided after Task Order award.)

**6.1    SPECIAL REQUIREMENTS**
**A. INTERFACE REQUIREMENTS**
The Contractor must obtain and install the telecommunications equipment necessary to interface with the ED System.
**System Connectivity**
Federal Student Aid provides connectivity to the Virtual Data Center (VDC) either through a Virtual Private Network (VPN) or a MultiProtocol Label Switching (MPLS) connection

Private Collection Agency                                             Task Order No. ED-FSA-09-O-0011

when required for contractor performance. Telecommunication costs are the responsibility of the contractor. Typical VPN connectivity setup requires 60 days, while MPLS connectivity setup requires 120 days. Dial in connections are not allowed, with exceptions for hardware vendors' remote use for troubleshooting on an as needed and scheduled basis.

The VPN solution is performed using the contractor's Internet connection and the contractor's networking hardware. The VPN solution is the primary method for remote site-to-site connections. Federal Student Aid may provide remote hardware for site-to-site VPN connectivity.

For MPLS connections, Federal Student Aid may provide the point of presence equipment; the contractor shall provide the plain old telephone system (POTS) line or analog line, necessary space, and environmental controls and any site modifications. Also, FSA may provide an MPLS connection, at FSA's discretion. FSA may provide an extended DMARC as well, but it is the responsibility of the contractor to provide any and all internal wiring.

All connections into the VDC are firewalled at the VDC. Minimum level security requirements prescribe that the contractor's site must be firewalled and any site that lacks this feature will not be connected to the VDC.

ED will connect to the contractor's main site only. The contractor is responsible for all other connections to their satellite offices or subcontractors.

## A.  SUMMARY OF CONTRACTOR COMPUTER SYSTEM REQUIREMENTS

Prior to the first transfer of accounts, the Contractor shall establish and maintain its own computer system and software, which can accept and accommodate data on all ED accounts. ED will provide electronic file format information after Task Order award.

The Contractor shall ensure that all ED data is protected from unauthorized disclosure while on the Contractor's computer system. The Contractor shall ensure that all ED account data is, at a minimum, partitioned off from other data maintained on the Contractor's computer system, and may only be password accessed by Contractor personnel assigned to this project.

The Contractor shall ensure that the data in its system is used exclusively for collection activities related to ED transferred accounts. The information must not be accessed by the Contractor in connection with any other collection efforts on the same borrower under another Task Order or contract.

The Contractor shall ensure that its system balance for all accounts is within $25 of the balance on the ED System.

The Contractor shall provide ED Regional personnel access (via dedicated data line from the Contractor's computer system to the ED LAN Network in Atlanta) to ED accounts maintained on the Contractor's computer system. Access through a single entry point, no matter whether a sub-collection office(s) is handling accounts, is required; however, an identifier indicating the office currently responsible for servicing the account must also be clearly defined to the ED-user. Access must include update capabilities to the ED account collection activity record so that ED may communicate to the Contractor any actions. The Contractor shall provide the necessary communication hardware/software to be installed at the regional ED service center office and provide training to designated ED personnel for its collection system at the Contractor's expense. The Contractor shall have a computer system capable of providing ad hoc reports to ED on demand. These reports shall be with respect to the accounts assigned to them.

The Contractor shall immediately update its computer files with information as specified in this Task Order. The Contractor's computer system must be capable of transmitting this information to the ED System via electronic file transfer. These updates must also incorporate data from any subcontractors used under this Task Order. The Contractor must transmit account information and request bills either daily or weekly depending on the method used to transmit the data listed below -

1. Account Information Update-- to update with name, address, telephone number changes and update the reference address with employer's name, address and telephone number in accordance with the terms and conditions of this Task Order. The ED computer contractor's service time commitment to process these updates is three (3) workdays from date of receipt of the file(s).

2. Billing Statement Request—to place an account on one of four billing cycles - only monthly billing is allowed per account. The Contractor must update the billing information within ED's system upon the successful negotiation of an approved repayment plan. The ED computer contractor's service time commitment to generate, print and mail all bills is six (6) workdays from date of receipt of the request. The Contractor may also delete an account from billing. NOTE: The Contractor is restricted from sending billing statements to the borrower from its own computer system.

3. Letter History Update—to update the account collection activity record with information gathered by the Contractor in accordance with the terms and conditions of this Task Order. The ED computer contractor's service time commitment to process these updates is five (5) workdays from date of receipt of the file(s).

4. Account Return—to return accounts to ED. The Contractor shall submit to the ED Monitor an electronic report listing the accounts for return (refer to Part 4.2.A RETURN OF ACCOUNTS). The ED Monitor will sign the transmittal letter and notify the Contractor that the files may be forwarded to the ED computer contractor. The ED computer contractor's service time commitment to process these updates is five (5) workdays from date of receipt of the file(s).

An Exception Error Report will be produced for each electronic transfer of data when processing cannot be accomplished by ED's computer contractor. The Contractor shall correct all deficiencies listed on the report, resubmit, and notify the ED Monitor of the correction within five (5) calendar days from receipt of the report.

Under the data exchange program, the Contractor shall format the files according to the layouts provided by ED for all required files. If it is determined by ED's computer contractor that the file(s) cannot be properly processed, the file(s) will be returned to the Contractor for corrections.

Use of the electronic transfer of data requires the Contractor to create a transmission header and trailer record for each unique record type of data transmitted to the ED-System, in accordance with formats to be provided by ED.

When problems are identified with any electronic file submissions, the Contractor has 45 days to make any and all corrections necessary. If final corrections are not made within this 45-day timeframe, transfer of accounts will be withheld until all problems are resolved.

**B. USE OF SUBCONTRACTORS**

The Contractor shall be permitted to use subcontractors to perform collection, clerical, and skip tracing activity and data processing. Certain restrictions govern the use of subcontractors. Performance of collection activities by subcontractors is restricted to the Contractor's primary and sub-collection offices.

The primary contractor office must retain control over all accounts at all times, and must ensure that the subcontractors are fully trained, receive all necessary information relative to this Task Order, and adhere to all requirements of this Task Order. Subcontractors are prohibited from the receipt and processing of payments under this Task Order.

The Contractor shall ensure that subcontractors keep all ED-related information in a secure, restricted location, and prohibit its access in connection with any other collection activity on the same borrower under any other Task Order or contract.

See clause C.2 of the Task Order for additional subcontract requirements.

### C.  PICK-UP AND DELIVERY OF MATERIALS

The Contractor shall be responsible for daily pick-up and delivery of all reports, records, hard copy reports and other materials to be exchanged between the Contractor, ED and ED's service contractors. In addition, the Contractor shall be responsible for any pick-up and delivery of any electronic data, including back-up data tapes, which contain ED information for the purposes of storage, retrieval, and recovery as it relates to the Contractor's Contingency Plan.

In all cases, if the contractor uses a private courier service, the courier service must be insured and bonded.

### D.  DELAYS

The Contractor shall be responsible for notifying the COR immediately of anticipated delays (3 days or more) in providing the services required under this Task Order. Notification of such anticipated delay does not excuse any failure of the Contractor to fulfill its responsibilities under this Task Order.

### E.  FACILITIES, EQUIPMENT, SUPPLIES AND MATERIALS

Except where otherwise noted, the Contractor shall obtain its own secured administrative and collection office facilities, equipment, supplies and materials. The specified area must be restricted to agency collectors or staff. Separation of this function from other commercial activity must be, at a minimum, an aisle whereby non-ED staff cannot sit directly across from or have "visual access" (unobstructed view of ED computer data or ED account documentation) into ED contractor workspace. Contract collectors shall be dedicated 100% to working ED accounts; no collector will be allowed to work ED accounts and other Contractor accounts. Other Contractor's clients or prospective clients are restricted from touring ED's Contract area.

The Contractor shall furnish at its administrative and collection office site(s) (including subcontractors) access for ED employees to conduct on-site compliance reviews. The Contractor shall make available to all ED employees a private office space that contains the necessary office furniture, telephone lines (including internet access) and terminals, including printers, accessing both the Contractor's system and the ED-System. In accordance with Federal regulations, this office space must be a non-smoking area.

### 6.2   SECURITY REQUIREMENTS

To ensure the confidentiality, integrity and availability of the Department's business assets, the Contractor shall ensure that all ED security requirements are met and in accordance with all Department of Education Security and Privacy Directives, Policy and Procedures including, but not limited to, the Departmental Directive, Handbook OCIO-01, Handbook for Information Assurance Security Policy, OMB Circular A-130, A-123 and A127, NIST Special Publications, FISMA, the Federal Information Processing Standard (FIPS) publications and the Payment Card Industry Data Security Standard (PCI DSS). The Department's Security Policies provide a full list of applicable regulations and standards for what is a necessary tool for

ensuring adequate controls under this Task Order. ED may also require contractor adherence to future and/or additional government security policies, reports, and memorandums necessary to safeguard and protect the Department's information and Information Technology (IT) resources. The Contractor shall comply with and also include all appropriate security provisions in any subcontract(s) awarded pursuant to this Task Order

### 6.2.1   RULES AND REGULATIONS

Department of Education systems must adhere to the Federal security requirements detailed in the publications listed below. The following laws, regulations or policies establish minimum requirements for system security.

#### 6.2.1.1      Federal Laws and Regulations

- FIPS 140-2 Security Requirements for Cryptographic Modules
- FIPS 186-2, Digital Signature Standard (DSS)
- FIPS 197 AES
- FIPS 199 Standards for Security Categorization of Federal Information and Information Systems
- Electronic Communications Privacy Act of 1986, Public Law 99-08, 100 Stat. 1848
- E-Government Act of 2002
- Freedom of Information Act, 5 United States Code 552, Public Law 93-502
- Privacy Act of 1974, 5 United States Code 552a, Public Law 99-08
- Federal Information Security Management Act (FISMA)
- OMB Circulars A-130 Appendix III
- HSPD #7 Critical Infrastructure Protection

#### 6.2.1.2    NIST Special Publications

- NIST 800-14 (Generally Accepted Principles and Practices for Securing Information Technology Systems)
- NIST 800-16 (Information Technology Security Training Requirements: A Role and Performance-Based Model)
- NIST 800-18 (Guide for Developing Security Plans for Information Technology Systems)
- NIST SP 800-21 (Guideline for Implementing Cryptography in the Federal Government)
- NIST 800-26 (Security Self-Assessment Guide for Information Technology Systems)
- NIST 800-30 (Risk Management Guide)
- NIST 800-34 (Contingency Planning)
- NIST 800-37 (Guidelines for the Security Certification and Accreditation of Federal Information Technology Systems)
- NIST 800-47 (Security Guide for Interconnecting Information Technology Systems)
- NIST 800-53 and 800-53A (Recommended Security Controls for Federal Systems)
- NIST 800-60 (Guide for Mapping Information Systems)
- NIST 800-61 (Computer Security Incident Handling Guide)

#### 6.2.1.3    Department of Education Policies and Procedures

- U.S. Department of Education Information Assurance Security Policy
- U.S. Department of Education, Contractor Employee Personnel Security Screenings
- U.S. Department of Education IT Security Configuration Management Procedures Handbook

- U.S. Department of Education Contingency Planning Procedures
- Federal Student Aid Policy and Procedures for Sending and Receiving Sensitive Documents and Media Using Land Shipment Methods
- Federal Student Aid Immediate Action Memorandum: Sensitive Data Protection on Portable Devices
- Federal Student Aid Incident Response and Reporting Procedures
- Payment Card Industry Data Security Standard (PCI DSS)

The Contractor shall be notified in the event of new or changed policies or procedures. All changes must be passed down to all subcontractors as applicable.

## 6.2.2 IT SECURITY COMPLIANCE

The Contractor shall provide personnel for a security control/review group. This group will address security problems, help provide for the maintenance of certification or accreditation under the control of the system security officer, report security problems, and make security recommendations.

In addition, in keeping with OMB Circular A-130, Appendix III, the Contractor shall designate a specific person responsible for information security.

## 6.2.3 CONTINGENCY PLANNING

An IT Contingency Plan is an essential component in the overall strategy of a business or public service organization to ensure the successful recovery of operations and functionality of essential IT resources in the event of an emergency or service interruption. IT contingency planning should be integrated into all aspects of the system development life cycle (SDLC). The IT Contingency Plan should be an active document that is tested and updated as needed throughout the entire SDLC.

The Contractor shall maintain a comprehensive Contingency Plan to ensure continuation of services and functions in the event of an emergency or service interruption. The Plan shall incorporate Continuity of Support, Disaster Recovery, Cyber Incident Response, and Business Recovery/Resumption Plans. The Contractor shall review the current plan and revise it as necessary to conform to the Contractor's configuration. The Contractor shall maintain safeguards and backup procedures for natural, deliberate, environmental, and accidental disasters.

**The Contingency Plan is subject to periodic reviews by the Department. The Contractor shall update the Plan when changes are approved by the Department and include environmental and/or configuration changes.**

The following solutions shall be incorporated in the overall Contingency Plan:
   a) Explain how the availability of services is to be maintained in the event of a disaster.
   b) Alls Plans must be tested and exercised on an annual basis, with results being documented and used to update the plans.
   c) Include an executive overview of how the security processes will be maintained within the contingency plan to ensure continuous protection of PII data so that the PII data is not compromised, lost or breeched.
   d) Document and adhere to a clear and specified process of change and configuration management;
   e) Establish a patch management program in accordance with Department guidelines;
   f) Implement incident monitoring and reporting procedures; to include use of incident response guidelines recommended by the DoED and FSA

1. Any security breaches of data need to be reported to an ED designated contact within "one-hour." In addition, the contractor needs to follow all ED incident escalation procedures (as provided by ED). The contractor will bear the liability associated with any loss of data, to the point where the contractor remedies any and all identity theft situations.

g) Document any involvement of the outsourced provider with relevant subcontractors;

h) Create required security documentation, including, but not limited to, Certification and Accreditation plan, System Security Plan, Risk Assessment, Security Test & Evaluation plan, Rules of Behavior, system interconnection agreements, Configuration Management Plan and Contingency Planning documentation;

### 6.2.3.1      Disaster Recovery Plan

**The Contractor shall conduct at least one test at a disaster recovery center comprised of a simulation of all procedures necessary to complete the transfer of services and functions, which would be implemented in the event a disaster occurred at the processing site within one year of the Task Order being awarded. The Government reserves the right to require additional disaster recovery plan tests.**

**The Contractor shall send the results of the disaster recovery test to the Department for review. Any findings from the test must be resolved. Once all issues are resolved and documented, the Contractor shall send a final report to the Department for review.**

| Disaster Recovery Plan | DRPs are necessary for reacting to major, usually catastrophic, events that deny access to the normal facility for an extended period. Frequently, DRP refers to an IT-focused plan designed to restore operability of the target system, application, or computer facility at an alternate site after an emergency. The DRP scope may overlap that of a COS; however, the DRP is focused on long-term outages (over 48 hours) that require relocation to an alternate processing site. The DRP does not address minor disruptions that do not require relocation. Generally, a DRP is included as part of the IT Contingency Plan if it is required based on system criticality and data sensitivity. |
|---|---|

### 6.2.4   PHYSICAL SECURITY

The Contractor shall implement effective physical security safeguards to ensure the protection of the ADP system, including the computer facilities, equipment, data, and personnel. A controlled, limited-access environment must exist in all areas where government data is maintained. Areas of the facility for which the Contractor shall provide protection include, but are not restricted to:

- Computer Room
- Data Control and Conversion Area
- Communications Equipment Area
- Data File Storage Area
- Form Storage Area
- Off-site Storage Areas

- Telephone Closet
- Power Supply (transformer vaults, and power panels)
- General Office Area (where sensitive data is handled)

The Contractor shall ensure that all sensitive materials, such as data, software documentation, borrower payment information, operating manuals and handbooks are labeled as sensitive and stored in a secure location.

The Contractor shall provide physical security for the protection of communications equipment. Multiplexers, concentrators and terminals, especially those handling sensitive information, must be located in physically secured areas.

Methods for physically protecting systems, hardware and equipment shall be provided by the Contractor. The protection shall be against damage, unauthorized access, alteration, modification and destruction, whether by act of nature, accident, or intrusion.

The Contractor shall complete and submit to the Department an annual Physical Access Review. All findings from the review must be corrected and the final report, with all resolutions must be submitted to the Department within 6 months of the final review report.

### 6.2.5   SECURITY CLEARANCES

The Contractor shall provide to ED, position descriptions of those employees to be granted access to the computer facility or application system, as applicable and shall map their position descriptions to the ED position description for the ED system (The ED position descriptions will be sent after Task Order Award). ED shall review the Contractor data and approve or reject the type of clearances (if any) are needed based upon the position's job duties and access required to complete work assignments under this Task Order. The Contractor shall supply to the COR on at least a monthly basis, a Project Staff Roster Report detailing the security status of each Project staff member and any individual no longer employed by the Contractor or otherwise involved in the project.

All project staff and all new hires must have their Social Security Numbers (SSN) matched against the ED-System and the National Student Loan Data System (NSLDS) databases to ensure that they have not defaulted on a federal student loan. All project staff requesting access to ED's system will be required to complete a detailed security package.

The sharing of ED-System ID's and passwords is strictly prohibited. ED shall revoke the access of any Contractor personnel found sharing their user ID and password. ED further reserves the right for additional actions deemed appropriate.

Please see sections H.12 and H.13 for more detailed information.

### 6.2.6   INFORMATION SECURITY TRAINING AND AWARENESS

The Contractor shall ensure that each ED contract employee (including subcontractors) receives documented security awareness training on an annual basis. All new hires will complete security training within 10 business days of ED contract employment from initiation of contract. All subsequent refresher security training shall be completed by July 15 of the following year (or any other date as specified by ED) for as long as the employees are on the ED contract. All security awareness training must be documented and recorded in the Security Awareness Training Report as required under section 5.2(f). Contractor shall follow the Department's training policy, IT Security Awareness and Training Guide, and will modify training in accordance with any updates, policies, or initiatives as directed by ED.

### 6.2.6.1 INCIDENT RESPONSE AND HANDLING PROCEDURES

The Contractor shall ensure that Incident Response and Handling procedures are documented within the security training and awareness training and that all personnel are trained on the FSA procedures. All incidents must be reported to the System Security Officer within 1 hour of identification.

### 6.2.7   CONTROL OF INFORMATION AND DATA

Any Department information shall be accounted for upon receipt and properly stored before, during and after processing. In addition, all related output shall be given the same level of protection as required for the source material.

If it is necessary to disclose Department information to perform under the contract, the contractor shall request written authorization from the contracting officer to make such necessary disclosure. The contractor shall ensure that sensitive information shall not be released outside the control of the organization, including release for maintenance or replacement purposes, without the written consent of the contracting officer.

The Contractor shall ensure that the security and privacy of data and information entrusted to the contractor are protected as described in the Computer Matching Agreement (CMA) between the Department of Health and Human Services Administration for Children and Families, Office of Child Support Enforcement and the Department of Education including the Security Requirements Addendum to the CMA. The CMA and Security Addendum will be provided.

Should the contractor make any unauthorized disclosure(s) of confidential information, the contract may be terminated per the terms of the Default clause (FAR 52.249-8).

### 6.2.8   CONTRACTOR SYSTEM CONTAINING DEPARTMENTAL INFORMATION

#### 6.2.8.1 Identification and Authentication

The system shall:

- Include a mechanism to require users to uniquely identify themselves to the system before beginning to perform any other actions
- Be able to maintain authentication data that includes information for verifying the claimed identity of individual users (e.g., passwords)
- Protect authentication data so that any unauthorized user cannot access it
- Be able to enforce individual accountability by providing the capability to uniquely identify each individual computer system user
- Raise alarms when attempts are made to guess the authentication data (either inadvertently or deliberately).

#### 6.2.8.2      Access Control

The system shall use identification and authorization data to determine user access to information. The system shall be able to define and control access between subjects and objects in the computer system. The enforcement mechanism (e.g., self/group public controls, access control lists, and roles) shall allow users to specify and control sharing of those objects by other users, or defined groups of users, or by both, and shall provide controls to limit propagation of access rights. These access controls shall be capable of

including or excluding access to the granularity of a single user. Only authorized users shall assign access permission to an object by users not already possessing access permission.

### 6.2.8.3 Auditing

The system shall be able to create, maintain, and protect from modification or unauthorized access or destruction of an audit trail of accesses to the objects it protects. The audit data shall be protected so that read access to it is limited to those who are authorized. Audit trail information should be maintained for at least 6 months.
The system shall be able to record the following types of events: use of identification and authentication mechanisms, introduction of objects into a user's address space (e.g., file open, program initiation), deletion of objects, and actions taken by computer operators and system administrators and/or system security officers and other security relevant events. The system shall also be able to audit any override of human-readable output markings.
For each recorded event, the audit record shall be able to identify the date and time of the event, user, type of event, and success or failure of the event. For identification and authentication events, the origin of request (e.g., terminal ID) shall be included in the audit record. For events that introduce an object into a user's address space and for object deletion events, the audit record shall include the name of the object and the object's label. The system administrator shall be able to selectively audit the actions of any one or more users based on individual identity and/or object label.

The audit system should raise alarms whenever a threshold is reached with respect to an auditing system resource (disk space in audit log volume) or when auditing has been turned off (either inadvertently or deliberately).

The Contractor will also allow the right of audit and assessment including but not limited to site visits, scanning, penetration testing, interviews by federal agencies, the Department and the Department's contractors.

### 6.2.8.4    Flaw Remediation

Flaw remediation is the process of tracking and correcting security flaws by the contractor.
- The contractor shall document the flaw remediation procedures.
- The contractor shall establish a procedure for accepting and acting upon reports of security flaws and requests for corrections to those flaws.
- The flaw remediation procedures documentation shall describe the procedures used to track all reported security flaws in each release of the system.
- The flaw remediation procedures shall require that a description of the nature and effect of each security flaw be provided, as well as the status of finding a correction to that flaw.
- The flaw remediation procedures shall require that corrective actions be identified for each of the security flaws.
- The flaw remediation procedures documentation shall describe the methods used to provide flaw information, corrections, and guidance on corrective actions to the Government.
- The procedures for processing reported security flaws shall ensure that any reported flaws are corrected and the correction issued to the Government.

- The procedures for processing reported security flaws shall provide safeguards that any corrections to these security flaws do not introduce any new flaws.

### 6.2.8.5 Closeout/Disposal

The contractor certifies that the data processed during the performance of this contract shall be purged and sanitized from all data storage components of its computer facility, and the contractor will retain no output after such time as the contract is completed. If immediate purging of all data storage components is not possible, the contractor certifies that any organization data remaining in any storage component will be safeguarded to prevent unauthorized disclosures.

At contract completion or termination, the contractor shall provide a status list of all users and shall note if any users still require access to the system to perform work under another contract. Any group accounts or other means of gaining access to the system also shall be listed, including maintenance accounts and security bypasses.

## 6.3   AUDITABILITY

The Contractor shall make available personnel facilities and ADP resources to assist Department ADP Security Auditors, Department's Independent Validation and Verification Contractor, Inspector General, General Accounting Office, and Department systems, operations and compliance staff in conducting reviews. The Contractor shall provide routine access to contract facilities, personnel, and records by auditors and other review teams. Provisions for the temporary or permanent installation of audit software packages must also be made. In addition, routine access, document retrieval and installation of audit software packages must be provided without additional costs.

### 6.3.1   AUDITING STANDARDS AND CERTIFICATION

ED requires all contractors, both unrestricted and small businesses, to have SAS 70 (Type I) audits performed within two (2) years from Task Order Award and shall cover environment, operations and general computer controls. The SAS 70 control objectives should be mapped to the requirements of the Statement of Work, OMB Circular A-123, the Department's Security and Privacy Directives, NIST Special Publication 800-53 and 53A. All completed audit reports must be provided to the COR, along with any corrective action plans and any other supporting documentation requested. Agencies will develop corrective action plans to address any concerns/findings. Based upon audit findings, ED may take additional steps as appropriate up to and/or including termination of a Task Order.

Agencies that will have an audit performed that equals or exceeds the SAS 70 standards may petition the COR's office for audit replacement consideration.

ED reserves the right to request multiple or follow-up audits (e.g. every two years, SAS Type II, etc.) or to require different auditing standards (e.g. NIST SP 800-53A, FIPS 200, OMB Circular A-123, etc.) depending upon Government standards and/or needs in order to safeguard and protect ED's systems, and data.

## 6.4   PILOT/SPECIAL PROJECTS

ED reserves the right to solicit assistance from current Contractors to help with pilot or special projects designed to develop, study, improve, or test, information or systems related to the ED collections contracts. ED may also determine that a new, separate Task Order or contract modification is necessary in order to appropriately establish an on-going pilot or special project.

## 6.5   FAILURE OF CONTRACTOR TO MEET TASK ORDER REQUIREMENTS

ED realizes that problems in the day-to-day operations may arise; however, any <u>continued failure</u> on the part of the Contractor to meet contractual requirements will result in ED discontinuing further transfers of accounts to the Contractor until the Contractor has made acceptable corrections. **ED may also terminate the Task Order for failure to meet Task Order requirements.**

ED shall recall, immediately, any account where evidence of Contractor impropriety threatens the integrity of this program or in any way threatens or jeopardizes the interests of ED. ED retains the right to recall any particular account at anytime.

## 6.6   AWARD AND CANCELLATION OF TASK ORDERS

ED reserves the unilateral right to recall all accounts and cancel Task Orders if the CO determines that it is in the Government's best interest to do so.

ED also reserves the right to award additional Task Orders to additional Contractors at any time the CO determines that it is in the Government's best interest.

(End of Attachment A)

## Attachment B- Wage Determination

### Debt Collection Services

WD 98-0642 (Rev.-18) was first posted on www.wdol.gov on 06/03/2008

Debt Collection Services

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REGISTER OF WAGE DETERMINATIONS UNDER

THE SERVICE CONTRACT ACT

By direction of the Secretary of Labor

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION

WAGE AND HOUR DIVISION

WASHINGTON, D.C. 20210

Shirley F. Ebbesen, Director

Division of Wage Determinations

Wage Determination No: 1998-0642

Revision No: 18

Date Of Revision: 05/29/2008

--------------------------------------------------------------------------------

States: Alabama, Alaska, Arizona, California, Colorado, Connecticut, District of

Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana,

Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri,

Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,

North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South

Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West

Virginia, Wisconsin

Area: Alaska Statewide

Alabama Statewide

Arizona Statewide

California - All Counties except: San Joaquin

Colorado Counties of Adams, Alamosa, Arapahoe, Archuleta, Baca, Bent, Boulder,

Broomfield, Chaffee, Cheyenne, Clear Creek, Conejos, Costilla, Crowley, Custer,

Delta, Denver, Dolores, Douglas, Eagle, El Paso, Elbert, Fremont, Garfield,

Gilpin, Grand, Gunnison, Hinsdale, Huerfano, Jackson, Jefferson, Kiowa, Kit

Carson, La Plata, Lake, Larimer, Las Animas, Lincoln, Logan, Mesa, Mineral,

Moffat, Montezuma, Montrose, Morgan, Otero, Ouray, Park, Phillips, Pitkin,

Prowers, Pueblo, Rio Blanco, Rio Grande, Routt, Saguache, San Juan, San Miguel,

Sedgwick, Summit, Teller, Washington, Weld, Yuma

Connecticut Statewide

District of Columbia Statewide

Florida Statewide

Georgia Statewide

Iowa - All Counties except: Page

Idaho Statewide

Illinois - All Counties except: Peoria

Indiana Statewide

Kansas Statewide

Louisiana Statewide

Massachusetts Statewide

Maryland Statewide

Maine Statewide

Michigan Statewide

Minnesota - All Counties except: Jackson

Missouri Statewide

Mississippi Statewide

Montana Statewide

North Carolina Statewide

Nebraska Statewide

New Hampshire Statewide

New Jersey Statewide

New Mexico Statewide

Nevada Statewide

New York - All Counties except: Monroe, New York

Ohio - All Counties except: Mahoning

Oklahoma Statewide

Oregon Statewide

Pennsylvania - All Counties except: Dauphin, Montgomery

Rhode Island Statewide

South Carolina Statewide

South Dakota Statewide

Tennessee - All Counties except: Sumner, Williamson

Texas - All Counties except: Collin, Coryell, Lampasas, Oldham

Utah Statewide

Virginia Statewide

Washington Statewide

Wisconsin Statewide

West Virginia Statewide

---------------------------------------------------------------------------------

**Fringe Benefits Required Follow the Occupational Listing**

Employed on contracts for debt collection services:

| OCCUPATION CODE - TITLE | MINIMUM WAGE RATE |
|---|---|
| **01030** **Collection Specialist** | |
| Alabama Statewide | 12.47 |
| Arizona | 12.88 |
| California-All Counties except: Lathrop, San Joaquin | 15.89 |
| Colorado Statewide | 15.07 |
| Connecticut Statewide | 16.88 |
| District of Columbia Statewide | 16.16 |
| Montana | 12.21 |
| Nebraska Statewide | 12.72 |
| Alaska | 16.69 |
| California Counties of Lathrop, San Joaquin | 15.12 |
| Florida Statewide | 14.16 |
| Georgia Statewide | 13.75 |
| Idaho Statewide | 13.11 |
| Illinois All Counties except: Peoria | 14.79 |
| Illinois County of Peoria | 13.35 |

| | | |
|---|---|---|
| Indiana Statewide | 13.97 | |
| Iowa All Counties except: Page | 13.21 | |
| Kansas Statewide | 12.12 | |
| Louisiana Statewide | 12.19 | |
| Massachusetts Statewide | 16.23 | |
| Maryland Statewide | 13.88 | |
| Maine Statewide | 13.70 | |
| Michigan Statewide | 15.72 | |
| Minnesota All Counties except: Jackson | 16.16 | |
| Minnesota County of Jackson | 11.56 | |
| Missouri Statewide | | 13.17 |
| Mississippi Statewide | 11.51 | |
| Ohio All Counties except: Mahoning | 12.84 | |
| New Hampshire Statewide | 14.60 | |
| Nevada Statewide | | 13.39 |
| New York All Counties except: Monroe, New York | 12.95 | |
| New York County of Monroe | 14.28 | |
| New Jersey Statewide | 15.61 | |
| Ohio County of Mahoning | 14.08 | |
| Oklahoma Statewide | 12.68 | |
| Oregon Statewide | | 14.08 |
| Pennsylvania All Counties | | |
|     Except: Dauphin, Montgomery, Ft. Washington | 13.23 | |
| Pennsylvania Counties of Ft. Washington, Montgomery | 13.44 | |
| Rhode Island Statewide | 14.49 | |

| South Carolina Statewide | 13.02 |
|---|---|
| South Dakota Statewide | 11.88 |
| Texas All Counties except: Collin, Coryell, Lampasas, Oldham | 14.48 |
| Utah Statewide | 13.35 |
| Texas County of Oldham | 10.92 |
| Texas County of Lampasas | 12.91 |
| Texas County of Collin | 16.08 |
| Texas County of Coryell | 12.15 |
| Washington Statewide | 15.21 |
| Iowa County of Page | 12.72 |
| West Virginia Statewide | 11.67 |
| Wisconsin Statewide | 13.79 |
| New Mexico Statewide | 12.63 |
| North Carolina Statewide | 13.70 |
| Tennessee All Counties except: Sumner, Williamson | 13.37 |
| Tennessee Counties of Sumner, Williamson | 13.86 |
| Virginia Statewide | 13.62 |
| Pennsylvania County of Dauphin | 13.89 |
| New York County of New York | 17.52 |

ALL OCCUPATIONS LISTED ABOVE RECEIVE THE FOLLOWING BENEFITS:

- HEALTH & WELFARE: $3.24 per hour or $129.60 per week or $561.60 per month

- VACATION: 2 weeks paid vacation after 1 year of service with a contractor or successor; 3 weeks after 5 years, and 4 weeks after 15 years. Length of service

includes the whole span of continuous service with the present contractor or

successor, wherever employed, and with the predecessor contractors in the

performance of similar work at the same Federal facility. (Reg. 29 CFR 4.173)

- HOLIDAYS: A minimum of ten paid holidays per year: New Year's Day, Martin Luther

King Jr.'s Birthday, Washington's Birthday, Memorial Day, Independence Day,

Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day. (A

contractor may substitute for any of the named holidays another day off with pay

in accordance with a plan communicated to the employees involved.) (See 29 CFR

4.174)

** OCCUPATIONS NOT INCLUDED IN THE SCA DIRECTORY OF OCCUPATIONS **

Collection Specialist

Responsibilities include using judgment to determine the appropriate and most

expedient way of resolving a portfolio of delinquent accounts in order to

maximize collection. Requests and analyze credit reports for use in determining

ways to resolve delinquent debt accounts. Determines whether write-off tools are

recommended to immediate supervisor when debts are uncollectible, i.e., in case

a bankruptcy. Monitors payments made by debtors and minimizes delinquents/the

number of accounts that are delinquent. .

(End of Attachment B)

# Supplemental Documents For Contract

# ED-FSA-09-O-0011

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30 | | 1. REQUISITION NUMBER | | PAGE 1 OF 6 |
|---|---|---|---|---|

| 2. CONTRACT NO. | 3. AWARD/EFFECTIVE DATE | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|
| GS-23F-0063J | APR 22, 2015 | ED-FSA-15-O-0028 | | |

| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME Patty Queen-Harper patty.queen-harper@ed.gov | b. TELEPHONE NUMBER (No collect calls) 404-682-3288 | 8. OFFER DUE DATE/ LOCAL TIME |
|---|---|---|---|

| 9. ISSUED BY | CODE | FSA-FS2 |
|---|---|---|
| United States Department of Education Federal Student Aid/Mission Support Group 830 First St NE - Suite 01F3 Washington DC 20202 | | |

10. THIS ACQUISITION IS [ ] UNRESTRICTED OR [ ] SET ASIDE: ___ % FOR:

[ ] SMALL BUSINESS

[ ] HUBZONE SMALL BUSINESS

[ ] SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS

[ ] WOMEN-OWNED SMALL BUSINESS (WOSB)

[ ] ECONOMICALLY DISADVANTAGED WOMEN-OWNED SMALL BUSINESS (EDWOSB)

[ ] 8 (A)

NAICS:

SIZE STANDARD:

| 11. DELIVERY FOR FOB DESTINA- TION UNLESS BLOCK IS MARKED | 12. DISCOUNT TERMS 0 Days 0% Net 30 | 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | 13b. RATING |
|---|---|---|---|
| [ ] SEE SCHEDULE | | 14. METHOD OF SOLICITATION [ ] RFQ  [ ] IFB  [X] RFP | |

| 15. DELIVER TO | CODE | FSA-FS2 |
|---|---|---|
| United States Department of Education Federal Student Aid/Mission Support Group 830 First St NE - Suite 01F3 Washington DC 20202 | | |

| 16. ADMINISTERED BY | CODE | FSA-FS2 |
|---|---|---|
| United States Department of Education Federal Student Aid/Mission Support Group 830 First St NE - Suite 01F3 Washington DC 20202 | | |

| 17a. CONTRACTOR/ OFFEROR. | CODE 00020096 | FACILITY CODE |
|---|---|---|
| FMS INVESTMENT CORP 1701 WEST GOLF ROAD SUITE 2-160 ROLLING MEADOWS IL 600084227 | | |

CAGE: 1TBX0
TIN: 521856093       DUNS: 020053606
TELEPHONE NO.

| 18a. PAYMENT WILL BE MADE BY | CODE | FSA-BUD |
|---|---|---|
| Budget Group/Invoice Admin US Department of Education/FSA/CFO/BG/FSAA 830 First Street, NE, Suite 64B1 Washington DC 20202-0001 | | |

| 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER [ ] | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED [ ] SEE ADDENDUM |
|---|---|

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| Please | see continuation page for line item details. | | | | |
| | (Use Reverse and/or Attach Additional Sheets as Necessary) | | | | |

| 25. ACCOUNTING AND APPROPRIATION DATA | 26. TOTAL AWARD AMOUNT (For Govt. Use Only) |
|---|---|
| See Schedule | $0.00 |

27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA [ ] ARE [ ] ARE NOT ATTACHED

27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA [X] ARE [ ] ARE NOT ATTACHED

| 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ___ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED | 29. AWARD OF CONTRACT: REF. _____ OFFER DATED. _____ YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS: |
|---|---|

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) |
|---|---|
| *[signature]* | *[signature]* |

| 30b. NAME AND TITLE OF SIGNER (Type or print) LEN STREPEK SR. VP FMS | 30c. DATE SIGNED 4/21/15 | 31b. NAME OF CONTRACTING OFFICER (Type or print) Murthlyn Aldridge  (202-377-3237 murthlyn.aldridge@ed.gov | 31c. DATE SIGNED APR 17, 2015 |
|---|---|---|---|

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 3/2011)
Prescribed by GSA - FAR (48 CFR) 53.212

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | | | | | |

32a. QUANTITY IN COLUMN 21 HAS BEEN

☐ RECEIVED   ☐ INSPECTED   ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED: _____

| 32b. SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 32c. DATE | 32d. PRINTED NAME AND TITLE OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
|---|---|---|
| 32e. MAILING ADDRESS OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | 32f. TELEPHONE NUMBER OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
| | | 32g. E-MAIL OF AUTHORIZED GOVERNMENT REPRESENTATIVE |

| 33. SHIP NUMBER | 34. VOUCHER NUMBER | 35. AMOUNT VERIFIED CORRECT FOR | 36. PAYMENT | | 37. CHECK NUMBER |
|---|---|---|---|---|---|
| ☐ PARTIAL ☐ FINAL | | | ☐ COMPLETE ☐ PARTIAL ☐ FINAL | | |
| 38. S/R ACCOUNT NO. | 39. S/R VOUCHER NUMBER | 40. PAID BY | | | |

| 41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42a. RECEIVED BY     (Print) |
|---|---|---|
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41c. DATE | 42b. RECEIVED AT     (Location) |
| | | 42c. DATE REC'D   (YY/MM/DD)   42d. TOTAL CONTAINERS |

**STANDARD FORM 1449** (REV. 3/2011)   **BACK**

GS-23F-0063J/ED-FSA-15-O-0028

4/17/2015                                           www.wdol.gov/wdol/scafilen/non-std/98-0842.sca?v=28

WD 98-0642 (Rev.-28) was first posted on www.wdol.gov on 01/20/2015
Debt Collection Services
*******************************************************************************
REGISTER OF WAGE DETERMINATIONS UNDER    |    U.S. DEPARTMENT OF LABOR
         THE SERVICE CONTRACT ACT        |  EMPLOYMENT STANDARDS ADMINISTRATION
By direction of the Secretary of Labor   |    WAGE AND HOUR DIVISION
                                         |    WASHINGTON, D.C. 20210


Diane C. Koplewski    Division of Wage   | Wage Determination No: 1998-0642
Director              Determinations     |       Revision No: 28
                                         |    Date Of Revision: 01/12/2015
-------------------------------------------------------------------------------
Note: Executive Order (EO) 13658 establishes an hourly minimum wage of $10.10
for 2015 that applies to all contracts subject to the Service Contract Act for
which the solicitation is issued on or after January 1, 2015. If this contract
is covered by the EO, the contractor must pay all workers in any classification
listed on this wage determination at least $10.10 (or the applicable wage rate
listed on this wage determination, if it is higher) for all hours spent
performing on the contract. The EO minimum wage rate will be adjusted annually.
Additional information on contractor requirements and worker protections under
the EO is available at www.dol.gov/whd/govcontracts.
States: Alabama, Alaska, Arizona, California, Colorado, Connecticut, District of
Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana,
Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri,
Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,
North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South
Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West
Virginia, Wisconsin
Area: Alaska Statewide
Alabama Statewide
Arizona Statewide
California - All Counties except : San Joaquin
Colorado Statewide
Connecticut Statewide
District of Columbia Statewide
Florida Statewide
Georgia Statewide
Iowa - All Counties except : Page
Idaho Statewide
Illinois - All Counties except : Peoria
Indiana Statewide
Kansas Statewide
Louisiana Statewide
Massachusetts Statewide
Maryland Statewide
Maine Statewide
Michigan Statewide
Minnesota - All Counties except : Jackson
Missouri Statewide
Mississippi Statewide
Montana Statewide
North Carolina Statewide
Nebraska Statewide
New Hampshire Statewide
New Jersey Statewide
New Mexico Statewide
Nevada Statewide
New York - All Counties except : Monroe, New York
Ohio - All Counties except : Mahoning

4/17/2015                                    www.wdol.gov/wdol/scafiles/non-std/98-0642.sca?v=28

Oklahoma Statewide
Oregon Statewide
Pennsylvania - All Counties except : Dauphin, Montgomery
Rhode Island Statewide
South Carolina Statewide
South Dakota Statewide
Tennessee - All Counties except : Sumner, Williamson
Texas - All Counties except : Collin, Coryell, Lampasas, Oldham
Utah Statewide
Virginia Statewide
Washington Statewide
Wisconsin Statewide
West Virginia Statewide
--------------------------------------------------------------------------------

**Fringe Benefits Required Follow the Occupational Listing**

Employed on contracts for debt collection services:

| OCCUPATION CODE - TITLE | FOOTNOTE | RATE |
|---|---|---|
| 01030 - Collection Specialist | | |
| Alabama Statewide | | 13.21 |
| Alaska | | 17.68 |
| Arizona | | 13.64 |
| California Counties of Lathrop, San Joaquin | | 16.01 |
| California-All Counties except: Lathrop, San Joaquin | | 16.83 |
| Colorado Statewide | | 15.96 |
| Connecticut Statewide | | 17.88 |
| District of Columbia Statewide | | 17.12 |
| Florida Statewide | | 15.00 |
| Georgia Statewide | | 14.56 |
| Idaho Statewide | | 13.89 |
| Illinois All Counties except: Peoria | | 15.67 |
| Illinois County of Peoria | | 14.13 |
| Indiana Statewide | | 14.79 |
| Iowa All Counties except:Page | | 13.99 |
| Iowa County of Page | | 13.47 |
| Kansas Statewide | | 12.84 |
| Louisian Statewide | | 12.92 |
| Maine Statewide | | 14.51 |
| Maryland Statewide | | 14.70 |
| Massachusetts Statewide | | 17.19 |
| Michigan Statewide | | 16.65 |
| Minnesota All Counties except: Jackson | | 17.12 |
| Minnesota County of Jackson | | 12.25 |
| Mississippi Statewide | | 12.19 |
| Missouri Statewide | | 13.95 |
| Montana | | 12.94 |
| Nebraska Statewide | | 13.47 |
| Nevada Statewide | | 14.19 |
| New Hampshire Statewide | | 15.46 |
| New Jersey Statewide | | 16.53 |
| New Mexico Statewide | | 13.38 |
| New York All Counties except:Monroe, New York | | 13.72 |
| New York County of Monroe | | 15.13 |
| New York County of New York | | 18.56 |
| North Carolina Statewide | | 14.51 |
| Ohio All Counties except: Mahoning | | 13.60 |
| Ohio County of Mahoning | | 14.92 |
| Oklahoma Statewide | | 13.43 |

**Attachment Page**

| | |
|---|---|
| Oregon Statewide | 14.92 |
| Pennsylvania All Counties except:Dauphin, Montgomery, Ft. Washington | 14.81 |
| Pennsylvania Counties of Ft. Washington, Montgomery | 14.24 |
| Pennsylvania County of Dauphin | 14.71 |
| Rhode Island Statewide | 15.35 |
| South Carolina Statewide | 13.79 |
| South Dakota Statewide | 12.58 |
| Tennessee All Counties except: Sumner, Williamson | 14.17 |
| Tennessee Counties of Sumner, Williamson | 14.68 |
| Texas County of Coryell | 12.87 |
| Texas All Counties except:Collin, Coryell, Lampasas,Oldham | 15.34 |
| Texas County of Collin | 17.03 |
| Texas County of Llampasas | 13.67 |
| Texas County of Oldham | 11.57 |
| Utah Statewide | 14.13 |
| Virginia Statewide | 14.43 |
| Washington Statewide | 16.11 |
| West Virginia Statewide | 12.36 |
| Wisconsin Statewide | 14.60 |

ALL OCCUPATIONS LISTED ABOVE RECEIVE THE FOLLOWING BENEFITS:

HEALTH & WELFARE: $4.02 per hour or $160.80 per week or $696.79 per month

VACATION: 2 weeks paid vacation after 1 year of service with a contractor or
successor, 3 weeks after 5 years, and 4 weeks after 15 years. Length of service
includes the whole span of continuous service with the present contractor or
successor, wherever employed, and with the predecessor contractors in the
performance of similar work at the same Federal facility. (Reg. 29 CFR 4.173)

HOLIDAYS: A minimum of ten paid holidays per year: New Year's Day, Martin Luther
King Jr.'s Birthday, Washington's Birthday, Memorial Day, Independence Day,
Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day. (A
contractor may substitute for any of the named holidays another day off with pay
in accordance with a plan communicated to the employees involved.) (See 29 CFR
4.174)

## SCHEDULE Continued

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE $ | AMOUNT $ |
|----------|-------------------|----------|------|--------------|----------|
| | The purpose of this Task Order is to issue the award term extension under clause H.4, Award Term Extension, of Task Order GS-23F-236K/ED-FSA-09-O-0005. Performance is hereby extended, in accordance with clause H.4, for the period from April 22, 2016 to April 21, 2017.<br><br>This award-term Task Order extension is subject to the terms and conditions of Task Order GS-23F-236K/ED-FSA-09-O-0005. This Task Order incorporates all terms and conditions identified in Task Order GS-23F-236K/ED-FSA-09-O-0005 with the same force and effect as if set forth in full text.<br><br>The updated Department of Labor Wage Determination, WD 98-0642 (Rev-28) is incorporated in accordance with 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards - Price Adjustment (Multiple Year and Option Contracts). | | | | |

# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**BID PROTEST**

| | |
|---|---|
| FMS INVESTMENT CORP., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 19-308C (Consolidated) |
| v. ) | |
| ) | (Judge Thomas C. Wheeler) |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

DECLARATION OF MICHAEL BRYANT

I, Michael Bryant, Business Operations Specialist, Federal Student Aid (FSA), United

States Department of Education, hereby make the following declaration in lieu of an affidavit, as

permitted by Section 1746 of Title 28 of the United States Code.  I am aware that this declaration

will be filed with the United States Court of Federal Claims in connection with the bid protests

captioned above and related cases.  I also understand that this declaration is the legal equivalent

of a statement under oath.  I make this declaration to the best of my knowledge and belief, based

on my personal knowledge and on information made available to me in my official capacity:

1.      As a Business Operations Specialist of FSA, I analyze FSA's portfolio of

defaulted student loans that have been referred for collection activity.  As such, I have direct

knowledge of historical volumes of collections and recoveries in that portfolio, and of how that

portfolio has been placed with different private collection agencies (PCAs) at different points in

time.

2.      I understand that FMS Investment Corp. (FMS), correctly notes  that the Table

related to "collections" included on page 11 (Net Collection Rate Table) of the administrative

record for the cancellation of Solicitation No. ED-FSA-16-R-0009 (PCA Solicitation), includes payments received through the Treasury Offset Program (TOP).

3.     In reviewing the Net Collection Rate Table, I note a mathematical rounding error. The net collections for FY 2016 were $2,358,874.01 and if rounded  would be $2.4 billion and not $2.5 billion as included in the Table.

4.     I also understand that FMS  prepared and included its own table that purports to subtract TOP dollars from FSA's net collections.

5.     In reviewing FMS' table, I note a mathematical error.  The TOP used and referenced in Footnote 15 of FMS' Table is incorrectly stated as $2.84 billion for FY 2018.  The correct amount is $2,482,711,653, rounded to $2.48 billion.  Subtracting $2.48 billion from $3.3 billion results in net collections of $.82 billion, not the incorrectly stated amount of $.46 billion. The net collection rate for FY 2018, using FMS's methodology, was therefore .58%, not the incorrectly stated rate of .32%.

6.     Excluding TOP dollars from Net Collections does not accurately show collections solely attributable to PCAs because there are other collections attributable to accounts in FSA's collections portfolio that were not assigned to a PCA, and therefore those other collections were not the result of work performed by a PCA.

7.     I created Table 1, attached to this Declaration, which only includes collections attributable to the work of PCAs.  These collections are limited to voluntary payments and administrative wage garnishment payments.

8.     I also created Table 2, attached to this Declaration, which only includes "recoveries" attributable to the work of the PCAs.  These recoveries are limited to collections (previously defined) plus the dollar value of loans rehabilitated at the time those loans were

transferred out of the collections portfolio and the dollar value of loans consolidated at the time

payoff was received from the consolidating servicer.

Dated: _4 - 1 8 . 1 9_

_____

MICHAEL BRYANT
Business Operations Specialist
Federal Student Aid
United States Department of Education

Attachments

Table 1: Net PCA Collections (Voluntary and Administrative Wage Garnishment)

| Date | Approximate Portfolio Size | Net Collections | Net Collection Rate | Dollars Collected | PCA Fees |
|---|---|---|---|---|---|
| 10/1/2016 | $105,519,497,976.06 | $269,700,607.69 | 0.26% | $1,019,641,743.25 | $749,941,135.56 |
| 10/1/2017 | $121,458,535,213.11 | $344,607,209.64 | 0.28% | $1,094,097,186.03 | $749,489,976.39 |
| 10/1/2018 | $142,210,790,729.42 | $557,171,790.80 | 0.39% | $1,350,176,976.48 | $793,005,185.68 |

Table 2: PCA Recoveries

| Date | Approximate Portfolio Value | Combined Recoveries | Recovery Rate |
|---|---|---|---|
| 11/1/2014 (end of FY14) | $70,116,467,384 | $8,885,965,593 | 13% |
| 10/2/1015 (end of FY15) | $82,192,328,144 | $8,667,817,801 | 11% |
| 10/1/2016 (end of FY16) | $105,519,497,976 | $8,777,093,361 | 8% |
| 10/1/2017 (end of FY17) | $121,458,535,213 | $9,873,991,521 | 8% |
| 10/1/2018 (end of FY18) | $142,210,790,729 | $10,452,204,513 | 7% |

4