## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

FMS INVESTMENT CORP., *et al.*,

               Plaintiff,

    v.

UNITED STATES.

Nos. 19-308C, 19-331C, 19-372C
(consolidated)

Judge Thomas C. Wheeler

████████████████

## PLAINTIFF CONTINENTAL SERVICE GROUP, INC.'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Todd J. Canni
Richard B. Oliver
Alexander B. Ginsberg
J. Matthew Carter
Aaron S. Ralph
Kevin R. Massoudi
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 488-7213
(213) 629-1033 (fax)

*Attorneys for Consolidated Plaintiff
Continental Service Group, Inc.*

# TABLE OF CONTENTS

### Contents

TABLE OF AUTHORITIES ................................................................................. iii

I.   STATEMENT OF THE CASE ................................................................. 1

II.  STATEMENT OF THE ISSUES ............................................................. 8

III. STATEMENT OF FACTS ....................................................................... 8

IV.  JURISDICTION AND STANDING ....................................................... 8

V.   STANDARDS OF REVIEW .................................................................. 10

   A.  JUDGMENT ON THE ADMINISTRATIVE RECORD ............................. 10

   B.  BID PROTEST REVIEW ........................................................................ 10

VI.  ARGUMENT ........................................................................................... 11

   A.  THE BPO SOLICITATION IMPROPERLY CONSOLIDATES SEVERAL DISTINCT SERVICES FROM DEFAULT RECOVERY TO LOAN SERVICING TO BACK-OFFICE PROCESSING IN VIOLATION OF CICA ............................................................................... 11

     i.   THE BPO SOLICITATION CONSOLIDATES SERVICES THAT HAVE HISTORICALLY BEEN  PROCURED SEPARATELY .................................. 11

     ii.  ED'S IMPROPER CONSOLIDATION VIOLATES CICA ......................... 12

     iii. ED Has Not Explained Why Consolidation of Default Recovery Services is Reasonable and Necessary .................................. 14

     iv.  Administrative Convenience Does Not Justify ED's Improper Consolidation of Default Recovery Services .................................... 15

     v.   Allowing Teaming Does Not Cure the Serious Defect in the BPO Solicitation ... 16

     vi.  ED'S IMPROPER CONSOLIDATION OF DEFAULT RECOVERY SERVICES AND LOAN SERVICING HAS CREATED AN UNMITIGABLE ORGANIZATIONAL CONFLICT OF INTEREST FOR ANY WINNING TEAM ............................................... 18

   B.  ED IMPROPERLY CANCELLED THE DEFAULT COLLECTION PROCUREMENT ............... 21

     i.   ED RELIES ON THE IMPROPERLY CONSOLIDATED BPO SOLICITATION TO JUSTIFY THE CANCELLATION ....................................... 22

     ii.  ED ADMITS THAT IT STILL HAS NOT CONDUCTED A LEGAL REVIEW OF THE NEXTGEN PROCUREMENT ............................ 23

     iii. THE NEW CANCELLATION DECISION DOES NOT EXPLAIN WHAT ED WAS DOING FROM SEPTEMBER 14, 2018, WHEN THE COURT ENJOINED IT, UNTIL IT ISSUED THE NEW CANCELLATION DECISION IN MARCH 2019 ....................... 24

     iv.  THE NEW CANCELLATION DECISION IS PREMISED ON THE INCORRECT ASSUMPTION THAT THE SMALL BUSINESSES CAN HANDLE THE ENTIRE VOLUME OF ED'S DEFAULT RECOVERY SERVICES ................................ 25

     v.   THE NEW CANCELLATION DECISION FOCUSED ON THE MERITS OF ENHANCING "SERVICING," WHICH DOES NOT JUSTIFY THE CANCELLATION OF A PROCUREMENT FOR DEFAULT RECOVERY SERVICES ...................... 34

   C.  ALL FACTORS FAVOR PERMANENT INJUNCTIVE RELIEF ................. 35

i

    **i.  ConServe has Succeeded on the Merits** ............................................................ 36
    **ii.** ████████████████████████████████████████████████████████████
    ████████████████████████████████████████████████████████████ 36
    **iii.  ED Will Sustain No Harm and the Harm to ConServe Outweighs Any
        Harm to ED** ............................................................................................. 38
    **iv.  Granting Permanent Injunctive Relief is in the Public Interest** ............. 39
**VII.  CONCLUSION AND REQUEST FOR RELIEF** ....................................... 40

## **TABLE OF AUTHORITIES**

**Page(s)**

Cases

*2B Brokers, et al.,*
  B-298561, Nov. 27, 2006, 2006 CPD ¶ 178 ........................................................... 18

*Aegis Techs. Grp., Inc. v. United States,*
  128 Fed. Cl. 561 (2016) ......................................................................................... 21

*Alion Sci. & Tech. Corp. v. United States,*
  74 Fed. Cl. 372 (2006) ........................................................................................... 42

*Banknote Corp. of Am. v. United States,*
  365 F.3d 1345 (Fed. Cir. 2004) .............................................................................. 12

*Bannum, Inc. v. United States,*
  404 F.3d 1346 (Fed. Cir. 2005) ......................................................................... 13, 14

*Better Serv.,*
  B-265751, Jan. 18, 1996, 96-1 CPD ¶ 90 .............................................................. 17

*C2C Innovative Solutions, Inc.,*
  B-416289, B-416289.2, July 30, 2018, 2018 CPD ¶ 269 ....................................... 22

*Centech Grp., Inc. v. United States,*
  554 F.3d 1029 (Fed. Cir. 2009) ........................................................................ 14, 39

*Charles H. Tompkins Co. v. United States,*
  43 Fed. Cl. 716 (1999) ........................................................................................... 15

*Cincom Sys., Inc. v. United States,*
  37 Fed. Cl. 266 (1997) ........................................................................................... 42

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ............................................................................................... 14

*Coast Prof'l, Inc. et al. v. United States,*
  120 Fed. Cl. 727 (2015), *vacated and remanded*, 828 F.3d 1349 (Fed. Cir.
  2016) .................................................................................................................... 7, 8

*Distributed Solutions, Inc. v. United States,*
  539 F.3d 1340 (Fed. Cir. 2008) .............................................................................. 12

*EDP Enters., Inc.,*
  B-284533.6, May 19, 2003, 2003 CPD ¶ 93 ...................................................... 16, 18

*FMS Investment Corp. v. United States,*
   136 Fed. Cl. 439 (2018) ............................................................................ 1

*FMS Investment Corp. v. United States,*
   139 Fed. Cl. 221 (2018) ...................................................................... passim

*FMS Investment Corp. v. United States,*
   139 Fed. Cl. 439 (2018) .......................................................................... 25

*General Revenue Corp., et al.,*
   B–414220.2 ................................................................................................ 1

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
   238 F.3d 1324 (Fed. Cir. 2001)............................................................... 14

*Insight Sys. Corp. v. United States,*
   110 Fed. Cl. 564 (2013) .......................................................................... 40

*Labatt Food Serv., Inc. v. United States,*
   577 F.3d 1375 (Fed. Cir. 2009)............................................................... 12

*Nat'l Customer Eng'g,*
   B–251135, Mar. 11, 1993, 93–1 CPD ¶ 225.......................................... 18

*Northrop Grumman Tech. Servs., Inc.,*
   B-406523, June 22, 2012, 2012 CPD ¶ 197............................................ 20

*Omega World Travel, Inc. v. U.S.,*
   82 Fed. Cl. 452 (2008) ............................................................................ 13

*Parcel 49C Ltd. P'ship v. United States,*
   31 F.3d 1147 (Fed. Cir. 1994).................................................................. 39

*Pemco Aeroplex, Inc.,*
   B-280397, 98-2 ................................................................................ 15, 20

*PGBA, LLC v. United States,*
   57 Fed. Cl. 655 (2003) ...................................................................... 39, 42

*Phoenix Sci. Corp.,*
   B-286817, 2001 CPD ¶ 24 (Feb. 22, 2001) ........................................... 21

*Sheridan Corp. v. U.S.,*
   94 Fed. Cl. 663 (2010) ............................................................................ 42

*Sigmatech, Inc. v. United States,*
   No. 18-1425C, 2018 WL 6920166 (Fed. Cl. Nov. 30, 2018) ................. 22

*Turner Const. Co., Inc. v. U.S.*,
    *94 Fed. Cl.* 561 (2010) ............................................................... 22

*Turner Constr. Co. v. United States*,
    645 F.3d 1377 (Fed. Cir. 2011) ................................................... 39

*Univ. Research Co. v. United States*,
    65 Fed. Cl. 500 (2005) ............................................................... 42

*Vantex Serv. Corp.*,
    B–290415, Aug. 8, 2002, 2002 CPD ¶ 131 ........................... 15, 17, 18

Statutes and Codes

Administrative Procedure Act .................................................... 13, 14

Competition in Contracting Act ....................................................... 2

Higher Education Act of 1965
    Title IV ................................................................................... 7

Tucker Act .................................................................................. 11

United States Code
    Title 28, section 1491(b)(1) .................................................... 12
    Title 31, sections 3718(d)-(e) .................................................. 22
    Title 41, section 107 ............................................................... 15
    Title 41, section 3301 ..................................................... 4, 14, 17
    Title 41, section 3301(a)(1) ..................................................... 21
    Title 5, section 706 ................................................................. 13

Rules and Regulations

Code of Federal Regulations
    Title 13, section 121.404(g)(3) ................................................ 33

ConServe ATE Task Order No. ED-FSA-15-O-0029 ....................... 8

Federal Acquisition Regulation
    Subpart 6.1 ............................................................................ 15
    Section 2.101 ......................................................................... 15

Rules of the United States Court of Federal Claims
    Rule 52.1 ................................................................................. 1
    Rule 52.1(c) ........................................................................... 13

Other Authorities

James Bergeron, *Effective debt collection helps the student loan landscape*, The Hill (3/20/19) (https://thehill.com/opinion/education/434358-effective-debt-collection-helps-the-student-loan-landscape) ........................................................................ 31

**PROTESTOR'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") and the Court's May 1, 2019 Order, Plaintiff Continental Service Group, Inc. ("ConServe"), by and through the undersigned counsel, respectfully submits this Motion and Memorandum of Points and Authorities in Support of its Motion for Judgment on the Administrative Record ("MJAR").

## I.   STATEMENT OF THE CASE

In this long-running procurement saga that now spans several years, the U.S. Department of Education, Federal Student Aid ("ED") repeatedly and continuously has engaged in "***blatant***" violations of the Competition in Contracting Act ("CICA"), "***slipshod***" decision-making, "***inconsistencies***" and "***unequal treatment of offerors***," and acts to mislead and deceive this Court, ConServe, and the other large Private Collection Agencies ("PCA").

Despite successfully protesting ED's flawed and misguided procurement decisions time after time at significant expense and distraction to ConServe's business, today, ConServe stands no closer to receiving the opportunity to compete fairly to provide ED with default recovery services than it did at the outset of this procurement and, indeed, ConServe already has sustained substantial harm, including losing hundreds of valued and highly-skilled employees and millions upon millions in revenue. While ED's plain violations of procurement law, alone, are sufficient to sustain this protest, we have observed something other than routine procurement violations during this procurement. Indeed, ED's actions, when viewed together, evidence bad faith and a clear and unwavering commitment to achieve ED's misguided goals regardless of the trail of destruction left behind. To date, the Court has given ED opportunity after opportunity to do the right thing on its own. ED appears unwilling to change its ways or to abide by the rules absent a

1

firm Court order requiring it to do so.  It is time to put away the carrot and to ***take out the stick***.
Permanent injunctive relief is necessary to prevent these procurement violations and abusive
practices from continuing, which will irreparably harm ConServe by sidelining it from
competing to provide ED with default recovery services.

As this Court has observed over the last few years, including during the instant
procurement, ED has taken step-after-step to sideline and exclude ConServe from competing
fairly to provide ED with default recovery services and, in turn, to cause ConServe to sustain
irreparable harm.  Specifically, ConServe has had to endure the following unlawful conduct by
ED that illustrates ED's cavalier attitude and utter disregard for the integrity of the procurement
process:

- <u>**March 27, 2017**</u>:  The GAO sustained protests filed by several of the PCA protesters challenging ED's award of contracts under Solicitation No. ED-FSA-16-R-0009 (hereinafter referred to as the "Default Collection Procurement"), and explained that "the record fails to show that the agency had a reasonable basis for its evaluation of proposals and its ***evaluation was not consistent with the terms of the solicitation or applicable procurement laws***." *Gen. Revenue Corp., et al.*, B–414220.2 *et al.*, Mar. 27, 2017, 2017 CPD ¶ 106 (emphasis added).
- <u>**March 29, 2017**</u>:  One day after ConServe filed a protest challenging ED's award of contracts under the Default Collection Procurement, this Court granted ConServe's Motion for a Temporary Restraining Order and enjoined ED from authorizing the purported awardees to begin performance on the contract. *Cont'l Servs. Grp., Inc. v. United States*, 130 Fed. Cl. 798, 801 (2017);
- <u>**May 2, 2017**</u>:  This Court granted ConServe's Motion for a Preliminary Injunction and enjoined ED from authorizing the purported awardees under the Default Collection Procurement to begin performance on the contract.  This Court explained that "it is likely that some or all Plaintiffs may prevail on the merits, based on the GAO's March 27, 2017 Decision finding that the ED's prior evaluation of proposals was unreasonable in numerous respects and resulted in the reasonable possibility of prejudice." *Cont'l Servs. Grp., Inc. v. United States,* 132 Fed. Cl. 191, 193 (2017);
- <u>**May 19, 2017**</u>:  ED filed a Notice of Corrective Action and advised the Court that it intended to make new awards under the Default Collection Procurement;
- <u>**February 26, 2018**</u>:  Following ED's post-corrective action award of new contracts under the Default Collection Procurement, this Court granted Motions for Preliminary Injunctions filed by ConServe and several of the other PCA protesters and held that they

2

were likely to succeed on the merits of protests challenging the new awards made by ED. *FMS Inv. Corp. v. United States*, 136 Fed. Cl. 439 (2018). This Court explained that "[t]he evidence currently before the Court points to ***inconsistencies, omissions, unequal treatment of offerors, and cherry-picked data*** that the Court finds to be rather problematic." *Id.* at 443 (emphasis added);

- **May 3, 2018**: After two unsuccessful attempts to award contracts, ***ED canceled the Default Collection Procurement under a flimsy pretext*** of switching to a new "enhanced servicing" approach to default recovery;

- **September 14, 2018**: This Court enjoined ED's attempted cancellation of the Default Collection Procurement and explained that ***ED's cancellation decision was "irrational, arbitrary, and capricious*.**" *FMS Inv. Corp. v. United States*, 139 Fed. Cl. 221, 225 (2018) (emphasis added);

- **Fall 2018**: While ConServe and the other successful PCA protesters awaited an announcement from ED as to how it intended to proceed with the Default Collection Procurement, ***ED attempted to evade the bid protest accountability process*** and to sideline ConServe and the other PCAs ***by shoehorning default recovery services into the Next Generation Financial Services Environment*** ("NextGen") Phase II Solicitation *after* the Phase I Solicitation was written, released, and proposals were due;

- **November 26, 2018**: ConServe filed a protest asserting that ED's decision to procure default recovery services under the NextGen Phase II Solicitation without providing offerors notice or an opportunity to compete under Phase I was arbitrary, capricious, and in violation of the CICA and other applicable procurement laws and regulations;

- **December 4, 2018**: During a hearing concerning a motion for preliminary injunction filed by Plaintiff MOHELA, this Court stated its belief that ConServe and the other PCA protesters had made a "fairly convincing argument" that they had been excluded from the NextGen Procurement in a ***"pretty blatant" and "clear violation" of CICA*.** Dec. 4, 2018 Hearing Transcript 33:6-17;

- **December 21, 2018**: During a separate hearing concerning a motion for preliminary injunction filed by Plaintiff FMS Investment Corp., ED informed the Court that it would be taking corrective action to amend the NextGen Solicitations so that ConServe and the other PCAs would have an opportunity to compete. Skeptical of ED's true intentions, ConServe informed the Court that it was concerned "that there will be a bundling of services that precludes the PCAs from competing." Dec. 21, 2018 Hearing Transcript 30:5-7;

- **January 15, 2019**: ED took corrective action and amended the NextGen Solicitations. However, ED did exactly what ConServe expressed concern about at the December 21, 2018 hearing and ***ED "doubled down" on its efforts to exclude ConServe and the other PCA protesters by consolidating default recovery services*** with other services in violation of CICA;

- **March 4, 2019**: ConServe and the other PCA protesters challenged ED's improper consolidation of default recovery services with other services under three NextGen Solicitations. ConServe also argued that rather than address the specific litany of concerns

3

identified in this Court's September 2018 decision invalidating ED's cancellation of the Default Collection Procurement, ED had ignored this Court's order and continued to go on with business as usual as though it was still cancelled;

- **March 6, 2019**:  Vindicating ConServe's protest contention that ED already had cancelled the Default Collection Procurement without taking formal action to do so (*i.e.*, an improper *de facto* cancellation), ***ED attempted to cover its tracks by formally cancelling the Default Collection Procurement*** (the "New Cancellation Decision");

- **March 7, 2019**: During an initial status conference concerning the protests challenging ED's consolidation of default recovery services under NextGen, this Court stated that "the way that the default collection work has been bundled . . . *makes very little sense to me*." Mar. 7, 2019 Status Conference Transcript at 16:15-17 (emphasis added).  The Court further states that "*I'm at a loss to understand the rationale behind some of these procurement actions*."  *Id.* at 17:3-5 (emphasis added);

- **March 21, 2019**: During a separate status conference following the production of the Administrative Record, this Court informed the parties that "[t]his, once again, seems like a *monumental mess* to the Court, and I'm just not – I have to tell you, *I'm not impressed with the procurement capability of the Department of Education*, and it seems to me we're going to end up a lot like we have in the past.").  Mar. 21, 2019 Status Conference Transcript at 41:7-11 (emphasis added); and

- **March 19 & 27, 2019**:  ED agreed to take corrective action to amend NextGen Solicitation Nos. 910031-19-R-0005 and 910031-19-R-0007 to remove default recovery services but ***ED refused to unbundle default recovery services from Solicitation No. 910031-19-R-0008*** for Business Process Operations (the "BPO Solicitation").

ED's pattern of procurement errors and acts of deception are neither routine nor should be accepted as merely the actions of an unsophisticated procurement shop.  ED's actions evidence clear and blatant violations of law and an utter disregard for the procurement process and rule of law.

On the core protest issue – the improper consolidation or bundling of default recovery services under the BPO Solicitation – this Court has expressed that ED's consolidation "*makes very little sense*," and has signaled that the protesters are likely to prevail on the merits.  Rather than listen and ***unbundle default recovery services***, ED, as it has done many times in the past, is stubborn and will now require this Court to enjoin it from proceeding with this BPO procurement as written.  Fatal to its position is the fact that the record before this Court does not offer a

reasonable explanation for the improper consolidation, let alone explain why default recovery services cannot be procured separately under NextGen and later integrated into its overall NextGen platform as appropriate.  And, any justification proffered now in the heat of litigation is too late.

ED knows that the consolidation of default recovery services with other services improperly restrains competition in violation of CICA, and that no single company can provide *all* of the services required by the BPO Solicitation.  *See* 41 U.S.C. § 3301.  Indeed, this is why the BPO Solicitation invites offerors to form teaming agreements, which cannot be exclusive.  It is undisputed at this point that ED has no legitimate justification for the consolidation and appears to have consolidated such services purely out of administrative convenience – there is ***no reason why ED cannot procure default recovery services separately***.  Because ED has not established that the restraints on competition through consolidation are reasonable and necessary, the Court should enjoin ED from proceeding with the BPO Solicitation unless and until ED amends the BPO Solicitation to unbundle the default recovery services and to procure them separately.

Moreover, ED appears to have wholly ignored the Court's injunction dated September 14, 2018, of its improper cancellation of the Default Collection Procurement and continued on with business as usual as though it was still cancelled, and ED's belated attempt to salvage its improper cancellation lacks merit.

First, and fatal, ED cannot escape the fact that the ***New Cancellation Decision is based on the flawed premise*** that ED can consolidate default recovery services with other services under the BPO Solicitation, which violates CICA.  *See* 41 U.S.C. § 3301.  Second, when this Court found ED's original cancellation of the Default Collection Procurement unlawful, the

Court noted that NextGen "still needs to be reviewed for compliance with applicable laws and regulations." *FMS Investment Corp.,* 139 Fed. Cl. at 225.  However, ***ED admits that it still has not obtained the legal review requested by this Court***.  *See* RFP No. 91003119R0005, Amend. 4 Q&A No. 62 (stating FSA is "***continuing to analyze*** the impact of applicable laws and legal developments on the unique NextGen structure") (emphasis added).

Third, the record plainly shows that the ***small business PCAs cannot currently handle the volume of accounts on their own*** – and accounts are increasing substantially - and that they need to subcontract the work to have any hope of meeting the demand, including to large PCAs like ConServe.  Thus, by claiming that the small business PCAs can handle the volume, ED, again is being disingenuous; if it were to be genuine, the best ED could represent is that the small businesses may be able to handle the current volume if they are able to subcontract a significant amount of the accounts to subcontractors, including to large business PCAs.  The record plainly shows that the small businesses cannot, however, handle the future volume on their own, which appears to be increasing substantially and well ahead of ED's initial estimates.  *See* AR 2789 (in which ED projects that the 11 small businesses can ***quadruple*** their current account inventory of ***4,757,381 to an account capacity of 17,186,381 by August 2019***); *see also* AR 10 (stating that the small business PCAs "if necessary, could manage up to 17 million borrower accounts by 2019").

Moreover, the available data shows that defaults are increasing, and that the small business PCAs' recovery rate is far lower than when the large business PCAs were handling the majority of account transfers.  ED is, in turn, "leaving billions of dollars in lost recoveries on the table each year" purely because it does not wish to do business with the large PCAs.  James Bergeron, *Effective debt collection helps the student loan landscape*, <u>The Hill</u> (3/20/19),

*available at* https://thehill.com/opinion/education/434358-effective-debt-collection-helps-the-student-loan-landscape.  It makes little sense for ED to exclude highly capable large business PCAs from collection work particularly when the data shows that the large businesses were more effective and, in any event, that the smalls need to subcontract much of the accounts to even meet current volume.  Thus, the New Cancellation Decision should be enjoined unless and until ED unbundles default recovery services from the BPO Solicitation and procures such services on an expedited basis separately.

In sum, when taken together, the improper consolidation of services in the BPO Solicitation and the improper cancellation of the Default Collection Procurement will unreasonably and irrationally shut out ConServe – who, in ED's own words, submitted "***one of the most highly rated proposals***" in response to the Default Collection Procurement – from *any* ED competition for default recovery services for the next 5 to 10 years.  Given the significant impact of such an exclusion and the irreparable harm to be sustained, the Court should grant ConServe's MJAR and request for permanent injunctive relief to ensure that it has a fair opportunity to compete for default recovery services.

ConServe has demonstrated in three court hearings that it is likely to prevail on the merits of this protest and further that it will suffer irreparable harm if permanent injunctive relief is not provided.  ConServe also has demonstrated that the balance of harms clearly favors permanent injunctive relief.  On the other hand, ***ED will sustain no harm*** if injunctive relief is granted.  In fact, ED will benefit by having more highly skilled and experienced debt collectors available to service existing accounts while it proceeds forward with its vision for the NextGen.  Moreover, ED will not even experience a delay in the BPO Solicitation if this procurement is enjoined, as it currently is not seeking proposals under the BPO Solicitation and, to afford ConServe the relief

requested, ED merely needs to unbundle default recovery services and procure them separately. Finally, granting permanent injunctive relief is in the best interest of preserving the integrity of the procurement system.

Accordingly, this Court should grant this Motion and declare that ED's decision to procure default recovery services under the NextGen BPO Solicitation is arbitrary, capricious, and in violation of CICA and other applicable procurement laws and regulations.  Additionally, this Court should grant ConServe permanent injunctive relief enjoining ED from procuring default recovery services under NextGen unless and until ED amends the NextGen Solicitations to unbundle default recovery services, and allow all interested offerors, including ConServe, to submit proposals.  Finally, this Court again should enjoin ED from cancelling the Default Collection Procurement.

## II.    STATEMENT OF THE ISSUES

A.   Whether the BPO Solicitation improperly consolidates several distinct services from default recovery to loan servicing to back-office processing in violation of CICA.

B.   Whether ED improperly cancelled the Default Collection Procurement.

## III.    STATEMENT OF FACTS

The long history and facts relevant to this and ConServe's earlier protests are set forth in the decisions cited above, various Orders issued by this Court and ConServe's Complaint and, therefore, will not be repeated here.

## IV.    JURISDICTION AND STANDING

This Court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to

a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1). ConServe has standing to bring this pre-award protest because it is a prospective offeror whose direct economic interest will be affected by ED's arbitrary, capricious, and unlawful attempt to consolidate many distinct services under the New NextGen Solicitations.  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (holding that an "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract").[1]  In doing so, ED has unreasonably restricted competition to offerors that can provide all of those services and/or those teams that can provide all of these services.  As a result, a highly rated PCA like ConServe – who was likely to receive an award for default recovery services work under ED's prior long-standing procurement model – cannot compete to provide default recovery services unless it can identify and team with other highly qualified and rated firms that have financing, loan servicing and other back-office processing capabilities.  Thus, given ConServe's superior record as a default recovery services provider for ED, it has a direct economic interest in how ED intends to procure default recovery services under the New NextGen Solicitations.

If ConServe's claims are successful and the requested relief granted, ED will be required to unbundle default recover services from the BPO Solicitation, procure such services separately, and open the competition to ConServe and other competitors, at which point ConServe will

---

[1]   To establish standing under 28 U.S.C. § 1491(b)(1), a protestor must establish that it is an "interested party" – *i.e.*, a protestor must establish that: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement.  *See Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).  A bidder or offeror has a direct economic interest if it suffered a competitive injury or prejudice.  *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that . . . the question of prejudice goes directly to the question of standing . . . .").

submit a timely, competitive proposal, with a substantial likelihood of receiving award.  *See, e.g., Omega World Travel, Inc. v. U.S.*, 82 Fed. Cl. 452, 462 (2008) ("[Protester] has sufficiently established that it likely would have competed for a contract for … services had the contract been competitively bid; accordingly, [protester] has standing to challenge the award of the master task order, and sub task orders…").

## V.     STANDARDS OF REVIEW

### A.     JUDGMENT ON THE ADMINISTRATIVE RECORD

When reviewing a motion for judgment on the administrative record under RCFC 52.1(c), the Court considers whether, given all the disputed and undisputed facts, the moving party has met its burden of proof based on the evidence in the record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).

### B.     BID PROTEST REVIEW

This Court reviews bid protests under the Administrative Procedure Act ("APA") Standards set forth at 5 U.S.C. § 706, which requires this Court to determine whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Per Aarsleff A/S*, 829 F.3d 1303, 1309 (Fed. Cir. 2016); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The Court does not substitute its judgment for that of the agency, and instead reviews the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971) (citations omitted).  The Court may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir.

2009); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

VI.     **ARGUMENT**

A.      **THE BPO SOLICITATION IMPROPERLY CONSOLIDATES SEVERAL DISTINCT SERVICES FROM DEFAULT RECOVERY TO LOAN SERVICING TO BACK-OFFICE PROCESSING IN VIOLATION OF CICA**

i.      **THE BPO SOLICITATION CONSOLIDATES SERVICES THAT HAVE HISTORICALLY BEEN PROCURED SEPARATELY**

On January 15, 2019, ED issued the three New NextGen Solicitations.  The BPO Solicitation prominently addresses default recovery services, consolidates such services with other services, and states that the services acquired under this solicitation will support operations "across the entire life cycle of student financing (from application for financing, to origination and disbursement, to processing and *servicing* and pay-off or *default*)."  BPO Solicitation at 3 (emphasis added).  The BPO Solicitation describes the "life cycle of student financing" and the current structure of ED's student loan processing:

> *Application to Financing Services:*
>
> At the beginning of the life cycle, customers apply for federal financing via the Free Application for Federal Student Aid ("FAFSA"). FSA uses this information to calculate eligibility for federal student loans. For eligible customers, FSA then originates and disburses loans, primarily through higher educational institutions, to FSA customers.
>
> *Processing and Servicing:*
>
> ***Once customers enter repayment, customer loans are currently assigned to one of nine servicers, which perform a complete set of Federal student loan servicing activities*** including: customer service; loan counseling; loan consolidation; billing and payment application and processing; repayment plan adjustments and application of benefits such as deferments, forbearance, or loan forgiveness/discharge; outreach and default aversion; quality control; and financial and other data reporting.

11

. . . .

### *Default Recovery Services:*

*For customers who fail to pay their loans, currently FSA and private collection agencies share Federal default recovery activities.* Once a loan defaults, FSA transfers the loan to a default management and collection system (DMCS) and attempts to bring the loan back to good standing. If unsuccessful, collections activity is turned over to one of a group of contracted third-party Private Collection Agencies (PCAs) that pursue default resolution. Customers may rehabilitate a defaulted loan by making a series of payments or consolidating their loans out of default. This process often results in rehabilitated borrowers being handed off multiple times between DMCS/PCAs and the servicers.

*Id.* at 3-4 (emphasis added).

The solicitation states that this "digital platform *will consolidate the functionalities* of the multiple websites, mobile applications, and contact centers *that currently exist across the full customer lifecycles (from application to school to servicing to default)*." *Id.* at 5-6 (emphasis added).

Keenly aware that ConServe and other PCAs cannot, independently, provide these consolidated services, the BPO Solicitation attempts to appease PCAs like ConServe by advising them to use *non-exclusive teaming agreements* to form a team, or multiple teams, to bid on the solicitation. *See* BPO Solicitation at 55.

### ii.    ED's Improper Consolidation Violates CICA

The BPO Solicitation violates CICA by improperly consolidating several distinct services from default recovery to loan servicing to back-office processing. As a result, ED has unreasonably and unnecessarily restricted competition under the BPO Solicitation to those offerors that can provide *all* of these discrete services, and the mere opportunity to team with others to provide the panoply of services does not justify the unnecessary barriers to competition.

CICA generally requires that solicitations permit full and open competition and contain restrictive provisions only to the extent necessary to satisfy the procuring agency's needs. *See* 41 U.S.C. § 3301; FAR Subpart 6.1; C*harles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 720 (1999) ("A consequence of this [full and open competition] duty is the requirement that solicitation provisions which restrict competition be used ***only to the extent necessary to satisfy the needs of the agency*** or as authorized by law.") (internal quotations omitted) (emphasis added).  Under CICA, the term "full and open competition" means that "all responsible sources are permitted to submit . . . competitive proposals on the procurement."  41 U.S.C. § 107.

Importantly, despite ED's disingenuous and misleading claim that "Plaintiffs do not point to any case law sustaining an anti-bundling challenge out of concern that it would restrict competition for firms that are other than small," the reality is that ***GAO has applied these principles in "consolidation" cases involving large businesses*** like ConServe.  Opposition at 31; *see also Pemco Aeroplex, Inc.*, B-280397, 98-2 CPD (1998) (sustaining protest by large business where the agency was unable to demonstrate that consolidation of services was necessary to meet the agency's needs); *Northrop Grumman Tech. Servs., Inc.*, B-406523, June 22, 2012, 2012 CPD ¶ 197 (involving protest by large U.S. defense contractor challenging the Air Force's "consolidation" of requirements for contractor logistics support for the C–20 and C–37 aircraft).

Moreover, since "bundling" is merely a subset of "consolidation" that impacts small businesses, it is hardly surprising that the GAO has applied the principles underlying the improper "bundling" cases discussed above – *i.e.,* ensuring full and open competition in accordance with CICA – to improper "consolidation" cases.  *Id.*  ED, tellingly, has not offered any explanation for why this Court should deviate from this GAO precedent.  Nor has ED

offered any rationale for why these basic and fundamental principles underlying CICA should not be applied in improper "consolidation" cases that deal with large businesses.  Instead, ED simply contends – without any citation to a case or statute – that this Court should allow ED to improperly and unreasonably restrain competition in procurements like this where large businesses are involved.  But this argument must fail because it cannot be reconciled with the plain text of CICA or the FAR Subpart 6.1 implementing regulations.

Indeed, there is no exception to CICA that permits an agency to restrict full and open competition in cases involving large businesses.  Rather, the plain text of CICA makes clear that the prohibition against restricting competition ***applies in all procurements***:  "an executive agency in conducting a procurement for property or services shall -- (1) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation "  41 USC § 3301(a)(1); *see also Phoenix Sci. Corp.*, B-286817, 2001 CPD ¶ 24 (Feb. 22, 2001) (CICA provides "a general statutory basis for challenging solicitations").  Thus, both GAO precedent and the plain text of CICA support ConServe's position that the principles underlying the GAO's improper "bundling" cases also apply to improper "consolidation" cases like this one.

### iii.   ED Has Not Explained Why Consolidation of Default Recovery Services is Reasonable and Necessary

Here, although it has now had the opportunity to articulate its position in three separate hearings before this Court and in its Opposition to the Plaintiffs' motions for a preliminary injunction, ***ED has not – and cannot for that matter – been able to provide a reasonable explanation for why the consolidation of these services is necessary*** to meet the Government's needs, particularly when the consolidation will result in the exclusion of the most qualified and highly rated PCAs, like ConServe, from the competition.  *See* New Cancellation Decision, AR 1-

12.  Indeed, the record – which consists of over 23,000 pages – does not in any way address why consolidation is necessary here.  Nor has ED explained why it cannot procure default recovery services under a separate NextGen solicitation and later integrate that work into its overall NextGen platform as is appropriate.  Simply put, ED's silence on this threshold issue is deafening.

### iv.  Administrative Convenience Does Not Justify ED's Improper Consolidation of Default Recovery Services

At best – and while not articulated in the record – ED apparently consolidated services under the BPO Solicitation out of administrative convenience, and there is no reason why ED cannot procure default recovery services under a separate NextGen solicitation.  The GAO has held that administrative convenience *does not* justify an agency's consolidation of disparate requirements and, in turn, violates CICA's "full and open competition" mandate:

> The agency's justification, quoted above, essentially amounts to reliance on administrative convenience as the basis for the bundling. However, *the fact that the agency may find that combining the requirements is more convenient administratively,* in that it has found dealing with one contract and contractor less burdensome, *is not a legal basis to justify combining the requirements, if the combining of requirements restricts competition*.

*Vantex Serv. Corp*., *supra*., at 4 (emphases added).

The GAO has further explained that "*CICA and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition*, whenever concerns of economy or efficiency are being weighed against ensuring full and open competition."  *Id.* (emphasis added)*; see also Better Serv.*, B-265751, Jan. 18, 1996, 96-1 CPD ¶ 90 ("When concerns of administrative convenience are being weighed against ensuring full and open

competition, [CICA]. . . and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition.").

In short, since ED's unstated justification for the consolidation all of these distinct services, at best, amounts to nothing more than a contention that it is more convenient administratively to the agency, the Court should follow the GAO's guidance and hold that administrative convenience alone is not a sufficient legal basis to justify the consolidation of services in a case like this where the consolidation unduly restricts competition.

     **v.**    **Allowing Teaming Does Not Cure the Serious Defect in the BPO Solicitation**

ED recognizes that the consolidation of default recovery services with other services improperly restrains competition in violation of CICA, and that no single company can provide *all* of the services required by the BPO Solicitation. *See* 41 U.S.C. § 3301; BPO Solicitation, AR 444. For this reason, the BPO Solicitation invites offerors to form teaming agreements, which cannot be exclusive. ED, however, continues to ignore that in cases like this the GAO has found unpersuasive an agency's position that offerors can team to meet the solicitation requirements. Specifically, GAO has held that "[t]he fact that the agency expects to receive some competition under the RFP does not relieve an agency of the burden under CICA of justifying restrictions to full and open competition." *2B Brokers, et al*., B-298561, Nov. 27, 2006, 2006 CPD ¶ 178 at 10; *see also Nat'l Customer Eng'g*, B–251135, Mar. 11, 1993, 93–1 CPD ¶ 225 at 6. "The issue is not whether there are any potential offerors which can surmount barriers to competition by, for example, entering into teaming or partnering arrangements as argued by the agency, but rather *whether the barriers themselves--here, bundling--are required to meet the government's needs*." *EDP Enters., Inc.,* B-284533.6, May 19, 2003, 2003 CPD ¶ 93 (emphasis added); *see also Vantex Serv. Corp.*, *supra*, at 5; *Nat'l Customer Eng'g*, *supra*, at 5.

16

Here, ED is attempting to consolidate via the BPO Solicitation several distinct services that have historically been procured separately or otherwise handled directly by ED.  In so doing, ED has unreasonably and unnecessarily restricted competition to those offerors that can provide *all* of these discrete services, and the mere opportunity to team with others to provide the panoply of services does not justify the unnecessary barriers to competition.  As a result, a highly rated PCA like ConServe – who was likely to receive an award for default recovery services work under ED's traditional procurement model – cannot compete for default recovery services work unless it can identify and team with other highly qualified and rated firms.



17



In short, there can be no dispute that ED's consolidation of services and its new teaming requirement are unreasonable and unnecessarily restrict competition in violation of CICA.

> vi.    **ED'S IMPROPER CONSOLIDATION OF DEFAULT RECOVERY SERVICES AND LOAN SERVICING HAS CREATED AN UNMITIGABLE ORGANIZATIONAL CONFLICT OF INTEREST FOR ANY WINNING TEAM**

As this Court has recognized, an underlying principle of the FAR's Organizational Conflict of Interest ("OCI") rules is "[p]reventing the existence of conflicting roles that *might bias a contractor's judgment*."  *Aegis Techs. Grp., Inc. v. United States*, 128 Fed. Cl. 561, 575 (2016) (quoting FAR 9.505(a)) (emphasis added).  This Court has explained that the "primary concern" of an impaired objectivity OCI is that "*a firm might not be able to render impartial advice*."  *Sigmatech, Inc. v. United States*, No. 18-1425C, 2018 WL 6920166, at *40 (Fed. Cl. Nov. 30, 2018) (internal quotations omitted); *see also Turner Const. Co., Inc. v. U.S.*, 94 Fed. Cl. 561, 569 (2010); *C2C Innovative Solutions, Inc.*, B-416289, B-416289.2, July 30, 2018, 2018 CPD ¶ 269 at 8 (stating that "an impaired objectivity OCI exists where a firm's ability to render impartial advice to the government will be undermined by *the firm's competing interests*, such as a relationship to the product or service being evaluated"); BPO Solicitation at AR 475 (defining impaired objectivity as when "[a] potential contractor . . . has financial or other

interests that would impair, or give the appearance of impairing, impartial judgment in the evaluation of government programs, in offering advice or recommendations to the government, or in providing technical assistance or other services to recipients of Federal funds as part of its contractual responsibility. . . .").

ED's improper consolidation of several services has created an unmitigable OCI for any winning team. For example, and highlighting but one OCI, default recovery services and loan servicing historically have been procured separately ***and compensated under separate payment regimes with different funding sources***. PCAs performing default recovery services are compensated through a contingency fee that is based upon the amount of money actually recovered from defaulted borrowers, and the fee is derived from the funds collected. *See* 31 U.S.C. §§ 3718(d)-(e). Loan servicers, on the other hand, are paid a set monthly fee per account through Congressional appropriations. *See, e.g.*, H.R. Rep. No. 115-862 at 149 (setting the appropriation amount for "Loan Servicing Activities" in fiscal year 2019 at $980,000,000); H.R. Rep. No. 115-244 at 125 (setting the appropriation amount for "Loan Servicing Activities" in fiscal year 2018 at $1,017,000,000). Since ED's new procurement model consolidates these services under the BPO Solicitation, the winning team will be subject to both payment regimes.

Moreover, the winning team will have a financial incentive to divert incoming accounts and shift resources to the service that will provide higher compensation and/or profits, which may conflict with what is best for the borrowers or the Government. As a result, this inherent incentive to assign accounts and shift resources to the more profitable components will impair the winning team's objectivity and will affect its ability to render impartial "services to recipients of Federal funds as part of its contractual responsibility." AR247, BPO Solicitation at 25.

Furthermore, the BPO Solicitation appears to exacerbate the issue by allowing offerors to set their own pricing models for loan servicing and default recovery work. *See* BPO Solicitation Attachment 18 ("Vendors may adjust both price methodologies (e.g., with/without implementation) and pricing model (e.g., per customer, flat price, performance-based)."). And although the Solicitation is somewhat unclear, ED's Opposition to the Plaintiffs' Motion for Preliminary Injunction confirms that offerors will be able to set their own pricing models for loan servicing and default recovery work under the BPO Solicitation. Opposition at 30 ("Vendors are free to propose alternate pricing methodology per the pricing template instructions."). As a result of this pricing flexibility, an offeror who underbids one component (e.g., loan servicing) in an attempt to be the lowest priced offeror would have an inherent financial incentive to assign accounts and shift resources to the more profitable component (e.g., default recovery) after award has been made.

Moreover, to the extent ED believes it has mitigated these OCI problems, it is mistaken. Indeed, during the Q&A session with offerors, ED acknowledged a potential OCI exists in the NextGen solicitations:

| Question 57 | If the scope of work for this solicitation is to include debt collection services currently performed by PCAs, will FSA allow an offeror to perform both loan servicing, as described in this solicitation, and debt collection services? If yes, then how does FSA intend to avoid the conflict of interest between loan servicing and debt collection servicers? | The Enhanced Processing Solution shall handle pre- and post-default activities. The pricing structure, and other terms of the contract, for the various services to be provided under the contract will be designed to avoid any potential that a contractor performing loan servicing would benefit by having loans go into default. This would mitigate the appearance of a conflict of interest. |
|---|---|---|

EPS Solicitation, Amendment 5, Attachment 25 - Responses to Questions.

Thus, ED admits that a conflict of interest exists and then essentially says it intends to address it by making changes in the future. ED's stated intention to address a current defect with the BPO Solicitation in the future is inadequate. Nor do ED's representations, at this point in this protest saga, carry credibility. Indeed, ED's inability to address these issues demonstrates that the BPO Solicitation is half-baked. Accordingly, the Court should sustain this protest because ED's new procurement model under the BPO Solicitation is arbitrary, capricious, and in violation of applicable law and regulations.

**B.    ED IMPROPERLY CANCELLED THE DEFAULT COLLECTION PROCUREMENT**

In its September 14, 2018 decision, this Court held that "ED either did not have, or did not sufficiently document, a rational basis for its decision to cancel" the Default Collection Procurement. *FMS Investment Corp.,* 139 Fed. Cl. at 223. This Court noted that the administrative record relied upon by ED was "scant," "slipshod," and that ED's new program to procure default recovery services "***still needs to be reviewed for compliance with applicable laws and regulations.***" *Id.* at 225 (emphasis added). This Court highlighted additional flaws in ED's attempted cancellation:

> Furthermore, the [Administrative Record ("AR")] is missing critical information about the enhanced servicer program. The AR does not include any plan or timeline for implementing the program. It does not include a request for proposals, or any mention of what that request might look like. It does not refer to a source of funding. It does not even include a copy of the solicitation that ED cancelled to clear a path for the enhanced servicers.
>
> The AR also lacks thorough estimates of current and future defaulted loan volumes and loan processing capacity. The cancellation notice assumes that enhanced servicers will begin processing loans "in the near future." AR 27. But it sheds no light on exactly when the enhanced servicers will begin processing

21

> loans, or what the enhanced servicers' processing capacity will be
> at any point in the future.

*Id.*

For these reasons, the Court enjoined ED from cancelling the Default Collection Procurement based on the administrative record before the Court. *See Id.* at 227; *see also FMS Investment Corp. v. United States*, 139 Fed. Cl. 439, 440 (2018).

On March 6, 2019, ***nearly six months after this Court's September 2018 order*** and two days after ConServe filed a protest alleging a *de facto* cancellation, ED finally announced a new Cancellation Decision. *See* Dkt. No. 17, AR1-13. The New Cancellation Decision states, "FSA's decision to cancel is based upon [1] maturation of the NextGen FSA vision, [2] the development and implementation of specific procurement activities to realize this vision with accompanying timelines and resource plans, and [3] a determination that existing PCAs under contract through 2024 have sufficient capacity to provide effective debt collection services during the transition period from now until full implementation of NextGen FSA, which under current timelines is expected to be completed by the end of 2020." AR 2. In other words, during the six months that passed since the Court's Order of September 14, 2018, ED merely continued on with the NextGen procurement as though the injunction of its cancellation decision did not occur, and ED did not revisit the Default Collection Procurement. Like the original decision, the analysis in the New Cancellation Decision (AR 1-13) is severely flawed and lacks a rational basis. For the reasons set forth below, this Court should enjoin the New Cancellation Decision.

### i.   ED RELIES ON THE IMPROPERLY CONSOLIDATED BPO SOLICITATION TO JUSTIFY THE CANCELLATION

Fatal to ED's cancellation decision is the premise that ED may legally consolidate default recovery services with other discrete services under the BPO Solicitation, which as demonstrated herein, ED cannot so do because such violates the CICA by restraining competition. Nor does

the New Cancellation Decision explain why consolidating these discrete services is necessary to meet the agency's needs or why these services cannot be procured separately under NextGen. Because the New Cancellation Decision rests on the flawed foundation of the BPO Solicitation, it, again, must be enjoined.

### ii.    ED ADMITS THAT IT STILL HAS NOT CONDUCTED A LEGAL REVIEW OF THE NEXTGEN PROCUREMENT

When this Court found ED's original cancellation of the Default Collection Procurement unlawful, the Court noted that NextGen "***still needs to be reviewed for compliance with applicable laws and regulations.***"  *FMS Investment Corp.,* 139 Fed. Cl. at 225 (emphasis added). However, despite having been put on clear notice by this Court that it must conduct a comprehensive legal review of NextGen ***before*** cancelling the Default Collection Procurement, the record shows that ED consciously elected ***not*** to obtain the legal review and confirmation of compliance requested by this Court before cancelling the procurement.  *See* RFP No. 91003119R0005, Amend. 4 Q&A No. 62 (stating FSA is "***continuing to analyze*** the impact of applicable laws and legal developments on the unique NextGen structure").  The fact ED chose not to obtain a legal review before proceeding forward with the cancellation demonstrates that ED genuinely does not care if its actions comport with law and is merely paying this Court's injunction "lip service."  Regardless of ED's views, ED cannot proceed forward with cancelling the Default Collection Procurement without determining the legal viability of the BPO Solicitation.

Moreover, when the Plaintiffs confronted ED about its failure to obtain a legal review of NextGen prior to issuing the New Cancellation Decision, ED did not deny that it failed to obtain the legal review requested by this Court.  *See* Opposition at 34-36.  Instead, ED – through its

23

Department of Justice litigation counsel - attempted to conduct a *post-hoc* legal review of NextGen during the heat of litigation in its Opposition brief. But this is insufficient. This Court requested a *pre*-cancellation decision review by ED's office of legal counsel, not a *post*-cancellation decision legal review by the Department of Justice's Civil Division attorneys.

In short, this Court should enjoin the New Cancellation Decision in light of ED's admission that NextGen still needs to be reviewed for compliance with applicable laws and regulations. Indeed, given ConServe's observations to date regarding ED's handling of this procurement, it would not surprise ConServe if ED avoided a formal, documented legal review because it knows that ED's lawyers' legal memorandum would have opined that the consolidation of services under NextGen is improper and violates CICA, among the many other defects identified below.

### iii. THE NEW CANCELLATION DECISION DOES NOT EXPLAIN WHAT ED WAS DOING FROM SEPTEMBER 14, 2018, WHEN THE COURT ENJOINED IT, UNTIL IT ISSUED THE NEW CANCELLATION DECISION IN MARCH 2019

ED appears to have largely treated the Court's injunction as a minor hiccup and one that could be easily overcome. Indeed, the New Cancellation Decision and AR reflect no meaningful efforts by ED to reevaluate its course and comply fully with the spirit and letter of this Court's September 14, 2018 Order.

For example, the AR contains many documents that predate, or are wholly unrelated to, the Court's Order. Indeed, the New Cancellation Decision relies heavily on "market research" that pre-dates the final contract awards made under the Default Collection Procurement in January 2018, the original cancellation decision in May 2018, and the Court's September 2018 Order enjoining that decision. In fact, much of the documentation in the AR related to NextGen

is premised on ED's "market research" collected in late 2017 and early 2018.  *See* AR Tabs 1,
12-14, 16, & 18.  And the one "market research" document that post-dates this period is a high-
level presentation giving an overview of how ED hopes to achieve "continuous, frequent, and
tailored customer engagement" with "amped" servicing for borrowers in default.  AR Tab 15.
As such, the "market research" relied upon by ED in the New Cancellation Decision does not
address the issues raised in the Court's September 2018 Order, rather it simply demonstrates that
ED has been working – albeit unsuccessfully - towards implementing the NextGen platform
since 2017.

While one would expect the New Cancellation Decision to explain expressly how ED has
attempted to comply with the Order, it does not.  Similarly, the New NextGen Acquisition Plans
do not reference the Order or the cancelled procurement.  *See* AR23247-23273.  Thus, it appears
that after the Court issued its September 2018 Order, ED continued on its path and never
seriously evaluated whether it should do anything other than try to bolster the paperwork
supporting its earlier decision.  Indeed, the record leaves ConServe with the impression that this
Court's decision did not faze ED, and that ED continued on as though the Court upheld the
cancellation.  ED's handling of the cancellation illustrates its steadfast intentions to proceed as it
wishes without any regard for the procurement rules, the devastating impact on the protesters
who have supported ED for many years, or this Court's rulings.

      iv.      **THE NEW CANCELLATION DECISION IS PREMISED ON THE INCORRECT ASSUMPTION THAT THE SMALL BUSINESSES CAN HANDLE THE ENTIRE VOLUME OF ED'S DEFAULT RECOVERY SERVICES**

           a.      **ED'S CLAIM THAT THE SMALL BUSINESSES HAVE CAPACITY TO HANDLE VOLUME IS UNSUPPORTED BY THE RECORD**

Among the many fatal flaws with ED's New Cancellation Decision, the most striking
may be ED's contention that the small business PCAs have the capacity to handle the entire

volume of ED's default recovery services.  Indeed, and illustrative of ED's clear efforts to pay lip service to the Court's injunction decision but not to really depart meaningfully from its planned course, the premise for saying it does not need the large business PCAs is that the 11 small businesses each said, via e-mail, that they can handle the volume.  The record reflects that ED simply sent the small business PCAs an e-mail and asked how many accounts they wanted – (*i.e.* **how much revenue do you want to collect**).  *See, e.g.,* AR2792 ("Please provide the **maximum number of accounts** your firm can handle for the next twelve months.") (emphasis added).  Surely, that cannot be what the Court envisioned when it informed ED that the prior decision was inadequate because it failed to address current and future volume of defaulted accounts.  *See FMS Investment Corp.*, 139 Fed. Cl. at 225 ("The AR also lacks thorough estimates of current and future defaulted loan volumes and loan processing capacity").

ConServe is protesting the fact that ED's simple e-mail exchanges with the small business PCAs **form the entire basis** for ED's claim that the large PCAs are not needed.  The small businesses are biased in favor of receiving more accounts and in turn more revenue, so their representations as to what they can handle should be taken with a grain of salt.  In short, while ED is essentially asking this Court to simply "take the small business PCAs word for it," we think this Court had something different in mind when it instructed ED to provide support for its position that **the large business PCAs were no longer needed because the small business PCAs can handle the additional volume**.  *See FMS Investment Corp.*, 139 Fed. Cl. at 225 ("Nor does the AR include any information regarding the small business' future loan processing capacity.").

Furthermore, ED's claim that the small business PCAs have the capacity to handle the entire volume of ED's default recovery services is further undermined by the fact that ED cannot

produce an accurate estimate of the agency's future defaulted loan volumes.  Indeed, in its New Cancellation Decision dated March 6, 2019, ED stated that its position regarding the small business PCAs' capacity was based upon its understanding that "***student loan borrowers in default will grow*** from 7.6 million in December 2018 ***to roughly 11.5 million in December 2024***."  AR Tab 1 at 9 (emphasis added).  Yet, on March 27, 2019, less than three weeks after the New Cancellation Decision was issued – and more than five years earlier than projected -, ED informed NextGen offerors during the Q&A session that ***ED already has 11.6 borrowers in default***.  *See* RFP No. 910031119R0007, Amend. 2 at Q&A No. 72.  This illustrates that ED's forecasts and projections are superficial and half-baked at best or evidence of efforts by ED to mislead and understate default volumes to fit ED's narrative.  Either way, ED's March 27, 2019 statement during the Q&A session calls into question the rationale underlying the New Cancellation Decision and provides an independent basis to sustain this protest.  Indeed, as with the original, the New Cancellation Decision failed to produce accurate or "thorough estimates of current and future defaulted loan volumes," which was a specific defect identified by the Court in its September 2018 Order.  *FMS Investment Corp.*, 139 Fed. Cl. at 225

> **b.    THE SMALL BUSINESS PCAS TOLD ED THEY CANNOT HANDLE THE VOLUME ON THEIR OWN**

Additionally, the small PCAs did not inform ED that they can handle the volume – as ED suggests – but rather the small businesses qualified their capabilities by making clear that they cannot handle these capacities without subcontracting agreements being approved.  *See, e.g.,* AR 2794 ("We have taken into consideration the potential, but not guarantee, of inventory recalls as well as ***the number of staffing and subcontracting agreements*** for which we anticipate approval receipt.") (emphasis added).

27

This is particularly disconcerting because the record reveals that many of the small business PCAs relied on other businesses to handle the past volume.  In other words, even to the extent the smalls can handle the volumes they represented, they can only do so with help from other companies, including large PCAs.  Indeed, ConServe identified that among the 5 small businesses that disclosed use of subcontractors, ***they are using 15 subcontractors***, and many of these subcontractors are large businesses.  *See* AR11935 to AR12321.[2]

In response, ED simply claims that the small businesses "have the ability to hire staff and to subcontract, and there is no reason for FSA to exclude reality from its consideration." Opposition at 16.  The fact is that ED needs the large PCAs to handle the past volume of defaults, let alone the increased volume expected in the future, which undermines directly ED's representation to the contrary.  And, the question becomes if the small business PCAs need to subcontract to large businesses to handle the volume, ***why not also continue working directly with the large businesses*** and maintain many qualified sources and best ensure the accounts are serviced?  ED's decision-making smacks of anything other than reasonable and rational behavior and rather reflects ED's steadfast intention to harm ConServe and exclude it from participating.

c.  **ED Unreasonably Assumes the Small Business PCAs Can Scale Quickly from an Account Capacity of 4.7 Million to a Capacity of 17 Million**

ED's growth estimates and projections for the small businesses is clearly unreasonable in light of the extensive subcontracting that is already taking place.  ED assumes that the 11 small businesses can ***quadruple*** their current account inventory of ***4,757,381 to an account capacity of 17,186,381 by August 2019***.  AR 2789; *see also* AR 10 (stating that the small business PCAs "if

---

[2] These 5 small businesses are: Action Financial (using one large subcontractor), Central Research (using one large subcontractor); FH Cann (using three subcontractors), Reliant (using two subcontractors), Immediate Recovery (using 7-8 subcontractors).

necessary, could manage up to 17 million borrower accounts by 2019"). ED believes that this phenomenal increase in capacity will come about through increased new hires and increased subcontracting. AR 2789; *see also* Opposition at 14 (asserting that the small business PCAs "retain sufficient capacity to absorb newly defaulted accounts until Next Gen is in place"). But there is simply no way that any rational actor could look at the record and reasonably conclude that the 11 small businesses – who already admit that they cannot handle the capacity without subcontracting to other businesses – can quadruple their current account inventory from 4 million to 17 million in less than six months.

> **d.** **THE ADMINISTRATIVE RECORD ALSO FAILS TO SUPPORT ED'S CLAIM THAT THE SMALL BUSINESS PCAS CAN BE AUTOMATICALLY EXTENDED UNTIL 2024**

ED's New Cancellation Decision is premised on these 11 small businesses being under contract through 2024. But the AR does not contain the contracts upon which ED is relying. Based on ConServe's more than two decades of experience collecting student loan debt, it is ConServe's understanding that even if the small businesses' contracts can be extended until 2024 – which the record does not support – the contracts likely contain a compliance/effectiveness assessment that results in lower performing PCAs not having their contracts extended. *See* AR Tab 18 at 2712, 2715 ("PCAs who don't achieve a minimum acceptable level of performance will get no new accounts"); Thus, while ED logically should have assumed that the number of eligible small business contractors will decrease in the future and, in turn, their

collective volume capabilities, the New Cancellation Decision irrationally does not take this into account.

> **e.      ED Failed to Take Into Account that Many of the 11 So-Called "Small Business PCAs" are No Longer Small**

Many of the small business PCAs are no longer small according to their System for Award Management representations and, in turn, they will not be part of the pool of small PCAs that ED can rely upon in the future to send account transfers to. *See* AR Tab 18 at 2710 (For 11 small businesses through 9-30-2024, "Several small businesses will no longer be eligible as a small business"). There is nothing in the record reflecting that ED has taken this fact into account in representing that the smalls PCAs can handle the projected volume forecasts in the future and through 2024.

Additionally, as several of these PCAs will no longer be small, ED presumably would not continue the restricted contracts with these PCAs as they can no longer represent themselves as small businesses. Indeed, 13 C.F.R. § 121.404(g)(3), which requires a business concern to recertify its small business size status before an agency can exercise an option of a contract with a duration of more than five years, plainly states that "[i]f the contractor certifies that it is other than small, *the agency can no longer count the options or orders issued pursuant to the contract towards its small business prime contracting goals*." (Emphasis added). The New Cancellation Decision, however, fails to take into account that there will be fewer small PCAs and how this change will impact the smalls' capabilities to handle the increasing volume. Moreover, ED fails to consider whether and how this may impact ED's willingness to exercise options for these no-longer-small businesses under restricted contracts. In short, ED's failure to do so was patently unreasonable and undermines the entire rationale for excluding the large businesses PCAs.

    **f.**  **THE RECORD SHOWS THAT THE SMALL BUSINESSES HAVE BEEN LESS EFFECTIVE AND HAVE CAUSED ED TO COLLECT BILLIONS OF DOLLARS LESS THAN WOULD HAVE BEEN COLLECTED IF ED TRANSFERRED ACCOUNTS TO THE ATES**

ED's New Cancelation Decision also is undermined by the fact that the small business PCAs have been less effective than the large business ATEs like ConServe.  Indeed, while the New Cancellation Decision suggests that the small business PCAs are doing as well as ATE PCAs, the record reveals that ED has manipulated the data.  In fact, the record shows that the small business PCAs are underperforming the ATEs and are causing ED to recover billions of dollars less than it would have if it transferred accounts to the ATEs.  As reported in a March 20, 2018 column in *The Hill*, ED is ***leaving billions of dollars in lost recoveries on the table each year.***  James Bergeron, *Effective debt collection helps the student loan landscape*, <u>The Hill</u> (3/20/19), *available at* <u>https://thehill.com/opinion/education/434358-effective-debt-collection-helps-the-student-loan-landscape</u>.   As highlighted in this article, ED had a recovery rate of 19% in 2014, when the large businesses received 80% of account transfers.  And, recovery rates started declining as the small business PCAs began receiving the majority of account transfers, resulting in a current recovery rate of 6%, which is or less than 1/3 of what the recovery rate was in 2014.  If ED operated as it was in 2014, it would net approximately $31.5 billion annually, or $21.1 billion more than achievable with the department's current small business PCAs.  *Id*.  These numbers are staggering and illustrate how illogical ED's New Cancelation Decision is

As explained below, ED appears to have manipulated the recovery rates and the recovery amounts, the result of which was to obfuscate the fact that ED could recover billions of dollars more if it would have allocated additional accounts to the large business ATE PCAs

First, ED manipulated the data presented in the New Cancellation Decision by including treasury offset data in the Net Collections Rate Table on AR11 and the Recovery Rates Table on

AR12, which inflated the small business PCAs' recovery rates.  Although the New Cancellation

Decision plays up the importance of the data in these charts, stating that it "is among the most

meaningful way to measure the financial value of our collection efforts," (AR11), ED's inclusion

of this data was designed to mislead the capabilities of the small PCAs.  ED defined "net

collections" as "as dollars collected (through borrower payments, wage garnishments and

Treasury offsets), minus the fees paid to PCAs."  AR11.  But, at no point during the periods

described in the charts did the PCAs have any control over the federal offset process and ED's

subsequent recoveries of offset monies.  *See* AR 2687 ("PCAs play no role in TOP and do not

earn a fee on TOP payments.")  Thus, including offset information in the recovery calculation is

not a meaningful measure of PCA performance and artificially inflated the small business PCAs'

recovery rates.

Second, ED manipulated the data by recalling 1.7 million accounts from the small

business PCAs in September 2018.  The effect of this recall was to reduce the number of

accounts each of the small businesses had, which eliminated a large swath of unproductive

accounts from the denominator of the equation evaluating effectiveness.  By reducing the total

inventory (in the denominator), ED was able to inflate the small business PCAs' effectiveness

percentages.

Third, ED's Net Collections Rate Table on AR 11 contains a mathematical error that also

misrepresents the small PCAs' recovery rates.  While ED's table shows the net collection rate

increasing from 2016 to 2018, the rest of the numbers in the chart show the opposite.  As

reflected in the chart below, using the numbers provided in the rest of the table, ConServe

calculated that the Net Collection Rate has, in fact, declined from 2.4% in FY2016 to 2.3% in

FY2018, which is the opposite of what the Department is claiming in its attempt to justify its

New Cancellation Decision:

| Date | Approximate Portfolio Size | Net Collections | Net Collection Rate (Claimed) | Net Collection Rate (Calculated) | Dollars Collected | PCAFees |
|---|---|---|---|---|---|---|
| 10/1/2016 | $105.5 billion | $2.5 billion | 2.2% | 2.4% | $3.1 billion | $750 million |
| 10/1/2017 | $121.5 billion | $2.8 billion | 2.3% | 2.3% | $3.5 billion | $749 million |
| 10/1/2018 | $142.2 billion | $3.3 billion | 2.3% | 2.3% | $4.1 billion | $793 million |

AR 11.

Fourth, confirming ConServe's assertion that the table on AR 11 was based on flawed

data, ED has attempted to distance itself from that table and, in an apparent show of desperation,

has presented a *new* table for the Court's consideration:

| Date | Approximate Portfolio Size | Net Collections | Net Collection Rate | Dollars Collected | PCA Fees |
|---|---|---|---|---|---|
| 10/1/2016 | $105,519,497,976.06 | $269,700,607.69 | 0.26% | $1,019,641,743.25 | $749,941,135.56 |
| 10/1/2017 | $121,458,535,213.11 | $344,607,209.64 | 0.28% | $1,094,097,186.03 | $749,489,976.39 |
| 10/1/2018 | $142,210,790,729.42 | $557,171,790.80 | 0.39% | $1,350,176,976.48 | $793,005,185.68 |

*See* Opposition, Ex. 2 at Attach. Table 1.  But this is a red herring.  This new table was not

considered by the Contracting Officer – let alone in existence – at the time the New Cancellation

Decision was signed.  Accordingly, the new table does nothing to negate the fact that the New

Cancellation Decision was based upon the flawed data in the Table on AR 11.

Additionally, the new table is no more reliable than the now-discredited table in the New

Cancellation Decision on AR 11.  In the new table, ED reduces the "Dollars Collected" figures to

less than a third of those in the table in the New Cancellation Decision on AR 11 by including

only voluntary and administrative wage garnishment ("AWG") activities.  From these reduced

figures, ED subtracts the same "PCA Fees" figures that were in the table on AR 11,

approximately $750 million for the first two fiscal years and almost $800 million for FY17.

Opposition, Ex. 2 at Attach. Table 1.  However, as with the table on AR 11, this new table

misrepresents the "Net Collections" figures presented to the Court.

Indeed, while the "PCA Fees" figures include fees earned on voluntary and AWG collection successes, they also include fees earned from rehabilitations, consolidations, administrative resolutions, litigation preparation packages, and bonuses paid to PCAs under the PCA contracts. Such manipulation artificially drives the "Net Collection Rate" down. Moreover, it is apparent that ED cannot possibly have paid PCAs fees of over $750 million in any year for just voluntary and AWG collections because the highest collection rate allowed in any borrower promissory note is 25%. Basic math shows that 25% of $1 billion yields a maximum of $250 million, or a third of the amount of purported "PCA Fees" ED subtracts from the "Dollars Collected" to yield new "Net Collections" numbers.

In short, the intent of ED's data errors and manipulations is to obfuscate the effect of ED's refusal to transfer accounts to the large business ATE PCAs.

**v.   THE NEW CANCELLATION DECISION FOCUSED ON THE MERITS OF ENHANCING "SERVICING," WHICH DOES NOT JUSTIFY THE CANCELLATION OF A PROCUREMENT FOR DEFAULT RECOVERY SERVICES**

By any plain reading, it also is clear that the New Cancellation Decision *was not* focused on ED's ability to procure default recovery services under NextGen. The concept of default recovery services is an *afterthought in the decision*. Indeed, ED, frustrated with its inability to procure default recovery services in compliance with law, threw up its hands and tucked such services into the BPO Solicitation.

As ED admits in the decision itself, the singular focus of the New Cancellation Decision is the alleged benefits of enhanced "servicing" under NextGen. Indeed, instead of providing this Court a "reasoned analysis" for why ED no longer needed to procure default recovery services under the Default Collection Procurement, the New Cancellation Decision simply sets forth the

alleged benefits of its new enhanced "servicing" model under NextGen – all of which address servicing rather than default recovery services.

ED does not deny this allegation.  Rather, ED claims that the New Cancellation Decision's focus on servicing, rather than default recovery, was appropriate because NextGen "sets forth an entirely new scheme" for loan servicing.  Opposition at 33.  But this claim is misleading.  Indeed, ED's attempt to recast the services solicited under the BPO Solicitation as something new and innovative reflects an exaggeration of the practical impact of NextGen. NextGen ***does not*** set forth a new approach to default recovery.  Instead, NextGen merely – and improperly – consolidates these previously separately procured services into a single platform under a single solicitation and contract.  As such, it was unreasonable for ED to ignore default recovery services in the New Cancellation Decision.

In short, given its clear focus on loan servicing rather than default recovery, ED's New Cancellation Decision – like the original – lacks a rational basis and fails to provide a "reasoned analysis" for the cancellation of the Default Collection Procurement.  Indeed, a plain reading of the New Cancellation decision makes clear that consolidating default recovery services within the BPO solicitation was simply an afterthought as a result of ED being unable to procure such default recovery services separately.

## C.  ALL FACTORS FAVOR PERMANENT INJUNCTIVE RELIEF

This Court has "broad equitable powers to fashion an appropriate remedy" in bid protest cases. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011).  Injunctive relief should "enjoin[] the illegal action and return[] the contract award process to the status quo ante any illegality."  *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994).  In deciding whether to grant a permanent injunction, courts must consider whether:

35

"(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  Here, each factor weighs heavily in favor of granting ConServe's request for a permanent injunction.

                i.      **CONSERVE HAS SUCCEEDED ON THE MERITS**

As demonstrated throughout these proceedings and further summarized herein, ConServe has demonstrated that ED's decision to improperly consolidate default recovery services under the BPO Solicitation violates CICA and other applicable procurement laws and regulations. Additionally, ConServe has established that ED's cancellation of the Default Collection Procurement was arbitrary, capricious and irrational.  For these reasons, ConServe has succeeded on the merits.





37



### iii. ED WILL SUSTAIN NO HARM AND THE HARM TO CONSERVE OUTWEIGHS ANY HARM TO ED

ED will suffer no harm if the BPO Solicitation is enjoined as ED does not currently have a due date for the submission of proposals – a fact it admitted in its Opposition to ConServe's motion for a preliminary injunction. And to the extent ED wants to move quickly, ED could unbundle default recovery services from the BPO Solicitation and promptly issue a separate solicitation for default recovery services without incurring any delay in the procurements while simultaneously increasing competition and resolving these protests.

Moreover, even if ED could manufacture a claim of harm, courts have long recognized that any harm to the Government caused by inconvenience or a delay in performance is generally less significant than the harm caused to a bid protester if the protest is ultimately sustained. *See PGBA,* 57 Fed. Cl. at 663 (citing *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999) (holding that "only in an exceptional case" would the delay and inconvenience to the

Government and awardee "warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests")).

### iv.   GRANTING PERMANENT INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

COFC has long recognized that the public interest lies in honest, open and fair competition in public procurement. *See Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997). Further, "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *Alion Sci. & Tech. Corp. v. United States*, 74 Fed. Cl. 372, 376 (2006). Similarly, courts have recognized that agencies should take the "time needed to get the award right the first (or at least the second) time. The public interest is not well-served when contracting officials rush to save a few weeks and end up delaying contracts by many months." *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 515 (2005).

The public interest factor weighs in favor of injunctive relief here for several reasons. First, it is well-settled that the public interest is served by preserving the integrity of the procurement process and ensuring that contracting agencies, like ED, comply with CICA's mandate for full and open competition and follow all applicable procurement statutes and regulations. *See, e.g., Sheridan Corp. v. U.S.*, 94 Fed. Cl. 663, 670 (2010). Second, the public interest is served by prohibiting ED from causing financial ruin to its top contractors and ensuring that the most highly rated PCAs, such as ConServe, are able to compete and are not sidelined by artificial barriers to competition that are not necessary to meet the agency's needs. Third, the public interest is served by ensuring that ED is contracting with the most qualified debt collectors who historically have been more successful in recovering funds for the Government. Indeed, as discussed previously, ED's procurement errors over the past years have

resulted in the agency *leaving billions of dollars in lost recoveries on the table.*  For these

reasons, granting the requested injunctive relief is in the public interest.

## VII.    **CONCLUSION AND REQUEST FOR RELIEF**

For the foregoing reasons, ConServe respectfully requests that the Court grant its MJAR

and declare that ED's decision to consolidate default recovery services under the NextGen BPO

Solicitation is arbitrary, capricious, and in violation of CICA and other applicable procurement

laws and regulations.  ConServe also requests that this Court grant ConServe permanent

injunctive relief enjoining ED from procuring default recovery services under NextGen unless

and until ED amends the NextGen Solicitations to unbundle default recovery services, and allow

all interested offerors, including ConServe, to submit proposals.  Additionally, ConServe

respectfully requests that the Court again enjoin ED from cancelling the Default Collection

Procurement until ED procures default recovery services separately and allows all interested

offerors, including ConServe, to submit proposals.  Finally, ConServe asks the Court to grant

such other and further relief, including the award of attorneys' fees and court costs, as the Court

may deem just and proper.


Dated: June 3, 2019                               Respectfully submitted,


Of Counsel:                                       /s/ Todd J. Canni
                                                  Todd J. Canni
Richard B. Oliver                                 **PILLSBURY WINTHROP**
J. Matthew Carter                                 **SHAW PITTMAN LLP**
Aaron S. Ralph                                    725 South Figueroa Street, Suite 2800
Kevin Massoudi                                    Los Angeles, CA 90017-5406
**PILLSBURY WINTHROP**                            (213) 488-7213
**SHAW PITTMAN LLP**                              (213) 629-1033 (fax)
725 South Figueroa Street, Suite 2800             todd.canni@pillsburylaw.com
Los Angeles, CA 90017-5406
(213) 488-7100

(213) 629-1033 (fax)
richard.oliver@pillsburylaw.com
matt.carter@pillsburylaw.com
aaron.ralph@pillsburylaw.com
kevin.massoudi@pillsburylaw.com

Alexander B. Ginsberg
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856
(703) 770-7521
(703) 770-7901 (fax)
alexander.ginsberg@pillsburylaw.com

*Attorney of Record for Continental Service
Group, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 3, 2019, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record in this matter who are registered with the Court's CM/ECF system.


<u>/s/ Todd J. Canni</u>
Todd J. Canni