REDACTED VERSION

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | |
|---|---|
| **HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI** )<br><br>**and** )<br><br>**GRANITE STATE MANAGEMENT AND RESOURCES,** )<br><br>     **Plaintiffs,** )<br><br>**v.** )<br><br>**THE UNITED STATES OF AMERICA,** )<br><br>     **Defendant.** ) | ▮▮▮▮▮▮▮▮▮<br><br>**No. 19-308C**<br><br>**Judge Thomas C. Wheeler** |

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND SUPPORTING MEMORANDUM OF LAW

Scott F. Lane
One US Bank Plaza
St. Louis, Missouri 63101-1693
(314 552-6535 (tel.)
(314) 552-7000 (fax)
slane@thompsoncoburn.com (e-mail)

Attorney of Record for Plaintiffs
*Higher Education Loan Authority of the State of Missouri
  and
Granite State Management and Resources*

Of Counsel:
Katherine S. Nucci
Jayna M. Rust
Thompson Coburn LLP
Dated: June 3, 2019

## **TABLE OF CONTENTS**

Page

**Contents**

I.    Introduction ................................................................................................ 1

II.   Statement of the Questions Presented ........................................................ 4

III.  Statement of Facts ...................................................................................... 4

    A.   Background on Federal Student Loan Servicing .............................. 4

    B.   The 2016 Procurement ...................................................................... 7

    C.   The NextGen Phase I Solicitation .................................................... 8

    D.   The NextGen Phase II Solicitations ................................................. 12

    E.   MOHELA's 2018 GAO Protest ........................................................ 13

    F.   MOHELA's 2018 Bid Protest in this Court ...................................... 14

    G.   The Current NextGen Solicitations ................................................... 15

        i)   The EPS Solicitation ................................................................. 15

        ii)  The OPS Solicitation ................................................................ 19

        iii) The BPO Solicitation ................................................................ 22

IV.   This Court Has Jurisdiction ....................................................................... 23

V.    Plaintiffs' Standing .................................................................................... 24

VI.   Standard of Review .................................................................................... 25

VII.  The EPS and OPS Solicitations are in Violation of Appropriations Acts .......................... 27

    A.   The EPS and OPS Solicitations Unlawfully Encompass Loan Servicing without Ensuring "Participation of Multiple Student Loan Servicers that Contract Directly with the Department" ................................................. 27

    B.   The EPS and OPS Solicitations Unlawfully Divide Loan Servicing Functions ......... 32

VIII. The NextGen Solicitations are in Violation of the Higher Education Act .......................... 34

IX.   The EPS and OPS Solicitations Improperly Consolidate Requirements ............................ 36

X.     The NextGen Solicitations Fail to Specify the Agency's Needs in a Clear and Reasonable Manner ......................................................................................................................... 38

XI.    The Court Should Enjoin the Department's Unlawful Procurements ................................. 43

       A. Irreparable Injury ......................................................................................................... 44

       B. Balance Of Hardships .................................................................................................. 45

       C. Public Interests............................................................................................................. 45

XII.   Conclusion ........................................................................................................................ 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Systems Technology, Inc. v. United States,*
  69 Fed. Cl. 474 (2006) ...............................................................................46

*Am. Fed'n of Gov't Emps., AFL–CIO v. United States,*
  258 F.3d 1294 (Fed. Cir. 2001)...................................................................24

*BINL, Inc. v. United States,*
  106 Fed. Cl. 26 (2012) ................................................................................27

*Cleveland Assets, LLC v. United States,*
  883 F.3d 1378 (Fed. Cir. 2018)...................................................................24

*Cleveland Assets, LLC v. United States,*
  897 F.3d 1332 (Fed. Cir. 2018) (Wallach, J. and Newman, J., dissenting) ...........................24

*Contracting, Consulting, Engineering LLC v. United States,*
  104 Fed. Cl. 334 (2012) ..............................................................................44

*Distributed Solutions, Inc. v. United States,*
  539 F.3d 1340 (Fed. Cir. 2008).............................................................23, 24

*FMS Investment Corp. v. United States,*
  136 Fed. Cl. 439 (2018) ..............................................................................44

*Magellan Corp. v. United States,*
  27 Fed. Cl. 446 (1993) ................................................................................44

*MORI Associates, Inc. v. United States,*
  102 Fed. Cl. 503 (2011) .........................................................................44, 46

*Palantir USG, Inc. v. United States,*
  904 F.3d 980 (Fed. Cir. 2018).................................................................24, 26

*PGBA, LLC v. United States,*
  389 F.3d 1219 (Fed. Cir. 2004)...................................................................44

*PGBA, LLC v. United States,*
  57 Fed. Cl. 655 (2003) ...........................................................................44, 45

*RAMCOR Services Group, Inc. v. United States,*
  185 F.3d 1286 (Fed. Cir. 1999)...................................................................23

*Rotech Healthcare Inc. v. United States,*
  118 Fed. Cl. 408 (2014) ..............................................................................27

*Rotech Healthcare, Inc. v. United States,*
   71 Fed. Cl. 393 (2006) ..................................................................................45, 46

*Seattle Sec. Servs., Inc. v. United States,*
   45 Fed. Cl. 560 (2000) ........................................................................................44

*Sparksoft Corporation v. United States,*
   141 Fed. Cl. 609 (2019) ......................................................................................27

*Weeks Marine, Inc. v. United States,*
   575 F.3d 1352 (Fed. Cir. 2009)..........................................................................25

**Administrative Decisions**

*EDP Enterprises, Inc.,*
   B-284533.6, May 19, 2003, 2003 CPD ¶ 93 ......................................................36

*Pemco Aeroplex, Inc.,*
   B-280397, Sep. 25, 1998, 98-2 CPD ¶ 79...........................................................36

*Phoenix Scientific Corp.,*
   B-286817, Feb. 22, 2001, 2001 CPD ¶ 24 ..........................................................36

**Statutes**

5 U.S.C. § 706...............................................................................................................26

20 U.S.C. § 1018a.........................................................................................................13

20 U.S.C. § 1078........................................................................................................4, 34, 35

20 U.S.C. § 1087f .....................................................................................................3, 6, 26, 34

28 U.S.C. § 1491......................................................................................23, 24, 26, 45

31 U.S.C. § 3551...........................................................................................................24

41 U.S.C. § 3301...........................................................................................................27

41 U.S.C. § 3306.....................................................................................................3, 27, 36, 38

"Consolidated Appropriations Act, 2016," Pub. L. No. 114-113, Dec. 18, 2015,
   129 Stat. 2242, Div. H, Title III .........................................................................29

"Consolidated Appropriations Act, 2017," Pub. L. No. 115-31, May 5, 2017, 131
   Stat. 135, Div. H, Title III..................................................................................29

"Consolidated Appropriations Act, 2018," Pub. L. No. 115-141, Mar. 23, 2018,
   132 Stat. 348, Division H, Title III .....................................................................30

"Department of Defense and Labor, Health and Human Services, and Education
  Appropriations Act, 2019 and Continuing Appropriations Act, 2019," Pub. L.
  No. 115-245, Sept. 28, 2018, 132 Stat. 2981, Div. B, Title III ........................................ *passim*

"Health Care and Education Reconciliation Act," Pub. L. No. 111-152, March 30,
  2010, 124 Stat. 1029, Title II, Part II, § 2201 ....................................................................... 5, 6

"Higher Education Amendments of 1992," Pub. L. No. 102-325, July 23, 1992,
  106 Stat. 448, Title IV, Part D, § 451 ...................................................................................... 4

"Higher Education Act of 1965," Pub. L. No. 89-329, Nov. 8, 1965, 79 Stat. 1219 ...................... 4

## Other Authorities

4 C.F.R. § 21.11(b) ................................................................................................................... 14

FAR (48 C.F.R.) § 1.602-2 ....................................................................................................... 46

FAR (48 C.F.R.) 5.002 .............................................................................................................. 38

FAR (48 C.F.R.) 15.206 ............................................................................................................ 13

FAR (48 C.F.R.) 15.304 ............................................................................................................ 38

Plaintiffs Higher Education Loan Authority of the State of Missouri ("MOHELA") and

Granite State Management and Resources ("GSMR"), by and through the undersigned Attorney

of Record, hereby submit their Motion for Judgment on the Administrative Record and

Supporting Memorandum of Law.  This bid protest contests the U.S. Department of Education's

(the "Department" or "Agency") procurement of a Next Generation Financial Services

Environment ("NextGen") as implemented under three solicitations:  Solicitation No. 910031-

19-R-0005 (the "EPS solicitation"); Solicitation No. 910031-19-R-0007 (the "OPS solicitation");

and Solicitation No. 910031-19-R-0008 (the "BPO solicitation").  Together, these three

solicitations are referred to herein as the "NextGen solicitations."

## I.      Introduction

The Department seemingly agrees that operational loan servicing work – such as that

performed by MOHELA and GSMR – should **NOT** be procured under the same solicitations

being used to acquire the new information technology platforms.  *See* AR Tab 61 (discussing

concerns with the combined requirements as initially solicited).  In fact, when the Department

amended the EPS and OPS solicitations in March 2019, government counsel informed the Court

that the purpose of those amendments was "to take the loan servicing pieces out" of the EPS and

OPS procurements.  *See* ECF No. 46, Mar. 21, 2019, Hearing Tr. 29:8-20.  Critically, however,

those solicitations still contain important and substantial loan servicing work.

In fact, essentially every task that was emphasized by the government in its April 10,

2019 brief (ECF No. 72) as having been placed under the BPO solicitation overlaps with one or

more discrete requirements under the EPS and/or OPS solicitations.  *See* § X, *infra*.  In addition

to those discrete overlapping tasks, the Department has crafted the EPS and OPS requirements in

an open-ended manner, to include "manual intervention," "manual processing," and "manual

activities."[1]  As a result, an award under either the EPS or OPS solicitations could result in that

awardee servicing the Department's full portfolio of 37 million student loan accounts, and it

would displace the need for the BPO solicitation.  Indeed, the Department has set the stage for its

EPS awardee to take the reins by requiring it to complete migration of **ALL** customer accounts

onto its platform within ten months of award.  Someone will be needed to service those accounts

very soon, and the Department has meanwhile announced it will not even set a proposal due date

under the BPO solicitation until **AFTER** the EPS contract is awarded.

The Department's intermingling of its loan servicing requirements within overlapping

solicitations is problematic for many reasons.  <u>**First**</u>, the FY 2019 Appropriations Act prohibits

any "new contract solicitation for a new Federal student loan servicing environment" that does

not "provide[] for the participation of multiple student loan servicers that contract directly with

the Department," and the EPS and OPS solicitations will result in single-award contracts –

meaning they fail to comply with this basic mandate repeatedly stressed by Congress.[2]  <u>**Second**</u>,

even if the EPS and OPS solicitations do not completely displace the BPO solicitation, at a

minimum they divide and compartmentalize loan servicing work for any particular student loan

among the EPS/OPS/BPO awardees.  This violates a related statutory provision that obligates the

Department to ensure each loan servicer is assigned "to manage a unique portfolio of borrower

accounts and the full life-cycle of loans from disbursement to pay-off …" Pub. L. No. 115-245.

---

[1] *E.g.*, AR 23363 (Tab 58) (referring to the EPS awardee performing "manual intervention," "manual correction[s]," and "manual processing" without any meaningful limitations); AR 23442, 23435 (Tab 59) ("manual correction[s]," "manual processing," and "manual activities" under the OPS solicitation).

[2] *See* "Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019," Pub. L. No. 115-245, Sept. 28, 2018, 132 Stat. 2981, Div. B, Title III (the "FY 2019 Appropriations Act").

**Third**, the Higher Education Act, 20 U.S.C. § 1087f(b), explicitly requires the Department to give "special consideration" in awarding any contract for student loan servicing to entities such as MOHELA and GSMR with agreements under the Federal Family Education Loan Program ("FFELP"). No such special consideration is afforded in any of the NextGen solicitations, and the record reflects the Agency has unreasonably ignored this law altogether.

**Fourth**, in addition to the Department's commingling of loan servicing work together with its IT procurements resulting in violations of the FY 2019 Appropriations Act and the Higher Education Act, the Department's consolidation of requirements also violates the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3306(a)(2). Importantly, while the Agency has contested the challenges to its consolidation of loan servicing work together with default collections work in response to contentions of other plaintiffs, the Department has not offered any defense for having combined substantial loan servicing work (that may seemingly be expanded to encompass servicing all of the Department's portfolio) together with its IT procurements. Consolidation of these requirements unlawfully circumvents the requirement for full and open competition.

**Fifth,** and finally, the overlapping requirements and missing milestones in the NextGen solicitations have left offerors to guess which aspects of the procurement are applicable to their businesses. For each solicitation, the Department is obligated to provide "clear and concise description of the supplies or services that is not unnecessarily restrictive of competition and will allow a prospective offeror to make an informed business judgment" on whether to participate. *See, e.g.*, Federal Acquisition Regulation ("FAR") 5.002 and 5.207. The Department's failure to abide by this fundamental requirement is yet another unreasonable restraint on competition in violation of the CICA. Each of these issues is addressed below.

II.     **Statement of the Questions Presented**

A.      Do the EPS and OPS solicitations violate the FY 2019 Appropriations Act?

B.      Do the NextGen solicitations violate the Higher Education Act?

C.      Do the EPS and OPS solicitations improperly consolidate the Department's requirements in violation of the CICA?

D.      Do the NextGen solicitations fail to specify the Department's needs in a clear and reasonable manner in violation of the CICA and the FAR?

E.      Are Plaintiffs entitled to declaratory relief and/or permanent injunctive relief?

III.    **Statement of Facts**

A.      <u>Background on Federal Student Loan Servicing</u>

Pursuant to the Higher Education Act of 1965, Pub. L. No. 89-329, Nov. 8, 1965, 79 Stat. 1219, Congress established the guaranteed student loan program known as the Federal Family Education Loan Program ("FFELP"), allowing banks and private institutions to provide loans to students that were guaranteed by the federal government.  MOHELA and GSMR's sister organization (New Hampshire Higher Education Assistance Foundation ("NHHEAF")) are among the entities that entered agreements with the Department under 20 U.S.C. § 1078(b) and (c) to participate in FFELP.

Prior to 2010, FFELP accounted for the majority of all federal student loans.  In 2010, FFELP was effectively replaced with the William D. Ford Federal Direct Loan Program (the "Direct Loan Program"); however, millions of loans made under FFELP remain outstanding and continue to be serviced.  In contrast to FFELP, the Direct Loan Program allows students to obtain loans directly from the Department, *i.e.*, the loans are funded by the government but actually serviced by contractors who specialize in those operational processes.

Although the Direct Loan Program is currently the primary government-backed student loan program available in the U.S., it began as a pilot "demonstration" program.  *See* "Higher

Education Amendments of 1992," Pub. L. No. 102-325, July 23, 1992, 106 Stat. 448, Title IV, Part D, § 451 *et seq*. As part of that demonstration, in or about 1993, the Department contracted with a company known as ACS Education Solutions ("ACS") as the single provider of both the software platform and the loan servicing for all student loan accounts processed under the Direct Loan Program. The single servicer and single software platform established for the Direct Loan Program proved to be what was widely reported as extremely costly to the federal government and to the student loan borrowers, while also providing very poor service and a lack of access to benefits and services otherwise available through a competitive and performance-based student loan servicing marketplace. *See* Complaint, ¶¶ 21-22.

In light of this experience, the Department issued a solicitation and selected four established student loan servicers in 2009 to assist with the rapidly-growing Direct Loan Program. *See* AR 14481 (Tab 37); *see also* Contract Nos. EDFSA09D0012, EDFSA09D0013, EDFSA09D0014, and EDFSA09D0015.[3] Those four contractors, referred to as Title IV [from Title IV of the Higher Education Act] Additional Servicer entities or "TIVAS entities," were: (a) Navient; (b) Nelnet; (c) the Pennsylvania Higher Education Assistance Agency ("PHEAA"); and (d) Great Lakes. *See* AR 14482 (Tab 37); *see also* Complaint, ¶ 23.

The 2010 amendments to the Higher Education Act required that, effective July 1, 2010, all new federal student loans would be Direct Loans made by the federal government, and the origination of new loans under FFELP would cease as of that date. "Health Care and Education Reconciliation Act," Pub. L. No. 111-152, March 30, 2010, 124 Stat. 1029, Title II, Part II, § 2201 *et seq*. ("HCERA"). However, loans made under FFELP through entities such as

---

[3] The administrative record does not include a copy of the TIVAS or NFP servicer contracts, but those contracts as well as their respective scopes of work and periods of performance are referenced repeatedly. *E.g.*, AR 14481 (Tab 37).

MOHELA and GSMR's sister organization remain active and continue to be serviced. *See* Complaint, ¶¶ 24, 115, 116.

The HCERA legislation reflected Congress' intent and expectation that the Department implement and foster a performance-based, competitive student loan servicing environment for purposes of the Direct Loan Program. Specifically, the Department was required to contract with qualifying Not-For-Profit ("NFP") servicers and assign each a minimum of 100,000 borrower accounts. Pub. L. No. 111-152, § 2212 (amending 20 U.S.C. § 1087f (2010)). At the time, there were nearly three dozen NFPs that met the qualification requirements, including MOHELA.

The Department and MOHELA executed a contract in September 2011 pursuant to which MOHELA became the first NFP with a prime servicing contract for Direct Loans. *See* Complaint, ¶ 26. Around this same time, the Department and NHHELCO (an affiliate of GSMR) also executed a Direct Loan prime servicing contract. *Id*. The Department awarded prime contracts to a number of other NFPs, in addition to continuing its contracts with the TIVAS entities. The 2011 NFP servicing contracts were awarded for a five-year period of performance, and they were renewed in 2016 for many NFPs (including MOHELA and NHHELCO) for an additional performance period that is scheduled to end in September 2019. AR 14481 (Tab 37). In 2012, NHHELCO added GSMR as a key subcontractor to its contract with the Department. *See* Complaint, ¶ 27.

There are currently nine student loan servicing entities, *i.e.*, five NFPs (including MOHELA and NHHELCO/GSMR) and four TIVAS entities, which contract directly with the Department to service the its Direct Loan portfolio – a portfolio that exceeds 37 million student loan accounts. *See* AR 14274 (Tab 31); AR 14482 (Tab 37). Significantly, only the four TIVAS entities maintain their own proprietary loan servicing software, and they license the use of their

IT systems to the five prime NFP loan servicers.  *See id.* (referring to the loan servicing software

as including "[f]our different servicing platforms" and identifying the TIVAS entities as owning

those platforms).  MOHELA has a license to use the PHEAA software platform, and

NHHELCO/GSMR has a license to use the Nelnet software platform.  AR 14498 (Tab 37).

B.    The 2016 Procurement

On April 6, 2016, the Department issued Phase I of a two-phase solicitation in which the

stated purpose was only to acquire a single loan servicing software system that would be utilized

by the multiple student loan servicing entities contracted on a separate basis.  AR 15127 (Tab

39).  Five offerors submitted proposals in response to Phase I of the 2016 solicitation, which did

not include MOHELA or GSMR because they do not own a loan servicing software system and

have performed their services using licensed software.  *Id.*, *see also* Complaint, ¶ 30.[4]

On October 26, 2016, the Department issued the second phase of its procurement via

Solicitation No. ED-FSA-17-R-0001.  Consistent with the first phase, that solicitation's purpose

was to acquire the IT system only, and it made clear that the IT system would be made available

by the government to all nine student loan servicing contractors (*i.e.*, the TIVAS and NFPs) to

enable those contractors to operate on a uniform technology platform.  Significantly, that

solicitation demonstrated that the Department knows how to acquire a loan servicing platform

separately from the loan servicing operational support.  *See* Complaint, ¶ 31.

On May 19, 2017, however, the Department amended that solicitation to completely

eliminate the concept that the loan servicing software would "be utilized by multiple customer

service providers."  In fact, the Department shifted that procurement to a "winner-take-all"

---

[4] The record does not include the referenced 2016 solicitation (Phase I or II), but acknowledges
its relevance to this procurement via Tab 39's inclusion of a list of the offerors who submitted
responses when that solicitation was limited to the procurement of an IT system.

approach whereby the awardee of the IT system contract would also be providing the operational

loan servicing work (*i.e.*, making phone calls, processing payments, printing and mailing

correspondence, resolving credit disputes, performing financial reporting/reconciliation and

otherwise communicating with borrowers – the work that MOHELA and GSMR perform) for the

Department's current and future portfolio of borrower accounts.  *See* Complaint, ¶ 32.

On July 7, 2017, MOHELA submitted a pre-award protest to the GAO, docketed as B-

414262.2, in which MOHELA objected to the Agency's substantial change in its requirements.

MOHELA's protest explained that the Agency's expansion of its requirements, which had

occurred after a down-selection of eligible offerors that had submitted proposals only for the

software solution and excluded MOHELA, was contrary to the CICA.  MOHELA also

emphasized that the Agency's decision to acquire all loan servicing from a ***single entity*** was

contrary to Congress' mandate in the FY 2017 appropriations law, which obligated the

Department to allocate student loan accounts among multiple servicers in a particular manner.

*See* Complaint, ¶ 33.

On August 1, 2017, prior to the due date for the Agency Report, the Department

announced that it had decided to cancel the solicitation as "no longer accurately reflect[ing] the

agency's requirements."  *See* AR 15127 (Tab 39) (acknowledging cancellation of the solicitation

as of this date).  Accordingly, the GAO dismissed the 2017 MOHELA bid protest as academic.

*See* Complaint, ¶ 34.

C.      The NextGen Phase I Solicitation

On the same day the Department announced its corrective action, August 1, 2017, the

Agency announced on FedBizOpps that it would be devising a new approach for its student aid

processing and servicing environment.  AR 15129 (Tab 41).  Notably, the announcement made

clear that the approach would "require the separation of database housing, system processing, and customer account servicing so that cost efficiencies can be achieved and current state-of-the-art technologies can be deployed and evolve in the future." *Id*. (August 1, 2017 notice).

On December 11, 2017, the Department issued a request for information to prospective offerors detailing how it would be "embarking on a new vision known as the Next Generation (NextGen) Financial Services Environment." AR 12388 (Tab 28). Consistent with the prior announcement's separation of the database, system processing, and customer account servicing requirements into different contracts, the request for information reflected that the Department's vision included dividing the procurement into discrete "components." This included single systems/providers for certain *technological* aspects of the NextGen environment, and multiple loan servicers for the *operational* aspects of the NextGen environment. Importantly, that request for information recognized the logical and historical separation of the IT aspects of the federal student loan servicing program from its manual and operational aspects.

For instance, there was a component of the procurement that would be dedicated to the "[c]ore processing platform, including rules engine, workflow, and core servicing system," which was further explained as the environment that "will perform all loan servicing processing across FSA's [the Office of Federal Student Aid's] various repayment plans, customer segments, loan statuses, and special programs." AR 12400 (Tab 28). There was a separate component anticipated for "Processing Operations," which would include the manual aspects of loan servicing, such as "[r]eview, validation, and processing capabilities associated with enrollment, applications, and requests for various borrower programs and loan status adjustments," "[e]rror and dispute resolution investigation and processing capabilities," and "[m]anual processing and support required to assist FSA reporting and oversight." AR 12401-02.

On February 20, 2018, the Department issued Phase I of a two-phase solicitation to acquire the NextGen solutions that had been contemplated in the request for information.  AR 14441 (Tab 37).  The Phase I Solicitation explained that, in the current environment, each of nine different loan servicers "operates its own engagement layer with proprietary branding (e.g., websites, mobile tools, contact centers), utilizes one of four servicing platforms, and maintains certain additional technical systems."  AR 14442.  According to the Department, the use of different technology had created a "fragmented vendor landscape" and resulted in inconsistent customer experiences, limited branding opportunities (for FSA), and operational complexities.  AR 14443.

The Department identified its vision for the NextGen procurement as including:  (1) "an enterprise-wide, FSA-branded omni-channel digital platform" that "will consolidate the multiple websites, mobile applications, and contact centers that currently exist across the full customer lifecycle (from application to servicing and default);" (2) "a common, integrated data management platform which contains all information of each student throughout the lifecycle" to generate customer insights and reduce error rates; (3) "enterprise-wide cybersecurity;" (4) solutions that are "implemented with both integration and future scalability in mind;" and (5) a model that "will allow business process operations providers to 'plug-in' these solutions while providing customers with a consistent, world-class customer experience."  AR 14445-46.  ***In other words, the objective of Department's NextGen vision was to require a common technical backbone for use by its multiple loan servicers to interact with borrowers on a consistent basis.***

Consistent with the request for information's use of "components" to segregate the different aspects of this procurement, the Phase I Solicitation delineated the following nine

"Components" of support that the Department had identified as being necessary to realize its vision, and offerors were permitted to respond to individual, multiple or all Components:

- **Component A:** Enterprise-wide digital platform and related middleware
- **Component B:** Enterprise-wide contact center platform, customer relationship management (CRM), and related middleware
- **Component C:** Solution 3.0 (core processing, related middleware, and rules engine)
- **Component D:** Solution 2.0 (core processing, related middleware, and rules engine)
- **Component E:** Solution 3.0 business process operations
- **Component F:** Solution 2.0 business process operations
- **Component G:** Enterprise-wide data management platform
- **Component H:** Enterprise-wide identity and access management (IAM)
- **Component I:** Cybersecurity and data protection

AR 15086 (Tab 37).

In essence, as set forth in Phase I, Solution 3.0 entailed the development and maintenance of a single environment for FSA's new customers, and Solution 2.0 was the environment that would be developed and maintained for FSA's existing customers.  Components C and D were to include the *technical systems* necessary to service loans that reside in Solutions 3.0 and 2.0, respectively; whereas, Components E and F were to include the *operational functions* (such as the contact centers, back-office support, error/dispute resolution and correction, account maintenance, financial-related functions, and printing/mailing all servicing related materials) necessary to service the loans in Solutions 3.0 (Component C) and 2.0 (Component D) to the extent those operational functions were not automated.  *See* AR 15098-15103.

Significantly, the Phase I Solicitation anticipated that "all" business process operations would be provided by the selected contractors under Components E and F, including performing contact center operations, print/mail operations and review, "validation, and processing associated with enrollment, applications, and requests for various borrower programs and loan status adjustment," and "error and dispute resolution investigation and processing."  AR 15101-

103.  This was reasonably segregated from the technical systems to be provided by the selected contractors under Components C and D.  Thus, the Phase I Solicitation demonstrated the Department could achieve its goals by acquiring a common technical solution separately from the operational aspects of the work.

As nationally-recognized leaders in student loan servicing, MOHELA's and GSMR's primary interests were in providing business process operations for all aspects of loan servicing. Having recognized that the Phase I Solicitation allocated all business process operations within Components E and F, MOHELA and GSMR each submitted Phase I proposals as prime contractors on Components E and F prior to the April 18, 2018 deadline.  AR 15125 (Tab 38).

D.      The NextGen Phase II Solicitations

On September 24, 2018, the Department issued Phase II solicitations.  In doing so, the Department split Component D and Component C into separate solicitations (Nos. 91003118R0022 and 91003118R0023, respectively) and consolidated Components E and F together under a different solicitation (No. 91003118R0024).  AR Tabs 47, 48 and 49. Additionally, the Department announced the limited subset of offerors that had been selected to participate in Phase II.  Nine offerors had been selected to participate in Phase II of the Components E and F solicitation, including MOHELA.  AR 15609 (Tab 49).  Four offerors were selected to participate in Phase II of the Component D solicitation, namely, GDIT, Infosys, Nelnet, and PHEAA.  AR 15515 (Tab 48).

With respect to its scope, the solicitation for Phase II Component D still covered development and maintenance of the IT environment for FSA's existing customers; however, the Agency also moved a substantial portion of the scope from Components E and F to Component D.  In particular, the Agency added requirements to Component D that would permit it to also

acquire business process operations, including but not limited to contact center support, student aid back-office processing and print/mail services.  AR 15472-74 (Tab 48).  Significantly, although a portion of those business process operations services were labeled as covering only a "transitional" period, there was no defined end to the transitional period.  Rather, those "transitional" services would continue "until the future state business process operations (responsible for contact center support, student aid back-office processing) are fully implemented or *as otherwise determined by FSA*."  *Id*. at 15474 (emphasis added).

        E.      <u>MOHELA's 2018 GAO Protest</u>

      On October 31, 2018, prior to the due date for proposals under Phase II Component D, MOHELA filed a pre-award bid protest at the GAO, which was docketed as B-417078.1.  MOHELA's protest contended that the Agency's movement of certain services to Component D in Phase II was unreasonable and improper because:  (a) Component D was structured as a single-award contract and therefore the Agency's procurement of loan servicing thereunder was in direct conflict with Congress' mandate in the FY 2018 and FY 2019 Appropriations Acts; (b) the changes were so substantial as to exceed what prospective offerors, including MOHELA, reasonably could have anticipated when the Phase I Solicitation was originally issued, and therefore violated the CICA; (c) the changes expanded the Component D procurement far beyond the scope and the purpose described in the Phase I Solicitation, thereby violating the very statute upon which the two-phase procurement was authorized, 20 U.S.C. § 1018a; (d) the changes made in the Phase II Component D solicitation were so substantial that they rendered the procurement in violation of FAR 15.206; and (e) the changes unduly restricted competition by improperly bundling or consolidating requirements in a manner that was beyond the Department's legitimate needs.  *See* Complaint, ¶¶ 48-49.

On November 8, 2018, the GAO dismissed MOHELA's protest pursuant to 4 C.F.R.

§ 21.11(b) because a bid protest had been filed in the U.S. Court of Federal Claims involving the

same procurement, namely, *Navient Solutions, LLC v. United States*, Case No. 18-1679.

F.    MOHELA's 2018 Bid Protest in this Court

On November 14, 2018, MOHELA filed a bid protest in this Court challenging the Phase

II NextGen solicitations, and the protest was docketed as *Higher Education Loan Authority of*

*the State of Missouri v. United States*, Case No. 18-1758.  The Court consolidated MOHELA's

action with the *Navient* case and other bid protests that had been filed concerning the NextGen

procurement, including those of certain providers of default collection services.

On November 16, 2018, MOHELA filed a motion for a temporary restraining order and

preliminary injunctive relief requesting that the Court prohibit the Department from proceeding

with soliciting proposals or making any contract awards under the NextGen procurement until

resolution of its bid protest.  *See* Case No. 18-1758, ECF No. 14.  On December 4, 2018, the

Court held oral argument on MOHELA's motion for a preliminary injunction.  At the conclusion

of oral argument, the Court commented in part that:

> As I understand the case at this point…the former default student
> loan contractors, who are among the Plaintiffs in this case, seem to
> have a fairly convincing argument that they have been excluded
> from the competition in this NextGen procurement now that
> default student loans have been added to the mix and, yet, they're
> not in a position to compete.

Case No. 18-1679, ECF No. 57, Dec. 4, 2018, Hearing Tr. 33:2-10.

In response to the Court's comments, the Department represented to the Court on

December 14, 2018 that it would take corrective action that "will render the consolidated

plaintiffs' claims moot because it provides the consolidated plaintiffs with the relief they seek: a

fresh opportunity to participate in the solicitation for support across the student aid lifecycle

covered by NextGen components C, D, E, and F."  AR 15626 (Tab 50).  On January 15, 2019,

the Department cancelled the Phase II solicitations for Components C, D, E and F and issued

new solicitations covering substantially the same work.  AR Tabs 51, 52 and 53.  On the same

day, the government requested that MOHELA's and the other consolidated plaintiffs' complaints

be dismissed as moot.  The Court granted the motion to dismiss on February 12, 2019.

>        G.        The Current NextGen Solicitations

 On January 15, 2019, the Department issued the three solicitations that are the subject of

this protest:  the EPS solicitation; the OPS solicitation; and the BPO solicitation.  In contrast with

the Department's past two procurement efforts, these solicitations do not contemplate the

Department's use of a two-phased procurement approach.

In a nutshell, the Department characterizes the seemingly separate roles of the

solicitations as follows:  the EPS solicitation seeks to acquire an IT platform accommodating the

migration of all existing borrower accounts, the OPS solicitation seeks to obtain an IT platform

designed to accommodate future borrower accounts, and the BPO solicitation is designed to

provide for the operational loan servicing of the borrower accounts.  However, as discussed

herein and reflected in the Department's prior delineations of this same work, the EPS and OPS

solicitations materially intrude upon and undermine the operational loan servicing purported to

be covered exclusively by the BPO solicitation.

>        *i) The EPS Solicitation*

The Department describes the EPS solicitation as the acquisition of an IT platform for all

existing student loan borrower accounts, but it actually opens the door for also acquiring student

loan servicing from a single contractor.  The EPS solicitation describes the Department's

objectives as follows:

>The Enhanced Processing Solution (Solution) will serve as the student financing servicing environment for FSA's existing customers. <u>Solution will provide full "life of the loan" servicing: servicing loans for customer accounts of all statuses, including those that are in default. Solution will rapidly migrate existing loans from current servicers, through loan migration</u> (maintaining dynamic and complete customer historical data) while minimizing customer disruption, per target milestones 2 and 3 (Section C.3.5). Solution will also deploy advanced capabilities to provide customers with a world-class experience, improve automation (i.e., reduce manual processing) and system flexibility, and reduce operational complexity and inefficiency for FSA.

AR 23359 (Tab 58), EPS solicitation, § C.3.1 (emphasis added).

The EPS solicitation currently anticipates a single fixed price contract that includes line items for:  (1) Solution Delivery, which is to be completed no later than three months after award; (2) Solution Operations and Maintenance, which includes a base period of one year and nine one-year option periods; (3) Optional Imaging/Printing/Mailing, with a base period of five years and one five-year optional ordering period; and (4) Optional Digital Engagement Layer, which includes a base period of two years and a one-year optional period.  AR 23356.

When the EPS solicitation was originally issued on January 15, 2019, it also provided that the EPS awardee would serve as the "sole" provider of business process operations until the awardees under the BPO solicitation became "fully operational" (AR 17923 (Tab 52)), and it included a line item under which the EPS awardee would continue to service approximately 20% of the student loans for up to 15 years after that "transitional" period concluded (AR 17914).

On March 6, 2019, the Department amended the EPS solicitation such that the EPS awardee's provision of business process operations support would cease within 12 months of the BPO solicitation awardees becoming fully operational, but the EPS solicitation maintained that the awardee would serve as the "sole" provider of business process operations for a "transitional" period of up to four years – limited only by the "discretion" of FSA.  AR 20029 (Tab 52).  The

- 16 -

March 6 amendment also <u>added</u> certain loan servicing functions to be performed by the EPS awardee during the full contract term, including interface support, loan consolidation origination applications and request processing, and credit dispute research and resolution.  AR 20027.

On March 19, 2019, the Department amended the EPS solicitation again in an apparent attempt to remove its prior objective of having the EPS awardee provide "transitional" business process operations.  AR 23287 (Tab 57).  The Department did not remove its line items or objectives that require the single EPS awardee to be responsible for all printing/mailing/imaging, which together constitute a considerable aspect of loan servicing.  Further, the Department added that at any point throughout the EPS contract's ten-year term, the EPS awardee may be required to perform, via "<u>manual intervention</u>," many operational functions which include tasks that MOHELA and GSMR perform as loan servicers, including but not limited to:

- Payment processing, including, receipt and applications of cash and non-cash payments accounts as well as research and resolution of lost or misapplied payments;

- Interface support, including tracking Work in Process (WIP) and resolving rejected transactions from other FSA systems (*e.g.*, NSLDS, FMS, origination system);

- Financial reporting, reconciliation and variance research;

- As needed support of audits (*e.g.*, annual audit reports such as the Service Organization Controls Type II Statements on Standards for Attestation Engagements (SSAE18));

- Research and resolution of treasury issues;

- Loan consolidation origination applications and request processing;

- Comprehensive cash management;

- Dynamic loan portfolio management;

- Effective internal financial controls; and,

- Credit bureau research resolution, including direct and indirect credit bureau disputes filed by customers or initiated by the credit bureaus.

AR 23294; *see also* AR 23363 (Tab 58); *compare* AR 14486-87 (Tab 37) (identifying "Servicer

functions that require substantial manual processing" under the current loan servicing contracts as including cash management, accounting and financial reporting, support for audits, application processing, and error correction/dispute resolution).

In addition, the EPS solicitation provides that the solution "shall conduct error and dispute resolution investigation and processing, including, but not limited to … Account maintenance, including <u>manual correction of errors</u> identified through data integrity scans; and, … Payment processing, including researching lost or misapplied payments and payment reapplication at the request of customers or FSA."  AR 23363 (Tab 58) (emphasis added). Further, the "Solution shall provide personnel to do <u>manual processing</u> related to financial functions, interface support, and error/dispute investigation and processing to be performed at the portfolio level."  *Id* (emphasis added).  The Acquisition Plan provides no explanation at all for the Department's inclusion of loan servicing work under the EPS solicitation.  *See* AR Tab 60.

The current operating elements of the proposed EPS solution include migrating 37 million customer loan and grant accounts from existing servicers and from the Default Management Collection System to the new environment.  AR 23370 (Tab 58).  The EPS awardee is also tasked with executing the full range of "life of the loan" servicing functions (such as consolidation, origination and default support), which includes "manual intervention" on various loan servicing tasks as listed above, an optional task for imaging, printing and mailing communications with borrowers, and another optional task for a temporary digital engagement layer until the future state digital platform solution is implemented.  AR 23362-64.

In other words, the EPS solicitation anticipates a rapid IT development period and up to ten years of IT support, and permits the Department to require that the EPS contractor perform a wide range of manual loan servicing work at any time.  When those "manual" tasks are paired

with the EPS awardee's responsibility for all printing, mailing and imaging operations, it is

evident that the Agency has retained the flexibility to order most if not all of its loan servicing

needs from the single EPS awardee.  Moreover, the EPS solicitation contains no milestone(s) for

the onboarding of awardees under the BPO solicitation to the new platform.  AR 23369-70.  The

due date for receipt of initial proposals under the EPS solicitation was April 2, 2019.

*ii) The OPS Solicitation*

Similar to the EPS solicitation, the Department describes the OPS solicitation as the

acquisition of an IT platform for all future student loan borrower accounts.  However, it too

includes provisions that effectively may result in a single entity performing all or much of the

loan servicing work.  The OPS solicitation describes the objectives as follows:

> Optimal Processing Solution shall be a highly adaptable solution
> set which supports current and future FSA products and processes
> across the entire lifecycle of student financing, including but not
> limited to:  functions for application for financing, to origination
> and disbursement, to processing and servicing and pay off or
> default. Solution will deploy integrated functions and products
> over time. Solution shall deliver cost efficiencies through
> significantly increased automation and a modern technical
> backbone (e.g., modular code base, cloud operability, two speed
> development compatibility, and/or innovative middleware)
> Solution shall better support changing rules, laws, and regulations
> with minimal operational complexity through the greater flexibility
> afforded by having separate rules engine(s) and integrated process
> workflows.

AR 23427 (Tab 59), OPS solicitation, § C.2.1 (emphasis added).

The OPS solicitation currently anticipates awarding a single firm-fixed price contract

with a one-year base period and nine one-year option periods.  When the OPS solicitation was

originally published on January 15, 2019, it also included a line item and ordering procedures for

business process operations, including a base ordering period of five years and two five-year

optional ordering periods.  AR 15630 (Tab 51).  On March 27, 2019, the Department amended

the OPS solicitation to, among other things, remove the business process operations line item. However, the "operating elements" and related requirements still include critical aspects of loan servicing as described below.

As currently structured, the OPS solicitation includes three operating elements for development/implementation of different aspects of the solution, as well as three corresponding operating elements for maintenance of those respective solutions.  Specifically, Operating Element 1 includes development/maintenance of the "Eligibility Processing Solution," Operating Element 2 includes development/maintenance of the "Origination and Disbursement Processing Solution," and Operating Element 3 is development/maintenance of the "Servicing Support Solution."  AR 23422 (Tab 59).

With respect to Operating Element 3, the OPS solicitation states that the solution shall execute the full range of "life of the loan" servicing functions.  AR 23440.  In relevant part, the solicitation requires the OPS awardee's "solution" to execute a list of "student financing servicing functions," including "but not limited to":

- loan status tracking;
- eligibility requirement assessment/annual recertification;
- loan consolidation origination;
- switching repayment plans; and
- retroactive processing.

AR 23441 (emphasis added).  The OPS awardee's "solution" is also required to perform a list of "financial and portfolio level functions," including "but not limited to":

- payment processing;
- interface support;
- financial reporting/reconciliation;
- audit support;
- treasury issues;
- loan consolidation origination applications and request processing;
- cash management;
- credit disputes;

- portfolio management; and
- internal financial controls.

AR 23441-42 (emphasis added).

The OPS solicitation also requires that the "solution" conduct "error and dispute resolution investigation and processing, including, but not limited to…Account maintenance, including manual correction of errors identified through data integrity scans, and…Payment processing, including researching lost or misapplied payments and payment reapplication at the request of customers or FSA." AR 23442. Again, the foregoing represent tasks that MOHELA and GSMR perform today as loan servicers. *See* AR 14486-87 (Tab 37) (identifying "Servicer functions that require substantial manual processing" under the current loan servicing contracts as including cash management, accounting and financial reporting, support for audits, application processing, and error correction/dispute resolution); AR 17989-90 (Tab 52) (same).

With respect to the separate BPO solicitation, the OPS solicitation ambiguously states:

> Solution shall automate all possible servicing and other functions to minimize manual processing. Solution may only rely on streamlined manual processing by the separately provided Business Process Operations in the cases where automation is not feasible; however, <u>Solution shall provide personnel to do manual processing related to financial functions and error/dispute investigation and processing to be performed at the portfolio level.</u>

AR 23442 (Tab 59) (emphasis added).

The OPS solicitation provides no guidance on what is meant by FSA's incorporation of personnel under OPS to perform "manual processing" that the record elsewhere describes as "substantial" (*e.g.*, AR 17990). Nor does it contain a milestone for onboarding any BPO solicitation awardees to the new platform. AR 23432-443. These ambiguous and conflicting statements, combined with the fact that FSA is separately soliciting these services under the BPO solicitation, leaves it unclear whether any manual aspects of loan servicing are included in the

OPS solicitation's requirements and, if so, the extent of that loan servicing work.  Moreover, the

Acquisition Plan provides no explanation at all for the Department's inclusion of loan servicing

work under the OPS solicitation.  *See* AR Tab 56.  The due date for receipt of proposals under

the OPS solicitation was May 8, 2019 as of the filing of the Complaint.  On April 30, 3019, FSA

suspended the proposal submission date.

### *iii) The BPO Solicitation*

The BPO solicitation is touted by the Department as the contract vehicle for actual

student loan servicing.  As described herein, a key concern is that the Department will never get

to this solicitation (it has no proposal due date) and will instead have the servicing performed

under the EPS/OPS contracts.  The BPO solicitation describes the objectives as follows:

> Business Process Operations will support efficient and effective
> operations, across the entire life cycle of student financing (from
> application for financing, to origination and disbursement, to
> processing and servicing and pay-off or default). Business
> Process Operations will do so under FSA's single brand, by
> providing the personnel necessary to respond to inbound customer
> (e.g. student applicants, borrowers, etc.) and partner (e.g. schools)
> inquiries, execute separately-developed outbound outreach
> campaigns, and perform back-office processing activities that
> cannot be automated. These personnel will provide an enhanced
> level of service, across the full life cycle of student financing,
> beyond today's environment and one that is consistent with leading
> financial services providers and other industry leaders recognized
> for their customer service. Solutions will also support the seamless
> transition of customers and partners from existing to new solutions,
> most especially the Enhanced Processing Solution and/or Optimal
> Processing Solutions, Digital Platform, and Contact Center.

AR 20012-13 (Tab 53).

The BPO solicitation anticipates multiple contract awards with a base ordering period of

five years with one five-year optional ordering period.  The operating elements of the BPO

solicitation include providing contact center support and back-office activities across the life

cycle of student financing, "especially those [sic] cannot be automated with other relevant solutions."  AR 20015-16.  The BPO solicitation specifically <u>excludes</u> imaging, printing and mailing operations from the back-office processing tasks, even though those operations require substantial manual effort.  AR 20017 ("Solutions shall not implement separate imaging, printing, and mailing solutions in the execution of back-office processing tasks.").

In accordance with the terms of the BPO solicitation, MOHELA and GSMR timely submitted questions to the Department before February 8, 2019.  On February 20, 2019, the Department published responses to 22 offeror questions.  AR 23244-46.  Those responses did not address a substantial number of questions that had been raised by MOHELA and GSMR.  The BPO solicitation does not provide a due date for the submission of initial proposals.  Rather, the BPO solicitation states:  "The Government will post the proposal due date for all volumes after an award for the Enhanced Processing Solution is made."  AR 23243.

## IV.    This Court Has Jurisdiction

The Tucker Act authorizes the U.S. Court of Federal Claims "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or <u>any</u> alleged violation of statute or regulation <u>in connection with</u> a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (emphasis added).  In *RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999), the U.S. Court of Appeals for the Federal Circuit explained that "[t]he operative phrase 'in connection with' is very sweeping in scope."  Further, in *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008), the Federal Circuit defined the phrase "procurement or proposed procurement" as including "all stages of the process of acquiring property or services, beginning with the process for determining a need for

property or services and ending with contract completion and closeout."  Here, because

MOHELA and GSMR are objecting to the Department's proposed procurements and are alleging

violations of statute and regulation in connection therewith, this Court has subject matter

jurisdiction.  *E.g., Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018).[5]

## V.       Plaintiffs' Standing

In order to maintain a bid protest action, a protester must be an "interested party."  28

U.S.C. § 1491(b)(1).  An "interested party" is "an actual or prospective bidder or offeror whose

direct economic interest would be affected by the award of the contract or by failure to award the

contract."  *Am. Fed'n of Gov't Emps., AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir.

2001); 31 U.S.C. § 3551(2)(A).  This generally requires a plaintiff to show that "(1) it was an

actual or prospective bidder or offeror, and (2) it had a direct economic interest in the

procurement or proposed procurement."  *Distrib. Solutions*, 539 F.3d at 1344.

MOHELA and GSMR are interested parties to file and pursue this protest.  MOHELA

and GSMR submitted separate proposals to the Agency under "Phase I" of the February 20, 2018

iteration of the NextGen procurement.  AR 15125 (Tab 38).  After MOHELA and others filed

pre-award protests in this Court challenging the Agency's "Phase II" solicitations (Case No. 18-

cv-01679, *et al.*), the Agency announced on December 14, 2018 that it was taking corrective

action.  AR 15626 (Tab 50).  The Agency issued the current NextGen solicitations on January

---

[5] The same jurisdictional analysis applies with respect to Plaintiffs' allegations concerning
violations of appropriations laws.  Notably, unlike the procedural statute at issue in *Cleveland
Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018), the FY 2019 Appropriations
Act specifically requires the Department to manage the NextGen procurement in a certain
manner.  *See also Cleveland Assets, LLC v. United States*, 897 F.3d 1332, 1333-36 (Fed. Cir.
2018) (Wallach, J. and Newman, J., dissenting) (explaining "precedent is clear that § 1491(b)(1)
should be interpreted broadly" and that its "plain language…places no limitations on the type of
statute alleged to have been violated.").

15, 2019 in order to replace solicitations covering requirements for which MOHELA and GSMR had previously submitted proposals, and which MOHELA had previously protested before the GAO and this Court.

MOHELA and GSMR are fully qualified to submit proposals under the BPO solicitation. Further, but for the contested issues raised herein, MOHELA and GSMR would have a substantial chance of obtaining contracts to provide the Agency with the loan servicing work that has been improperly included in the EPS and OPS solicitations. More specifically, MOHELA is widely recognized for its world-class student loan servicing and is currently a prime contractor to the Department for these services. MOHELA is the fifth-largest servicer of student loans originated and funded directly by the Department (AR 14515 (Tab 37)), and in recent years MOHELA has been ranked as the highest performing servicer, as measured by the Department's performance metrics, in every rating period (*e.g.*, AR 15128 (Tab 40)). GSMR is also a widely-recognized leader providing best-in-class student loan servicing and is a subcontractor under the Department's current program for these services. *Id*. As such, MOHELA and GSMR would have a substantial chance of obtaining awards for the loan servicing work and have standing to contest the NextGen solicitations. *See also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009) (holding that the pre-award protester needed only demonstrate a "non-trivial competitive injury which can be addressed by judicial relief" for purposes of showing a direct economic interest).

## VI.     Standard of Review

Rule 52.1 of the United States Court of Federal Claims ("RCFC") authorizes a party to move for judgment on the administrative record. "In deciding these motions, the court considers whether, given all the disputed and undisputed facts, a party has met its burden of proof based on

the evidence in the record." *Palantir*, 904 F.3d at 989 (internal quotation marks omitted).

Additionally, when considering a motion for judgment on the administrative record, the proper

standard to be applied to the merits is set forth in the Administrative Procedure Act ("APA"), 5

U.S.C. § 706(2)(A).  *See* 28 U.S.C. § 1491(b)(4).  Under the APA, an agency's procurement

action "must be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law,' or 'without observance of procedure required by law.'" *Palantir*,

904 F.3d at 989 (quoting 5 U.S.C. § 706(2)).

In this case, Plaintiffs contend that the Department's actions lack a rational basis and

otherwise violate applicable law and regulations for at least five equally compelling reasons:

- **First**, despite the March 2019 amendments, the EPS and OPS solicitations each contain substantial loan servicing functions – and they are crafted in such an ambiguous manner that the awarded contracts under either solicitation could be used to service the Department's entire portfolio of student loan accounts.  Consequently, those single-award contracts are contrary to the Congressional mandate in the FY 2019 Appropriations Act that "for any contract solicitation for a new Federal student loan servicing environment," the Department must ensure "participation of multiple student loan servicers that contract directly with the Department of Education…" Pub. L. No. 115-245.

- **Second**, even assuming the Department eventually makes multiple awards under the BPO solicitation to cover some aspects of the loan servicing work, on any particular student loan account, the contractor selected under EPS (for currently existing accounts) and under OPS (for future-state accounts) will perform other aspects of the loan servicing work.  This conflicts with a related requirement in the FY 2019 Appropriations Act that for any "new Federal student loan servicing environment," the multiple student loan servicers selected must be contracted "to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off…" *Id*.

- **Third**, under all three of the NextGen solicitations, the Department has neglected to give the "special consideration" to State agencies such as MOHELA and GSMR that have a history of high quality performance and agreements under FFELP despite the requirement to do so under the Higher Education Act, 20 U.S.C. § 1087f(b).  In fact, the record evidences no assessment whatsoever by the Department regarding compliance with this law.

- 26 -

- **Fourth**, the Department's consolidation of its traditional loan servicing work with its procurement of new IT systems under the EPS and OPS solicitations constitutes an unreasonable restraint on competition in violation of the CICA, 41 U.S.C. §§ 3301(a), 3306(a)(2).

- **Fifth,** all three NextGen solicitations are littered with ambiguous, open-ended and conflicting requirements – leaving offerors unable to make informed business decisions on the nature and extent of their participation in the various elements of this procurement, which is contrary to the CICA and the FAR.

Each of these violations is addressed below in turn.

## VII.    The EPS and OPS Solicitations are in Violation of Appropriations Acts

In cases where it is determined that a solicitation is contrary to applicable law, the court has upheld pre-award protests challenging the solicitation's terms as arbitrary, capricious, an abuse of discretion or not in accordance with law.  *E.g., Sparksoft Corporation v. United States*, 141 Fed. Cl. 609 (2019) (held solicitation was contrary to applicable regulation); *Rotech Healthcare Inc. v. United States*, 118 Fed. Cl. 408 (2014) (held solicitation was contrary to applicable statutory non-manufacturer rule); *BINL, Inc. v. United States*, 106 Fed. Cl. 26 (2012) (held solicitation was contrary to applicable statutory requirements).  As detailed in the sub-sections below, the EPS and OPS Solicitations do not comply with statutory requirements that have been imposed specifically upon the Department's NextGen procurement.

A.    The EPS and OPS Solicitations Unlawfully Encompass Loan Servicing without Ensuring "Participation of Multiple Student Loan Servicers that Contract Directly with the Department"

The March 19 and March 27 amendments to the EPS and OPS solicitations purport to direct their respective focuses on procuring IT systems, but those solicitations still contain critical, traditional loan servicing functions which can be continued with a single awardee for up to ten years.  Particularly, the EPS solicitation requires the single contract awardee to begin migrating customer accounts to its newly developed environment within six months of contract

award, and the EPS solicitation includes the ability for that single contract awardee to perform a wide range of "manual" and substantial loan servicing functions on all loans residing on its system. *E.g.*, AR 23363 (Tab 58) (referring to the EPS awardee performing "manual intervention," "manual correction[s]," and "manual processing"). Put simply, there is no limit to the "manual" tasks that can be added to the EPS vendor's responsibilities. In addition, ***all*** existing customer accounts are to be migrated to the new environment within ten months of the EPS contract award – meaning the Department has retained the flexibility to make the EPS awardee responsible for servicing the Department's entire portfolio of over 37 million student loan accounts.

Likewise, the OPS solicitation anticipates a single contract awardee and includes numerous critical loan servicing functions as well as an <u>open-ended</u> ability to procure "manual processing" related to financial functions, interface support and error/dispute investigation and processing. AR 23442, 23435 (Tab 59) ("manual correction[s]," "manual processing," and "manual activities" under the OPS solicitation). Thus, the Department has drafted the OPS solicitation in a manner that could also include providing business process operations for the entire portfolio of student loan accounts. Contrary to the government's characterizations, these are not merely IT procurements.

Further, while we acknowledge that the BPO solicitation (which provides for multiple awardees) is referenced in various places under each of those solicitations, the BPO solicitation contains no date for the receipt of proposals. And neither the EPS solicitation nor the OPS solicitation contains any milestone for onboarding BPO awardees to their respective platforms. In addition, the Department is under no obligation to make contract awards under the BPO solicitation, particularly if the Department is able to acquire open-ended solutions under the EPS

and OPS awarded contracts that encompass "manual processing," "manual correction" of errors, and other "manual activities."  Further still, the existing loan servicing contracts of MOHELA, GSMR and other NFP loan servicers expire in September 2019 – compounding concern that the unlawful discretion reserved in the EPS and OPS solicitations will be exercised to obtain loan servicing work for up to ten years under those contracts.

To reiterate, the EPS solicitation requires the awardee to "rapidly migrate" all existing loan accounts to the EPS solution; whereas, the Department will not even establish a proposal due date for the BPO solicitation until after the EPS contract is awarded.  If MOHELA and GSMR lose all of their current servicing volume through the "rapid migration" to EPS, and then they are required to wait several years before becoming providers under the BPO solicitation, the Department will have effectively "starved out" both MOHELA and GSMR.

All of this is a problem for the Department because Congress has ***repeatedly*** expressed that the Department must contract for student loan servicing using a performance-based approach that enables ongoing competition and choices among multiple loan servicers.  Going back to the FY 2016 Appropriations Act, Congress mandated that the Department allocate new student loan borrower accounts to eligible student loan servicers (both TIVAS entities and NFPs) on the basis of their performance compared to all loan servicers utilizing established common metrics, and based on the capacity of each servicer to process new and existing accounts, providing:

> …That the Secretary shall, no later than March 1, 2016, allocate new student loan borrower accounts to eligible student loan servicers on the basis of their performance compared to all loan servicers utilizing established common metrics, and on the basis of the capacity of each servicer to process new and existing accounts.

"Consolidated Appropriations Act, 2016," Pub. L. No. 114-113, Dec. 18, 2015, 129 Stat. 2242, Div. H, Title III; *see also* "Consolidated Appropriations Act, 2017," Pub. L. No. 115-31, May 5,

2017, 131 Stat. 135, Div. H, Title III.  The FY 2018 Appropriations Act expanded on this

directive *by explaining its applicability to the NextGen procurement*:

> *Provided further*, That in order to promote accountability and high-quality service to borrowers, the Secretary **shall not award funding for any contract solicitation for a new Federal student loan servicing environment**, including the solicitation for the FSA Next Generation Processing and Servicing Environment as amended by the Department of Education on February 20, 2018, **unless such an environment provides for the participation of multiple student loan servicers that contract directly with the Department of Education to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off** with certain limited exceptions, and allocates student loan borrower accounts to eligible student loan servicers based on performance…

"Consolidated Appropriations Act, 2018," Pub. L. No. 115-141, Mar. 23, 2018, 132 Stat. 348,

Division H, Title III (bold emphasis added).  Substantially similar language was included by

Congress and signed into law in the FY 2019 Appropriations Act:

> For Federal administrative expenses to carry out part D of title I, and subparts 1, 3, 9, and 10 of part A, and parts B, C, D, and E of title IV of the HEA, and subpart 1 of part A of title VII of the Public Health Service Act, $1,678,943,000, to remain available through September 30, 2020…
>
> *Provided*, That the Secretary shall allocate new student loan borrower accounts to eligible student loan servicers on the basis of their performance compared to all loan servicers utilizing established common metrics, and on the basis of the capacity of each servicer to process new and existing accounts...
>
> *Provided further*, That for student loan contracts awarded prior to October 1, 2017, the Secretary shall allow student loan borrowers who are consolidating Federal student loans to select from any student loan servicer to service their new consolidated student loan…
>
> *Provided further*, That in order to promote accountability and high-quality service to borrowers, the Secretary **shall not award funding for any contract solicitation for a new Federal student loan servicing environment**, including the solicitation for the

FSA Next Generation Processing and Servicing Environment as amended by the Department of Education on February 20, 2018, **unless such an environment provides for the participation of multiple student loan servicers that contract directly with the Department of Education to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off** with certain limited exceptions, and allocates student loan borrower accounts to eligible student loan servicers based on performance…

*Provided further*, That such servicers described in the previous proviso shall be evaluated based on their ability to meet contract requirements, future performance on the contracts, and history of compliance with applicable consumer protections laws…

"Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019," Pub. L. No. 115-245, Sept. 28, 2018, 132 Stat. 2981, Div. B, Title III (bold emphasis added).

Congress' intent and mandates – as repeatedly reflected in these laws – would be completely frustrated were the Department to funnel all Direct Loan servicing to a single contractor via the EPS or OPS solicitations. Yet, those solicitations contain no protections to avoid that result. In fact, the EPS and OPS solicitations specifically afford the Department with broad discretion to order "manual" servicing functions thereunder as applicable to the Department's entire portfolio of student loan accounts.[6] Moreover, aside from a February 2019 slide deck discussing <u>benefits</u> of removing BPO work from the EPS and OPS solicitations, there is nothing in the record reflecting that the Agency has even given any consideration to its obligations under the appropriations laws. Even that slide deck acknowledges that (1)

---

[6] Additionally, to the extent the EPS solicitation and OPS solicitation anticipate "teaming" among loan servicers and IT developers, such arrangements do not satisfy the FY 2019 Appropriations Act – which requires that "for any contract solicitation for a new Federal student loan servicing environment," the Department must ensure "participation of multiple student loan servicers **that contract directly with the Department of Education**…" *See* Pub. L. No. 115-245 (emphasis added).

integrating BPO services within the EPS and OPS solicitations has led to confusion and unintended results (AR 23539 (Tab 61)); and (2) separating "technical loan servicing" from "operational loan servicing" is "common practice" and would enable the respective providers to focus on their own distinct services (AR 23538). There is no rational basis, let alone a lawful one, for the Department to reserve in the EPS and OPS solicitations the ability to acquire an unlimited scope of loan servicing work.

In sum, the Department has structured the EPS and OPS solicitations in a manner that could create a servicing monopoly scheduled to last for many years, as well as a single point of failure that could result in tremendous difficulties and costs for the Department, the borrowers and the American taxpayers, all of which directly conflict with Congress' mandate and intent expressed in the referenced statutes. Therefore, the EPS and OPS solicitations are arbitrary, capricious, an abuse of discretion, and contrary to law.

B.     The EPS and OPS Solicitations Unlawfully Divide Loan Servicing Functions

The EPS and OPS solicitations violate the FY 2019 Appropriations Act for an additional reason – they are designed to inhibit each loan servicer from being assigned "to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off …" Pub. L. No. 115-245. Particularly, the EPS and OPS solicitations include discrete loan servicing tasks discussed above, including but not limited to cash management, accounting and financial reporting, support for audits, application processing, error correction/dispute resolution, and print/mail processing. AR 23363 (Tab 58); AR 23441-42 (Tab 59). Thus, even if the EPS and OPS solicitations do not completely displace the requirements specified in the BPO solicitation, they will divide and compartmentalize aspects of the student loan servicing work—meaning that

the BPO solicitation awardees will not be permitted to manage the "full life-cycle of loans" with respect to their own unique portfolio of borrower accounts.

Again, the Department's approach is unlawful because the FY 2019 Appropriations Act obligates it to ensure that each loan servicer is assigned "to manage a unique portfolio of borrower accounts and the full life-cycle of loans from disbursement to pay-off …"  Pub. L. No. 115-245.  The plain meaning of this statutory language is that each of the multiple servicers must be assigned a portfolio of borrower accounts that is unique to that servicer, and that servicer must be responsible for managing those accounts through their full life-cycle from disbursement to pay-off.

Now, via the EPS and OPS solicitations, the Department is dividing up portions of that loan servicing work, such that the single contractor selected under EPS (for current accounts) and under OPS (for future-state accounts) will perform some segments of the work on all borrower accounts, *e.g.*, manual processing related to payment processing, interface support, financial functions, error/dispute investigation and processing, and printing/mailing.  Indeed, the record makes clear that these tasks have traditionally been considered as loan servicing work as opposed to IT functions.  AR 14486-87 (Tab 37) (identifying "Servicer functions that require substantial manual processing" under the current loan servicing contracts as including cash management, accounting and financial reporting, support for audits, application processing, and error correction/dispute resolution).  Consequently, loan servicers that are selected under the BPO solicitation will not be given the opportunity to service the full life-cycle of their portfolio of borrower accounts, which is contrary to statute.

## VIII.   The NextGen Solicitations are in Violation of the Higher Education Act

The Higher Education Act is the basis for the Department's authority to "enter into contracts for…the servicing and collection of loans made or purchased" in the Direct Loan Program.  20 U.S.C. § 1087f(b).  With respect to such contracts, the Higher Education Act further states:

> The entities with which the Secretary may enter into contracts shall include only entities which the Secretary determines are qualified to provide such services and supplies and will comply with the procedures applicable to the award of such contracts. In the case of awarding contracts for the origination, servicing, and collection of loans under this part, the Secretary shall enter into contracts **only** with entities that have extensive and relevant experience and demonstrated effectiveness. The entities with which the Secretary may enter into such contracts shall include, where practicable, agencies with agreements with the Secretary under sections 1078(b) and (c) of this title, if such agencies meet the qualifications as determined by the Secretary under this subsection and if those agencies have such experience and demonstrated effectiveness. In awarding contracts to such State agencies, the Secretary shall, to the extent practicable and consistent with the purposes of this part, give special consideration to State agencies with a history of high quality performance to perform services for institutions of higher education within their State.

20 U.S.C. § 1087f(b) (the "Special Consideration Law") (emphasis added).

As relevant to the Special Consideration Law, MOHELA has extensive and relevant experience and demonstrated effectiveness in student loan servicing, as well as a history of high-quality performance (*e.g.*, AR 15128 (Tab 40)), and MOHELA entered into agreements with the Department under 20 U.S.C. § 1078(b) and (c), which allowed participation in FFELP and under which loan servicing and collections work continue to be performed to this day (Complaint, ¶¶ 19, 115).  The Department is required by statute to give "special consideration" to such offerors, including MOHELA, in awarding contracts for the origination, servicing, and collection of loans.

Similarly, GSMR has a history of high-quality performance in student loan servicing (*e.g.*, AR 15128 (Tab 40)), and its sister organization, NHHEAF, entered into agreements with the Department under 20 U.S.C. § 1078(b) and (c), which allowed participation in FFELP and under which loan servicing and collections work continue to be performed to this day (Complaint, ¶¶ 19, 116).  Specifically, GSMR provides loan servicing work for FFELP loans made by NHHEAF.  Thus, the Department is required by statute to give "special consideration" to GSMR as well in awarding contracts for the origination, servicing, and collection of loans.

Contrary to the Special Consideration Law, ***none*** of the three NextGen solicitations includes any such "special consideration" or preference for State agencies with agreements under 20 U.S.C. § 1078(b)/(c) having a history of high-quality performance.  Indeed, the Acquisition Plans make no reference to the law whatsoever.  AR Tabs 54-56, 60.

Further, the OPS and EPS solicitations do not even require offerors to have or submit past performance with respect to their student loan servicing work, let alone require that the selected contractor have "extensive and relevant experience and demonstrated effectiveness" in student loan servicing.  The Department's failure to require that the EPS and OPS offerors demonstrate their background in performing loan servicing functions is particularly alarming because, as set forth above, the EPS and OPS solicitations contemplate that the awardees could perform such work for up to ten years.  The Department's failure to comply with the statutory requirements of the Special Consideration Law in the context of procuring student loan servicing further renders the NextGen solicitations as arbitrary, capricious, an abuse of discretion, and contrary to law.

**IX.    The EPS and OPS Solicitations Improperly Consolidate Requirements**

The CICA requires that solicitations include specifications which permit full and open competition and contain restrictive provisions only to the extent necessary to satisfy the needs of the agency.  41 U.S.C. § 3306(a)(2).  Unless necessary to satisfy an agency's legitimate needs, this obligation is construed as precluding the bundling or consolidation of separate requirements in a solicitation where doing so restricts competition by excluding firms that can furnish only a portion of the requirements.  *E.g.*, *Pemco Aeroplex, Inc.*, B-280397, Sep. 25, 1998, 98-2 CPD ¶ 79; *Phoenix Scientific Corp.*, B-286817, Feb. 22, 2001, 2001 CPD ¶ 24 at 4 ("Since bundled, consolidated, or total-package procurements combine separate, multiple requirements into one contract, they have the potential for restricting competition by excluding firms that can furnish only a portion of the requirement.")  Further, "CICA and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition, whenever concerns of economy or efficiency are being weighed against ensuring full and open competition." *EDP Enterprises, Inc.*, B-284533.6, May 19, 2003, 2003 CPD ¶ 93.

Here, the EPS solicitation consolidates requirements that were <u>not</u> previously contracted on a bundled basis, namely, operational loan servicing work and the development of a new loan servicing IT system.  Similarly, the OPS solicitation is written so ambiguously that the Department could arguably include all of its operational loan servicing work together with its acquisition of the new loan servicing IT system.

The business process operations aspect of this program includes all direct borrower interactions, *e.g.*, phone calls, e-mails, and mailings.  As set forth above, for the past ten years, the entire portfolio of non-defaulted student loan accounts under the Department's program has been serviced under multiple prime contracts between the Department and student loan servicers,

including MOHELA and GSMR/NHHELCO.  Those contracts did not require the prime

contractors to maintain or use a common loan servicing solution; rather, the loan servicers were

able to use their own loan servicing system, or a licensed system of their choosing, and their

contract pricing was required to include the costs for such systems that needed to be compliant

for servicing federally-held debt.  Since the entities providing loan servicing have not previously

had a need to develop such a loan servicing system, acquiring or developing such a system now,

together with the actual servicing of the entire portfolio of student loan accounts on a bundled

basis, has the potential effect of greatly limiting the competition.

Further, the Agency has no reasonable need to acquire customer service for its entire

portfolio of student loan accounts from a single entity, especially on terms that could extend for

ten years, let alone from the same entity that develops the new IT system.  In fact, procuring the

servicing component separately through multiple student loan servicers (as the Department has

done in recent years) has the added benefit of enabling a servicing environment that fosters

competition and rewards superior performance – and would be consistent with the mandates of

Congress in the FY 2018 and FY 2019 Appropriations Acts.

Indeed, by separately soliciting loan servicing work under the BPO solicitation, the

Department has already acknowledged that it does not actually need these two requirements –IT

system development/implementation and loan servicing – to be procured under the same

solicitation.  Relatedly, the record includes confirmation that the Department has no legitimate

need to combine its acquisitions of IT requirements together with the operational loan servicing

work (AR 23538-39 (Tab 61)), and the Department even recognized that procuring these aspects

separately provides substantive benefits in the form of offerors competing on clear terms and

being able to focus on their respective competencies (*id*.).  That same document notes that, in

commercial financial services firms, it is "common practice" that IT procurements are separate

from the operational loan servicing activities.  AR 23538.  In fact, it would seem from Tab 61

that the Department <u>intended</u> to segregate operational loan servicing work from the IT aspects of

the procurement, but inexplicably retained (1) several critical, manual loan servicing tasks in the

EPS and OPS solicitations, and (2) an unlimited discretion to expand those services.  The

Acquisition Plans and other documents in the record contain no support whatsoever for

consolidating these fundamentally different aspects of the work.  *See* AR Tabs 56, 60.

Accordingly, the Agency's decision to consolidate in a single contract all, or a substantial

portion of, servicing of the Department's entire portfolio of over 37 million student loan

accounts with the acquisition of a common loan servicing system in the EPS and OPS

solicitations is unreasonable and contrary to the CICA's requirements.

**X.      The NextGen Solicitations Fail to Specify the Agency's Needs in a Clear and
         Reasonable Manner**

The CICA requires contracting agencies to specify their needs and solicit proposals in a

manner designed to achieve full and open competition, and to clearly delineate all significant

factors and sub-factors that will be considered in the evaluation.  41 U.S.C. § 3306(a) and (b);

*see also* FAR 15.304(d) and 15.101-1(b).  Relatedly, FAR part 5 requires contracting agencies to

publicize contract actions in order to increase competition and to include in those publications a

"clear and concise description of the supplies or services that is not unnecessarily restrictive of

competition and will allow a prospective offeror to make an informed business judgment" on

whether to participate.  *See, e.g.*, FAR 5.002 and 5.207.

Here, the milestones, objectives and operating elements of the EPS, BPO and OPS

solicitations are ambiguous and overlapping.  As a result, offerors such as MOHELA and GSMR

are left to guess what the Department intends to actually procure under each solicitation.  For

example, in response to earlier briefing in this case regarding the ambiguous nature of the BPO

solicitation's requirements, Defendant cited a list of tasks included therein.  ECF No. 72, April

10, 2019, pp. 27-28.  The left-hand column in the below table includes the majority of tasks cited

by Defendant as included in the BPO solicitation.  As depicted in the right-hand column,

however, there are overlapping requirements included in the EPS and OPS solicitations for

nearly every one of those tasks.

| BPO Requirements *(as identified by Defendant at ECF No. 72, pp. 27-28)* | Conflicting Requirements *(all emphasis added)* |
|---|---|
| "[B]ack-office processing" | -- **OPS**:  "Eligibility back-office processing: Solution shall efficiently execute eligibility determination and support other **back-office, exception and manual activities**, as assigned by ED, **especially those that cannot be automated** within other relevant solutions."  (AR 23431 (Tab 59)) |
| "All repayment plan processing (e.g., income-driven repayment) across all loan types and statuses, including application and eligibility review, income checks and payment calculations, and annual recertification activities" | -- **EPS**:  "Solution shall execute student financing servicing functions, including, but not limited to…**Eligibility requirement assessment and annual recertification, and payment recalculation for income-driven plan**s tied to a customer's income, family situation, and other characteristics that may fluctuate…**Switching between repayment plans**." (AR 23362-63 (Tab 58))

-- **OPS**:  "Solution shall execute student financing servicing functions, including, but not limited to…**Eligibility requirement assessment and annual recertification, and payment recalculation for income-driven plans** tied to a customer's income, family situation, and other characteristics that may fluctuate…**Switching between repayment plans**." (AR 23441)

-- **OPS**:  "…Solution shall provide personnel to do **manual processing related to financial functions**, interface support, and error/dispute investigation and processing to be performed at the portfolio level." (AR 23442).

-- **OPS**:  "**Eligibility determination**: Solution shall receive completed applications, perform edits, execute matching, |

| | |
|---|---|
| | accurately calculate the Expected Family Contribution (EFC), and conduct verification selection." (AR 23433)<br><br>-- **OPS**: "**Eligibility back-office processing**: Solution shall efficiently execute eligibility determination and support other back-office, exception and **manual activities**, as assigned by ED, **especially those that cannot be automated** within other relevant solutions." (AR 23431) |
| "Processing associated with military service members, including requests for deferment and forbearance, Servicemembers Civil Relief Act benefits, and hostile pay benefits" | -- **EPS**: "Solution shall execute relevant functions for the full FSA student financing portfolio which includes, but is not limited to, varying…Customer segments (e.g., **military customers**) [AR 23362] … Solution shall execute student financing servicing functions, including, but not limited to…**Retroactive processing (e.g., retroactive application of deferments, forbearances, payments**) [AR 23362-63]."<br><br>-- **OPS**: "Solution shall provide relevant functions for the full lifecycle of student financing portfolio which includes, but is not limited to…Customer segments (e.g., **military customers**) [AR 23430] … Solution shall execute student financing servicing functions, including, but not limited to…**Retroactive processing (e.g., retroactive application of deferments, forbearances, payments**) [AR 23441]." |
| "Deferment and forbearance application processing" | -- **EPS**: "Solution shall execute student financing servicing functions, including, but not limited to…**Retroactive processing (e.g., retroactive application of deferments, forbearances, payments**)." (AR 23362-63)<br><br>-- **OPS**: "Solution shall execute student financing servicing functions, including, but not limited to…**Retroactive processing (e.g., retroactive application of deferments, forbearances, payments**)." (AR 23441). |
| "Loan consolidation origination applications and request processing" | -- **EPS**: "Solution shall execute student financing servicing functions, including, but not limited to…**Loan consolidation origination,** including application, pay off, booking new loans, maintaining account histories, performing all reconciliation and financial reporting, among other activities" (AR 23362-63).<br><br>-- **EPS**: "Solution shall perform financial and portfolio level functions, **including manual intervention if necessary. This** |

| | |
|---|---|
| | includes, but is not limited to …**Loan consolidation origination applications and request processing**" (AR 23363).<br><br>-- **OPS**: "Solution shall execute student financing servicing functions, including, but not limited to…**Loan consolidation origination,** including application, pay off, booking new loans, maintaining account histories, performing all reconciliation and financial reporting, among other activities" (AR 23441).<br><br>-- **OPS**: "Solution shall perform financial and portfolio level functions, including, but not limited to…**Loan consolidation origination applications and request processing**" (AR 23441). |
| "Provide technical help desk support to Schools for Origination and Disbursement Processing for the Direct Loans, Title IV Grant Programs…" | -- **EPS**: "Solution shall perform financial and portfolio level functions, **including manual intervention if necessary.** This includes, but is not limited to…**Interface support, including tracking Work in Process (WIP) and resolving rejected transactions from other FSA systems (e.g. NSLDS, FMS, origination system)**" (AR 23363).<br><br>-- **OPS**: "**Solution shall provide a Tier 2 Technical Support Help Desk to address technical issues with the solution or data generated by it**. Tier 1 support will be provided a separate contact center support solution, and Tier 2 is an escalation of calls from Tier 1." (AR 23431).<br><br>-- **OPS**: "…Solution shall provide personnel to do manual processing related to financial functions, **interface support**, and error/dispute investigation and processing to be performed at the portfolio level." (AR 23442). |
| "Conduct error and dispute resolution investigation and processing, including…Direct and indirect credit bureau disputes filed by customers or initiated by the credit bureaus…" | -- **EPS**: "Solution shall perform financial and portfolio level functions, **including manual intervention if necessary.** This includes, but is not limited to…**Credit bureau research resolution, including direct and indirect credit bureau disputes filed by customers or initiated by the credit bureaus**" (AR 23363).<br><br>-- **OPS**: "Solution shall perform financial and portfolio level functions, including, but not limited to… **Credit bureau research resolution, including direct and indirect credit** |

| | |
|---|---|
| | **bureau disputes filed by customers or initiated by the credit bureaus**" (AR 23441).<br><br>-- **OPS**: "…Solution shall provide personnel to do manual processing related to financial functions, interface support, and **error/dispute investigation and processing** to be performed at the portfolio level." (AR 23442). |
| "Conduct error and dispute resolution investigation and processing, including… Account maintenance, including manual correction of errors identified through data integrity scans and in response to FSA change requests" | -- **EPS**: "Solution shall conduct **error and dispute resolution** investigation and processing, including, but not limited to…**Account maintenance, including manual correction of errors identified through data integrity scans**; and… Payment processing, including researching lost or misapplied payments and payment reapplication at the request of customers or FSA." (AR 23363).<br><br>-- **OPS**: "Solution shall conduct **error and dispute resolution** investigation and processing, including, but not limited to … **Account maintenance, including manual correction of errors identified through data integrity scans**, and … Payment processing, including researching lost or misapplied payments and payment reapplication at the request of customers or FSA." (AR 23442). |

Notably, the foregoing is not an all-inclusive list of the overlapping requirements. Rather, it emphasizes that those tasks which Defendant has proclaimed are clearly the responsibility of the BPO awardees overlap with the other two solicitations. *See also* Complaint, ¶ 135 (comparing BPO solicitation requirements for "contact center support and back-office processing across the full life cycle of student financing" including the execution of "claims (e.g., discharge, forgiveness), credit disputes and reporting, and consolidation origination" (AR 20064 (Tab 53)) to the EPS solicitation requirements to provide a solution as well as personnel to perform manual intervention on, *inter alia*, payment processing, financial reporting, loan consolidation origination, credit bureau research resolution and disputes, etc. (AR 23362 (Tab 58)). Moreover, there are no pricing mechanisms under the EPS or OPS solicitations for these loan servicing tasks.

The overlapping requirements are of even greater concern in view of the acquisition timelines and lack of milestones for these procurements.  For instance, EPS is being fast-tracked to include beginning migration of customer accounts within six months of contract award and completing migration of all accounts within ten months of award.  AR 23369 (Tab 58).  On the other hand, the BPO and OPS solicitations do not even have proposal due dates set.  And neither the EPS solicitation nor the OPS solicitation contains milestones for onboarding the BPO awardees to their respective technical solutions.  If the BPO solicitation is intended to be the Department's solution for loan servicing work, then there is no rational basis for the BPO solicitation progressing on a separate and substantially delayed path from the EPS solicitation. The Court should require that the Department fulfill its statutory obligations by revamping the solicitations to ensure the BPO awardees – and only the BPO awardees – perform all loan servicing functions in the NextGen environment.

For all of these reasons, and in violation of the CICA and FAR parts 5 and 15, the Agency has failed to delineate its requirements and objectives for the NextGen solicitations in a manner that enables offerors to make intelligent business decisions about which aspects of the procurement to compete upon, and has otherwise drafted its requirements in a manner that is so ambiguous as to preclude a fair competition.

## XI.    The Court Should Enjoin the Department's Unlawful Procurements

Based on the foregoing, Plaintiffs have demonstrated success on the merits of this action. In deciding whether to grant injunctive relief, the Court must weigh three other factors:  (i) irreparable injury to Plaintiffs if Defendant is not enjoined; (ii) whether the harm to Plaintiffs outweighs the harm to Defendant; and (iii) whether the public interest is served by enjoining

Defendant.  *E.g., PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *MORI Associates, Inc. v. United States*, 102 Fed. Cl. 503 (2011).  Each factor is addressed below.

      A.    <u>Irreparable Injury</u>

When assessing irreparable injury, "[t]he relevant inquiry in weighting this factor is whether plaintiff has an adequate remedy in the absence of an injunction."  *Magellan Corp. v. United States,* 27 Fed. Cl. 446, 447 (1993); *FMS Investment Corp. v. United States*, 136 Fed. Cl. 439, 443 (2018).  "This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm."  *PGBA, LLC v. United States,* 57 Fed. Cl. 655, 664 (2003), citing *Overstreet Elec. Co. v. United States,* 47 Fed. Cl. 728, 744 (2000) and *Seattle Sec. Servs., Inc. v. United States,* 45 Fed. Cl. 560, 571 (2000).  It is "well-established that the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable harm."  *MORI Associates,* 102 Fed. Cl. at 552-53; *see also Contracting, Consulting, Engineering LLC v. United States*, 104 Fed. Cl. 334, 335 (2012).

Plaintiffs have been deprived of a fair opportunity to compete by virtue of the Department having designed these procurements in violation of appropriations laws, the Higher Education Act and the CICA.  Indeed, MOHELA and GSMR are key providers of the loan servicing work at issue under the current loan servicing program.  Absent injunctive relief, the Department will have set the stage to acquire all or a large majority of its loan servicing work together with the IT solutions procured under the EPS and/or OPS solicitations – thereby shutting Plaintiffs out of competition for this important and substantial business.  Moreover, because the Department is required to spread out its loan servicing work under multiple contract awards and based on performance metrics (*see* § VII.A, *supra*), there is no meaningful way to

measure the value of those competitive and business interests that will be lost unless the Court

issues an injunction.  Accordingly, it is vitally important that injunctive relief be granted.

B.    Balance Of Hardships

Under this factor, the Court must consider whether the balance of hardships leans in the

Plaintiffs' favor.  This requires a consideration of the harm to the Government.  In considering a

bid protest, the Court is also required to "give due regard to the interests of national defense and

national security."  28 U.S.C. § 1491(b)(3).  In Plaintiffs' view, injunctive relief does not present

any hardships to the Department.  MOHELA, GSMR and other student loan servicers are

currently performing this work in a highly satisfactory manner.  The Department will simply

continue obtaining the same services from MOHELA, GSMR and other similarly-situated

providers that it has obtained for many years.  Moreover, although the contracts of the TIVAS

entities expire in June 2019 and the contracts of the NFPs expire in September 2019, the

Department can either extend these contracts under their terms or execute bridge contracts with

all of them to ensure continued service.

On the other hand, Plaintiffs should not be deprived of the fair opportunity to compete,

and thus lose substantial business, on the basis of the Department's unlawful procurement

approaches.  There are no legitimate factors weighing against the injury to Plaintiffs.  A

balancing of hardships weighs strongly in favor of Plaintiffs.

C.    Public Interests

The public interest will be served by granting the requested injunctive relief.  "Clearly,

the public interest in honest, open, and fair competition in the procurement process is

compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  *PGBA,*

57 Fed. Cl. at 663; *see also Rotech Healthcare, Inc. v. United States,* 71 Fed. Cl. 393, 430

(2006). "The public interest is better served if offerors are given the fair treatment required by 48 C.F.R. § 1.602-2(b)," *MORI Associates,* 102 Fed. Cl. at 553, and the "public has a strong interest in insuring that public officials treat contractors fairly and generally obey procurement laws and regulations," *Rotech Healthcare,* 71 Fed. Cl. at 431. "There is an overriding public interest in preserving the integrity of the procurement process." *Advanced Systems Technology, Inc. v. United States,* 69 Fed. Cl. 474, 486 (2006). In the instant case, the public's interest likewise lies in preserving the integrity of the competitive process by ensuring that agencies follow appropriations laws and other longstanding procurement statutes and regulations when expending public funds.

## XII. Conclusion

For all of the foregoing reasons, and based on the record as a whole, Plaintiffs respectfully request that this Court issue (a) a judgment declaring that the NextGen solicitations are arbitrary and capricious, an abuse of discretion, and otherwise contrary to law and regulation; and (b) permanent injunctive relief prohibiting the Department from proceeding with the NextGen solicitations until it takes lawful and corrective measures to remedy the violations discussed herein. Alternatively, Plaintiffs request declaratory and permanent injunctive relief requiring the Department to cancel the NextGen solicitations and issue new solicitations that provide for multiple loan servicers in compliance with the applicable appropriations statute, provide for the "special consideration" required under the Higher Education Act, maximize competition under applicable law by affording MOHELA, GSMR and similarly-situated student loan servicers an opportunity to compete, and accurately reflect the Agency's needs. In addition, Plaintiffs request that this Court afford such other and further relief the Court may deem just and proper.

Respectfully submitted,

s/Scott F. Lane_____
Scott F. Lane
One US Bank Plaza
St. Louis, Missouri  63101-1693
(314 552-6535 (tel.)
(314) 552-7000 (fax)
slane@thompsoncoburn.com (e-mail)
Attorney of Record for Plaintiffs
*Higher Education Loan Authority of the State of Missouri*
  *and*
*Granite State Management and Resources*

Of Counsel:
Katherine S. Nucci
Jayna M. Rust
Thompson Coburn LLP
Dated:  June 3, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2019, a copy of the foregoing document was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/Scott F. Lane
Scott F. Lane