**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

REDACTED
VERSION

FMS INVESTMENT CORP., *et al.*,

             Plaintiff,

   v.

UNITED STATES

            Defendant.

No. 19-308C, 19-331C, 19-372C
(consolidated)

Judge Thomas C. Wheeler

█████████████

## PLAINTIFF CONTINENTAL SERVICE GROUP, INC.'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Todd J. Canni
Richard B. Oliver
Alexander B. Ginsberg
J. Matthew Carter
Aaron S. Ralph
Kevin R. Massoudi
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 488-7213
(213) 629-1033 (fax)

Attorneys for Consolidated Plaintiff
Continental Service Group, Inc.

████████████████████

## TABLE OF CONTENTS

Page

I.  SUMMARY ........................................................................................................ 1

   A.  ED's CONSOLIDATION OF DEFAULT RECOVERY SERVICES WITH LOAN
      SERVICING IS IMPROPER ............................................................................ 2

   B.  ED's NEW CANCELLATION DECISION SHOULD BE ENJOINED ........................ 5

II. ARGUMENT .................................................................................................... 7

   A.  THE BPO SOLICITATION IMPROPERLY CONSOLIDATES DEFAULT
      RECOVERY SERVICES WITH SEVERAL DISTINCT SERVICES IN VIOLATION
      OF CICA ................................................................................................ 7

      1.  ED's CONSOLIDATION OF SERVICES PREVENTS CONSERVE FROM COMPETING AND
         UNDULY RESTRICTS COMPETITION ........................................................ 7

      2.  ED HAS NOT DEMONSTRATED THAT CONSOLIDATION OF SERVICES INTO A SINGLE
         NEXTGEN SOLICITATION *IS NECESSARY* .................................................. 8

      3.  ADMINISTRATIVE CONVENIENCE DOES NOT JUSTIFY ED's IMPROPER
         CONSOLIDATION OF DEFAULT RECOVERY SERVICES .................................. 15

      4.  ED CONTINUES TO IGNORE THE FACT THAT ALLOWING TEAMING *DOES NOT*
         CURE THE SERIOUS DEFECT IN THE BPO SOLICITATION ........................... 16

      5.  ED's IMPROPER CONSOLIDATION OF DEFAULT RECOVERY SERVICES AND LOAN
         SERVICING HAS CREATED AN UNMITIGABLE ORGANIZATIONAL CONFLICT OF
         INTEREST FOR ANY WINNING TEAM ...................................................... 17

   B.  ED IMPROPERLY CANCELLED THE DEFAULT COLLECTION
      PROCUREMENT ...................................................................................... 18

      1.  ED RELIES ON THE IMPROPERLY CONSOLIDATED BPO SOLICITATION TO JUSTIFY
         THE CANCELLATION .............................................................................. 18

      2.  ED DOES NOT DENY THAT IT STILL HAS NOT CONDUCTED A LEGAL REVIEW OF
         THE NEXTGEN PROCUREMENT ............................................................... 18

      3.  THE NEW CANCELLATION DECISION IS PREMISED ON THE INCORRECT
         ASSUMPTION THAT THE SMALL BUSINESSES CAN HANDLE THE ENTIRE VOLUME
         OF ED's DEFAULT RECOVERY SERVICES ................................................. 19

III. THE INJUNCTIVE RELIEF FACTORS WEIGH IN FAVOR OF RELIEF ............... 26

   A.  CONSERVE HAS SUCCEEDED ON THE MERITS .............................................. 26

   B.  CONSERVE WILL SUSTAIN IRREPARABLE HARM ABSENT PERMANENT
      INJUNCTIVE RELIEF ............................................................................... 26

   C.  ED WILL SUSTAIN NO HARM AND THE BALANCE OF HARMS FAVORS
      CONSERVE ............................................................................................ 27

   D.  GRANTING INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST ....................... 28

IV. CONCLUSION AND REQUEST FOR RELIEF ................................................. 29

## Table of Authorities

<u>Cases</u>

*2B Brokers, et al.*,
  B-298561, Nov. 27, 2006, 2006 CPD ¶ 178 ......................................................................... 16

*Alion Sci. & Tech. Corp. v. United States*,
  74 Fed. Cl. 372 (2006) ......................................................................................................... 28

*Better Serv.*,
  B-265751, Jan. 18, 1996, 96-1 CPD ¶ 90 ............................................................................ 15

*Cincom Sys., Inc. v. United States*,
  37 Fed. Cl. 266 (1997) ......................................................................................................... 28

*EDP Enters., Inc.*,
  B-284533.6, May 19, 2003, 2003 CPD ¶ 93 ........................................................................ 16

*FMS Investment Corp.*,
  139 Fed. Cl. at 225 ................................................................................................ 5, 18, 20, 21

*Insight Sys. Corp. v. United States*,
  110 Fed. Cl. 564 (2013) ....................................................................................................... 27

*Nat'l Customer Eng'g*,
  B–251135, Mar. 11, 1993, 93–1 CPD ¶ 225 ....................................................................... 16

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ......................................................................................................... 4, 13

*Sheridan Corp. v. U.S.*,
  94 Fed. Cl. 663 (2010) ......................................................................................................... 29

*United States v. Fausto*,
  484 U.S. 439 (1988) ............................................................................................................. 14

*Univ. Research Co. v. United States*,
  65 Fed. Cl. 500 (2005) ......................................................................................................... 28

*Vantex Serv. Corp.*,
  B-290415, Aug. 8, 2002, 2002 CPD ¶ 131 .............................................................. 14, 15, 16

*Watt v. Alaska*,
  451 U.S. 259 (1981) ............................................................................................................. 14

### Statutes and Codes

United States Code
  Title 41, Section 253 ................................................................................................ 7

United States Code
  Title 41, Section 3301 .............................................................................................. 5

### Other Authorities

Consolidated Appropriations Act,
  2018, Pub. L. No. 115-141, Div. H, Title III, 132 Stat. 348 (2018) ……passim

James Bergeron, *Effective debt collection helps the student loan landscape*, The
  Hill (Mar. 20, 2019)………………………………………………...6, 22, 23

Colleen Campbell, *Education Department Proposes Major Changes to Student Aid,* Center for
  American Progress (Jan. 8, 2019) ……………………………………………………3, 12

Stephanie Eidelman, *ED Proposes Single Source Model for Massive Student Loan Servicing
  Contract*, insideARM (May 22, 2017) …………………………………………… 3, 11

Andrew Kreighbaum, *DeVos Shifts Course Again on Loan Servicing*, Inside Higher ED (August
  2, 2017) …………………………………………………………………………… 3, 12

**PLAINTIFF CONTINENTAL SERVICE GROUP, INC.'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiff Continental Service Group, Inc. ("ConServe") respectfully submits this Reply in support of its Motion and Memorandum of Points and Authorities in Support of its Motion for Judgment on the Administrative Record ("MJAR").

I.   **SUMMARY**

> ***This, once again, seems like a monumental mess to the Court***, and I'm just not -- I have to tell you, ***I'm not impressed with the procurement capability*** of the Department of Education, and it seems to me ***we're going to end up a lot like we have in the past***.

*See* Transcript of Hearing on March 21, 2019 at 41 (emphases added).

The Court's genuine and candid remarks echo, in part, the frustration ConServe has with the U.S. Department of Education, Federal Student Aid ("ED") and this procurement saga that has now persisted for three long years. While the Court questioned ED's capabilities viewing the violations, then to date, as indicia of an unsophisticated agency, ED's conduct – when viewed cumulatively to date – no longer warrants such an innocent label. ED should no longer be afforded credibility, and its representations should all be scrutinized because the record shows that ED has acted deliberately to mislead protesters and this Court to avoid complying with procurement law.

While most of the original Private Collection Agencies ("PCA") protesters seemingly have abandoned hope and their protests, ConServe is committed to restoring integrity to the procurement process, exposing ED's egregious behavior, and to ensuring that it is afforded a fair opportunity to compete. ConServe requests that the Court enjoin this procurement from proceeding on this illegal course.

ED's most recent display of disingenuous and misleading behavior is documented in its latest filing.  Rather than recognize the procurement violations and take corrective actions, ED approaches the danger presented by ConServe's arguments much like an ostrich, wholly ignoring the matter hoping they will go away, or alternatively, advancing disingenuous positions.

A.     **ED's Consolidation of Default Recovery Services with Loan Servicing is Improper**

After being unable to articulate a cogent reason for the improper consolidation of default recovery services despite being afforded three separate hearings and its Opposition to the Plaintiffs' motions for a preliminary injunction, suddenly, ***ED now has concocted a post-hoc justification*** – a desperate attempt to avoid the inevitable – ***and claims that Congress is responsible***.  Indeed, ED disingenuously manipulates the text of the March 2018 Consolidated Appropriations Act (the "Appropriations Act") to assert that the consolidation is a necessary response to a "Congressional directive."  Response at 18 ("Congress has specifically directed FSA to combine loan servicing activities under the Next Gen procurement").  The plain text of the Appropriations Act illustrates that it is focused on loan servicing, not default recovery, which is not mentioned at all, and ensuring that ED makes awards to multiple servicers.

First, if ED actually believed that the Appropriations Act – which was issued in ***March 2018*** – "specifically directed" it to consolidate default recovery services, that would have been the justification proffered in the ***March 2019*** New Cancellation Decision.  Response at 18.  Yet, this alleged justification appears ***nowhere in that decision***.  Rather ED justifies the cancellation based on the "maturation of the Next Gen FSA vision."  AR 2 at 2.

Second, ED admits that the Appropriations Act ***does not*** specifically address default recovery services.  Response at 18-19 (stating that "Congress intended FSA to make awards to

servicers who were able to manage student loans for 'the full life-cycle of loans from disbursement to pay-off,' ***which necessarily includes collection activities***") (emphasis added). Indeed, these terms appear nowhere in the Appropriations Act.

Third, the plain text of the Appropriations Act illustrates that it is focused on the servicing of loans, which is evidenced by fact it refers to "servicing" multiple times, never mentions default recovery, and directs ED to use "multiple" student loan servicers, ***which PCAs have never been called***.  ED knows that loan servicing and default recovery work are distinct service offerings.  ED undoubtedly understands that the law is focused on directing ED to make awards to multiple servicers – ***as opposed to a "single servicer model"*** – which is what prompted the "directive" in response to a proposal developed by Secretary Betsy DeVos.  ***That is the directive***.  To contend otherwise is disingenuous.  *See* Ex. 1, Stephanie Eidelman, *ED Proposes Single Source Model for Massive Student Loan Servicing Contract*, insideARM (5/22/17), *available at* https://www.insidearm.com/news/00042929-ed-proposes-single-source-model-massive-s/ ("On Friday the U.S. Department of Education Secretary Betsy DeVos used a Wall Street Journal OpEd to announce her new plan for the massive student loan servicing contract – including her ***intention to move to a single-servicer model***.") (emphasis added); *see also* Ex. 2, Andrew Kreighbaum, *DeVos Shifts Course Again on Loan Servicing,* Inside Higher ED (8/2/17), *available at* https://www.insidehighered.com/news/2017/08/02/department-education-scraps-single-servicer-plan-keeps-one-portal-borrowers ("***DeVos has taken heat*** since May from members of Congress and representatives from the loan-servicing sector ***over the plan to pick a single servicer*** that would hire subcontractors to collect loan payments") (emphases added); Ex. 3, Colleen Campbell, *Education Department Proposes Major Changes to Student Aid,* Center for American Progress (1/8/19) ("This past spring, FSA amended that plan, reducing

protections for students and proposing to award the contract to a single company. *After facing bipartisan opposition from Congress, FSA scrapped the contract and announced its plans to start anew*.") (emphases added).

Fourth, despite the "directive", ED has signaled that it still intends to press forward with the single-servicer model. While the Appropriations Act clearly directs ED to use "*multiple student loan servicers*," ED indicates that it only plans to utilize "*a single servicer* to manage its unique loan portfolio." Response at 24 (emphasis added). Clearly, Congress' concerns were justified when it felt compelled to direct ED not to proceed with a single-servicer model even after ED suggested that it would scrap the single-servicer model proposal.

Fifth, the Appropriations Act *does not* require ED to consolidate loan servicing and default recovery services under a single solicitation. Given that ED already has issued three separate solicitations under NextGen, there is no reason why ED cannot procure default recovery services under a fourth NextGen solicitation and integrate that work into its overall NextGen platform.

Sixth, ED appears to be operating under the mistaken belief that the Appropriations Act provides an exception to the Competition in Contracting Act ("CICA"). Indeed, ED even appears to take the remarkable position that the Court cannot sustain this protest because doing so "would effectively thwart Congress's mandate to ED." Response at 34. The plain terms of the Appropriations Act do not create an exception to CICA that permits ED to restrict full and open competition for the NextGen procurement, and the Court therefore should not read such an exception into the Act. *See, e.g., Rodriguez v. United States*, 480 U.S. 522, 524 (1987) ("*[R]epeals by implication are not favored*, . . . and will not be found unless an intent to repeal is clear and manifest.") (emphases added and citations omitted).

Seventh, ED has not shown that the consolidation of services into a single solicitation *is necessary* to achieve the agency's needs, which is fatal to ED's litigation position.  ED knows that the consolidation of default recovery services with other services improperly restrains competition in violation of CICA, and that no single company can provide *all* of the required services.  *See* 41 U.S.C. § 3301.  Indeed, this is why the BPO Solicitation invites offerors to form teaming agreements, which cannot be exclusive.  With its *post-hoc* justification thoroughly discredited, ED has no legitimate justification for the consolidation.

### B.   ED's New Cancellation Decision Should Be Enjoined

ED appears to have wholly ignored the Court's injunction, dated September 14, 2018, of its improper cancellation of the Default Collection Procurement and continued on as though it was never enjoined.  Indeed, in ED's response, it catalogs the activities it was engaged in post-cancellation and all are consistent with ED continuing to move forward with the implementation of the cancellation.  *See* Response at 14-15.  Additionally, like the original decision, the analysis in the New Cancellation Decision (AR 1-13) is severely flawed.

First, the New Cancellation Decision is based on the flawed premise that ED can consolidate default recovery services with other services, which violates CICA.

Second, when this Court found ED's original cancellation of the Default Collection Procurement unlawful, the Court noted that NextGen "still needs to be reviewed for compliance with applicable laws and regulations."  *FMS Investment Corp.,* 139 Fed. Cl. At 225.  ED admits that it still has not obtained the legal review requested by this Court.  See RFP No. 91003119R0005, Amend. 4 Q&A No. 62 (stating FSA is "continuing to analyze the impact of applicable laws and legal developments on the unique NextGen structure") (emphasis added).  Indeed, ED admits organizational conflicts of interest ("OCI") exist, which have not been

addressed.  *See* Response at 29 (stating that "[t]he pricing structure, and other terms of the contract, for the various services to be provided under the contract ***will be designed*** to . . . ***mitigate any conflict of interest***") (emphases added).

Third, the record plainly shows that ***the small business PCAs cannot handle the future volume on their own without subcontracting***, and the future volume appears to be increasing substantially and well ahead of ED's initial estimates.  *See* AR 2789; *see also* AR 10.  In fact, ED misinterpreted the small businesses' capacity responses as several said that ***they cannot handle the volume on their own***, but rather will require subcontracting.  ED disingenuously interpreted these e-mails as affirmative representations that they can handle the volume.  It is unreasonable for ED to justify cancelling the Default Collection Procurement on the basis of not needing the large PCAs when the small businesses represent that they need the large PCAs.

ED does not even attempt to refute the available data proffered by ConServe that shows that defaults are increasing, and that the small business PCAs' recovery rate is far lower than when the large business PCAs were handling the majority of account transfers.  Indeed, this data shows that ED is "leaving billions of dollars in lost recoveries on the table each year" purely because it does not wish to do business with the large PCAs.  James Bergeron, *Effective debt collection helps the student loan landscape*, The Hill (3/20/19), *available at* https://thehill.com/opinion/education/434358-effective-debt-collection-helps-the-student-loan-landscape.

In sum, when taken together, the improper consolidation and the improper cancellation will unreasonably shut out ConServe from ***any*** ED competition for default recovery services for the next five to 10 years.  For the reasons explained herein, injunctive relief is necessary.

## II.    ARGUMENT

### A.    THE BPO SOLICITATION IMPROPERLY CONSOLIDATES DEFAULT RECOVERY SERVICES WITH SEVERAL DISTINCT SERVICES IN VIOLATION OF CICA

#### 1.    ED'S CONSOLIDATION OF SERVICES PREVENTS CONSERVE FROM COMPETING AND UNDULY RESTRICTS COMPETITION

ConServe seeks *merely the opportunity to compete* to furnish ED with default recovery services and currently that is not possible unless ConServe finds suitable teaming partners, which it has been unable to do so.  *Id.* at ¶ 39 ("ConServe has spent a significant amount of time trying to find a suitable teaming partner so that it can compete.  But to date, those efforts have been unsuccessful.").  If ED were promptly to issue a separate RFP procuring default recovery services and to proceed expeditiously, ConServe's concerns would be resolved.

Importantly, ED now has abandoned its position that the principles underlying the GAO's anti-bundling cases do not apply to "consolidation" cases like this involving large businesses such as ConServe.  *See* Opposition to Plaintiffs' Motions for a Preliminary Injunction at 31-32; *see* ConServe's MJAR at 13-14.  ED instead simply argues that "plaintiffs have failed to establish how such consolidation unduly restricts competition."  Response at 25 ("Plaintiffs operate call centers, and they have not sufficiently demonstrated that their businesses are incapable of meeting these requirements;" "it does not appear that the skills required to provide traditional default collection services are of such a different nature that plaintiffs could not leverage their experience and meet the requirements of this new servicing environment").

ConServe's Complaint and MJAR establish that ED's improper consolidation of services unduly restricts competition in this case.  *See* Complaint at ¶¶ 47-57; MJAR at 11-21.  ED appears to believe that ConServe is in the business of protesting and, despite being able to provide the host of services required by the BPO Solicitation, has elected to protest instead.  But

this is simply not the case. ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████



ED is attempting to consolidate several services that have historically been procured separately, which has unnecessarily restricted competition to those offerors that can provide ***all*** of these discrete services.  As a result, a highly rated PCA like ConServe cannot compete.

2. **ED HAS NOT DEMONSTRATED THAT CONSOLIDATION OF SERVICES INTO A SINGLE NEXTGEN SOLICITATION *IS NECESSARY***

In a last-ditch effort, ED finally has concocted a *post-hoc* justification for why the consolidation of services into a single NextGen solicitation is necessary.  ED disingenuously asserts that the consolidation of distinct services in this case is a necessary response to a "Congressional directive."  Response at 18 ("Congress has specifically directed FSA to combine loan servicing activities under the Next Gen procurement").  ED points to the following excerpt from the Appropriations Act, which was issued on March 23, 2018:

███████████████████████████████████████████████

> . . . That *in order to promote accountability and high-quality
> service to borrowers*, the Secretary shall not award funding for any
> contract solicitation for a new Federal student loan servicing
> environment, including the solicitation for the FSA Next
> Generation Processing and Servicing Environment as amended by
> the Department of Education on February 20, 2018, unless such an
> environment provides for the participation of multiple student loan
> servicers that contract directly with the Department of Education *to
> manage a unique portfolio of borrower accounts and the full life-
> cycle of loans from disbursement to pay-off* with certain limited
> exceptions . . .

*Id.* (quoting Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, Div. H, Title III, 132

Stat. 348, 746-47 (2018) (emphasis added by ED)).

> a.    **ED'S RELIANCE ON THE APPROPRIATIONS ACT IS BELIED BY THE
>       NEW CANCELLATION DECISION**

ED's disingenuous and misplaced reliance on the Appropriations Act is confirmed by the

plain terms of the New Cancellation Decision.  Indeed, if ED actually believed that the

Appropriations Act – which was issued in *March 2018* – "specifically directed" it to consolidate

default recovery services under NextGen, that would have been the justification proffered in the

*March 2019* New Cancellation Decision.  Response at 18.  Yet, this alleged justification for the

consolidation of services appears *nowhere in that decision*.  Rather, ED justifies the New

Cancelation as follows:

> On March 6, 2019, after due consideration and based on the
> updated Administrative Record provided herein, FSA is cancelling
> Solicitation No. ED-FSA-16-R-0009. As discussed and
> documented below, *FSA's decision to cancel is based upon*
> maturation of the Next Gen FSA vision, the development and
> implementation of specific procurement activities to realize this
> vision with accompanying timelines and resource plans, and a
> determination that existing PCAs under contract through 2024
> have sufficient capacity to provide effective debt collection
> services during the transition period from now until full
> implementation of Next Gen FSA, which under current timelines is
> expected to be completed by the end of 2020. As a result of all of

> these factors, which have fundamentally changed our
> requirements, FSA management believes that Solicitation No. ED-
> FSA-16-R-0009 is no longer necessary and should be cancelled.

AR 2 (emphasis added).  In short, ED's proffered justification for consolidation is at odds with

the rationale set forth in the New Cancellation Decision and must therefore be rejected.

> **b.**   **THE PLAIN TEXT OF THE APPROPRIATIONS ACT *DOES NOT SUPPORT* ED'S LITIGATION POSITION**

First, by its plain terms, the Appropriations Act ***does not*** address default recovery

services.  Indeed, these terms appear nowhere in the Appropriations Act.  This fact completely

undermines ED's claim that the Appropriations Act "specifically directed" ED to consolidate

debt collection or default recovery services under NextGen.

Second, ED admits that the Act does not reference default recovery services, and

attempts to address such proactively by stating that "Congress intended FSA to make awards to

servicers who were able to manage student loans for 'the full life-cycle of loans from

disbursement to pay-off,' ***which necessarily includes collection activities***."  Response at 18-19

(emphasis added).  In other words, ED is reading into the Act language that does not appear.  ED

attempts to minimize the impact of this admission by stating that:

> ***Plaintiffs do not define "life-cycle" otherwise***. Thus, FSA's
> inclusion of debt collection activities within Next Gen's BPO
> solicitation loan servicing requirements was reasonable.

*Id.* at 19.  But ED's attempt to shift the burden to the Plaintiffs is again a disingenuous attempt to

conceal the frailties of its position.

The plain text of the Appropriations Act does not reference default recovery services and

ED knows that there has always been a distinction between loan servicing and default recovery,

which have been procured separately.  *See* Declaration of William Leith, *Continental Serv. Grp.,*

*Inc. v. United States*, No. 17-449 *et al.*, Dkt. No. 183-2 at ¶ 7 (stating that "***these two functions [loan servicing versus default collection], are substantively different and take place at different stages in the life of a loan***. FSA acquires these two types of services using distinct and separate solicitations and contracts. Loan servicer contractors are assigned work from a pool of accounts distinct and separate from the pool of accounts the PCAs service.") (emphasis added); *see also id.* at ¶ 6 ("***The work of the loan servicers is separate and distinct from the debt collection work*** that the PCAs perform under their respective default collection services contracts.") (emphasis added). As such, ED's reliance on the Appropriations Act is misplaced and does not support its litigation position.[1]

Third, the plain text of the Appropriations Act illustrates that it is focused solely on servicing of loans, which is evidenced by fact it refers to "servicing" multiple times, and directs ED to use "multiple" student loan servicers, ***which PCAs have never been called***. The law is focused on directing ED to make awards to multiple servicers – ***as opposed a "single servicer model."*** Indeed, as chronicled in several news articles, the "directive" is in response to a single servicer proposal announced by Secretary Betsy DeVos which was criticized by members of Congress and the loan-servicing sector:

> insideARM, *ED Proposes Single Source Model for Massive Student Loan Servicing Contract* (5/22/17) (*see* Ex. 1)
>
> "***On Friday the U.S. Department of Education Secretary Betsy DeVos used a Wall Street Journal OpEd to announce her new plan for the massive student loan servicing contract – including her intention to move to a single-servicer model.*** The Department

---

[1] Moreover, *assuming arguendo* that Congress – despite not using the words default recovery services – nonetheless meant to include them, default recovery services would fit within the "certain limited exceptions" provision of the Act given that default recovery services work performed by PCAs historically has been procured separately and compensated with different funding sources than loan servicing work performed by servicers.

currently has four primary servicers: Navient, NelNet, Great Lakes Educational Loan Services, and FedLoan Servicing.")

Inside Higher ED, *DeVos Shifts Course Again on Loan Servicing* (8/2/17) (*see* Ex. 2)

***DeVos has taken heat since May from members of Congress and representatives from the loan-servicing sector over the plan to pick a single servicer that would hire subcontractors to collect loan payments***. Department officials at the time argued that the plan would make oversight of servicers by the government more efficient.  But the proposal found critics among both Republicans like Senator Roy Blunt of Missouri, who argued that the system would remove choice and competition, and Democrats like Massachusetts Senator Elizabeth Warren, who warned against creating a federal contractor "too big to fail."  ***Blunt and Warren were part of a bipartisan group of senators who introduced legislation ahead of the department's announcement Tuesday to block the single-servicer plan***. Their bill would instead require the participation of multiple loan servicers.

Center for American Progress, *Education Department Proposes Major Changes to Student Aid* (1/8/19) (see Ex. 3)

In 2016, the Obama administration sketched out its plans for a new, student-centered servicing system. This past spring, FSA amended that plan, reducing protections for students and ***proposing to award the contract to a single company. After facing bipartisan opposition from Congress, FSA scrapped the contract and announced its plans to start anew***.

***But FSA's latest vision for the student loan servicing system looks a lot like the one drafted by the Obama administration***. For example, FSA's proposal also includes a single platform from which all student-loan borrowers would manage their loans.

(Emphases added).

c.   **DESPITE THE DIRECTIVE, ED HAS SIGNALED THAT IT STILL INTENDS TO PRESS FORWARD WITH A SINGLE-SERVICER MODEL**

While the Appropriations Act clearly directs ED to utilize multiple loan servicers, ED indicates that it only plans to utilize a single servicer:

> The agency has determined that its minimum need to meet its mission is a loan servicing environment that allows *a single servicer* to manage its unique loan portfolio from loan disbursement to payoff, *without having* student borrowers being bounced around to *several servicers* for a single loan.

Response at 24 (emphasis added).  Clearly, Congress' concerns were justified when it felt compelled in March 2018 to direct ED not to proceed with a single-servicer model.

### d.    THE APPROPRIATIONS ACT *DOES NOT* REQUIRE THE CONSOLIDATION OF SERVICES UNDER A SINGLE NEXTGEN SOLICITATION

Nothing in this Appropriations Act precludes ED from issuing multiple solicitations, including a separate solicitation for default recovery services.  Given that ED has already issued three separate solicitations under NextGen, there is no reason why ED cannot procure default recovery services under a fourth NextGen solicitation.  ED's failure to consider this option is particularly unreasonable in light of the fact that consolidation under a single solicitation will result in the unnecessary exclusion of the most qualified and highly rated PCAs.

### e.    ED IS OPERATING UNDER THE MISTAKEN BELIEF THAT THE APPROPRIATIONS ACT PROVIDES AN EXCEPTION TO CICA

ED appears to believe that the Appropriations Act gives it a free pass to ignore CICA. Indeed, ED even appears to take the remarkable position that the Court cannot sustain this protest because doing so "would effectively thwart Congress's mandate to ED."  Response at 34; *id*. at 18 (stating that "in order to sustain plaintiffs' protest on this ground, the Court would have to disregard the express mandate to ED from Congress").  The plain terms of the Appropriations Act do not create an exception to CICA that permits ED to restrict full and open competition for the NextGen procurement and the Court therefore should not read such an exception into the Act. *See, e.g., Rodriguez v. United States*, 480 U.S. 522, 524 (1987) ("*[R]epeals by implication are*

13

*not favored*, . . . and will not be found unless an intent to repeal is clear and

manifest.") (emphases added and citations omitted); *United States v. Fausto*, 484 U.S. 439, 453

(1988) ("[It] can be strongly presumed that Congress will specifically address language on the

statute books that it wishes to change."); *Watt v. Alaska*, 451 U.S. 259, 267 (1981) (holding that

a court "must read [two allegedly conflicting] statutes to give effect to each if [it] can do so while

preserving their sense and purpose.").

### f.   ED STILL HAS NOT SHOWN THAT CONSOLIDATION OF SERVICES *IS NECESSARY* TO SATISFY THE AGENCY'S NEEDS

ED has not demonstrated that the consolidation of services into a single NextGen

solicitation is necessary to achieve ED's stated goal of "implementing a single data management

and servicing platform so that borrower information and account history is centrally housed and

available to use during each borrower interaction."  Response at 17.  Indeed, regardless of

whether the services are consolidated into a single NextGen solicitation or default recovery

services are procured via a separate NextGen solicitation, ED can accomplish its vision.[2]  ED

has not shown that consolidation of services into a single solicitation *is necessary* to achieve the

agency's needs.  This shortcoming is fatal to ED's litigation position.  *See* 41 U.S.C. §

3306(a)(2)(B) (stating that procuring agencies may include restrictive requirements in a

solicitation only to the extent they are necessary to satisfy the agency's minimum needs); *Vantex*

*Serv. Corp.*, B-290415, Aug. 8, 2002, 2002 CPD ¶ 131 (stating that CICA "generally requires

that solicitations include specifications which permit full and open competition and contain

---

[2]  In either case, "borrowers can log into one website, a single portal hosted by ED, to get information about their Federal student loan(s), make payments, apply for benefits, and manage their account — regardless of loan status, eliminating the need for borrowers to know the name of an individual servicer."  Response at 17.  Under either scenario, "multiple vendors will utilize the same portal to access borrower account information and to provide seamless access to borrower information and consistent loan servicing communication to borrowers."  *Id.*

restrictive provisions and conditions only to the extent necessary to satisfy the needs of the agency").

### 3.   ADMINISTRATIVE CONVENIENCE DOES NOT JUSTIFY ED'S IMPROPER CONSOLIDATION OF DEFAULT RECOVERY SERVICES

With its new *post-hoc* rationale for consolidation thoroughly discredited, at best, ED appears to have consolidated services purely because ED prefers to do so or it is more convenient to do so.  However, the GAO has held that administrative convenience ***does not*** justify an agency's consolidation of disparate requirements and, in turn, violates CICA's "full and open competition" mandate:

> The agency's justification, quoted above, essentially amounts to reliance on administrative convenience as the basis for the bundling. However, ***the fact that the agency may find that combining the requirements is more convenient administratively,*** in that it has found dealing with one contract and contractor less burdensome, ***is not a legal basis to justify combining the requirements, if the combining of requirements restricts competition***.

*Vantex Serv. Corp.*, B–290415, Aug. 8, 2002, 2002 CPD ¶ 131 at 4 (emphases added).

GAO also has explained that "***CICA and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition***, whenever concerns of economy or efficiency are being weighed against ensuring full and open competition."  *Id.* (emphasis added)*; see also Better Serv.*, B-265751, Jan. 18, 1996, 96-1 CPD ¶ 90 ("When concerns of administrative convenience are being weighed against ensuring full and open competition, [CICA]. . . and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition."); ConServe MJAR at 13 (citing additional case law support).

In short, while ED has not proffered administrative convenience as its rationale, to the extent it attempts to do so now during the upcoming hearing, it is far too late, and, moreover, administrative convenience, alone, is not a sufficient legal basis to justify the consolidation.

### 4.   ED CONTINUES TO IGNORE THE FACT THAT ALLOWING TEAMING *DOES NOT* CURE THE SERIOUS DEFECT IN THE BPO SOLICITATION

ED does not address the fact that the GAO has found unpersuasive an agency's position that offerors can team to meet the solicitation requirements.  GAO has held that "[t]he fact that the agency expects to receive some competition under the RFP does not relieve an agency of the burden under CICA of justifying restrictions to full and open competition." *2B Brokers, et al.*, B-298561, Nov. 27, 2006, 2006 CPD ¶ 178 at 10; *see also Nat'l Customer Eng'g*, B–251135, Mar. 11, 1993, 93–1 CPD ¶ 225 at 6.  "The issue is not whether there are any potential offerors which can surmount barriers to competition by, for example, entering into teaming or partnering arrangements as argued by the agency, but rather ***whether the barriers themselves--here, bundling--are required to meet the government's needs***."  *EDP Enters., Inc.*, B-284533.6, May 19, 2003, 2003 CPD ¶ 93 (emphasis added); *see also Vantex Serv. Corp.*, *supra*, at 5; *Nat'l Customer Eng'g*, *supra*, at 5.  ED has unreasonably restricted competition to those offerors that can provide *all* of these discrete services, and the mere opportunity to team with others does not justify the unnecessary barriers to competition.  As a result, a highly rated PCA like ConServe cannot compete unless it can identify and team with other highly qualified firms.



16



In short, ED's consolidation of services and its new teaming requirement are unreasonable and unnecessarily restrict competition in violation of CICA.

**5.     ED's IMPROPER CONSOLIDATION OF DEFAULT RECOVERY SERVICES AND LOAN SERVICING HAS CREATED AN UNMITIGABLE ORGANIZATIONAL CONFLICT OF INTEREST FOR ANY WINNING TEAM**

ED fails to meaningfully address ConServe's protest that the improper consolidation of several services has created an unmitigable OCI for any winning team. Instead, ED simply explains that it addressed the OCI issue during the Q&A session with offerors in response to the following question: "how does FSA intend to avoid the conflict of interest between loan servicing and debt collection servicers?" Response at 29. ED explains that it told the offerors that: "The pricing structure, and other terms of the contract, for the various services to be provided under the contract *will be designed* to avoid any potential that a contractor performing loan servicing would benefit by having loans go into default. ***This would mitigate any conflict of interest***." *Id.* (emphases added). ED ***admits that a conflict of interest exists*** and its response is that it intends to address it by making changes in the future. This is not adequate to address an OCI and shows that ED has not obtained a legal review.

**B.      ED IMPROPERLY CANCELLED THE DEFAULT COLLECTION PROCUREMENT**

The New Cancellation Decision suffers from similar flaws that led this Court to find ED's original cancellation of the Default Collection Procurement unlawful.

**1.      ED RELIES ON THE IMPROPERLY CONSOLIDATED BPO SOLICITATION TO JUSTIFY THE CANCELLATION**

Fatal to the New Cancellation Decision is the fact that it is based on the flawed premise that ED can legally consolidate default recovery services under the BPO Solicitation, which as noted above, ED cannot so do because such violates the CICA by restraining competition. *See supra* at Section II(A). Indeed, ***nowhere in the New Cancellation Decision*** does ED explain why consolidating these discrete services is necessary to meet the agency's needs or why these services cannot be procured separately under NextGen. Thus, because the New Cancellation Decision rests on the flawed foundation of the BPO Solicitation, it, again, must be enjoined.

**2.      ED DOES NOT DENY THAT IT STILL HAS NOT CONDUCTED A LEGAL REVIEW OF THE NEXTGEN PROCUREMENT**

ED does not address, let alone dispute, ConServe's assertion that, despite having been put on clear notice by this Court that it must conduct a comprehensive legal review of NextGen ***before*** cancelling the Default Collection Procurement, ED consciously elected not to obtain the legal review and confirmation of compliance requested by this Court before cancelling the procurement. *See FMS Investment Corp.*, 139 Fed. Cl. at 225 (finding the original cancellation decision unlawful because, among other things, NextGen "***still needs to be reviewed for compliance with applicable laws and regulations***") (emphasis added); *see also* RFP No. 91003119R0005, Amend. 4 Q&A No. 62 (stating FSA is "***continuing to analyze*** the impact of applicable laws and legal developments on the unique NextGen structure") (emphasis added). ED's silence on this critical issue is deafening. Moreover, in its Opposition, ED admits that it

still has not resolved open conflict of interests issues inherent in NextGen (*see* Response at 29) and that it still intends to proceed with a single-servicer model in violation of the Appropriations Act. *See id.* at 24 (stating that "[t]he agency has determined that its minimum need to meet its mission is a loan servicing environment that allows a single servicer to manage its unique loan portfolio from loan disbursement to payoff"). Indeed, the fact ED chose not to obtain a legal review before proceeding forward with the cancellation demonstrates that ED genuinely does not care if its actions comport with law and is merely paying this Court's injunction "lip service." ED cannot proceed forward with cancelling the Default Collection Procurement without determining the legal viability of the BPO Solicitation.

3. **THE NEW CANCELLATION DECISION IS PREMISED ON THE INCORRECT ASSUMPTION THAT THE SMALL BUSINESSES CAN HANDLE THE ENTIRE VOLUME OF ED'S DEFAULT RECOVERY SERVICES**

a. **ED'S CLAIM THAT SMALL BUSINESS PCAS HAVE CAPACITY TO HANDLE VOLUME IS UNSUPPORTED BY THE RECORD**

ED does not dispute that the core "foundation" for its belief that the small business PCAs have the capacity to handle the entire volume of ED's default recovery services is ***their self-serving statements that they do***. Response at 9. Instead, ED states that "it was rational for FSA to ask for and rely in part upon the small business PCAs own estimation of how many new accounts they could handle." *Id*. ConServe does not allege that it was irrational for ED ***to inquire with the small businesses***, but ConServe is protesting the fact that ED's simple e-mail exchanges with the small business PCAs ***form the foundation*** for ED's claim that they have the capacity to handle the additional volume.

First, the small businesses are biased in favor of receiving more accounts, so their representations as to what they can handle should be taken with a grain of salt. In short, while

ED is essentially asking this Court to simply "take the small business PCAs word for it," we think this Court had something different in mind when it instructed ED to provide support for its position that ***the large business PCAs were no longer needed because the small business PCAs can handle the additional volume***. *See FMS Investment Corp*., 139 Fed. Cl. at 225 ("Nor does the AR include any information regarding the small business' future loan processing capacity.").

ED states that it also considered its "experience with the Small Business PCAs' successful expansion from award in 2014 to managing roughly 80 percent of a growing portfolio." Response at 8. ED concludes that it was "entirely rational for FSA to rely on those years of experience, which tellingly included an increase in account assignments, without a material diminution in performance." *Id.* at 8-9. But this argument is based on the flawed premise that the small business PCAs have had a "successful expansion . . . without a material diminution in performance." The record actually shows that the small business PCAs have had a material diminution in performance that has caused ED to recover billions of dollars less than it would have if it transferred accounts to the ATEs.

Finally, ED tellingly does not offer a single word in defense of its failure to produce an accurate estimate of the agency's future defaulted loan volumes. As set forth in ConServe's MJAR, ED stated in its New Cancellation Decision dated March 6, 2019 that its position regarding the small business PCAs' capacity was based upon its understanding that "***student loan borrowers in default will grow*** from 7.6 million in December 2018 ***to roughly 11.5 million in December 2024***." AR Tab 1 at 9 (emphasis added). Yet, on March 27, 2019, less than three weeks after the New Cancellation Decision was issued – and more than five years earlier than projected –, ED informed NextGen offerors during the Q&A session that ***ED already has 11.6 borrowers in default***. *See* RFP No. 910031119R0007, Amend. 2 at Q&A No. 72. This

illustrates that ED's forecasts and projections are superficial and half-baked at best or evidence efforts by ED to mislead and understate default volumes to fit ED's narrative.  In short, the New Cancellation Decision failed to produce accurate or "thorough estimates of current and future defaulted loan volumes," which was a specific defect identified by the Court in its September 2018 Order.  *FMS Investment Corp.*, 139 Fed. Cl. at 225.

> i.     **THE SMALL BUSINESSES TOLD ED THEY CANNOT HANDLE THE VOLUME ON THEIR OWN**

ED disingenuously misinterpreted the small businesses' capacity responses as several expressly said that they cannot handle the volume on their own, but rather will require subcontracting to other businesses, including to large PCAs.  Instead, ED deliberately misinterpreted these e-mails as affirmative representations that they can handle the volume.  It is unreasonable for ED to justify cancelling the Default Collection Procurement on the basis of not needing the large PCAs when ED relies solely on the small businesses who expressly say but we need the large PCAs.

In response,  ED claims that "the ability of any PCA (whether a small business or a large business) to take on new accounts depends on the staffing levels available" and their ability "to quickly ramp up capacity either through direct hiring or by entering into subcontracting arrangements with other vendors."  Response at 9 (internal quotations omitted).  The fact is that the smalls, and in turn ED, have needed the large PCAs to handle the past volume of defaults, let alone the increased volume expected in the future, which undermines directly ED's representation to the contrary.  Undermining the rationality of ED's decision-making is the appropriate question of why ED would cancel the Default Collection Procurement if the small business PCAs need to subcontract to large businesses to handle the volume?  Indeed, a rational

actor would ***continue working directly with the large businesses*** and maintain many qualified sources and best ensure the accounts are serviced.

> **ii.     ED UNREASONABLY ASSUMES THE SMALL BUSINESSES CAN SCALE QUICKLY FROM AN ACCOUNT CAPACITY OF 4.7 MILLION TO A CAPACITY OF OVER 17 MILLION**

ED "doubles down" on its claim that the small business PCAs, through increased new hiring and increased subcontracting, will have sufficient capacity to absorb all of the newly defaulted accounts until Next Gen is in place. *See* AR 2789; Response at 8-11. But ED's growth estimates and projections for the small businesses is clearly unreasonable in light of the extensive subcontracting that is already taking place. ED assumes that the 11 small businesses can ***quadruple*** their current account inventory of ***4,757,381 to an account capacity of 17,186,381 by August 2019***. AR 2789; *see also* AR 10 (stating that the small business PCAs "if necessary, could manage up to 17 million borrower accounts by 2019"). But this wishful thinking is belied by the facts. There is simply no way that any rational actor could look at the record and reasonably conclude that the 11 small businesses – who already admit that they cannot handle the capacity without subcontracting to other businesses – ***can quadruple their current account inventory from 4 million to 17 million*** in less than six months.

> **b.     ED WHOLLY IGNORES THE "HILL ARTICLE" WHICH EVISCERATES ED'S CONTENTION AND SHOWS THAT THE SMALL BUSINESSES HAVE BEEN LESS EFFECTIVE THAN THE ATES**

ED asserts that the small businesses "are performing as well as or better than the large PCAs." Response at 11. ED further claims that "there appears to be little difference in performance between the small and large PCAs." *Id.* at 12. ED apparently believes that if it just keeps saying this, the Court will ignore the wealth of contrary evidence. But ED's failure to respond to several of *ConServe's* specific allegations speaks to the credibility of its position.

First, ED does not – because it cannot – even attempt to refute the March 20, 2018 column in *The Hill* that shows that ED is ***leaving billions of dollars in lost recoveries on the table each year.***  James Bergeron, *Effective debt collection helps the student loan landscape*, <u>The Hill</u> (3/20/19), *available at* <u>https://thehill.com/opinion/education/434358-effective-debt-collection-helps-the-student-loan-landscape</u>.  As highlighted in this article, ED had a recovery rate of 19% in 2014, when the large businesses received 80% of account transfers.  And, recovery rates started declining as the small business PCAs began receiving the majority of account transfers, resulting in a current recovery rate of 6%, which is or less than 1/3 of what the recovery rate was in 2014.  If ED operated as it was in 2014, it would net approximately $31.5 billion annually, or $21.1 billion more than achievable with the department's current small business PCAs.  *Id*.  The numbers identified in this report are staggering and undermine ED's claim that the small business PCAs "are performing as well as or better than the large PCAs."

Second, ED does not dispute that the data presented in the New Cancellation Decision included treasury offset data in the Net Collections Rate Table on AR11 and the Recovery Rates Table on AR12, which inflated the small business PCAs' recovery rates.  Although the New Cancellation Decision plays up the importance of the data in these charts, stating that it "is among the most meaningful way to measure the financial value of our collection efforts," (AR11), ED's inclusion of this data was designed to mislead the capabilities of the small PCAs.  ED defined "net collections" as "as dollars collected (through borrower payments, wage garnishments and Treasury offsets), minus the fees paid to PCAs."  AR11.  But, at no point during the periods described in the charts did the PCAs have any control over the federal offset process and ED's subsequent recoveries of offset monies.  *See* AR 2687 ("PCAs play no role in TOP and do not earn a fee on TOP payments.")  Thus, including offset information in the

recovery calculation is not a meaningful measure of PCA performance and artificially inflated the small business PCAs' recovery rates.

Third, ED does not dispute ConServe's claim that it manipulated the data by recalling 1.7 million accounts from the small business PCAs in September 2018. The effect of this recall was to reduce the number of accounts each of the small businesses had, which eliminated a large swath of unproductive accounts from the denominator of the equation evaluating effectiveness. By reducing the total inventory (in the denominator), ED inflated the small businesses' effectiveness percentages. ED's failure to address this argument is an admission of its validity.

Fourth, ED does not respond to ConServe's assertion that its Net Collections Rate Table on AR 11 contains a mathematical error that also misrepresents and inflates the small PCAs' recovery rates. While ED's table shows the net collection rate increasing from 2016 to 2018, the rest of the numbers in the chart show the opposite. As reflected in the chart below, using the numbers provided in the rest of the table, ConServe calculated that the Net Collection Rate has, in fact, declined from 2.4% in FY2016 to 2.3% in FY2018, which is the opposite of what the Department is claiming in its attempt to justify its New Cancellation Decision:

| Date | Approximate Portfolio Size | Net Collections | Net Collection Rate (Claimed) | Net Collection Rate (Calculated) | Dollars Collected | PCAFees |
|---|---|---|---|---|---|---|
| 10/1/2016 | $105.5 billion | $2.5 billion | 2.2% | 2.4% | $3.1 billion | $750 million |
| 10/1/2017 | $121.5 billion | $2.8 billion | 2.3% | 2.3% | $3.5 billion | $749 million |
| 10/1/2018 | $142.2 billion | $3.3 billion | 2.3% | 2.3% | $4.1 billion | $793 million |

AR 11. ED's failure to address this error further undermines the New Cancellation Decision.

Fifth, ED acknowledges that it presented for the Court's consideration a new chart in its "opposition to the motion for preliminary injunction that eliminates certain recovered amounts that plaintiffs thought were improperly included in the same chart in the Decision Memorandum." Response at 11. But ED completely ignores the fact that this new table was not

considered by the Contracting Officer – let alone in existence – at the time the New Cancellation Decision was signed.  Thus, despite its position to the contrary, the new table does nothing to negate the fact that the New Cancellation Decision was based upon the contracting officer's reliance on the flawed data in the original Table on AR 11.

Additionally, ED does not specifically refute ConServe's assertion that the new table contains serious flaws that make it no more reliable than the now-discredited table in the New Cancellation Decision on AR 11.  In the new table, ED reduces the "Dollars Collected" figures to less than a third of those in the table in the New Cancellation Decision on AR 11 by including only voluntary and administrative wage garnishment ("AWG") activities.  From these reduced figures, ED subtracts the same "PCA Fees" figures that were in the table on AR 11, approximately $750 million for the first two fiscal years and almost $800 million for FY17.  Opposition, Ex. 2 at Attach. Table 1.  However, as with the table on AR 11, this new table misrepresents the "Net Collections" figures presented to the Court.

Indeed, while the "PCA Fees" figures include fees earned on voluntary and AWG collection successes, they also include fees earned from rehabilitations, consolidations, administrative resolutions, litigation preparation packages, and bonuses paid to PCAs under the PCA contracts.  Such manipulation artificially drives the "Net Collection Rate" down.  Moreover, it is apparent that ED cannot possibly have paid PCAs fees of over $750 million in any year for just voluntary and AWG collections because the highest collection rate allowed in any borrower promissory note is 25%.  Basic math shows that 25% of $1 billion yields a maximum of $250 million, or a third of the amount of purported "PCA Fees" ED subtracts from the "Dollars Collected" to yield new "Net Collections" numbers.

In short, the intent of ED's data errors and manipulations is to obfuscate the effect of ED's refusal to transfer accounts to the large business ATE PCAs.  Each of these issues undermines ED's credibility and, in turn, its justification proffered in the Cancellation Decision.

## III.   THE INJUNCTIVE RELIEF FACTORS WEIGH IN FAVOR OF RELIEF

### A.   CONSERVE HAS SUCCEEDED ON THE MERITS

For the many reasons set forth in ConServe's MJAR and herein, respectfully, the Court should find that ConServe has succeeded on the merits.

### B.   CONSERVE WILL SUSTAIN IRREPARABLE HARM ABSENT PERMANENT INJUNCTIVE RELIEF

ED asserts that "plaintiffs will not be irreparably harmed by the cancellation decision, because they have the opportunity to pursue sub-contracts from current PCAs, and because they may also be able to compete for a BPO award either as a prime or as a subcontractor."  Response at 33.  But ED is mistaken.  First, the potential ability to subcontract does not cure the procurement violations here and is not a rational response to the protest.

For these reasons, an injunction enjoining ED's improper consolidation is necessary because it is the only type of relief that would redress ConServe's loss of the opportunity to fairly compete for default recovery services.  This Court has found this type of loss, deriving from a lost opportunity to compete for a contract, to be sufficient to prove irreparable harm.  *See, e.g.*, *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 582 (2013).



### C.    ED WILL SUSTAIN NO HARM AND THE BALANCE OF HARMS FAVORS CONSERVE

In contrast to the severe irreparable harm ConServe will sustain, ED will suffer no harm if the BPO Solicitation is enjoined as ED does not currently have a due date for the submission of proposals – a fact it admitted in its Opposition to ConServe's motion for a preliminary injunction.  *See* Dkt. No. 72 at 12 ("FSA also commits to informing the Court and the parties if a

proposal due date for the BPO procurement is imminent and this protest is still pending before

this Court."). And to the extent ED wants to move quickly, ED has had this entire year to

unbundle default recovery services and to procure them separately.

Additionally, there is no merit to ED's claim that an injunction would harm the agency by

delaying and constraining "its ability to move forward with the Next Gen procurement."

Response at 34. ConServe is not challenging the other NextGen procurements, which are

underway, and the BPO solicitation does not even have due dates for proposals. Additionally,

courts have long recognized that any harm to the Government caused by inconvenience or a

delay in performance is generally less significant than the harm caused to a bid protester if the

protest is ultimately sustained. *See, e.g., PGBA, LLC v. U.S.,* 57 Fed. Cl. 655, 663 (2003).

    **D.**     **GRANTING INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST**

COFC has long recognized that the public interest lies in honest, open and fair

competition in public procurement. *See Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269

(1997). Further, "[i]t is well established that there is an overriding public interest in preserving

the integrity of the federal procurement process by requiring government officials to follow

procurement statutes and regulations." *Alion Sci. & Tech. Corp. v. United States*, 74 Fed. Cl.

372, 376 (2006). Similarly, courts have recognized that agencies should take the "time needed to

get the award right the first (or at least the second) time. The public interest is not well-served

when contracting officials rush to save a few weeks and end up delaying contracts by many

months." *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 515 (2005).

The public interest factor weighs in favor of injunctive relief here for several reasons.

First, ED appears to take the remarkable position that it is in the public interest for the Court to

ignore the agency's clear procurement errors in this case so that it can move forward with its

vision – even if that means allowing ED to violate CICA.  *See* Response at 18.  But ED's position must be rejected because, as demonstrated above, the Appropriations Act does not support ED's rationale and does not provide an exception to CICA.  Moreover, it is well-settled that the public interest is served by preserving the integrity of the procurement process and ensuring that contracting agencies, like ED, comply with CICA's mandate for full and open competition and follow all applicable procurement statutes and regulations.  *See, e.g., Sheridan Corp. v. U.S.*, 94 Fed. Cl. 663, 670 (2010).  Thus, the public interest weighs in favor of this Court exercising its power to sustain protests where an agency violates procurement laws.

Second, the public interest is served by prohibiting ED from causing financial ruin to its top contractors and ensuring that the most highly rated PCAs, such as ConServe, are able to compete and are not sidelined by artificial barriers to competition that are not necessary to meet the agency's needs.  Third, the public interest is served by ensuring that ED is contracting with the most qualified debt collectors who historically have been more successful in recovering funds for the Government.  Indeed, as discussed previously, ED's procurement errors over the past years have resulted in the agency *leaving billions of dollars in lost recoveries on the table.*

For these reasons, granting the requested injunctive relief is in the public interest.

## IV.   CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, ConServe respectfully requests that the Court grant its MJAR and declare that ED's decision to consolidate default recovery services under the NextGen BPO Solicitation is arbitrary, capricious, and in violation of CICA and other applicable procurement laws and regulations.  ConServe also requests that this Court grant ConServe permanent injunctive relief enjoining ED from procuring default recovery services under NextGen unless and until ED amends the NextGen Solicitations to unbundle default recovery services, and allow

all interested offerors, including ConServe, to submit proposals.  Additionally, ConServe
respectfully requests that the Court again enjoin ED from cancelling the Default Collection
Procurement until ED procures default recovery services separately from other services (either
under NextGen or otherwise) and allows all interested offerors, including ConServe, to submit
proposals.  Finally, ConServe asks the Court to grant such other and further relief, including the
award of attorneys' fees and court costs, as the Court may deem just and proper.


Dated: July 3, 2019                                    Respectfully submitted,


Of Counsel:                                            /s/ Todd J. Canni
Richard B. Oliver                                      Todd J. Canni
J. Matthew Carter                                      **PILLSBURY WINTHROP**
Aaron S. Ralph                                         **SHAW PITTMAN LLP**
Kevin Massoudi                                         725 South Figueroa Street, Suite 2800
**PILLSBURY WINTHROP**                                 Los Angeles, CA 90017-5406
**SHAW PITTMAN LLP**                                   (213) 488-7213
725 South Figueroa Street, Suite 2800                  (213) 629-1033 (fax)
Los Angeles, CA 90017-5406                             todd.canni@pillsburylaw.com
(213) 488-7100
(213) 629-1033 (fax)                                   *Attorney of Record for Continental Service*
richard.oliver@pillsburylaw.com                        *Group, Inc.*
matt.carter@pillsburylaw.com
aaron.ralph@pillsburylaw.com
kevin.massoudi@pillsburylaw.com

Alexander B. Ginsberg
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7521
(703) 770-7901 (fax)
alexander.ginsberg@pillsburylaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically via the

CM/ECF system on this 3rd day of July 2019:

<u>/s/ Todd J. Canni</u>
Todd J. Canni