# In the United States Court of Federal Claims

Nos. 19-308C, 19-331C, 19-372C (consolidated)

(Filed: July 31, 2019)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| FMS INVESTMENT CORP., *et al.*, <br><br>            Plaintiff, <br><br>  v. <br><br> UNITED STATES, <br><br>            Defendant, | Rational Basis Standard; Competition in Contracting Act; Bundling; Consolidation; Agency Discretion; Presumption of Regularity; Motion for Permanent Injunction; 28 U.S.C. § 1491(b); Denying Injunctive Relief. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*David R. Johnson*, with whom were *Tyler E. Robinson* and *Ryan D. Stalnaker*, Vinson & Elkins LLP, Washington, DC, for Plaintiff FMS Investment Corp.

*Todd J. Canni*, with whom were *Richard B. Oliver*, *Alexander B. Ginsberg*, *J. Matthew Carter*, *Aaron S. Ralph*, and *Kevin R. Massuodi*, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California, for Plaintiff Continental Service Group, Inc.

*William M. Jack*, with whom were *William C. MacLeod*, *David E. Frulla*, *Amba M. Datta*, and *Elizabeth C. Johnson*, Kelley Drye & Warren LLP, Washington, DC, for Plaintiff GC Services Limited Partnership.

*Alexis J. Echols* and *David R. Pehlke*, Trial Attorneys, with whom were *Jana Moses*, Trial Attorney, *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, as well as *Tracey Sasser*, Assistant General Counsel, Division of Business and Administrative Law, U.S Department of Education, Washington, DC, for Defendant.

OPINION AND ORDER

WHEELER, Judge.

There is no such thing as a perfect procurement, and the Department of Education's ("ED") years-long series of student loan servicing and debt collection solicitations typifies the axiom. But a flawed procurement is not necessarily an illegal one.

Plaintiffs are a group of Private Collection Agencies ("PCAs") who collect defaulted student debt on ED's behalf. Plaintiffs challenge ED's latest student loan servicing procurement, three "Next Generation Financial Services Environment" ("Next Gen") solicitations, which combine default collection with other student loan servicing work, so that one entity oversees the "full life-cycle" of a student loan from origination to payoff. Because Plaintiff PCAs only provide default collection services, they claim that Next Gen's "full life-cycle" structure unfairly excludes them from competing for contracts.

On cross-motions for judgment on the administrative record ("MJARs"), Plaintiffs claim that the Next Gen solicitations are unlawful because (1) they consolidate loan servicing and default collection without justification, thereby restricting competition; (2) they violate federal and state laws governing debt collectors; and (3) they are otherwise arbitrary and capricious. Further, Plaintiffs claim that (4) ED's March 2019 decision to cancel a solicitation solely for PCA services ("the PCA solicitation") was arbitrary and capricious. The Government responds that Next Gen's full life-cycle structure will achieve legitimate policy goals, which justify consolidating loan servicing and default collection work, and that ED cancelled the PCA solicitation because it no longer needs the PCAs' services.

The Court concludes that (1) ED provides sufficient justification for combining loan servicing and default collection work; (2) Next Gen does not per se violate federal and state laws governing debt collectors; (3) Next Gen is not otherwise arbitrary and capricious; and (4) ED's decision to cancel the PCA solicitation was not arbitrary and capricious. Accordingly, the Government's cross-MJAR is GRANTED, Plaintiffs' cross-MJARs are DENIED, and Plaintiffs' motion for a permanent injunction is DENIED.

Background

This dispute has a lengthy history, which the Court will summarize briefly. In December 2015, ED released the PCA solicitation seeking default collection services for its portfolio of student debt. See FMS Invest. Corp. v. United States, 139 Fed. Cl. 221, 223 (2018) clarified by 139 Fed. Cl. 439. A cycle of contract awards, protests, and corrective actions ensued, which prevented ED from making and executing a contract award. See id. at 223–24. In May 2018, ED decided to cancel the PCA solicitation altogether. See id. at

224. A group of PCAs challenged the cancellation decision, and in September 2018, this Court ruled that that decision was arbitrary and capricious. Id. at 227.

While ED struggled with the PCA solicitation, it also began working to combine all student loan servicing work into one procurement to ensure that every student loan would have one cradle-to-grave servicer, a plan it dubbed "Next Gen." See FMS Invest. Corp. v. United States, 142 Fed. Cl. 488, 489 (2019). ED proceeded with the original Next Gen solicitation in two phases: it planned to narrow the pool of offerors in Phase I, then make awards in Phase II. Id. After Phase I, without notice, and soon after this Court enjoined ED from cancelling the PCA solicitation, ED shoehorned default collection into Next Gen Phase II. See id. In doing so, ED sidelined the PCAs, who did not participate in Phase I because the original Next Gen solicitation did not include default collection services. Id.

A group of PCAs challenged the original Next Gen solicitation, and in December 2018, ED decided to take corrective action. See id. FMS Investment Corp. ("FMS") nevertheless asked this Court for a preliminary injunction preventing its Award Term Extension from ending and ordering ED to give it more accounts. See id. at 489–90. This Court denied the motion, reasoning that FMS's requested relief would go beyond preserving the status quo that existed before the litigation began and would exceed the scope of relief available to FMS upon final judgment. See id. at 489–91.

In January 2019, ED completed its corrective action, scrapped the two-phase approach, and reissued the three Next Gen solicitations at issue here: the Enhanced Processing Solution ("EPS") RFP; the Optimal Processing Solution ("OPS") RFP; and the Business Processing Operations ("BPO") RFP, which encompasses default collection work. AR 2. Plaintiffs challenged all three solicitations.[1]

## Procedural History

On February 27, 2019, FMS filed its Complaint. ECF No. 1. Over the next six weeks, six more PCAs filed protests. ECF Nos. 9, 12, 52, 62, 63 (consolidation order and subsequent amendments). Five PCAs filed motions for a preliminary injunction, claiming that they would suffer irreparable harm if their ATEs ended, as scheduled, on April 21, 2019, and ED recalled their remaining accounts. See FMS Invest. Corp., 142 Fed. Cl. at 490–91 (citation omitted).

On April 24, 2019, the Court issued an Opinion and Order denying the motions for preliminary injunction, again reasoning that the relief Plaintiffs sought would go beyond preserving the status quo that existed before the litigation began. Id.

---

[1] It is unclear why Plaintiffs challenged all three solicitations when only the BPO solicitation includes default collection work. The Government argues that Plaintiffs have effectively abandoned their challenge to the EPS and OPS solicitations because Plaintiffs did not "raise any substantive challenge" to them. Gov't Reply at 2 n.1, ECF No. 120. Ultimately, the point is irrelevant to the disposition of this protest.

In May 2019, two Plaintiffs voluntarily dismissed their claims. ECF Nos. 100, 101. Another two Plaintiffs began discussing settlement with the Government and later voluntarily dismissed their claims. ECF No. 124. With three Plaintiffs remaining—FMS, Continental Service Group, Inc. ("ConServe"), and GC Services Limited Partnership ("GC Services")—the Court held oral argument on the parties' cross-MJARs on July 17, 2019.

## Analysis

First, the Court will lay out the basis for its jurisdiction and the standard of review. Second, the Court will explain why the Next Gen solicitations are not unlawful. Third, the Court will address why ED's decision to cancel the PCA solicitation was not arbitrary and capricious. And finally, the Court will conclude by discussing why Plaintiffs are not entitled to a permanent injunction.

### I. Jurisdiction and Standard of Review

The Tucker Act grants this Court subject-matter jurisdiction over bid protests. 28 U.S.C. § 1491(b)(1) (2012). In a bid protest, the Court reviews an agency's decision pursuant to the standards set out in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4) (2012); 5 U.S.C. § 706 (2012). Under the APA, this Court shall set aside an agency action if it is irrational—that is, if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citation omitted).

An irrational agency action is one that "entirely failed to consider an important aspect of the problem, offered an explanation . . . counter to the evidence," or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus. Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (citation omitted). An agency action is not irrational if the agency "provided a coherent and reasonable explanation of its exercise of discretion." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (citation omitted). A court will uphold even an agency "decision of less than ideal clarity if the agency's path may reasonably be discerned." Balestra v. United States, 803 F.3d 1363, 1373 (Fed. Cir. 2015) (internal quotation and citations omitted).

### II. The Next Gen Solicitations

Plaintiffs set forth two main arguments for why the Next Gen solicitations are unlawful: (i) they violate the Competition in Contracting Act ("CICA") by bundling distinct services without justification; and (ii) they violate consumer protection laws governing debt collectors. Plaintiffs also make several other minor arguments. The Court will dispose of each in turn.

A.  Alleged CICA Violation

Plaintiffs first argue that the Next Gen solicitations "are unlawful because they needlessly combine two separate services," thereby restricting competition to offerors who can provide both of those services, in violation of CICA. FMS MJAR, ECF No. 104 at 13–14; ConServe MJAR, ECF No. 108 at 12–14. Courts refer to these types of CICA claims as "bundling" or "consolidation" claims. See, e.g., CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1353, 1355 (Fed. Cir. 2008). An agency "bundles" or "consolidates" when it combines "two or more procurement requirements that were previously solicited as separate, smaller contracts." Feldman, S., Bundling, Gov't Cont. Guidebook § 4:6 (4th ed. 2018).

Under CICA, agencies must design procurements to achieve "full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a)(1) (2012). An agency may "include restrictive provisions or conditions only to the extent necessary to satisfy [its] needs." 41 U.S.C. § 3306(a)(2)(B) (2012). Thus, an agency can consolidate once-separate services in a single procurement only if it is necessary to meet the agency's needs. However, an agency enjoys broad discretion to determine its own needs. See Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010). As a result, to mount a successful challenge to an agency's consolidating multiple procurement requirements, a protester must show that the consolidation is not rationally related to the agency's needs. See id. at 1286–87; CHE Consulting, 552 F.3d at 1354.

1.  The 2019 Appropriations Act

The Administrative Record ("AR") shows that ED has a rational basis for Next Gen and its "cradle-to-grave" approach to student loan servicing. ED's strongest supporting authority for Next Gen is a Congressional directive cited, and partially quoted, in the Decision Memorandum: "[ED shall] award no funding for any solicitation for a new federal student loan servicing environment . . . 'unless the environment provides for the full life-cycle of loans from disbursement to payoff.'" AR 7 (citing, and quoting in part, Dep't of Def. and Labor, Health and Hum. Servs., and Educ. Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, Div. B, Title III, 132 Stat. 2981, 3102 (2018) ("2019 Act")).[2] ED interpreted "full life-cycle" and "from disbursement to payoff" to mean that its new student loan servicing environment—Next Gen—must combine loan servicing and default collection work, so that one entity provides cradle-to-grave, origination-to-payoff servicing for every student loan.

ConServe and GC Services insist that ED cannot rely on the 2019 Act because the term "full life-cycle" does not encompass default collection and because the 2019 Act

---

[2] The Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, Div. H, Title III, 132 Stat. 348, 746–47 (2018) ("2018 Act"), contains the same "full life-cycle" directive to ED.

5

refers to "loan servicers," a term which does not encompass PCAs. ConServe MJAR at 9–12, ECF No. 108; GC Services Reply and Resp. at 12–16, ECF No. 117. Plaintiffs are off the mark. First, the relevant provision of the 2019 Act refers to "disbursement to payoff" as the "full life-cycle" of a loan. The ordinary meaning of "full life-cycle" and "disbursement to payoff" includes origination (when the debt is created) to payoff (when the debt is extinguished) and everything in between. This plainly includes any period in which a loan falls into default. See, e.g., Starry Assocs., Inc. v. United States, 892 F.3d 1372, 1377 (Fed. Cir. 2018) (noting that statutory language with a plain and unambiguous meaning controls) (citation omitted). Second, Congress's use of the term "loan servicer" does not imply that Plaintiffs' PCA services fall outside of the life-cycle of a loan just because "loan servicer," in industry parlance, does not include PCAs. If its intent is clear from the ordinary meaning of its words, Congress is not required to strictly adhere to industry terms of art. Plaintiffs' reading of the provision would allow an industry-specific term to impliedly supersede what is otherwise the most natural reading of the provision.

Plaintiffs next claim that ED ignores other language in the 2019 Act that requires ED to contract with multiple loan servicers and that the 2019 Act does not provide an exception to CICA. ConServe Reply and Resp. at 12–15, ECF No. 118. These arguments also fail. ED is clearly complying with the 2019 Act because ED does intend to contract with multiple loan servicers under Next Gen, each of which will manage its own cradle-to-grave loan portfolio. AR 20009, 20012. And ED does not argue that the 2019 Act provides an exception to CICA. ED argues that the 2019 Act provides a basis for its policy needs, which in turn justify consolidating default collection with other student loan servicing work in the Next Gen solicitations.

ConServe then claims that ED did not cite the 2019 Act as a reason for cancelling the PCA solicitation, and so—apparently—ED cannot rely on it to support Next Gen now. ConServe MJAR at 9–10, ECF No. 118. Though an oversight, ED's failure to cite a Congressional directive in cancelling the PCA solicitation is not fatal to the cancellation decision and is not a reason to enjoin the Next Gen solicitations.

Finally, GC Services argues that ED cannot rely on the 2019 Act, or the 2018 Act, because ED has consistently taken the position that default collection is separate from loan servicing. See, e.g., GC Services Reply and Resp. at 15–16, ECF No. 117. GC Services' best evidence for this argument is AR 23421, the OPS solicitation, which defines the "full life-cycle" of a student loan as being from "application to pay-off or default." GC Services Reply and Resp. at 15, ECF No. 117. This single, minor variation from the language in the 2019 Act is most reasonably a more specific description of the loan "life-cycle" (consider that the 2019 Act does not mention "application" either) or merely redundant. Either way, it is not enough to prove irrationality.

2.      Other Support for Consolidation

The AR also shows that, in executing Next Gen, ED is responding to criticism from members of Congress.  See AR 14389 (hyperlinks to letters, reports, and press accounts).[3]  One linked document on AR 14389 is a January 2018 letter from twelve United States Senators criticizing ED's relationship with the PCAs and expressing concern that ED prioritizes collecting debts over borrowers' long-term success.  Letter from U.S. Sen. Kamala D. Harris, *et al.*, to Betsy DeVos, Sec'y of Educ., and Dr. A. Wayne Johnson, Chief Operating Officer, Fed. Student Aid, Dep't of Educ. (Jan. 23, 2018), cited in AR 14389.  ED reasonably seems to respond to this criticism in formulating Next Gen and its cradle-to-grave loan servicing model.

The Decision Memorandum, with support from the AR, also explains how the current loan servicing and default collection model confuses borrowers.  See AR 2–3, 2507–13, 14382–88.  Under the current model, if a loan falls into default, the loan is transferred from a servicer to a debt collector, a process which can take up to 60 days and which can confuse borrowers as to where to send payments and who to contact with questions.  See AR 3–4, 2507–11.  The Decision Memorandum sensibly refers to the need to reduce borrower confusion, simplify borrower interactions, and standardize systems and branding as reasons for implementing Next Gen.  AR 3–5.

Plaintiffs try to cast ED's reason for Next Gen as "administrative convenience," which is a legally insufficient reason to justify consolidation under GAO precedent.  See, e.g., ConServe MJAR at 15–16, ECF. No 108 (citation omitted).  But this entirely ignores that ED is responding to a Congressional mandate and to outside criticism, as well as trying to rectify the borrower engagement problems documented in the AR.

For the reasons stated above, ED has provided a "coherent and reasonable explanation," Impresa Construzioni, 238 F.3d at 1333, for consolidating student loan servicing and default collection in its Next Gen solicitations.  Therefore, Next Gen does not violate CICA.

B.      Laws Governing Debt Collectors

Next, Plaintiffs argue that Next Gen violates laws governing debt collectors in two ways.  First, they argue that ED's plan to unify loan servicer branding under the Federal Student Aid ("FSA") banner violates a provision of the Fair Debt Collection Practices Act ("FDCPA") that requires debt collectors to identify themselves when interacting with borrowers.  FMS MJAR at 17–19, ECF No. 104 (citing 15 U.S.C. § 1692e(14)).  Second,

---

[3] GC Services suggests that ED's citing to hyperlinked documents on one page of the AR itself highlights the "lack of record evidence" to support Next Gen.  GC Services Reply and Resp. at 2–3, 17, ECF No. 117.  Although this is a careless way to support what ED claims is such an important program, courts do not police the format of agencies' administrative records, so long as what an agency cites provides a rational basis for its actions.

they contend that ED's goal of increasing engagement with delinquent borrowers ignores many state laws that cap the number of times a debt collector can contact a borrower in a given period.

ED's general goal of standardizing its branding does not per se force Next Gen contractors to violate the FDCPA. See AR 3. ED appears to intend to reconcile its goal of consistent branding with the requirements of federal law, and this Court owes ED a presumption of regularity in that respect. See Impresa Construzioni, 238 F.3d at 1338.

The same applies to Plaintiffs' argument that Next Gen violates state laws governing debt collectors. As part of Next Gen, ED set a goal of increasing borrower engagement. See AR 4–5, 2496–2502. The presumption of regularity requires that this Court give ED the benefit of the doubt that it will pursue this goal and execute Next Gen in a way that complies with applicable state laws. At this stage in the procurement, ED is not required to set out exact state-by-state borrower engagement strategies.

### C. Plaintiffs' Remaining Arguments

Plaintiffs focus on CICA and the laws governing debt collectors, but, with their typical firehose approach to protesting ED procurements, they make several other points worthy of direct refutation.

For one, Plaintiffs stress that ED still has not conducted a legal analysis of Next Gen. FMS MJAR at 19, ECF No. 104 (citing FMS Invest. Corp., 139 Fed. Cl. at 225). However, an agency is "not required to synthesize its thinking and its market research into a prelitigation written explanation of the rationale for each of [its] solicitation requirements." Savantage Fin. Servs., Inc., 595 F.3d at 1287. Moreover, the lack of a legal analysis was just one of many factors that rendered the May 2019 cancellation decision irrational. FMS Invest. Corp., 139 Fed. Cl. at 225–26 (reciting reasons, including inadequate documentation in the AR and the lack of a Next Gen request for proposals, among others).

Plaintiffs argue that the Next Gen solicitations are unlawfully vague because "they do not indicate how the resulting contracts will be priced." FMS MJAR at 25, ECF No. 104. Specifically, FMS notes that ED "'does not intend[] to continue use of the current default collections pricing structure,' *i.e.*, no more contingency fees." FMS MJAR at 23 (quoting EPS RFP, Amendment 5, Attachment 25 – Responses to Questions, Q&A 64). The Next Gen solicitations and the AR include detailed pricing proposal worksheets, see, e.g., AR 20281–87, and offerors are permitted to propose their own alternative pricing models, see AR 20285. The PCAs may be upset over losing contingency fees, but ED's path forward is not irrationally vague.

ConServe similarly points out that PCAs and loan servicers operate using different pricing models and that by teaming up to provide cradle-to-grave servicing, companies will be incentivized to shift accounts to the most profitable servicing stage, creating an organizational conflict of interest. ConServe MJAR at 18–21, ECF No. 108. But ED already addressed this issue by expressly disclaiming contingency fees and any other pricing model that would incentivize pushing loans into default. See EPS RFP, Amendment 5, Attachment 25 – Responses to Questions, Q&A 57, 64.

FMS complains that the solicitations do not provide sufficiently clear goals or metrics of success specific to default collection. FMS MJAR at 24–26, ECF No. 104. The thrust of FMS's argument is that Next Gen focuses too much on non-default collection work. Since Next Gen combines default collection with other student loan servicing work, FMS's observation that the AR does not focus on default collection is not surprising.

### D. Conclusion

Although ED's Next Gen solicitations are far from procurement paragons, the Court will uphold even an agency action "of less than ideal clarity if the agency's path may reasonably be discerned." Balestra, 803 F.3d at 1373 (internal quotation and citation omitted). ED and its Next Gen solicitations have managed to clear this low bar.

### III. PCA Solicitation Cancellation Decision

The Court now turns to ED's March 2019 decision to cancel the PCA solicitation. Plaintiffs argue that the cancellation is arbitrary and capricious primarily because (i) ED's decision relies on Next Gen to justify winding down standalone default collection work, and Next Gen is unlawful; (ii) although ED has contracts with small business debt collectors ("the smalls") to perform default collection services until 2024, ED's estimates of the smalls' capacities are inaccurate; and (iii) ED's conclusion that the smalls and the large PCAs perform similarly well is contrary to the evidence. Plaintiffs also throw in several lesser arguments that the Court will address.

### A. Next Gen

At the outset, because the Next Gen solicitations are rational based on the record before the Court, Plaintiffs' first argument fails.

### B. Small Business Capacity Estimates

ED also asserts that it cancelled the PCA solicitation because the smalls that it has under contract until 2024 can handle all defaulted accounts until Next Gen is up and running. AR 2, 8–12. Plaintiffs contend that because ED merely asked the smalls how many more accounts they could take on, and took them at their word, the smalls inflated

their capacity estimates as a ploy to get more business. FMS MJAR at 27–31, ECF No. 104; ConServe MJAR at 25–27, ECF No. 108. FMS quotes this Court's September 2018 decision: "[the AR] does not identify the source of [the smalls'] capacity estimates or explain how the data was compiled." FMS MJAR at 27, ECF No. 104 (quoting 139 Fed. Cl. at 225).

Although the Court agrees that asking the small businesses to estimate their own account capacities is not an ideal policy planning method, it is an improvement on the bare, contextless spreadsheets ED apparently relied upon in making its May 2018 cancellation decision. See FMS Invest. Corp., 139 Fed. Cl at 225. The Decision Memorandum also discusses how ED relied on the smalls' staff-to-portfolio ratios and on ED's increased monitoring of the smalls' performance in deciding whether their capacity estimates were reliable. AR 8–12.

Plaintiffs point out that the smalls cannot handle the current volume of accounts without subcontracting. See ConServe MJAR at 6–7, 27–28, ECF No. 108. But this is irrelevant because subcontracting is a valid way for the smalls to increase their capacity. Plaintiffs try to make an example of a small that ED suspended from receiving new accounts in early 2019. See FMS MJAR at 29–30, ECF No. 104. But one small business's underperformance does not bring the whole edifice down; and, in any case, ED has explained that it worked with that small to resolve the problem. See AR 12347 (meeting minutes discussing that smalls' performance).

### C. Small Business Performance Versus Large PCA Performance

Plaintiffs also accuse ED of manipulating and misrepresenting collections data to show that the smalls perform at least as well as the large PCAs. Plaintiffs cite to collections data in an attempt to argue that the large PCAs perform better than the smalls. See, e.g., FMS MJAR at 31–36, ECF No. 104. The Government cites similar data in an attempt to argue the opposite. Def. Resp. and MJAR at 11–14, Ex. 1, ECF No. 114.

None of the parties' arguments on this point deserve much weight. Both sides draw—at best—weakly supported and self-serving conclusions from the data they present. For example, the Government claims that the smalls perform just as well as the large PCAs because collections data show that recovery rates stabilized (after declining for years) when the smalls began taking on "most" of the accounts. See Def. Resp. and MJAR at 11–14, Ex. 1, ECF No. 114; see also AR 11. FMS claims that recovery rates continue to decline because the PCAs are receiving fewer accounts. FMS MJAR at 34–36, ECF 104. The broad trend data cited by the parties does not strongly support these specific conclusions. Many other factors can (and presumably do) influence year-on-year recovery rates other than the smalls' and the large PCAs' relative performance.

Plaintiffs also attack ED's projection of how much its defaulted loan portfolio will grow in the future. See, e.g., FMS MJAR at 36. Yet, in the AR, ED calculates the historical rate of growth of its defaulted debt portfolio, adds a margin of error, then extrapolates this rate into the future to estimate how many more accounts it will have in the coming years. AR 9. ED compared this estimate to the smalls' estimated capacity and concluded that it would not need additional PCA services before Next Gen is up and running. See AR 9–12. ED's method of projecting future loan volumes appears reasonable.

Even if all of Plaintiffs' performance and capacity allegations were true, if ED rationally decides that the PCA solicitation is incompatible with its needs, ED does not have to continue with it just because it may produce more money.

### D. Plaintiffs' Remaining Arguments

Here, the Court addresses two of Plaintiffs' remaining arguments. First, ConServe alleges that ED has done nothing since May 2018 to add support to its decision to cancel the PCA solicitation, so ED should be in the same position as it was in September 2018. ConServe MJAR at 22, ECF No. 108. Not so. ED has updated the smalls' capacity estimates and its projections of future loan volumes, see AR 10, and has begun meeting with the smalls every month to monitor their performance, see AR Tabs 23–25 (meeting minutes and related records). And most importantly, ED is executing Next Gen, which will begin to siphon off default collection work in 2020. See AR 6–7, 10.

Second, FMS accuses ED of ignoring Congress's mandate in the Debt Collection Improvement Act of 1996 ("DCIA") that all agencies should seek "'to maximize collections of delinquent debts owed to the Government.'" FMS MJAR at 26–27, ECF 104 (quoting Pub. L. 104-134 §§ 31001(b)(1)). But the Congressional mandates in the relevant provision of the 2019 Act are both more recent and more specific than the quoted subsection of the DCIA, so to the extent that the two conflict, the 2019 Act takes precedence. See N. Singer, S. Singer, Sutherland Statutory Constr. § 51:2 (7th ed. 2018) (courts should try to construe statutes to avoid conflict, but a more specific statute trumps a more general one, and a more recent statute trumps an older one).

### E. Conclusion

For the reasons stated above, ED's March 2019 decision to cancel the PCA solicitation—though far from perfect—was not arbitrary and capricious.

### IV. Legal Standard for a Permanent Injunction

In a bid protest, this Court can issue an injunction pursuant to 28 U.S.C. § 1491(b) and RCFC 65(d). In deciding whether to grant a permanent injunction, a court considers (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer

irreparable harm without an injunction; (3) whether the balance of the hardships favors an injunction; and (4) whether an injunction is in the public interest. PGBA, LLC v. United States, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citation omitted).

First, for the reasons stated above, Plaintiffs have not succeeded on the merits. Second, Plaintiffs' irreparable harm here is unclear. On the one hand, Plaintiffs may lose the opportunity to compete as prime contractors. On the other hand, Plaintiffs can still compete as parts of teams or as subcontractors. Further, Plaintiffs continue to ignore the fact that this Court cannot order ED to assign them accounts to service. So even if this Court resurrected the PCA solicitation (again), and ED proceeded with awards, the winning PCAs are not entitled to some minimum amount of business.

The balance of hardships does not favor either party. An injunction would delay Next Gen and ED's cradle-to-grave servicing goal, and ED would be forced to commit resources to a PCA solicitation that it no longer needs. Plaintiffs would have to subcontract or team up with other loan servicers to compete for Next Gen contracts. Finally, the public interest does not favor an injunction because, among other reasons, there's no procurement defect here—at least not one significant enough for ED's action to be irrational.

## Conclusion

For the reasons set forth above, the Court DENIES Plaintiffs' motion for judgment on the administrative record and DENIES Plaintiffs' motion to permanently enjoin the Department of Education from proceeding with the Next Gen solicitations and cancelling the PCA solicitation. The Court GRANTS the Government's motion for judgment on the administrative record. The Clerk of the Court is directed to enter judgment for the Government. No costs are awarded to either party.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge
